## THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MASSACHUSETTS COALITION FOR IMMIGRATION REFORM,** )<br>**111 Edinboro St.** )<br>**Newton MA 02460** )<br>**KEVIN LYNN** )<br>**13 W. Chestnut St. No. 1** )<br>**Lancaster PA 11603** )<br> )<br> )<br> )<br>**Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**U.S. CITIZENSHIP AND IMMIGRATION** )<br>**SERVICES,  U.S. DEPARTMENT OF** )<br>**HOMELAND SECURITY** )<br>**Office of General Counsel** )<br>**Washington, DC 20258.** )<br> )<br>**Defendants.** )<br> ) | **Civil Action No. _____** |

## COMPLAINT FOR DECLATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.     Defendant Department of Homeland Security ("DHS"), acting through its

component agency United States Citizenship and Immigration Services ("USCIS"),

regulates the entry and settlement of millions of foreign nationals into the United

States through its authority to develop and implement visa and citizenship policy.[1]

---

[1] In 2003, the Secretary of State and the Secretary of Homeland Security signed a
Memorandum of Understanding regarding visa policy in implementation of the
Homeland Security Act of 2002. Memorandum of Understanding between the

To a very substantial and increasing degree, most American population growth in the past several decades has been caused and continues to be caused by the entry and settlement of foreign nationals as a result of DHS policy. This robust population growth causes significant impacts to the human environment for U.S. citizens. Therefore, the agencies regulating visa and citizenship policy have an ongoing obligation to analyze the environmental effects of their actions before implementing them under the National Environmental Policy Act ("NEPA"). The Nat'l. Env't. Policy Act of 1969, Pub. L. 91-190, 42 U.S.C. 4321-4347 (Jan. 1, 1970). Because USCIS, a subcomponent of DHS, is responsible for visa and citizenship policy and promulgating visa and citizenship regulations.[2] USCIS (and DHS as well, because USCIS is a component of DHS) is therefore an agency whose actions have very significant impacts on the environment.

2.      DHS, and USCIS within it, however, have turned a blind eye to the significant environmental impacts resulting from its major visa and citizenship policy actions. DHS has never prepared an Environmental Impact Statement ("EIS") or an Environmental Assessment ("EA") in connection with any of its ongoing actions related to visa and citizenship policy. The agencies' continuing failure to do so stems from a failure of DHS's NEPA procedures which DHS adopted

Secretary of State and the Secretary of Homeland Security Concerning Implementation of Section 428 of the Homeland Security Act of 2002, https://nationalimmigrationproject.org/PDFs/practitioners/practice_advisories/pr/do s-dhs-mou.pdf

[2] Other agencies, such as the Department of State and the Department of Labor, are also involved in the promulgation of such regulations, but USCIS has final authority over them, including those which are promulgated jointly with agencies in other departments such as the Department of State and the Department of Labor.

in 2014.[3] These procedures, which are binding on all of DHS and are used by USCIS as its guide to determine when and how to apply NEPA, fail to even consider the potential environmental impacts of USCIS's entire mandate.

3.      DHS's blindness to the environmental impacts of the entry and settlement of foreign nationals originates from that of its predecessor agency, the Immigration and Naturalization Service ("INS"). INS was a component agency of the Department of Justice and handled both the enforcement of immigration laws and the administration of immigration services. With the formation of DHS, these functions were split into three separate component agencies: (1) USCIS, which handles immigration services as INS did, but has also now been granted some authority over visa policy that previously resided in the Department of State rather than in INS; (2) Immigration and Customs Enforcement, which handles the enforcement of immigration law; and (3) Customs and Border Protection, which handles border security.[4]

4.      The historical blind spot is apparent through an examination of the DOJ's NEPA procedures, which were promulgated in 1981, as mandated by the Counsel for Environmental Quality (CEQ)'s regulations adopted in 1978.[5] The DOJ had an

---

[3] These procedures can be found on DHS's website at
https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex.
[4] Information on this history can be found at USCIS's website:
https://www.uscis.gov/about-us/our-history
[5] The 1978 regulations were largely unchanged until this year, when CEQ promulgated significantly updated regulations. 85 Fed. Reg. at 43304 (July 16, 2020), 40 C.F.R. § 1500 *et seq.* The new regulations became effective on September

appendix with NEPA procedures specifically for INS. 46 Fed. Reg. 7,953 (Jan. 26, 1981). The DOJ appears to have interpreted the guidance from CEQ as merely establishing a requirement to determine when any of its components might need to build new physical structures in pursuit of its mission. INS states that through its enforcement of the nation's immigration laws, it sometimes needs to "detain aliens believed deportable," and that it would consider the environmental impacts of "efforts associated with the leasing, purchase, design, construction, and maintenance of new and existing INS facilities."[6]

5.     However, the scope of NEPA has never been so narrow as to simply determine when an agency may be involved in the purchase or construction of a physical structure. Rather, the core purpose of NEPA is to ensure that, before a federal agency undertakes a federal action, its decision-makers consider the range of potential environmental impacts the action may have on the "human environment[.]" 42 U.S.C. § 4331(c)(C) (2012). NEPA, as it was conceived, written and interpreted by the courts, embodies a grander national policy that aims to ensure that decisions affecting the human environment are made with eyes wide open and in full view of the public, so that all stakeholders may understand the implications of federal actions on the natural resources on which we all depend. The recently updated CEQ regulations state that "NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions

---

14, 2020. See White House statement on CEQ modernization at https://www.whitehouse.gov/ceq/nepa-modernization/
[6] *Id.*

under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 40 C. F.R. § 1500.1 (2020). With respect to visa and citizenship related actions which regulate the entrance and settlement of foreign nationals into the United States, DHS and USCIS are woefully deficient in carrying forth this Congressional obligation.

6.     When DHS was formed as a new agency, it adopted its own NEPA procedures, pursuant to the then current CEQ regulations, which at the time had been largely unchanged since 1978. DHS's procedures were finalized in 2014 with the issuance of DHS Directive 02301, Implementation of the National Environmental Policy Act ("Directive"), and Instruction Manual 023-01-001-01 ("Instruction Manual"). Notice of the Final Directive and Instruction Manual was published in the *Federal Register* on November 26, 2014 and became effective on March 26, 2015. 79 Fed. Reg. at 70538. Together, the Directive and the Instruction Manual, which went through public notice and comment, and established legally consequential procedures, constituted final agency action under the Administrative Procedures Act. According to DHS itself:

> Together, the Directive and Instruction apply to all of the Components of DHS and help ensure the integration of environmental considerations into DHS decision making as required by NEPA.  The Instruction serves as the DHS implementing procedures for NEPA (as required by 40 CFR 1505.1 and 1507.3) and includes the Department's list of Categorical Exclusions, found in Appendix A, Table 1.[7]

---

[7] DHS homepage at https://www.dhs.gov/administrative-revisions-dhs-instruction-023-01-001-01-rev-01, last accessed on November 16, 2020.

7.      DHS's adoption of new NEPA procedures for a new agency presented an opportunity to correct INS's decades-long failure to recognize environmental impacts resulting from its population-growth inducing programs—a particularly important task in light of the ever-increasing numbers of foreign nationals settling in the United States and the resulting obvious associated environmental impacts. However, the Instruction Manual continued to perpetuate the INS blind spot regarding the myriad environmental consequences of its actions concerning the entry into and settlement of mass numbers of people into the United States. In the Instruction Manual, DHS arbitrarily and capriciously fails even to recognize or consider whether there are any potential environmental consequences to the entire mandate of one of its components agencies—USCIS. USCIS's sole mission is the regulation of the entry into and settlement of foreign nationals in the United States. Because the programs that USCIS regulates involve the entrance and settlement of millions of foreign nationals, it certainly is a mandate fraught with significant environmental consequences.

8.      The administrative record of the DHS NEPA procedures shows that DHS never considered whether the mandate of USCIS results in any environmental impacts.[8]  DHS' NEPA procedures are the only NEPA procedures available for

---

[8] DHS' Synopsis of the Administrative Record to Support New Categorical Exclusions under the National Environmental Policy Act can be found on DHS' webpage at https://www.dhs.gov/sites/default/files/publications/CATEXs_admin%20record_version_Final_Dec2014_508compliantversion.pdf. The Administrative Record for the entire NEPA procedures can be found on the Center for Immigration Studies'

USCIS to use. While some subcomponents of DHS have individual NEPA procedures, which must be approved by DHS, USCIS does not have its own NEPA procedures. Nor do any of DHS' main NEPA procedures applicable to all its other components provide any reasoned guidance related to USCIS' mandate. The failure of DHS and USCIS to develop a NEPA framework for these actions means that DHS and USCIS continue to fail to undertake any environmental analysis whatsoever when adopting major actions regarding visa and citizenship related actions, or other actions regarding the entry and settlement of foreign nationals into the United States.

9.      DHS's NEPA procedures also fail to any express categorical exclusions relating to entry and settlement of foreign nationals. None of the categorical exclusions on DHS's list adopted in Appendix A of the Instruction Manual relate in any way to USCIS's mandate of visa and citizenship related activities. Further, the administrative record of the Categorical Exclusion shows that no contemplation of visa and citizenship related activities were considered in the adoption of any of DHS's categorical exclusions. *See* Instruction Manual at A-1-A-30 and DHS' Synopsis of the Administrative Record to Support New Categorical Exclusions. It is arbitrary and capricious for DHS never to have given any consideration to USCIS' actions. Given that USCIS' mandate, visa and citizenship related actions, does have profound environmental consequences, this failure amounts to a continuing violation of NEPA.

---

website, at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Administrative-Record.pdf.

10.     The CEQ has recently promulgated a substantive overhaul of its 1978 regulations directing and providing guidance to all Federal agencies, including DHS, on their adoption of new NEPA procedures. This new regulation became effective on September 14, 2020. *See* 85 Fed. Reg. at 43304-43376 (July 16, 2020). The new regulations mandate that all Federal agencies, including DHS, adopt new NEPA procedures within one year of the regulation's effective date. DHS should be enjoined from promulgating new procedures without considering the adoption of components procedures for USCIS that ensure that DHS complies with its statutory obligations regarding the its actions regulating the entrance and settlement of foreign nationals.

11.     In order to establish the scope and magnitude of the environmental impacts at issue, Plaintiffs have undertaken extensive research and retained experts[9] to:

---

[9] Plaintiffs retained three experts for this action. First, Jessica Vaughan, an expert on United States immigration law, policy, and practice, has analyzed DHS's (and legacy INS's) visa and citizenship related actions and their impacts on the United States population. Her affidavit regarding these actions can be found on the Center for Immigration Studies (CIS) website at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Vaughan.pdf. ("Vaughan Affidavit") Second, Steven Camarota, Ph.D., an expert on the demographic impacts of immigration, produced an expert report addressing the impact of immigration on population growth ("Camarota Report"). His report actions can be found on the CIS website at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Camarota.pdf. Third, Philip Cafaro, Ph.D., a sustainability expert, produced a report on the environmental impacts of population growth. ("Cafaro Report"). His report can be found on the CIS website at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Cafaro.pdf.

(a) identify and delineate the profound growth of the population of the United States as a result of the entrance and settlement in the United States of multitudinous foreign nationals;

(b) identify and delineate environmental impacts to Plaintiffs resulting from this immigration- induced population growth; and

(c) specifically identify numerous major actions that escaped NEPA review as a result of DHS's—and previously, INS's—promulgation of NEPA procedures that are arbitrary and capricious.

12.     Plaintiffs seek to compel DHS and USCIS to properly comply with NEPA in connection with its programs that regulate the entry into and settlement of myriad foreign nationals in the United States. Plaintiffs seek both a declaration from this Court that DHS is violating NEPA and an injunction to require DHS to comply with the law. Further, Plaintiffs assert that, in the course of approving its agency actions implementing its programs regulating the entry into and settlement of foreign nationals in the United States, DHS has continually violated its fundamental obligation to engage in well-reasoned, non-arbitrary decision-making under the Administrative Procedure Act, ("APA"). *See* 5 U.S.C. § 701 *et seq.*

13.     Plaintiffs' Count I asserts that the NEPA procedures DHS adopted in 2014 are arbitrary and capricious, in violation of the APA and NEPA. Plaintiffs ask the Court to order the Defendants to promulgate new procedures that incorporate analysis of the environmental effects of USCIS' mandate. Plaintiffs' Count II lists

specific, ongoing actions that Plaintiffs assert DHS/INS implemented in violation of

its NEPA obligations and continue to maintain and update without NEPA analysis.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

(federal question jurisdiction), 5 U.S.C. § 701 et seq.  (APA), 28 U.S.C. § 1361

(mandamus).  Plaintiffs also seek a declaratory and injunctive judgment and

further relief pursuant to 28 U.S.C. § 2202.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) (2012)

because this is an action against an agency of the United States.

## RELEVANT STATUTES

A.       **THE NATIONAL ENVIRONMENTAL POLICY ACT**

16.     NEPA was the first major environmental law of the United States, and it has

often been called the "Magna Carta" of the nation's environmental laws. NEPA

expressly recognizes Congressional concern for "the profound influences of

population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through

NEPA, Congress directs, in relevant part, that the Federal Government shall:

> use all practicable means, consistent with other essential considerations of
> national policy, to improve and coordinate Federal plans, functions,
> programs, and resources to the end that the Nation may—
> (1) fulfill the responsibilities of each generation as trustee of the environment
> for succeeding generations;
> (2)  assure for all Americans safe, healthful, productive, and esthetically and
> culturally pleasing surroundings;
> (3)  attain the widest range of beneficial uses of the environment without
> degradation, risk to health or safety, or other undesirable and unintended
> consequences;

(4)  preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible an environment which supports diversity and variety of individual choice;

(5)  *achieve a balance between population and resource use* which will permit high standards of living and a wide sharing of life's amenities . . . . 42 U.S.C. § 4331(b) (emphasis added).

17.    To accomplish its goals, NEPA requires each federal agency to identify and consider the environmental impacts of its proposed federal actions. *See generally* 42 U.S.C. § 4331. Each agency must also consider alternatives and mitigating measures which could avoid or reduce such impacts before implementing federal agency actions that may significantly affect the environment. To these ends, NEPA establishes, in relevant part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall--

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impacts of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action, . . .
(v) any irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.

18.    NEPA is designed to inject environmental considerations early into a Federal agency's decision-making process in order to "ensure that agencies consider environmental impactions in their planning and decisions." 40 C.F.R. § 1501.2 (a). NEPA is also designed to engage the public. "NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by

focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989). *See* 40 C.F.R. § 1500.1(b); see also §§ 1503.1(a)(2)(v) (Inviting comments and requesting information and analyses), 1506.6 (Public involvement) (2020). Because public involvement is paramount in the NEPA process, each agency shall "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities to comment, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b). NEPA thus is, at the very least, an environmental disclosure and public participation tool.

19.    NEPA established the White House Council on Environmental Quality ("CEQ"), which issues regulations guiding agencies' compliance with NEPA. See 42 U.S.C. § 4341 et seq. (2012); 40 C.F.R. § 1500 (2020). CEQ regulations define what constitutes agency action and set forth the process for determining whether an action or program significantly affects the quality of the human environment; "Major federal actions" are defined to include "new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; [and] new or revised agency rules, regulations, plans, policies, or procedures . . . ." 40 C.F.R. § 1508.1 (q)(2)(2020).

20.    At the time that DHS promulgated its current NEPA procedures, CEQ's regulations provided that each federal agency shall adopt procedures to ensure that its "decisions are made in accordance with [NEPA's] policies and procedures . . . ."

40 C.F.R. § 1505.1 (1978) (archived). An agency must specifically ensure that its NEPA procedures provide for designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them. *Id.* The CEQ regulations at the time also explicitly recognized that human population growth is an effect subject to NEPA analysis. 40 C.F.R. § 1508.8(b) (1978) (archived) provided, in relevant part: "Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."

21.     DHS never took into account any of these effects.

22.     Pursuant to NEPA and the CEQ regulations, after a public notice and comment period and approval from the CEQ, DHS published its NEPA procedures on November 26, 2014. The Instruction Manual "serves as the DHS implementing procedures for NEPA (as required by 40 C.F.R. §§ 1505.1 and 1507.3) which supplement the CEQ regulations and therefore must be read in conjunction with them." Instruction Manual at III-1. The Instruction Manual states that NEPA applies to a wide range of DHS activities:

> Generally, NEPA applies to Federal actions that affect the human environment. Within DHS, NEPA generally applies to actions to be undertaken, funded, permitted or otherwise approved by DHS[,] including activities that may be wholly initiated within DHS, executed by DHS under the direction of Congress, or proposed by persons or organizations outside of DHS that require approval funding, a license, or a permit from DHS. *Id.*

23.     Pursuant to 42 U.S.C. § 4332(C), each agency is required to prepare an "Environmental Impact Statement" ("EIS") for each "major federal action[] significantly affecting the quality of the human environment . . . ."

24.     CEQ regulations provide for the preparation of a document known as an Environmental Assessment ("EA") to enable an agency to determine whether a particular action may have a significant impact on the quality of the human environment and thus require preparation of an EIS. 40 C.F.R. § 1501.5 (2020).

25.     An EA or EIS must also discuss and analyze alternatives to a proposed program or project—including a "no-action" alternative, which may have less environmental impact than the proposed action, as well as mitigation measures in relation to potential environmental impacts. *See* 40 C.F.R. §§ 1502.14, 1502.16.

26.     CEQ regulations provide that "agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). An adoption of a new agency program is an action for which an EIS may be prepared. 40 C.F.R. § 1502.4(b). When preparing EISs on programmatic actions, agencies may evaluate if actions have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter. 40 C.F.R. § 1502.4 (b)(ii).

27.     At the time when DHS promulgated its NEPA procedures, and adopted its visa and citizenship related actions, CEQ's regulations specifically gave guidance that, in preparing an EA or EIS, an agency must consider direct, indirect, and

14

cumulative effects. See 40 C.F.R. §§ 1502.16, 1508.8, 1508.9, 1508.27 (1978)

(archived). Under the regulations in force when DHS carried out all of the actions at

issue in this case, "effects" and "impacts" are synonymous and include:

> ecological (such as the effects on natural resources and on the components,
> structures, and functioning of affected ecosystems), aesthetic, historic,
> cultural, economic, social, or health, whether direct, indirect or cumulative.
> Effects may also include those resulting from actions which may have both
> beneficial and detrimental effects . . . .
> 40 C.F.R. § 1508.8(b) (1978 archive).

28.     Both the 1978 and the current CEQ regulations authorize agencies to exempt

certain agency actions from environmental review through the use of "categorical

exclusions," which are "categories of actions that normally do not have a significant

effect on the human environment, and therefore do not require preparation of an

environmental assessment or environmental impact statement." 40 C.F.R. § 1508.4

(2020).

29.     For those federal actions that are not categorically excluded and are,

following completion of an EA, determined not to have "a significant impact on the

human environment" and thus do not require preparation of an EIS, the agency

issues a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1501.6. (2020).

**B.      THE ADMINISTRATIVE PROCEDURE ACT**

30.     The APA provides for judicial review of federal agency actions. *See* 5 U.S.C. §

701 *et seq*. Under the APA, a reviewing court must "hold unlawful and set aside

agency action, findings, and conclusions" found to be "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A)

(2012). Accordingly, a federal agency must take a hard look at the consequences of

its actions. It must examine the relevant data and articulate a satisfactory explanation for its action, including "a rational connection between the facts found and the choice made*." Motor Vehicle Mfrs. Ass'n of the U.S. Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). An agency must explain in an explicit and rational manner how its decision is based upon and complies with the relevant factors specified in the controlling statutory provision(s), together with applicable agency regulations. *See id*. at 42-43. A reviewing court may set aside, as arbitrary and capricious, agency factual findings and conclusions found to be unsupported by substantial record evidence. 5 U.S.C. § 706(2).

## PARTIES

### A.    PLAINTIFFS

31.    Plaintiff Massachusetts Coalition for Immigration Reform ("MCIR") is a non-partisan, membership-based public interest group. The members of the Massachusetts Coalition for Immigration Reform (MCIR) are citizens united by their belief that record levels of mass immigration into the United States in recent years, both legal and illegal, have distinctly negative effects on our environment and quality of life, as well as on taxpayers and the wages of working Americans. MCIR therefore takes a strong interest in seeing implementation of the National Environmental Policy Act (NEPA), live up to the statute's mandate that the federal government engage in environmentally informed decision-making. MCIR and its members are being, and will continue to be, harmed by the failure of DHS and USCIS to make any attempt to comply with NEPA.

32.   Henry Barbaro is a co-chair of MCIR and lives in Newton, Massachusetts and has lived in the state for sixty-one years, his entire life. Ex. 1, Declaration of Henry Barbaro, at ¶1. He is also a member of the New England Coalition for Sustainable Population and was a member of the Sierra Club and was on its Population Committee for the Boston area. Dec. at   ¶ 2. Mr. Barbaro has devoted his entire adult life to environmental work; he graduated with a B.S. in Environmental Science from UMass Amherst and a Masters in Natural Resources Planning (with an emphasis on water chemistry) from the University of Vermont. Dec. at ¶ 3. He is a naturalist with an avocation watching and photographing wildlife, natural landscapes, and other open spaces. Dec. at ¶ 4 . In his role as a career environmental scientist and community planner, Mr. Barbaro helps communities protect their water resources (e.g., drinking water aquifers, wetlands, rivers, streams, floodplains) and promote land use laws and ordinances (e.g., on-site sewage disposal, land use zoning, subdivision regulations) so as to protect neighborhood character and the natural resources of the communities. Dec. at ¶ 5. In his free time, he often participates in volunteer river clean-ups. Dec. at ¶ 2.

33.   It was partly because of his career in regional planning, that he realized that the source of all the environmental impacts and degradation that he works to prevent is population growth. As he states:

> As a regional planner in New Hampshire, I worked with a variety of municipalities with a focus on environmental management. I helped communities protect their water resources (e.g., drinking water aquifers, wetlands, rivers, streams, floodplains) and I promoted land use laws and ordinances (e.g., on-site sewage disposal, land use zoning, subdivision

regulations) so as to protect neighborhood character and the natural resources of the communities. Dec. at ¶ 5.

All of these land use controls had their basis in the municipal master plans. One thing that struck me is that the introductory content of every plan had a population projection, with the remainder of the plan methodically describing how the town was going to accommodate the future population growth. What proved to be true is that no matter what land use laws were passed by the community's legislative body, growth and development kept marching forward, inexorably changing farmland, forests, and fields into subdivisions, apartment buildings, and commercial/office developments. Dec. at ¶ 6.

After some years, I came to realize that as long as population growth continued, the natural landscape and character of every community within the seacoast of New Hampshire (and just about everywhere else) would be forever changed. I felt a special connection to rural landscapes and their myriad of ecological and societal benefits, and I wanted to protect these areas as best I could. Dec. at ¶ 7.

34.   Mr. Barbaro greatly mourns the natural areas and views that he himself has

personally watched be lost to development. Dec. at ¶ 8. He has also experienced a

multitude of negative impacts on his personal hobbies, enjoyment of the

environment, and profession based on immigration-led population growth. Mr.

Barbaro is a hiker and cross country skier and has found his ability to enjoy these

outdoor activities in New England has significantly declined because of

overcrowding caused by population growth. Dec. at ¶¶ 11-13 . Cross country skiing

trails are now overrun with snowmobiles and walking trails are saturated with

mountain bikers, making it hazardous for him to enjoy them and get exercise as he

used to in the past. Dec. at  ¶ 11. The over trafficking of hiking trails, "exposes

rocks, protruding tree roots, and unstable soil" making "extremely hazardous

conditions for hikers and first responders alike," which often leads to complete

destruction of these trails due to erosion. Dec. at ¶12. As a result, he has suffered

personal injuries from having his ability to watch and enjoy nature reduced as a

result of from population growth.  Dec. at ¶14.

35.     Mr. Barbaro also personally feels the loss of resource strain due to a greater

density of local population. Local New England cod and haddock used to be plentiful

in his youth—a local dietary staple. He now must buy these fish from out of state

since overpopulation has caused overfishing. Dec. at ¶ 16. Because of aquifer

depletion caused by greater use of water to support the population, his home value

suffers as he is no longer able to landscape properly as he once did. Dec. at ¶ 17.

36.     Mr. Barbaro has also personally witnessed the spread of invasive species—

greatly caused by greater footprint encroachment by a greater population. This

spread of invasive species choke out native coastal vegetation and coastal marshes,

"makes more difficult and less rewarding [his] job as a conservationist, [his]

enjoyment of nature as a photographer, and local use of nature as an outdoorsman."

Dec. at ¶18.

37.     Mr. Barbaro knows that the population growth he has experienced at home is

due in part to the federal government's immigration policies. He was "deeply

disappointed" when he learned that "NEPA has never been applied to immigration

actions by U.S. Citizenship and Immigration Services (USCIS), which implements

actions which result in relentless and unsustainable population growth, urban

sprawl, and the permanent loss of open spaces and their ecological services." Dec. at

¶ 20. He believes that if America's immigration agencies had been applying NEPA

according to the law, it might never have made decisions causing so much population growth." Dec. at ¶ 20.

38.     David Holzman is a member of MCIR and is a resident of Lexington, Massachusetts. Ex. 2 at ¶ 1. A freelance journalist by trade, he holds bachelor's degree in Zoology from UC Berkeley. Dec. at ¶ 1. Much of his writing is geared towards protection and stewardship of the environment; he also calls into National Public Radio talk shows frequently and has been published in the New York Times, the Washington Post, and the Boston Globe over the last twenty years. Dec. at ¶ 1. He used to be a member of Zero Population Growth and the Sierra Club but he "quit both when they started pretending that overpopulation in the U.S. is not a population problem. Dec. at ¶ 3. His love for the U.S. geographic and open spaces can be traced back to the cross-country road trips he took with his family as a child to national parks. Dec. at ¶ 10. He vividly remembers the wide open spaces he passed through Kansas and the Colorado Great Plains. Since then, he has derived great spiritual and benefit from visiting open spaces. He visited Nevada by train on a route surrounded by completely undeveloped land. Unfortunately, many of the beautiful places he has visited in the past have been changed by population growth. Dec. at ¶ 10. He mourns for the lost open spaces between Tucson and Phoenix, the San Francisco Bay area, and around Salt Lake City, which he experienced in the 1970's but have disappeared in more recent trips. Dec. at ¶ 18.

39.     Mr. Holzman lives now in the same neighborhood as during his childhood. Dec. at ¶ 4. As a child in neighborhood, he used to enjoy the sounds of silence from

his porch and Monarch and Swallowtail butterflies, along with lightening bugs.
Now with sprawl and traffic, he has "measured 60 decibels most of the day and
evening from traffic on the nearest highway" (Dec. at ¶11) and further that "now, I
only see about as many beautiful butterflies over the whole summer as I saw in a
couple of days as a kid." Dec. at  ¶17. He used to see Monarch butterflies in Cape
Cod frequently, and now he hasn't seen a Monarch butterfly there in two decades.
Dec. at ¶15. Noise pollution and loss intrinsic enjoyment and connection to nature
has been severely augmented in Mr. Holzman's daily life. This traffic increase has
also impaired his family visits and recreation activities. Mr. Holzman suffers the
personal injury of increased noise and inability to personally view wildlife caused by
population growth. He notes that, "my siblings and I have a family house on Cape
Cod. On a Saturday in July or August, what as an hour and forty-five-minute drive
(reliably so in the '60s when I was a kid) often takes almost *four hours*." Dec. at ¶
14. On top of this, in order to visit his parents in Washington, D.C., Mr. Holzman
often has to drive at night because of traffic. Dec. at ¶13.  Mr. Holzman is aware
that NEPA requires that federal agencies ensure that decision-making on large
projects is informed by environmental science and also stipulates mandatory public
participation:

> I also know that the Department of Homeland Security (and its predecessors)
> are federal agencies and that all legal immigrants—and a large proportion of
> illegal immigrants—use a visa to enter and remain in the country (although
> illegal immigrants gain illegal status by overstaying their visa). I am very
> angry that the Department of Homeland Security has done zero
> environmental review on the environmental impact of their visa regulations,
> programs, and policies. Any policy that admits numbers equivalent to the
> population of New York State *every decade* has a huge environmental impact.

> Had the relevant agencies considered the environmental consequences of their immigration policies and actions, and made different decisions accordingly, it is likely that the metropolitan area I live in would have much less sprawl, and much less traffic, even during rush hour. It would be easier to drive to Cape Cod during the summer, and to park in Cambridge and Boston all year round, and there would be far less noise from traffic. There would be a lot more wildlife, including those iconic monarch and swallowtail butterflies, which I see now maybe several times a summer instead of several times a day. Recreation would be much more accessible, less crowded, and plentiful. Dec. at ¶ ¶ 19-21.

40.    Steve Kropper has served as co-chair of the Massachusetts Coalition for Immigration Reform (MCIR) for over a decade. Ex. 3 at ¶1. He has lived in the Boston area for a total of 50 years and was born in Needham, Massachusetts. Dec. at ¶1. He has an MBA from Cornell University and a BA from Boston University. Since 1979, his professional life has revolved around on three sectors: cleantech; telecommunications and wireless communication, and big data. Professionally, he is currently an entrepreneur. Dec. at ¶2. Since 1972, he has been an active member of the Sierra Club, the Wilderness Society, the Appalachian Mountain Club, the Green Mountain Club, and other environmental organizations. Dec. at ¶2. More recently, he founded Windpole Ventures to provide specialized meteorology data to both wind farm developers and managers of the electrical grid to assist in renewable energy source integration. Dec. at ¶2. Politically, his politics are "progressive, supporting liberal causes and Democrat candidates since 1976." Dec. at ¶4. He believes that current levels of immigration, and resultant population footprint growth, are negatively affecting social justice and environmental justice. Dec. at ¶4.

41.    Mr. Kropper himself has been subject to adverse effects of this immigration led population growth: Mr. Kropper notes that emissions from a growing population

has caused rising temperatures; this has led to a "the huge upswing in deer ticks and poison ivy throughout [Massachusetts]." Dec. at ¶6. Deer ticks carry Lyme disease whose effects once contracted include neurological impairments, facial palsy, chronic joint inflammation, and heart rhythm irregularities; and the poison ivy is much denser. Dec. at ¶6. As a result, he records that "my friends and their children, even my own family, are much more hesitant to use the outdoors. Areas that were once great for hiking, picnicking, or walking are much more hazardous." Dec. at ¶6. Increased temperatures have also hurt his favorite winter recreation pastimes, as warmer temperatures make "skiing (a favorite pastime of mine) in the state much more limited in duration, lesser in quality." Dec. at ¶6.

42.     Mr. Kropper's own neighborhood in Lexington, whose population is 17% foreign born) has seen a devastating impact on open space and quality of life because of local population growth, much of which is due to immigration. As an elected town meeting member involved with development, he knows that local planning is hugely affected by population growth. More people and more housing affects his quality of life in a number of ways. Housing has become less affordable. *Id*. It has become so crowded that the drive from Lexington to Boston commute time to Boston has gone from 18 minutes in his youth to an hour. The time he spends commuting to Boston is an opportunity cost and a loss of productive hours. Dec. at ¶7.

43.     Similar negative effects are felt on his love for hiking and the biodiversity he encounters on these hikes: he mentions "I have been a longtime hiker of the

Vermont's Long Trail, hiking over 272 miles of it over the years. During my youth, I used to enjoy the ample biodiversity, specifically three species that I would see frequently from a distance: the Timber Rattlesnake, Bald Eagle, and the Eastern Mountain Lion. In my adult life, these species have *never* appeared during my months of solo and group hiking." Dec. at ¶9. Increased human footprint, because of immigration-led growth, have decimated these species. He expresses dismay that he "cannot provide my children the same enjoyment of recreation species and biodiversity that I had in my youth." Dec. at ¶9.  Mr. Kropper suffers personal injury from the ability to view wildlife because it is reduced by population growth.

44.      Mr. Kropper is also personally affected by population growth creating congestion beyond his daily commute. He regularly travels to the Washington, D.C. metro area for business as well. He recalls, "As a regular commuter to D.C. and Tyson's corner for business, things have gotten worse. Between breakfast and dinner, I used to be able to schedule four meetings a day in the area; now, with the hellacious traffic, I can only schedule two meetings in that same window. This is a direct loss of income and productivity." Dec. at ¶8. Mr. Kropper suffers the personal injury of lengthened commute times caused by increased population. He is also saddened by the nature he used to see in the DC area which is now gone because of population growth. Dec. at ¶8.

45.      Mr. Kropper wonders if DHS will ever live up to its responsibility to analyze the environmental impacts it causes through NEPA review. "Federal law is clear that all agencies, including DHS, must analyze the environmental effects of their

actions. Department of Homeland Security policy impacts both legal and illegal migration to the U.S., which has tremendous environmental impacts, and yet has no history of environmental review of visa programs." Dec. at ¶11.

46.     Mike Hanauer is a member of MCIR and a longtime Massachusetts resident who has resided in Carlisle, Massachusetts for the past 19 years. Ex. 4 at ¶1. He graduated from college with a BS in electrical engineering, with additional training in psychology, computers, and systems engineering from the University of Massachusetts in Lowell; he then obtained an MS in Engineering Management from Northeastern University. An ardent environmentalist, he believes that "true sustainability should be a major goal of all environment organizations, and that population growth (led largely by immigration) in the overarching issue of the century." Dec. at ¶ 2.

47.     Mr. Hanauer has been a sustainability, climate change, and population activist for over twenty-five years. Dec. at ¶ 7. He has served as a climate action coordinator, has been co-chair of the New England Coalition for Sustainable Population and chair of Zero Population Growth of Greater Boston. He has also served as a Director on the National Board of Zero Population Growth (now Population Connection). Dec. at ¶7. He was inspired to this life of activism because of his love for nature; he continues this fight to combat the harms he experiences personally because of immigration-led population growth. Dec. at ¶7.

48.     Population growth has transformed the "[p]ristine wild habitat, where [he] used to love to walk, observe nature, and hike." Dec. at ¶14.  Over time, the nature

he used to enjoy is "being turned into housing, shopping malls, schools and just plain ugly sprawl." Dec. at ¶14. Losing open spaces around him is a very upsetting experience: "having adequate open space for recreation is essential to [his] physical and mental health." Dec. at ¶14. Mr. Hanauer suffers the personal injury of being deprived of the ability to enjoy open space and view nature because of increased population growth. When hiking, he has found that: "when I do have the chance to walk and hike in the woods, I almost invariably notice a considerable increase in trails trampled, litter, trail wear, and crowding" and "to enjoy hikes where I see substantial wildlife, I need to drive much farther to get to these places, which are often inconveniently located." Dec. at ¶15. He has experienced similar effects at national and state parks. According to Mr. Hanauer, what once was emblematic of "Americana" is now "ridiculously packed—with often tour busses, traffic jams, and legions of tourists." Dec. at ¶16. He has to schedule visits to many of them now during undesirable parts of the year just to get a semblance of the experience he once felt as a child: "trails and roads are much more used and litter prone; campsites are now often almost on top of each other. Many of our national parks I once enjoyed have become veritable amusement parks where nature is viewed from afar rather than being an immersive experience. This is saddening." Dec. at ¶16.

49.     Locally, his recreation and enjoyment of nature is also impaired. A case in point is biking, which he considers "an important part of how I mitigate the stresses of life and get enjoyable exercise." Dec. at ¶18. However, he stresses that, "roads are more congested and more dangerous every year. Even when I attempt to take my

bike recreation out of the city, bike trails are now often as dangerous as the roads because of overpopulation which results on heavy congestion. It was not always this way!" Dec. at ¶18. Also on a local level, he feels the "pressure to always grow, accommodating always more people, results in always more financial pressures to build roads, schools. This puts extra burden on me as a taxpayer." Dec. at ¶19.

50.     Over the course of his own lifetime, the U.S. population has gone from 140 million to 330 million people. Dec. at ¶22. He knows that Census Bureau projections indicate that our population is likely to surpass one-half billion in the coming century. Dec. at ¶22. He believes that analysis and calculations from the biological and physical sciences support the contention that U.S. population is now at over double the sustainable level: "Attainable reductions in consumption will not do the job if we do not also stop population growth. We all want a truly sustainable world which can support a reasonable standard of living with reasonable levels of consumption for all." Dec. at ¶22. Mr. Hanauer also realizes that immigration is the biggest single cause of our population growth, and thus, he believes "the Department of Homeland Security must, for both legal and moral reasons, evaluate its recommendations and actions in light of the National Environmental Policy Act." Dec. at ¶24.

51.     Kevin Lynn is Executive Director at Progressives for Immigration Reform (PFIR), which exists to protect American workers from unemployment and wage suppression caused by unfair labor and trade practices. Ex. 5 at ¶1.  He is a graduate of Kemper Military College, a former Second Lieutenant in the U.S.

army's military intelligence; and professionally has worked at Ernst and Young, technology startups, and a tax consulting firm. He now resides in Lancaster County, Pennsylvania and was born in Bucks County, Pennsylvania. Dec. at ¶1. He is also a member of a few environmental organizations, such as Respect Farmland as well as Lancaster Against Pipelines. Dec. at ¶2.

52.     Mr. Lynn considers himself "an ardent progressive and longtime member of the Democratic Party." Dec. at ¶3. He was a delegate to the California Democratic Party from (2006-2008) and also on the executive board of the California Democratic Party (2007-2011).  Dec. at ¶3. He mentions that his primary goal in forming PFIR was to "have an open conversation about immigration within the left, especially on what are the unintended consequences of immigration and more particularly on the environment and workers' rights." Dec. at ¶4. He notes that, "I myself am a son of an immigrant, and I appreciate how immigration works well for American when it is regulated and measured. However, I know that current levels of immigration will ensure further environmental degradation, sprawl, and population growth." Dec. at ¶¶5-6.

53.     This impact has been palpable in his own life. Mr. Lynn spent many years living in Southern California, first in a small cabin in Malibu, where there was plenty of open space, and he "could literally embark onto mountain biking trails from my front porch. Nature was plentiful and palatable." However, [he] had to move downtown because the area he loved to live in had been changed beyond recognition by development, and because [his] commute was becoming unbearable

with the ever-growing traffic congestion in Los Angeles." Dec. at ¶9. The area has

now changed from "pastoral to suburban, public space to exclusive estates, and

hiking trails to backyards." Dec. at ¶9. The area he had enjoyed was "ruined

recreationally and atheistically." Dec. at ¶9.

54.     After moving to downtown Los Angeles, traffic became a commercial and

recreational impairment. He notes that "every year I remained downtown, however,

traffic got worse and worse. Many of my hours were spent idly behind a wheel." Dec.

at ¶ 10. His recreation and environmentally friendly-habits were also threatened by

congestion: though he tried to bicycle ride to work and other places for the "obvious

environmental reasons," he remarks that "boy, was it dangerous. Congestion made

it very hazardous to navigate traffic as a pedestrian or cyclist; I almost was hit by

cars a few times. On top of this, the smog was disgusting and damaging to my

health." Dec. at ¶10.

55.     Because population growth had made California such a less enjoyable place

to live, Mr. Lynn went back to Pennsylvania. He would have loved to move back to

Bucks County, however, it was not the same place it used to be because of

population growth. Dec. at ¶11. He explains:

> the area has transformed beyond recognition since my childhood there in the
> 1980's. The area used to have wide and plentiful open spaces, it also had
> some of the best game lands in the country at the time.  I used to love
> trapping game in the Winter and playing in fields and pastures with friends
> in the Summer.  Hiking, fishing, and outdoor activates were a part of life and
> easily accessible.  However, now I barely recognize the place; population
> growth and sprawl have transformed open spaces, bucolic landscape, and
> wild game areas into suburban guard-gated communities. Dec. at ¶11.

56.     As a result, Mr. Lynn decided to move to Lancaster County for a "more rural existence" where he could "ride his bike…to go buy fresh produce." Dec. at ¶12. However, the county is under threat of swelling growth because of Federal refugee relocation to the area, with the British Broadcasting Company calling it the "refugee county of America." Dec. at ¶12. Mr. Lynn is "fighting development to save the farmland and rural character of the area" because "there are already many more people in Lancaster County than sustainable there is already less open space, more pollution, and more traffic." Dec. at ¶13.  Mr. Lynn suffers the personal injury of not being able to enjoy the rural character of Lancaster because of population growth resuling from federally directed refugee resettlement. Dec. at ¶13.

57.     Regarding NEPA, his opinions are strong:

> Years ago, I learned of NEPA and certainly lauded what it stood for; it offered an environmental barometer on Federal policy decisions. However, I felt a combination of dismay and disappointment when I later learned that the Department of Homeland Security (DHS)—and its various sub-agencies that control immigration intake and policy—has never performed environmental review of its immigration related policies and actions. This sad abdication of authority for DHS to not invoke NEPA when immigration policy is being drafted and executed.  DHS has not only the authority, but also, more importantly a *mandate*. Over 80% of U.S population growth comes from immigration, and if NEPA were to be properly applied in the past, we would be much better off now, and I would have not suffered the harms noted above. DHS needs to appreciate the full range of powers under NEPA and needs to act on its mandate. Dec. at ¶14.

## B.     DEFENDANTS

58.     Defendant DHS is a federal agency that was established in 2003, pursuant to the Homeland Security Act passed on November 25, 2002. See Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002) ("Act"). Pursuant to this

grant of authority, DHS is mandated to administer border security, immigration enforcement, naturalization, and establish and administer rules governing the granting of visas or other forms of permission to enter the country. See 116 Stat. at 2178, 2187. By the authority of the Act, DHS took over the functions of government formerly delegated by Congress to the INS, a division since 1940 of the Department of Justice. DHS now carries out the functions of the former INS, that is, the regulation of immigration into the U.S., through three sub-agencies, U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"), CBP and ICE took over the law enforcement functions of INS (which are not at issue in this case). USCIS took over the service and benefits functions of INS. CBP is responsible for inspecting both persons and goods arriving at the border and granting or denying entry to the United States. ICE is responsible for investigating and enforcing violations of the immigration laws within the United States. USCIS adjudicates benefits for immigrants and non-immigrants, such as granting and extending visas, green cards, and naturalization, and reviews appeals of visa decisions. As a federal agency, DHS and its component USCIS are subject to NEPA and the APA. In accordance with NEPA, DHS has adopted NEPA regulations to guide its discretionary agency action decision making. See 42 U.S.C. § 4333 (2016); Ex. 2 (Instruction Manual); Synopsis of Administrative Record to Support Proposed New Categorical Exclusions Under the National Environmental Policy Act, Dep't of Homeland Sec. (Dec. 2014), Ex. 3.

## GENERAL ALLEGATIONS

59.   Visa and citizenship policy, the province of USCIS within DHS, allows the settlement of people into the United States in large numbers. People inevitably interact with the environment, and, today, environmental scientists are well able to measure these effects. NEPA accordingly requires DHS to consider the environmental effects of USCIS's visa and citizenship policy related actions.

60.   DHS/USCIS has failed and continues to fail to analyze the environmental impacts of its policy actions that have allowed and continue to allow millions of foreign nationals to enter into and settle in the United States. These actions result in significant population growth that produces ongoing myriad environmental impacts. Plaintiffs accordingly assert that NEPA requires DHS/USCIS to assess the impacts of its actions under NEPA.

61.   NEPA requires Federal agencies to apply NEPA when undertaking federal actions and making decisions that could have a significant impact on the human environment. CEQ regulation 40 C.F.R. §1508.18(a) provides that federal programs constitute "major federal actions" subject to NEPA compliance. 40 C.F.R. §1508.18(3) provides that federal actions include: "Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."

62.   People cause myriad impacts to the environment. Additional people result in additional impacts to the environment. *See* Cafaro Report. The primary factor

driving future U.S. population growth is international migration. Foreign nationals settling into the U.S. from abroad add directly to the nation's population by their arrival and by the children they have after they come. Because the fertility of American women has been at or below replacement level for many years—2.1 children per women—absent immigration there would be very little long-term population growth in the United States. *See* Camarota Report at 1. Plaintiffs' demographic expert Dr. Camarota estimates that immigration accounted for about 57 percent of U.S. population growth between 1990 and 2017. *Id*. The most recent Census Bureau projections indicate that the U.S. population will be nearly 85 million larger in 2060 than it otherwise would be if there were no new immigration. *Id*.

63.     USCIS is the component of DHS charged with the mission of visa and citizenship policy. USCIS controls and sets the conditions for the entry into and settlement of foreign nationals in the United States. DHS therefore is the agency that causes most of the population growth of the United States.

64.     It is, therefore, manifest that DHS controls one of the most environmentally significant mandates delegated to any federal agency, and yet DHS fails even to consider any potential environmental impacts of USCIS' entire statutory mission.

65.     DHS has continuously failed to make well-informed decisions; failed to conduct reasoned analyses of potential impacts to the human environment resulting from USCIS's visa and citizenship policy actions; and has failed to engage the public on the range of potential environmental impacts or create public records so that

interested or affected members of the public can learn about the environmental implications of USCIS programs. This is notwithstanding that all of these steps are required by both NEPA and the APA.

66.     Despite the enormous impacts to the human environment resulting from USCIS's visa and citizenship policy regulating the entry into and settlement of foreign nationals in the United States, DHS has failed to initiate *any* NEPA review analyzing the impact of such actions. DHS or its predecessor agencies have implemented at least 90 actions since the promulgation of CEQ's 1978 NEPA regulations pursuant to its authority under the nation's immigration laws, specifically the Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952), (the "INA"). *See* Vaughan Affidavit at 1, which specifically identifies and briefly describes these actions. Each of these actions qualify as "major actions" under NEPA. They were created and updated through the ongoing exercise of discretion by USCIS or by the agencies which once carried out its functions, via the adoption of both regulations and policy memoranda. DHS visa and citizenship related actions have resulted and will continue to result in impacts to the human environment, including but not limited to significant ongoing population growth in the United States and unending increases in the population density of numerous localities throughout the United States.

67.     DHS and USCIS have demonstrated the arbitrary and capricious nature of their NEPA compliance though recent inconsistent and post hoc rationalizations. DHS has no guidance in the Instruction Manual for anything related to USCIS's

entire mandate, no record support for any exemption from NEPA relating to visa and citizenship policies, and no categorical exclusions related to the entrance and settlement of foreign nationals. There is no evidence in the administrative record of DHS' NEPA procedures that it ever even occurred to anyone in DHS to consider whether the entry and settlement of foreign nationals into the US could have environmental impacts.

68.     However, once the public started to comment on the environmental effects of USCIS' actions, Defendants could no longer entirely ignore the question of whether there should be NEPA review of visa and citizenship related actions. In a final rulemaking on January 17, 2017, DHS responded to public comment that "DHS agrees that NEPA applies to this, as to every, final rulemaking," but insisted a categorical exclusion applied.[10] Later, Defendant came up with another explanation in a rule relating to the H-1 B program published on January 31, 2019. There DHS and USCIS claimed that NEPA doesn't apply to such actions at all. In this regulation, Defendant claimed that it had "analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis."[11] These inconsistent and post-hoc rationalizations are arbitrary and capricious. Instead of conducting any NEPA analysis on the effects commentators pointed out, Defendant concluded that since the Instruction Manual is silent on the environmental impact of visa and citizenship related actions, it must not need to conduct any. This is a clear violation of NEPA.

---

[10] 82 Fed. Reg. 5,238, 5,284 (Jan. 17, 2017).
[11] 84 Fed. Reg. 888 (Jan. 31, 2019).

69.    Plaintiffs' commissioned immigration policy expert, Jessica Vaughan,
identified 80 actions that she estimated have expanded the population of the United
States. The list of 80 actions below, grouped by type and chronology, promulgated
with no environmental analysis, violate NEPA because they have the potential to
increase the population of the United States and thus impact the environment:

<u>Refugee Visas</u>

- 46 Fed. Reg. 45118 (Sept. 10, 1981): Initially implementing the Refugee Act of 1980 and setting out refugee procedures.
- 56 Fed. Reg. 26897 (Jun. 12, 1991): Implementing the procedures by which a refugee adjusts status to LPR)
- 57 Fed. Reg. 42883 (Sept. 17, 1992): Amending procedures for filing for LPR status.
- 62 Fed. Reg. 10312 (Mar. 6, 1997): Amending handling of refugee claims.
- 63 Fed. Reg. 3795 (Jan. 27, 1998): Establishing guidelines for the policy governing admitting the family members of refugees.
- 63 Fed. Reg. 30105 (Jun. 3, 1998): Changing procedures for refugees to adjust status to LPR.

<u>Granting of Citizenship</u>

- 47 Fed. Reg. 940 (Jan. 8, 1982): Regulatory language defining subject to the jurisdiction very broadly.

<u>Non Immigrant Visas</u>

- 52 Fed. Reg. 42590 (Nov. 5, 1987), with minor corrections at 53 Fed. Reg. 9172 (Mar. 21, 1988): Creation of number of various rules for entry, including temporary visitors for business or pleasure, border crossing cards, visas (B-visas, BCC-visas), student visas, temporary workers, spouses and children of certain non-immigrant visa holders, and miscellaneous others.
- 59 Fed. Reg. 41818 (Aug. 15, 1994): Implementing new provisions of several temporary worker program.
- 59 Fed. Reg. 511101 (Oct. 7, 1994): Allowing certain temporary workers to apply to become lawful permanent residents (LPRs).
- 60 Fed. Reg. 44260 (Aug. 25, 1995): Corrected at 60 Fed. Reg. 52248 (Oct. 5, 1995): Adding T-visa.
- 62 Fed. Reg. 10422 (Mar. 7, 1997): Revising h-1, h-2, h-13(ii).
- 62 Fed. Reg. 48138 (Sept. 12, 1997): Revising visa for treaty investor.

- 63 Fed. Reg. 31872 (Jun. 10, 1998): Allowing F-1 students to work.
- 64 Fed. Reg.  29208 (Jun. 1,1999): Revising H-1 and L-1 status during pending application, corrected at 64 Fed. Reg.  30103 (Jun. 4, 1999).
- 64 Fed. Reg.  32146 (Jun. 15, 1999): Extending period of duration of status for F and J nonimmigrants.
- 65 Fed. Reg. 10678 (Feb. 29, 2000): Revising petitions for H-1B, interim.
- 66 Fed. Reg. 31107 (Jun. 11, 2001): Created a new visa category for nurses.
- 66 Fed. Reg. 46697 (Sept. 7, 2001): Adding another V nonimmigrant visa.
- 67 Fed. Reg. 4783 (Jan. 31, 2002): Implementing new classification for trafficking victims.
- 67 Fed. Reg. 18062 (Apr. 12, 2002): Requiring change of status from B to F before taking course of study.
- 67 Fed. Reg. 54941 (Aug. 27, 2002): Reducing required course load for F and M students near border.
- 70 Fed. Reg. 23775 (May 5, 2005): Allocating additional H-1B visas under 2004 H-1B Visa Reform Act.
- 72 Fed. Reg. 18856 (Apr. 16, 2007): Changing petitioning requirements for O and P visas.
- 72 Fed. Reg. 19100 (Apr. 17, 2007): Giving more flexibility to USCIS in processing applications.
- 73 Fed. Reg. 53014 (Sept. 17, 2007): Establishing the requirements and procedures for seeking U visa status; updated further by 73 Fed. Reg. 75560 (Dec. 12, 2008)
- 73 Fed. Reg. 15389 (Mar. 24, 2008): Clarifying treatment of H-1B workers subject to numerical limitations.
- 73 Fed. Reg. 61332 (Oct. 16, 2008): Extending TN visas.
- 73 Fed. Reg. 18944, April 8, corrected at 74 Fed. Reg. 26514 (Jun. 3, 2009): Extending period graduated students can stay in the country while working in the OPT program.
- 73 Fed. Reg. 55683 (Sept. 26, 2008): Adjusting Student and Exchange Visitor Program fees.
- 73 Fed. Reg. 75540 (Dec. 12, 2008): Allowing T or U visa holders to apply for permanent resident status.
- 73 Fed. Reg. 76891 (Dec. 18, 2008): Removing certain limitation on H-2A employers.
- 75 Fed. Reg. 47699 (Aug. 9 2010): Granting work authorization for dependents of foreign officials.
- 77 Fed. Reg. 8119 (Feb. 14, 2012): Extending validity of L visas by DOS beyond that set by DHS.
- 77 Fed. Reg. 76353 (Dec. 28, 2012): Making corrections to H-2A petitions, rules.

- 78 Fed. Reg. 24047 (Apr. 24, 2013): Making interim rule, with the Department of labor, changing methodology of H-2B petitions.
- 78 Fed. Reg. 58867 (Sept. 25, 2013): Issuing notification of numerical limitation for Northern Mariana Islands for FY 2014.
- 78 Fed. Reg. 68992 (Nov. 13, 2013): Creation of T visa for those approved by DHS.
- 74 Fed. Reg. 61517 (Nov. 25, 2013): Implementing the S-visa classifications (DHS created the program).
- 79 Fed. Reg. 58241 (Sept. 29, 2014): Setting numerical limitations on CW-1 workers in northern Mariana Islands.
- 80 Fed. Reg. 10284 (Feb. 25, 2015): Allowing H-4 dependent spouses to have work permits.
- 80 Fed. Reg. 24145 (Apr. 29, 2015): Implementing wage methodology for H-2B program.
- 80 Fed. Reg. 63911 (Oct. 10, 2015): Setting numerical limitation of CW-1 workers in Northern Mariana Islands.
- 81 Fed. Reg. 2068, January 15, 2016 (loosening employer rules for H-1B1, CW, and EB visas)
- 81 Fed. Reg. 60581 (Sept. 2, 2016): Setting numerical limitation of CW-1 workers in Northern Mariana Islands.
- 81 Fed. Reg. 82398 (Nov. 18, 2016): Increasing flexibility in worker programs.
- 81 Fed. Reg. 92266 (Dec. 19, 2017): Changing regulations governing T visas.
- 82 Fed. Reg. 32987 (Jul. 19, 2017): Increasing H-2B agricultural workers.
- 83 Fed. Reg. 24905 (May 31, 2018): Increasing agricultural workers.
- 84 Fed. Reg. 888 (Apr. 1, 2019): Changing H-1B program, filing petitions)

Entrance without Visas

- 54 Fed. Reg. 24901 (Jun. 30, 1988): Creation of the Visa Waiver Program

  o 73 Fed. Reg. 67711 (Nov. 17, 2008): Addition of countries to the Visa Waiver Program: Czech Republic, Estonia, Hungary, Latvia, Lithuania, the Republic of Korea, and the Slovak Republic

  o 73 Fed. Reg. 79595 (Dec. 30, 2008): Addition of Malta to the Visa Waiver Program

  o 77 Fed. Reg. 64409 (Oct. 22, 2012): Addition of Taiwan to the Visa Waiver Program

  o 79 Fed. Reg. 17852 (Mar. 31, 2014): Addition of Chile to the Visa Waiver Program

Employment Immigrant Visas

- 56 Fed. Reg. 60897 (Nov. 29, 1991): Creation of employment visa program.
- 58 Fed. Reg. 44606 (Aug. 24, 1993): Creation of a pilot investor program.
- 71 Fed. Reg. 19805, (Apr. 18, 2006): Rules for special alien broadcasters.
- 81 Fed. Reg. 2068 (Jan. 15, 2016): Allowing increased work authorizations.
- 81 Fed. Reg.  82398 (Nov. 18, 2016): Increased benefits for certain work based visa holders.

Family Immigrant Visas

- 57 Fed. Reg.  41053 (Sept. 9, 1992): Expanding family members eligible for immigration benefits.
- 60 Fed. Reg. 38947 (Jul. 31, 1995): Clarifying the process of adjusting status.
- 61 Fed. Reg. 13061 (Mar. 26, 1996): Creating a process for victimized relatives.
- 71 Fed. Reg. 35732 (Jun. 21, 2006): Creating an easier process for sponsoring family members.
- 72 Fed. Reg. 19100 (Apr. 17, 2007): Making it easier to grant immigration benefits.
- 76 Fed. Reg. 28303 (May 17, 2011): Allowing certain petitioners to file abroad.

Student and Exchange Visitor Program

- 58 Fed. Reg. 15196 (Mar. 19, 1993): Implementation of overhaul of the exchange visitor program.
- 67 Fed. Reg. 60107 (Sept. 25, 2002): Initial implementation overall of (still operating) Student and Exchange Visitor Program (SEVP) visa program. Further revisions by DOS including:
  - 67 Fed. Reg. 76256 (Dec. 11, 2002): Changing retention and reporting for SEVP
  - 69 Fed. Reg. 39814, July 1, 2004: Authorizing fee collection for SEVP)
- 70 Fed. Reg. 96 (May 19, 2005): extending stay for professors and researchers (coordinated with DHS).
- 71 Fed. Reg. 33237 (Jun 8, 2006): au pair program expanded.
- 72 Fed. Reg. 33669 (Jul. 2007): Expanding Trainee and intern program.
- 73 Fed. Reg. 34861 (Jun. 19, 2008): au pair program expanded.
- 73 Fed. Reg. 55683 (Sept. 26, 2008): Adjusting program fees, recertification of schools.
- 75 Fed. Reg. 48555 (Aug. 11, 2010): expanding the trainee and intern program.
- 75 Fed. Reg. 65975 (Oct. 27, 2010): revising secondary school rules for exchange program.
- 76 Fed. Reg. 23177 (April 26, 2011): Amending summer work travel program.

- 80 Fed. Reg. 23680 (Apr. 29, 2015): Expanding the Student Exchange Visitor program.
- 81 Fed. Reg. 4945 (Jan. 29, 2016): Amending Teacher category in exchange program.
- 81 Fed. Reg. 13040 (Mar. 11, 2016): Expanding time F-1 visa holders can stay and work in the country after graduation in the "OPT program."

70.    DHS' NEPA procedures arbitrarily provide no framework to analyze any of the environmental effects of the actions listed in Paragraph 64. As a result, most of these regulations were implemented with no reference to NEPA analysis at all. Only a small number of these actions cite categorical exclusions, and none of the categorical exclusions cited include scoping that addressed potential effects on population.

71.    One can only conclude—as the Plaintiffs have—that DHS, with its outsized influence on our nation's population growth and, ipso facto, upon our nation's environmental health, has acted and continues to act in a manner that is arbitrary and capricious with respect to its NEPA obligations.

72.    The result of these actions is massive, federally induced, population growth. Furthermore, when foreign nationals enter the United States, the resulting population growth is not merely limited to those individuals who enter the country and the children they will have. Foreign nationals who ultimately become lawful permanent residents ("LPRs") can themselves sponsor further immigration to the country via what is known as "chain migration." One prominent team of researchers has calculated a chain migration "multiplier." This multiplier is based on data on family-sponsored immigration for the period 1996-2000. According to this research, every 100 original immigrants to the United States during this period sponsored

another 345 family members as immigrants. *See* further discussion in Vaughan

Affidavit, available at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-

USCIS/Vaughan.pdf.

73.     The listed growth inducing major actions are described and analyzed by

Plaintiff's expert Jessica Vaughan. Ms. Vaughan identified the 80 specific, discrete

instances where DHS has undertaken regulatory action, which together have had a

massive environmental impact, but which the DHS NEPA procedures provide no

framework for analysis. These growth-inducing impacts are felt not just at a

national but at a local level, for there are many areas of the country that have been

particularly attractive to foreign nationals settling in the United States.

74.     Like INS before it, DHS and its component agencies do consider whether the

environmental impacts of its facilities such as detention centers are significant.[12]

DHS apparently believes that the detainment of an increased number of foreign

nationals may require the building of more housing if enough foreign nationals are

detained—which has the potential of causing environmental impacts. However,

foreign nationals entering the U.S. do not only have an environmental footprint

while in DHS custody. Settled inhabitants outside of the custody of DHS also have

housing needs, as well as every other kind of need any resident of a country has. For

the year of 2019, the last year on record and one that was particularly large, the

---

[12] See, e.g., Department of Homeland Security Finding of No Significant Impact for
Actions to Address An Increased Influx of Unaccompanied Alien Children and
Family Units Across the Southwest Border of the United States, Aug. 14, 2014,
available at
https://www.dhs.gov/sites/default/files/publications/FONSI_UAC%26FamUnits_201
40812.pdf

average daily detained population as calculated by ICE was over 50,000.[13] In 2019,

the foreign born population was 46.6 million, as estimated by Ms. Vaughan. It is

arbitrary and capricious for DHS to promulgate NEPA procedures that at least

consider whether the impacts of facilities for 50,000 people are significant, but

completely ignore the impacts of tens of millions of people that include facilities but

so much more.

**Environmental Impacts Resulting from Visa and Citizenship Policies**

75.    Upon information and belief, 46.6 million foreign nationals have entered and

settled in the United States as a result of actions by DHS and its predecessor

agency INS since NEPA was passed. Furthermore, millions of foreign nationals will

continue to enter and settle in the United States, yet these foreseeable impacts

remain unanalyzed by any DHS despite obligations under NEPA. In some cases,

DHS's very failure to provide public transparency and analysis regarding the

numbers of foreign nationals subject to and benefiting from its action has

disadvantaged Plaintiffs in their quest to establish the true magnitude of

environmental impacts resulting therefrom. DHS's compliance with NEPA would

remedy this lack of transparency.

76.    Visa and citizenship policy has a significant effect on the size and growth of

the United States population, as well as the particular distribution which that

population growth takes. Population growth itself is a significant environmental

---

[13] U.S. Immigration and Customs Enforcement, Fiscal Year 2019 Enforcement and
Removal Operations Report at 5. Available at
https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.
pdf.

impact, as particularly noted by Congress in NEPA. Plaintiffs' environmental expert, Dr. Cafaro, wrote a report, "The Environmental Impact of Immigration into the United States," which provides an overview of how population growth, as driven by immigration, yields a host of harmful environmental impacts. Report available at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Cafaro.pdf.

77.     As noted by Dr. Cafaro, population growth is a key factor in a wide variety of environmental impacts. For example, immigration-driven population growth leads to urban sprawl and farmland loss; habitat and biodiversity loss; an increase in worldwide levels of greenhouse gas emissions; and an increase of water demands and water withdrawals from natural systems. *See* Cafaro Report at 1**.**

78.     By surveying the "purposes and needs" sections of several recent federal and state agency EISs, Dr. Cafaro explains how new, environmentally harmful projects are continually created around the country to accommodate immigration-driven population growth. *Id*. at 17. These recent EISs cite anticipated or planned population growth as creating the need for a wide range of environmentally harmful new infrastructure, for example, transit projects, such as the creation of light rail systems, new airports, and projects for road-widening and road construction: energy projects, such as coal and natural gas development, new power plants, and pipelines, along with water supply projects, such as new dams and reservoirs. *See id* at 17-23. There are many other kinds of developments, such as new schools and

housing projects, that are only needed because of population growth. *See id*. at 22-23.

79.     Population growth is responsible for one of the leading environmental problems across the United States: urban sprawl, that is, new development on the fringes of existing urban and suburban areas. *Id* at 24-33. Sprawl increases overall energy and water consumption and air and water pollution, and decreases open space and natural wildlife habitat, endangering the survival of many species. *Id*. From 1982 to 2010, a period of massive immigration, 41.4 million acres of previously undeveloped urban land was built on to accommodate the United States' growing cities and towns—an area approximately equivalent to the State of Florida. *Id*.

80.     The future loss of the undeveloped land remaining in the United States, due to unrelenting population growth, will continue to produce significant harmful environmental consequences. The ongoing loss of open spaces, habitats, and wilderness to unrelenting population growth is a source of anguish to those who love the wilderness, including the Plaintiffs. Former President Barack Obama acknowledged this great environmental loss in his speech marking the designation and preservation from development of the Papah   naumoku   kea Marine National Monument in Hawaii. President Obama, who supported a platform of immigration expansion during his presidency, at the same time, mourned the environmental losses within the United States that would be caused by the population growth he supported. In 2016, he stated, "I look forward to knowing that 20 years from now,

40 years from now, 100 years from now, this is a place where people can still come to and see what a place like this looks like when it's not overcrowded or destroyed by human populations." White House Press Release, Remarks by the President at the Designation of the Papahānaumokuākea Marine National Monument (September 1, 2016), available at https://obamawhitehouse.archives.gov/the-press-office/2016/09/01/remarks-president-designation-papahanaumokuakea-marine-national-monument. NEPA was created precisely so that leaders in government would not be unaware of the environmental damages of their own policies.

81.     Population growth also threatens to accelerate biodiversity loss and the extinction of animal and plant species. *See* Cafaro Report at 41. The United Nations Secretariat of the Convention on Biological Diversity estimates that humanity may be causing the extinction of one out of every three species on Earth in the next one to two hundred years. *Id*. Conservation biologists agree that the most important "direct drivers" of biodiversity loss are: habitat loss, the impacts of alien species, over-exploitation, pollution, and global climate change. *Id*. at 42. All five are caused by increased human population and the increased human activities associated with human population growth. *Id*.

82.     The carbon dioxide ("CO2") emissions produced in the United States also are increasing because of immigration-driven population growth. Furthermore, those foreign nationals that settle in the United States produce an estimated four times more CO2 in the United States than they would have in their countries of origin. The estimated 637 tons of CO2 produced annually by U.S. immigrants is 482

million tons more than they would have produced had they remained in their home countries. The impact of immigration to the United States on global emissions is equal to approximately 5 percent of the increase in annual world-wide $CO_2$ emissions since 1980. That is 5 percent of total global $CO_2$ emissions, not 5 percent of U.S. emissions. These numbers do not even include the $CO_2$ impacts of children born to United States immigrants. *See id* at 66-67.

83.     Because a greater population uses more water, population growth also results in a higher aggregate water use. This higher aggregate use puts increased pressure on water systems, including rivers and underground aquifers. Water taken for human consumption is necessarily removed from an ecosystem, leading to a cascade of harmful environmental impacts. *Id*. at 75-79. "When too much water is taken from these ecosystems for consumptive use by human beings, there may not be enough water left behind to perform these critical ecosystem services and functions." *Id*. at 79.

84.     As detailed by Dr. Cafaro, the impacts of the mass entry and settlement of foreign nationals are deep and profound. Yet DHS, the very agency responsible for regulating all policies related to entry and settlement has promulgated NEPA procedures devoid of any framework for accounting for any of it.

## CAUSES OF ACTION

### COUNT I

The DHS Instruction Manual Violates the APA and NEPA by Failing to Require NEPA Compliance with Respect to its Actions Relating to the Entry Into and Settlement of Foreign Nationals in the United States.

85.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

86.     DHS promulgated its current NEPA procedures under CEQ regulations requiring each federal agency to adopt internal NEPA procedures to ensure NEPA compliance. 40 C.F.R. § 1507.3. These agency NEPA procedures needed to comply with CEQ regulations. 40 C.F.R. § 1507.1.

87.     CEQ's previous regulation 40 C.F.R. § 1507.3(b)(2) requires DHS to set forth "specific criteria for and identification of those typical classes of action[]" which normally require (i) the preparation of an environmental impact statement, (ii) the finding that they are subject to categorical exclusion, or (iii) the preparation of an environmental assessment.

88.     DHS promulgated its current Instruction Manual on November 6, 2014.

89.     The Instruction Manual qualifies as a "rule" under the APA because it is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). NEPA rules qualify as final federal actions under the APA. 40 C.F.R. §1508.18(a) provides that federal actions include "new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals[.]"

90.     The regulation of the entry into and settlement of foreign nationals in the United States is a major component of DHS's statutory mission, and such regulation comprised "principal programs" pursuant to 40 C.F.R. § 1505.1(b) and "typical classes of action" pursuant to 40 C.F.R. § 1507.3(b)(2).

91.    The entry into and settlement of foreign nationals in the United States has myriad impacts on the "human environment" subject to NEPA analysis, including, but not limited to, population growth and the attendant impacts such growth produces. 42 U.S.C. § 4331(c)(C).

92.    The Instruction Manual, which is a final agency action with legal consequences, omits any mention of that vast class of USCIS actions implementing visa and citizenship policy. The Instruction Manual omits any analysis specific to USCIS at all, even though USCIS' specific mission must be analyzed.

93.    DHS's failure to address these "typical classes of actions" and/or "principal programs" in its Instruction Manual violated the CEQ NEPA regulations 40 C.F.R §§ 1500-1508.

94.    The recently promulgated CEQ regulation requires that DHS promulgated new NEPA procedures by September 14, 2021. 40 CFR 1500 *et seq*.

95.    The previous failure of DHS to incorporate NEPA compliance into its Instruction Manual for those actions relating to the entry into and settlement of foreign nationals or to visa and citizenship policy in the United States violates the CEQ regulations, and accordingly is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

96.    Failure to consider the environmental impacts of USCIS' visa and citizenship programs when DHS next adopts new NEPA procedures would also constitute a violation of NEPA and the APA.

<u>COUNT II</u>

DHS and USCIS are in Continuing Violation of the APA and NEPA for Failing to
Conduct NEPA Review for at Least 80 Ongoing Actions.

97.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

98.     CEQ regulation 40 C.F.R. § 1508.1(q)(3)(iii) provides that federal actions

subject to NEPA include: "Adoption of programs, such as a group of concerted

actions to implement a specific policy or plan; systematic and connected agency

decisions allocating agency resources to implement a specific statutory program or

executive directive."

99.     DHS's decision to proceed without initiating any NEPA compliance for any of

these visa related regulations is contrary to NEPA and the CEQ regulations and

accordingly is arbitrary, capricious, an abuse of discretion, and otherwise contrary

to law, in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that this

Court grant the following relief:

1)      Enter a declaratory judgment that DHS's failure to address any of USCIS's

mission in its NEPA procedures is arbitrary and capricious and in violation of its

duties under the law both at the time DHS promulgated its NEPA procedures and

under the law today; and

2)      Enter a declaratory judgment that DHS shall promulgate a component

procedure for USCIS that provides guidance for the analysis of the environmental

impacts of its visa and citizenship programs in accordance.

3)      Enter a preliminary injunction preventing DHS from promulgating new NEPA procedures that fail to address the environmental impacts of USCIS's visa and citizenship policies.

5)      Award Plaintiff reasonable attorney fees, costs and expenses incurred in pursuing this action to the extent permitted by law; and

6)      Provide such other relief as this Court deems just and proper.


Dated: November 24, 2020

Respectfully submitted,



_____

John Miano
Fellow
Center for Immigration Studies
Center for Immigration Studies
1629 K Street N.W., Suite 600
Washington, DC  20006
D.C. Bar No. 1003068


Lesley Blackner
Legal Fellow
Center for Immigration Studies
1629 K Street N.W., Suite 600
Washington, DC  20006
tel: 561-818-6621
email:  lesleyblackner@gmail.com
Florida Bar:  654043

**Certificate required by LCvR 26.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

I, the undersigned, counsel of record for Plaintiff Massachusetts Coalition for Immigration Reform, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of Plaintiff Massachusetts Coalition for Immigration Reform which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.

John M. Miano
D.C. #1003068
Attorney of Record for
Massachusetts Coalition for Immigration Reform

**Certificate required by LCvR 7.1**
**of the Local Rules of the**
**United States District Court**
**for the**
**District of Columbia**

I, the undersigned, counsel of record for Massachusetts Coalition for Immigration Reform, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of Massachusetts Coalition for Immigration Reform which have any outstanding securities in the hands of the public:

None

These representations are made in order that judges of this court may determine the need for recusal.


John M. Miano
D.C. Bar No. 1003068
Attorney of Record for
Massachusetts Coalition for Immigration Reform