**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MASSACHUSETTS COALITION FOR IMMIGRATION REFORM | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.* | ) | |
| | ) | |
| Defendants. | ) | Case Nos. 1:20-cv-03438-TNM |
| | ) | 1:21-cv-01198-TJK |
| And | ) | (consolidated cases) |
| | ) | |
| LINDA HUHN, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS; STATEMENT OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND .................................................................................................. 3

III. STANDARD OF REVIEW .................................................................................. 4

    A. Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ........................................ 4

    B. Judicial Review Under the Administrative Procedure Act .................................... 6

    C. The National Environmental Policy Act ................................................................ 6

IV. ARGUMENT ....................................................................................................... 7

    A. Plaintiffs Lack Standing Under Article III and the APA to Pursue Their Claims .................................................................................................................... 7

        1. Plaintiffs Must Separately Establish Standing for Each Agency Action They Seek to Challenge .................................................................. 8

        2. Plaintiffs Fail to Allege a Sufficient Injury-In-Fact Because Their Alleged Injuries Are Too Generalized ........................................................ 12

        3. Plaintiffs Fail to Allege a Sufficient Injury-In-Fact Because Their Alleged Injuries Lack a Geographic Nexus ............................................... 14

        4. Plaintiffs' Alleged Injuries Are Not Fairly Traceable to the Agency Actions They Challenge ........................................................................... 16

    B. Count I Fails to Allege a Final Agency Action and Must Be Dismissed for That Reason As Well ........................................................................................... 21

        1. The Instruction Manual Does Not Mark the Consummation of DHS's Decision-Making Under NEPA .................................................... 21

        2. The Instruction Manual Does Not Bind DHS with the Force of Law ...... 23

    C. Count II Must Be Dismissed Because that Claim is a Non-Justiciable Programmatic Challenge ...................................................................................... 25

    D. Most of the Agency Actions Challenged in Count II are Barred by the Statute of Limitations ........................................................................................... 29

V. CONCLUSION ................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  937 F.3d 559 (D.C. Cir. 2019) ................................................................................... 9, 14

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ......................................................................................... 20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................................................... 5

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*,
  785 F.3d 710 (D.C. Cir. 2015) ....................................................................................... 23

*Attias v. Carefirst, Inc.*,
  865 F.3d 620 (D.C. Cir. 2017 ) ........................................................................................ 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................................................... 5

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 6, 21, 23

*Broadgate Inc. v. U.S. Citizenship & Immigration Servs.*,
  730 F. Supp. 2d 240 (D.D.C. 2010) ............................................................................... 23

*Citizens for Better Forestry v. U.S. Dept. of Agric.*,
  341 F.3d 961 (9th Cir. 2003) ......................................................................................... 14

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*,
  894 F.3d 1005 (9th Cir. 2018) ......................................................................................... 9

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2019) ....................................................................................... 13

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ...................................................................................................... 4, 8

*Darby v. Cisneros*,
  509 U.S. 137 (1993) ....................................................................................................... 22

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ......................................................................................................... 7

*Donelson v. U.S. Dep't of Interior*,
  730 F. App'x 597 (10th Cir. 2018) ................................................................................... 8

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ................................................................................. 4

*Fed'n for Am. Immigration Reform v. Reno*,
93 F.3d 897 (D.C. Cir. 1997) ................................................................................ 13

*Firestone v. Firestone*,
76 F.3d 1205 (D.C. Cir. 1996) ................................................................................ 5

*\*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) ........................................................................... 15, 19

*Harris v. FAA*,
353 F.3d 1006 (D.C. Cir. 2004) ............................................................................ 29

*Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*,
335 F.3d 607 (7th Cir. 2003) ........................................................................... 22, 23

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
475 F.3d 1291 (D.C. Cir. 2007) .............................................................................. 6

*Kimberlin v. U.S. Dep't of Justice*,
150 F. Supp. 2d 36 (D.D.C. 2001) ........................................................................... 5

*Lewis v. Casey*,
518 U.S. 343 (1996) ................................................................................................ 8

*\*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................... 4, 8, 9, 12, 13, 19

*\*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................... 6, 8, 15, 17, 25, 26, 27, 28, 29

*Macht v. Skinner*,
916 F.2d 13 (D.C. Cir. 1990) ................................................................................. 6

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) ............................................................................ 29

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983) ............................................................................................. 27

*Nat. Res. Def. Council, Inc. v. EPA*,
822 F.2d 104 (D.C. Cir. 1987) ............................................................................... 7

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
417 F.3d 1272 (D.C. Cir. 2005) .............................................................................. 4

*Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv.*,
34 F. Supp. 3d 50 (D.C. Cir. 2014) ...................................................................... 19

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ................................................................................. 6

*\*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................................................................... 21, 25

*RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.,
  614 F. Supp. 2d 39 (D.D.C. 2009) .................................................................... 23

Robertson v. Methow Valley Citizens Council,
  490 U.S. 332 (1989) .......................................................................................... 7

Schlesinger v. Reservists Comm. to Stop the War,
  418 U.S. 208 (1974) ........................................................................................ 12

Spokeo, Inc. v. Robins,
  136 S. Ct. 1540 (2016) ................................................................................. 8, 9

St. John's United Church of Christ v. FAA,
  520 F.3d 460 (D.C. Cir. 2008) ......................................................................... 9

Steel Co. v. Citizens for a Better Env't,
  523 U.S. 83 (1998) ........................................................................................ 4, 8

*Summers v. Earth Island Inst.,
  555 U.S. 488 (2009) ....................................................................... 9, 15, 16, 17

Taylor v. FDIC,
  132 F.3d 753 (D.C. Cir. 1997) ......................................................................... 5

Trudeau v. FTC,
  456 F.3d 178 (D.C. Cir. 2006) ....................................................................... 21

Wash. Env'tl Council v. Bellon,
  732 F.3d 1131 (9th Cir. 2013) ....................................................................... 17

Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen,
  No. 3:16-cv-2583-L-BLM, 2018 WL 4700494 (S.D. Cal. Sept. 30, 2018) ........ 2, 21, 24, 28, 30

Whitman v. Am. Trucking Ass'ns,
  531 U.S. 457 (2001) ........................................................................................ 22

**Statutes**

28 U.S.C. § 2401 ................................................................................................ 29

28 U.S.C. § 2401(a) ........................................................................................... 30

42 U.S.C. § 4332(C) ........................................................................................ 6, 7

5 U.S.C. § 551(13) .......................................................................................... 6, 25

5 U.S.C. § 702 ................................................................................................ 6, 25

5 U.S.C. § 704 ...................................................................................... 6, 8, 23, 25

5 U.S.C. § 706(2) ............................................................................................... 25

**Regulations**

40 C.F.R. § 1501.4 .............................................................................................................. 7

40 C.F.R. § 1507.3(b)(2) ..................................................................................................... 7

40 C.F.R. § 1508.4 .............................................................................................................. 7

40 C.F.R. § 1508.9 .............................................................................................................. 7

**Other Authorities**

33 CHARLES ALAN WRIGHT ET AL.,
  FEDERAL PRACTICE AND PROCEDURE § 8322 (2d ed. 2019) ..................................................... 27

46 Fed. Reg. 45,116 (Sept. 10, 1981) ..................................................................................... 29

56 Fed. Reg. 60,897 (Nov. 29, 1991) ...................................................................................... 30

67 Fed. Reg. 60,107 (Sept. 25, 2002) ..................................................................................... 30

76 Fed. Reg. 28,303 (May 17, 2011) ...................................................................................... 30

80 Fed. Reg. 23,680 (Apr. 29, 2015) ...................................................................................... 18

81 Fed. Reg. 13,039 (Mar. 11, 2016) ...................................................................................... 19

81 Fed. Reg. 60,581 (Sept. 2, 2016) ....................................................................................... 14

84 Fed. Reg. 888 (Jan. 31, 2019) ............................................................................................ 19

Defendants, U.S. Citizenship and Immigration Services and U.S. Department of Homeland Security (collectively, "Defendants" or "DHS"), hereby move pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure to dismiss the Complaints (ECF Nos. 1) in these consolidated cases with prejudice on the grounds that Plaintiffs lack standing and have failed to state a claim upon which relief can be granted. The grounds for this motion are more fully set forth below in the accompanying statement of points and authorities.

## I.      INTRODUCTION

The Center for Immigration Studies (the "Center"), "an independent, non-partisan, non-profit research organization" committed to research and policy analysis of the impacts of immigration on the United States,[1] filed lawsuits in this Court and in the District of Minnesota, now consolidated (ECF No. 12), asserting the same two claims under the Administrative Procedure Act (APA) and the National Environmental Policy Act (NEPA). Count I challenges an internal DHS "Instruction Manual" based on the government's alleged failure to "incorporate NEPA compliance . . . for those actions relating to the entry into and settlement of foreign nationals or to visa and citizenship policy." *See* MCIR Compl. ¶¶ 85-96; Huhn Compl. ¶¶ 72-83. Count II alleges that Defendants "are in continuing violation of" the APA and NEPA by failing to conduct an environmental review under NEPA for "programs" involving at least 80 visa and immigration-related actions dating back to the early 1980s. MCIR Compl. ¶¶ 97-99; Huhn Compl. ¶¶ 84-86.

Specifically, Plaintiffs list 80 different actions initiated by DHS or its predecessor agencies between 1981 and 2019, on which they base their NEPA challenge. MCIR Compl. ¶

---

[1] *See* "About the Center for Immigration Studies," https://cis.org/Center-For-Immigration-Studies-Background.

69; Huhn Compl. ¶ 57.  However, the APA does not provide a cause of action that allows Plaintiffs to lodge a programmatic challenge to agency programs in gross.  Plaintiffs' broad NEPA challenge involving 80 "visa related regulations" in Count II is also not reviewable under the APA because it does not target discrete final agency action.

This is not the first lawsuit brought by the Center seeking to use NEPA in the immigration context.  In 2016, the same organization brought a lawsuit in the Southern District of California on the same theme, including one claim identical to Count I and another claim substantially similar to Count II in this action.  *See generally Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen*, No. 3:16-cv-2583 (S.D. Cal. filed Oct. 17, 2016) ("Whitewater Draw").  In that case, the court dismissed both counts because the Instruction Manual is not a final agency action or a rule under the APA and Count II is a non-justiciable programmatic challenge.  *Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen*, No. 3:16-cv-2583-L-BLM, 2018 WL 4700494 (S.D. Cal. Sept. 30, 2018).  The court then granted the government's motion for summary judgment on Plaintiffs' remaining claims on standing grounds.  *Whitewater Draw Nat. Res. Conservation Dist. v. Nielsen*, No. 3:16-cv-2583-L-BLM, 2020 WL 2849943 (S.D. Cal. June 1, 2020).  Plaintiffs appealed, and that case is currently before the Ninth Circuit.  *See Whitewater Draw Nat. Res. Conservation Dist. v. Wolf*, No. 20-55777 (9th Cir. filed July 31, 2020).

This lawsuit has no more merit than *Whitewater Draw* did and should be dismissed for the same reasons.  First, both Counts I and II fail for lack of standing.  Plaintiffs fail to identify specific and particularized injuries to their interests that are traceable to any specific DHS action and instead seek to vindicate a generalized grievance with immigration policy that is more appropriately addressed through legislative channels than through this NEPA action.  Second,

2

Count I fails for the additional reason that the DHS Instruction Manual that Plaintiffs challenge is not a reviewable final agency action. Third, Count II fails because despite listing "at least 80 ongoing actions," it is a nonjusticiable programmatic challenge and fails to state a claim for which relief can be granted under the APA. Finally, even if Count II was a justiciable claim under the APA, 65 of the 80 actions listed are barred by the six-year statute of limitations.

## II.   BACKGROUND

Plaintiffs in the *MCIR* case are: the Massachusetts Coalition for Immigration Reform ("MCIR"), "a non-partisan, membership-based public interest group" comprised of members who believe "that record levels of mass immigration into the United States in recent years, both legal and illegal, have distinctly negative effects on our environment and quality of life, as well as on taxpayers and the wages of working Americans"; certain current and former officers of MCIR as well as individual members of the organization who reside in Massachusetts; and the Executive Director of Progressives for Immigration Reform, Kevin Lynn. MCIR Compl. ¶¶ 31-57. Plaintiffs in the *Huhn* case are three residents of Minnesota. Huhn Compl. ¶¶ 31-43.

Plaintiffs assert that DHS' policies and actions over four decades have allowed foreign nationals to enter and remain in the United States, leading to population growth, which in turn has led to a myriad of sweeping environmental harms, including urban sprawl, loss of wilderness, loss of biodiversity, and air and water pollution. *See, e.g.*, MCIR Compl. ¶¶ 1, 75-84; Huhn Compl. ¶¶ 1, 63-71. Plaintiffs allege that DHS failed to consider environmental impacts from "immigration-induced population growth" in at least 80 agency actions dating back to the early 1980s and aver the agency was required to conduct a NEPA analysis for each of those actions because "they have the potential to increase the population of the United States and thus impact the environment[.]" MCIR Compl. ¶¶ 11, 69; Huhn Compl. ¶¶ 11, 57.

In particular, Count I of the Complaint alleges that DHS failed "to incorporate NEPA compliance" into its "Instruction Manual 023-01-001-01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)" ("Instruction Manual"), an internal document that guides DHS personnel in complying with NEPA. *See* MCIR Compl. ¶¶ 85-96; Huhn Compl. ¶¶ 72-83. Count II alleges that DHS's "decision to proceed without initiating any NEPA compliance" for a vast array of "visa related regulations is contrary to NEPA, CEQ regulations, and . . . violat[es] the APA." MCIR Compl. ¶ 99; Huhn Compl. ¶ 86. Specifically, Plaintiffs list 80 different actions initiated by DHS or its predecessor agencies between 1981 and 2019, to which they object. MCIR Compl. ¶60; Huhn Compl. ¶ 57.

## III.   STANDARD OF REVIEW

### A.   Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

Before the Court can consider the merits of the consolidated cases, it must first determine whether Plaintiffs have properly invoked the Court's jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause."). One prerequisite to a court's exercise of subject matter jurisdiction is that a plaintiff has standing. *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1286 (D.C. Cir. 2005). Plaintiffs bear the burden of establishing each element of standing, and standing is determined on a claim-by-claim basis. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

On a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden of demonstrating subject matter jurisdiction. *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). Under Fed. R. Civ. P. 12(b)(6), by contrast, the moving party has the burden of demonstrating that a plaintiff has failed to state a claim for which relief may be granted.

*Kimberlin v. U.S. Dep't of Justice*, 150 F. Supp. 2d 36, 41 (D.D.C. 2001), *aff'd*, 318 F.3d 228 (D.C. Cir. 2003).  In either case, while the Court must accept all of the well-pleaded factual allegations in the complaint as true, and must give Plaintiffs the benefit of all inferences to be drawn from those allegations, it need not "assume the truth of legal conclusions [or] accept inference that are unsupported by the facts set out in the complaint."  *Attias v. Carefirst, Inc.*, 865 F.3d 620 (D.C. Cir. 2017 ) (citation and quotation omitted).

To survive a motion to dismiss under Rule 12(b)(6), however, the plaintiff is required to provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007)), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (omission in original).  Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  If "the [C]ourt finds that the plaintiff[ ] ha[s] failed to allege all the material elements of [his] cause of action," then the court may dismiss the complaint without prejudice, *Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997), or with prejudice, if the court "determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency," *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (internal quotation marks and citations omitted).

### B.    Judicial Review Under the Administrative Procedure Act

The APA provides for judicial review of challenges to a federal agency's compliance with NEPA.  *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007). The APA waives federal sovereign immunity to the extent that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "Agency action" . . . "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]"  5 U.S.C. § 551(13).

Jurisdiction under the APA is limited to review of "[a]gency action made reviewable by statute and final agency action for which there is no adequate remedy in a court . . . ."  5 U.S.C. § 704; *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).  For an agency action to be a "final agency action" reviewable under § 706(2), the action must both "mark the consummation of the agency's decisionmaking process," and "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).  To state a cognizable claim under § 706(2) of the APA, a plaintiff must identify a final agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Nevada v. Dep't of Energy*, 457 F.3d 78, 87-88 (D.C. Cir. 2006).

### C.    The National Environmental Policy Act

In enacting NEPA, Congress was concerned with the potential impacts of major federal actions significantly affecting the physical environment.  *See* 42 U.S.C. § 4332(C).  NEPA does not apply to every action involving a federal agency, however, but only where there is a proposal for "major Federal action."  *See Macht v. Skinner*, 916 F.2d 13, 16-17 (D.C. Cir. 1990),

*abrogated on other grounds by Karst Envtl. Educ. & Prot.*, 475 F.3d at 1296. NEPA imposes procedural rather than substantive requirements. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987).

NEPA requires federal agencies to prepare a detailed "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Where it is not clear whether a proposed major federal action requires preparation of an EIS, the agency may conduct a shorter preliminary examination, called an environmental assessment (EA). 40 C.F.R. §§ 1501.4, 1508.9. If the agency determines that the effects will not be significant, it issues a "finding of no significant impact" (FONSI) in lieu of preparing an EIS. *Id.* § 1508.13. Agencies may also comply with NEPA by identifying classes of actions, referred to as "categorical exclusions" ("CATEXs"), which normally "do not individually or cumulatively have a significant effect on the human environment" and are therefore excluded from the requirement of preparing an EA or an EIS. *Id.* §§ 1508.4, 1507.3(b)(2). An agency's compliance with NEPA is bounded by a "rule of reason" to "ensure[] that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (citation omitted).

## IV.   ARGUMENT

### A.   Plaintiffs Lack Standing Under Article III and the APA to Pursue Their Claims.

Count I of the Complaints challenges the DHS's Instruction Manual, alleging that the Manual arbitrarily and unlawfully fails to require NEPA compliance for DHS's immigration-related actions. Count II challenges "at least 80 ongoing actions"—most decades old—that

Plaintiffs allege violate NEPA.  Plaintiffs lack standing under Article III and the APA to bring both claims in their entirety.

### 1.   Plaintiffs Must Separately Establish Standing for Each Agency Action They Seek to Challenge.

The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (*quoting Defs. of Wildlife*, 504 U.S. at 560). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citations omitted).  "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998) (footnote and citation omitted).

Standing "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  A plaintiff instead must separately establish standing "for each claim he seeks to press." *DaimlerChrysler Corp.*, 547 U.S. at 352.  Because a claim brought under the APA must target discrete "final agency action," 5 U.S.C. § 704, "[e]ach specific final agency action should be treated as giving rise to an independent claim, and thus named plaintiffs must allege that each challenged action has caused some injury to them." *Donelson v. U.S. Dep't of Interior*, 730 F. App'x 597, 602 (10th Cir. 2018).  The APA independently obligates the plaintiff to "show that he has 'suffer[ed] legal wrong' *because of the challenged agency action*, or is 'adversely affected or aggrieved' *by that action*[.]" *Nat'l Wildlife Fed'n*, 497 U.S. at 883 (emphasis added) (quoting 5 U.S.C. § 702).

Although plaintiffs alleging a procedural violation of NEPA need not meet "all the normal standards for redressability and immediacy," *Defs. of Wildlife*, 504 U.S. at 572 n.7, they

must still show that the challenged decision affects their concrete interests.  The mere "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also See Spokeo, Inc.*, 136 S. Ct. at 1549 ("a bare procedural violation, divorced from any concrete harm," cannot satisfy the injury-in-fact requirement).  Further, plaintiffs have an obligation to tie their alleged injuries to the effects of the rule they challenge on the specific places they use, *i.e.*, establish a "geographic nexus."  *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 592 (D.C. Cir. 2019) (holding that to demonstrate standing plaintiffs must show the action they challenge will "imperil the members' particularized interests in a species or habitat with which its members share a geographic nexus." (internal citations and quotation marks omitted)).  In the *American Fuel* case, the D.C. Circuit found that plaintiffs had standing to challenge an EPA rule setting renewable fuel standards, *because* their declarants established the rule was likely to harm "the particular habitats of the whooping cranes and Gulf sturgeon in which [the declarants] have interests."  *Id.* at 593-94 (noting plaintiffs showed land conversions caused by the rule "near and within *the very areas* that [the declarant] visits to observe whooping cranes. . . .") (emphasis added).

Moreover, standing is "ordinarily substantially more difficult to establish," in cases such as this one, where the existence of one or more elements "depends on the unfettered choices made by independent actors not before the courts."  *Defs. of Wildlife*, 504 U.S. at 562.  In those circumstances, the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury."  *Id.*; *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018); *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008).

9

Here, Plaintiffs submitted standing declarations from Henry Barbaro, David Holzman, Steve Kropper, Mike Hanauer, and Kevin Kynn in the *MCIR* case and Linda Huhn, Rob Meyer, and Bruce Anderson in the *Huhn* case.  MCIR Compl. Exs. 1-5; Huhn Compl. Exs. 7-9.  Mr. Barbaro, Mr. Holzman, Mr. Kropper, and Mr. Hanauer are all members and in some cases officers of Plaintiff MCIR.  Mr. Barbaro lives in Newton, Massachusetts, and claims to have experienced "a multitude of negative impacts on his personal hobbies, enjoyment of the environment, and profession based on immigration-led population growth," including more snowmobiles and mountain bikes on trails he uses for exercise and the unavailability of certain species of local fish to catch.  MCIR Compl. ¶¶ 34-35.  Mr. Holzman, a freelance journalist, alleges "many of the beautiful places he has visited in the past have been changed by population growth," including in Arizona, California, and Utah.  *Id.* ¶ 38.  At home in Lexington, Massachusetts, Mr. Holzman claims population growth has increased traffic and noise and diminished his ability to view wildlife such as butterflies.  *Id.* ¶ 39.  Mr. Kropper, who also lives in Lexington, claims to have experienced the adverse impacts of immigration-led population growth in the form of the attendant effects of climate change, such as more Lyme-disease-carrying ticks.  *Id.* ¶ 41.  Mr. Kropper also attributes increased traffic, including longer commutes to Boston, and housing costs where he lives, to population growth, pointing out that 17 percent of the population of his neighborhood is foreign born.  *Id.* ¶¶ 42, 44.  Mr. Kropper credits immigration-led growth for an alleged decreased ability to view wildlife where he hikes.  *Id.* ¶ 43.  Mr. Hanauer lives in Massachusetts, and claims population growth has caused more development and a loss of open space for recreation and nature viewing.  *Id.* ¶ 48.  Mr. Hanauer credits population growth for the trampled trails, litter, trail wear, and crowding on trails and at campsites he has observed at state and national parks.  *Id.*  Mr. Hanauer claims population

growth—the "biggest single cause" of which is immigration—has meant roads and bike trails are more dangerous and less enjoyable for bicyclists like himself. *Id.* ¶¶ 49-50. Finally, Mr. Lynn, Executive Directive at Progressives for Immigration Reform (not a plaintiff), resides in Pennsylvania currently, but used to live in the Los Angeles area, which has been ruined recreationally and atheistically, he says, by traffic, smog, and development, all caused by population growth. *Id.* ¶¶ 51-54. In his current home state, Mr. Lynn claims he is under the threat of swelling growth because of the refugee program, which in his opinion has already caused more pollution and traffic and less open space to enjoy. *Id.* ¶ 56.

Ms. Huhn, Mr. Meyer, and Mr. Anderson are all Plaintiffs in the *Huhn* action who live in Minnesota and claim injuries due to population growth that they broadly attribute to immigration policy. Ms. Huhn, a photographer, claims that increased development and population growth where she lives has resulted in the decline of certain species of butterflies, birds, and native wildflowers that she enjoyed photographing. Huhn Compl. ¶ 32. Ms. Huhn attributes the population growth where she lives to immigration, and in particular, the refugee program. *Id.* Mr. Meyer alleges that development and forest fragmentation near his vacation cabin in northwest Wisconsin has diminished his enjoyment of the area. *Id.* ¶ 36. Mr. Meyer also asserts that "massive suburban development" fueled by population growth in Minneapolis-Saint Paul has resulted in more traffic and greater crowds along the beaches on the rivers where Mr. Meyer boats—rivers, which Mr. Meyer alleges have become more polluted. *Id.* ¶¶ 37-38. Mr. Meyer attributes all of these changes to immigration-driven population growth, and in particular to "the refugee programs that have settled so many people in the area he lives[.]" *Id.* ¶ 39. Mr. Anderson, a birdwatcher, alleges a "dramatic decline" in avian species that he used to be able to find easily, a change he attributes to urban sprawl and development caused by population

11

growth. *Id.* ¶ 42. Mr. Anderson also credits "motorized recreation on public lands" and the expansion of invasive plant species for his diminished enjoyment of nature. *Id.* ¶ 43. Mr. Anderson attributes these negative changes to population growth. *See id.*

The Complaints also refer to (or in the *Huhn* case, attach) three "expert reports" that Plaintiffs aver support their contentions that federal immigration policy has contributed to population growth and environmental harm. *See* MCIR Compl. n. 9; Huhn Compl. n. 9, Exs. 4-6. One of those experts, Jessica Vaughan, identifies the more than eighty actions enumerated in the Complaints that she "estimated have expanded the population of the United States." MCIR Compl. ¶ 69.

Plaintiffs' declarations alleging broad environmental and quality-of-life harms allegedly caused by population growth fall far short of establishing standing to challenge the Instruction Manual challenged in Count I or the "80 ongoing" immigration actions enumerated in the Count II of the Complaints.

### 2. Plaintiffs Fail to Allege a Sufficient Injury-In-Fact Because Their Alleged Injuries Are Too Generalized.

Plaintiffs' allegations that the federal government's immigration policies have contributed to environmentally damaging population growth over decades are too generalized to confer standing and Plaintiffs have not plead that the challenged actions threaten them "in a personal and individual way." *Defs. of Wildlife*, 504 U.S. at 560 n.1. The Supreme Court has made clear that "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974).

Plaintiffs allege that "most American population growth in the past several decades has been caused and continues to be caused by the entry and settlement of foreign nationals as a

result of DHS policy" and that "[t]his robust population growth causes significant impacts to the human environment for U.S. citizens." MCIR Compl. ¶ 1. The "impacts" Plaintiffs have plead are broad environmental harms such as urban sprawl, air and water pollution, loss of farmland, and loss of habitat and biodiversity, not the invasion of a legally protected interest that is concrete and particularized. *Id.* ¶¶ 75-84. Although the Plaintiffs or their members allege to have experienced impacts from population growth where they live (*see* discussion of Plaintiffs' declarations, above), these impacts—e.g., more traffic and noise, loss of open spaces, etc.—are archetypal generalized grievances that affect every other person in their communities or anywhere in the United States (or the world, for that matter) that has experienced population growth whatever the root causes.

Plaintiffs' complaints about population growth thus amount to a "generally available grievance about government—claiming only harm to [their] and every citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits [them] than it does the public at large[.]" *Defs. of Wildlife*, 504 U.S. at 573-74. The resolution of such grievances "is the function of Congress and the Chief Executive," not the courts. *Id.* at 576. In analogous circumstances, the D.C. Circuit has explained that alleged injury based on global climate change is "too generalized" to establish standing because climate change—like population growth—"is a harm that is shared by humanity at large." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2019); *see also Fed'n for Am. Immigration Reform v. Reno*, 93 F.3d 897, 901 (D.C. Cir. 1997) (noting that the "injury (if any) to a citizen qua citizen from admission of an alien is an injury common to the entire population, and for that reason seems particularly well-suited for redress in the political rather than the judicial sphere").

13

In sum, Plaintiffs fail to establish a concrete and particularized injury.

### 3.    Plaintiffs Fail to Allege a Sufficient Injury-In-Fact Because Their Alleged Injuries Lack a Geographic Nexus.

Plaintiffs also fail to allege a sufficient injury-in-fact, because their alleged injuries lack a geographic nexus to Plaintiffs. Plaintiffs tie their alleged injuries to "immigration-led" population growth. Plaintiffs fail to allege how the Instruction Manual itself—even if a final agency action challengeable under the APA—has had any effect on population, much less an effect on population that impacts the specific areas used and enjoyed by the Plaintiffs. With respect to the "80 ongoing actions" enumerated in paragraphs 57 (Huhn) and 69 (MCIR) of the Complaints, Plaintiffs have not plead that any one action or combination of actions is likely to meaningfully increase the population within the United States as a whole, much less any specific geographic area. Without sufficient allegations of a geographic nexus between their declarants and any area affected by the challenged actions, Plaintiffs lack standing. *See Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) (a plaintiff must show they "will suffer harm by virtue of their geographic proximity to and use of areas that will be affected").

While Plaintiffs allege population-based harms—such as increased traffic and increased crowding in particular natural areas—they fail to put forth sufficient allegations that, assuming the challenged actions do in fact induce population growth, that growth will occur where the Plaintiffs are *and* in a manner causing harm to their interests. *C.f. Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 593-94. Indeed, in many cases it is simply inconceivable that the challenged action would have any impact on Plaintiffs at all. For example, setting aside the fact that the notice setting a numerical limitation of CW-1 Workers in the Commonwealth of the Northern Mariana Islands for Fiscal Year 2017, 81 Fed. Reg. 60,581 (Sept. 2, 2016), no longer had any

14

actionable legal effect after the end of that fiscal year, it is also clear that such notice bears no relationship to the Plaintiffs in Minnesota and New England. Plaintiffs do not plead—likely because they cannot—that meaningful numbers of persons re-locating to the United States on either a permanent or temporary basis under any of the challenged actions will end up in the places used by the Plaintiffs. Rather than carry their burden of doing so, Plaintiffs apparently ask the Court to assume that any population growth anywhere in the country (or, presumably also in U.S. territories) will necessarily harm their interests. But this Court cannot assume that the areas used and enjoyed by a plaintiff will suffer all or any environmental consequences that the rule itself may cause. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667-68 (D.C. Cir. 1996); *see also Summers*, 555 U.S. at 496 (holding a court cannot assume a declarant's use of areas subject to a challenged regulation). Nor can standing be based on the statistical probability that one the challenged actions will induce population growth that will cause injury to one of Plaintiffs. *See Summers*, 555 U.S. at 498 (basing standing on the "statistical probability that some of [plaintiffs'] members are threatened with concrete injury . . . would make a mockery of our prior cases"); *see also Nat'l Wildlife Fed'n*, 497 U.S. at 889 (standing not established by allegation that one of plaintiff's members "uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action").

In their Complaints, Plaintiffs make vague claims that "the refugee program," "refugee programs," "Federal refugee relocation," or "refugee resettlement," has led to increased population growth in the specific geographic areas affecting Plaintiffs. *See* MCIR Compl. ¶ 56; Huhn Compl. ¶¶ 32, 39. These allegations are insufficient. First, the six specific agency actions Plaintiffs challenge that relate to refugee visas are all decades old and thus fall outside of the

15

limitations period.  *See* MCIR Compl. ¶ 69; Huhn Compl. ¶ 57; *infra* Part IV.D.  But even if that were not the case, Plaintiffs fail to plead sufficient facts showing that the number of refugees that have resettled in the areas affecting Plaintiffs have increased the population of those areas to a degree that would cause the harms they complain of—more traffic, more pollution, more crowds, etc.  In Minnesota where the *Huhn* Plaintiffs live, for example, approximately 111,000 refugees have arrived in the state between 1979 and 2019.[2]  This number accounts for less than 6 percent of the population growth over the same period.[3]  It is simply implausible that the resettlement of 111,000 refugees in a state the size of Minnesota over a fifty-year time period resulted in the extinction of the Karner Blue Butterfly Ms. Huhn used to photograph (Huhn Compl. ¶ 32) or increased Mr. Meyer's commute by thirty minutes (*id.* ¶ 37).

To be clear, Plaintiffs do not explicitly make such outlandish allegations.  The problem, however, is that they fail to clearly articulate the nexus between the broad environmental, aesthetic, and lifestyle harms they allege to be experiencing where they live and an action by the government.

### 4.  Plaintiffs' Alleged Injuries Are Not Fairly Traceable to the Agency Actions They Challenge.

Plaintiffs' asserted injuries from population growth are not fairly traceable to the Instruction Manual or to any of the 80 listed actions.  Article III requires a plaintiff to show that he or she has suffered a concrete and particularized injury that is "fairly traceable to the challenged action of the defendant."  *Summers*, 555 U.S. at 493.  That requirement "is a hard

---

[2] *See* Minnesota Department of Health, "Refugee Health Statistics – Cumulative Arrivals," https://www.health.state.mn.us/communities/rih/stats/index.html (last visited June 10, 2021).

[3] *See* U.S. Census, "Historical Population Change Data (1910-2020)," https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html (last visited June 10, 2021).

floor of Article III jurisdiction that cannot be removed by statute." *Id*. at 497.  The APA also requires the plaintiff to "show that he has 'suffer[ed] legal wrong' *because of* the challenged agency action, or is 'adversely affected or aggrieved' by that action[.]" *Nat'l Wildlife Fed'n*, 497 U.S. at 883 (quoting 5 U.S.C. § 702) (emphasis added).  Here that means Plaintiffs are required to plead sufficient facts that the challenged government action meaningfully contributes to the population growth that allegedly is *causing* the harm.  *See Wash. Env'tl Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013) (even under relaxed standing test that applies in procedural injury cases, plaintiffs would be required to show that the challenged action made a "meaningful contribution" to greenhouse gas emissions allegedly causing global warming).  Plaintiffs have not done so.

First, Plaintiffs fail to plead sufficient facts demonstrating that the Instruction Manual or any of the "80 ongoing actions" at issue—rather than a multitude of broader economic and geopolitical forces—is the cause of their injuries.  Taking MCIR Plaintiff member, Mr. Barbaro, as an example, Plaintiffs plead no facts to support that the increased presence of snowmobiles and mountain bikers on the recreation trails he uses are in any manner tied to immigration.  *See* MCIR Compl. ¶ 34.  Plaintiffs do not allege, for example, that the snowmobilers and mountain bikers on the trails Mr. Barbaro uses are immigrants that came to the United States under one of the challenged decisions.  Furthermore, whether to allow snowmobiles and mountain bikes on recreation trails is ultimately a land use decision made by whatever entity controls the land in question, not Defendants in this lawsuit.  Mr. Barbaro's—indeed all Plaintiffs'—other alleged injuries suffer from the same fundamental flaw.  Plaintiffs do not or cannot connect those injuries

17

to the specific government actions challenged in the Complaint.  Urban sprawl,[4] crowds,[5] loss of open space,[6] loss of habitat,[7] wildlife,[8] and biodiversity,[9] traffic,[10] noise,[11] etc., undoubtedly have many contributing causes.  While population growth may be one such cause (and while immigration may be one cause of such growth, among such other causes as reduced infant mortality, safer roads, or improved public health measures), Plaintiffs do not allege facts showing that the specific actions itemized in their Complaints meaningfully contributed to population growth, let alone to any one of the attendant harms.

In fact, the narrow scope of the specific actions Plaintiffs challenge would render such a meaningful contribution impossible.  As explained in the sections that follow, only a few of the eighty government actions Plaintiffs enumerate in the Complaints fall within the statute of limitations.  None of these actions directly authorizes additional permanent immigration to the United States.  And, due to their narrow scope, such actions could not conceivably lead to the broad environmental harms alleged by Plaintiffs.  In fact, many of the challenged actions do not even authorize the entry of a single additional person into the United States.  For example, the rule Adjustments to Limitations on Designated School Official Assignment and Study by F-2 and M-2 Nonimmigrants, 80 Fed. Reg. 23,680 (Apr. 29, 2015), simply grants school officials more flexibility in determining the number of designated school officials to nominate for the

---

[4] *E.g.*, MCIR Compl. ¶¶ 37, 39, 48, 52, 55, 77, 79; Huhn Compl. ¶¶ 32-33, 37, 41-43, 64, 66.

[5] *E.g.*, MCIR Compl. ¶¶ 34, 39, 42, 48; Huhn Compl. ¶¶ 37, 43.

[6] *E.g.*, MCIR Compl. ¶¶ 37-38, 42, 48, 55-56, 79-80; Huhn Compl. ¶¶ 34, 36, 66-67.

[7] *E.g.*, MCIR Compl. ¶¶ 77, 79-81; Huhn Compl. ¶¶ 32, 43, 64, 66.

[8] *E.g.*, MCIR Compl. ¶¶ 39, 43; Huhn Compl. ¶¶ 32, 42, 66.

[9] *E.g.*, MCIR Compl. ¶¶ 43, 77, 81; Huhn Compl. ¶¶ 32, 34, 64, 68.

[10] *E.g.*, MCIR Compl. ¶¶ 39, 44, 48, 53-54, 56; Huhn Compl. ¶¶ 37, 43.

[11] *E.g.*, MCIR Compl. ¶ 39; Huhn Compl. ¶ 43.

oversight of campuses and allows spouses and children that were already allowed to accompany the visa holder to engage in less than a full course of study at a qualifying school.  The rule Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students, 81 Fed. Reg. 13,039 (Mar. 11, 2016), allows certain nonimmigrant students holding F-1 visas to extend their time in the United States by an additional two years, or slightly longer in the event that a student will soon commence work under the H-1B program.  Finally, the rule Registration Requirement for Petitioners Seeking To File H-1B Petitions on Behalf of Cap-Subject Aliens, 84 Fed. Reg. 888 (Jan. 31, 2019), requires certain petitioners on behalf of H-1B beneficiaries to register electronically with the agency, but does not alter the number of individuals who may be granted entry to the United States.  To the extent any of the actions may increase the population of the United States ever so slightly, whether on a temporary or permanent basis, Plaintiffs fail to make any allegations connecting the specific government action to their alleged harms.

Third, Plaintiffs' alleged injuries flow from the voluntary actions of third parties and are therefore not fairly traceable to the government.  Standing cannot rest on speculation about the actions of independent third parties.  *See Defs. of Wildlife*, 504 U.S. at 560 (An "injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the Court.'" (citation omitted)).  "An action by a third party not before the court may cause injury for Article III standing [only] when that action is the result of a determinative or coercive effect upon that third party." *Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv.*, 34 F. Supp. 3d 50, 59 (D.C. Cir. 2014); *see also Florida Audubon* Soc'y, 94 F.3d at 669-70 (affirming dismissal of plaintiffs' NEPA claims for lack of standing to challenge expanded tax credit for ethanol-based gasoline additives under theory that

19

the credit would lead to increased agricultural pollution "because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury").

As the D.C. Circuit explained in rejecting a challenge to the 2012 DACA policy, the decisions of foreign nationals "to enter the United States unlawfully lack any legitimate causal connection" to DACA. *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (county sheriff lacked standing to challenge DACA where alleged injuries from individuals crossing the border and committing crimes were not fairly traceable to the policy). "Just as the law does not impose liability for unreasonable reliance on a promise, . . . it does not confer standing to complain of harms by third parties the plaintiff expects will act in unreasonable reliance on current governmental policies that concededly cannot benefit those third parties." *Id.*

Plaintiffs' alleged injuries—*e.g.*, development, pollution, traffic—are even more attenuated that those alleged in *Arpaio*. Even assuming Plaintiffs have plead sufficient facts that their injuries were caused at least in part by population growth, they have not plead that the population growth where they live was caused by the challenged government actions as opposed to the independent choices of third parties—including United States citizens—to locate in those geographic areas, or, in the case of visa holders, to extend their stay in the country in the precise locations affecting Plaintiffs. Plaintiffs thus fail to put forth sufficient allegations that their claimed injuries are "fairly traceable" to the challenged government actions.

In sum, Plaintiffs lack Article III and APA standing to challenge both the Instruction Manual (Count I), and the at least "80 ongoing actions" listed in the Complaints (Count II).

**B.** **Count I Fails to Allege a Final Agency Action and Must Be Dismissed for That Reason As Well.**

The Court should dismiss Count I on the grounds that the Department's Instruction Manual is not "final agency action" reviewable under the APA. NEPA claims are reviewable under the APA, which limits what federal agency activities can be challenged in federal court. *Trudeau v. FTC*, 456 F.3d 178, 185, 187 (D.C. Cir. 2006). Specifically, the APA limits judicial review to "final agency action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) (SUWA) (quoting 5 U.S.C. § 704). The Supreme Court has established a two-part test for determining whether agency action is final: the action must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. at 177-78 (internal quotation marks and citations omitted). The Instruction Manual does not satisfy either requirement.  Indeed, for those reasons, the Southern District of California dismissed an identical claim in the *Whitewater Draw* case. *Whitewater Draw*, 2018 WL 4700494 at *2-4. There is no reason for a different outcome here.

**1.** **The Instruction Manual Does Not Mark the Consummation of DHS's Decision-Making Under NEPA.**

To satisfy the first prong of the *Bennett* test, the challenged agency action must represent the consummation of the agency's decision-making process. *See* 520 U.S. at 177–78. Courts have examined several factors to ascertain whether an action marks the consummation of an agency's decision-making process and the Instruction Manual satisfies none of them. First, the action "must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 178. "Tentative" is an apt description of the Instruction Manual challenged here as the document is merely a guide to assist DHS personnel in applying NEPA to their work. The Instruction Manual establishes DHS's "policy and procedures" for complying with NEPA when the agency

21

makes decisions, Instruction Manual at III-1,[12] setting forth "a flexible framework for implementing NEPA" to "ensure the integration of environmental stewardship into DHS decision making as required by NEPA."  Directive 023-01 at 1.  Agency action that "establishes only the procedural framework under which the [agency] intends to operate" is not reviewable under the APA.  *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 619 (7th Cir. 2003).

Second, an action may mark the consummation of an agency's decision-making process if it constitutes the agency's "last word on the matter."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).  The Instruction Manual is not such a final statement of position.  Rather, the Instruction Manual sets out DHS's procedures for ensuring compliance with *preexisting* requirements of NEPA in the course of agency decision-making.  *See, e.g.*, Instruction Manual at V-1 to V-22 (explaining NEPA's statutory and regulatory requirements).  For any proposed action, regardless of subject matter, the Instruction Manual explains that DHS components must determine "the appropriate analytical approach, including whether NEPA applies."  *Id.* at V-1.

Third, a court may inquire whether an agency has "arrived at a definitive position on the issue that inflicts an actual, concrete injury[.]"  *Darby v. Cisneros*, 509 U.S. 137 (1993).  Agency decision-making under NEPA generally concludes with the issuance of a record of decision, a finding of no significant impact, or a determination that the proposed action falls under a categorical exclusion.  *See* Instruction Manual at V-1 to V-2.  The Instruction Manual itself is not a final decision under NEPA with respect to any DHS action.  Rather, the Instruction Manual is

---

[12] For the Court's convenience, copies of Directive 023-01 (Oct. 31, 2014) establishing DHS's policy for implementing the requirements of NEPA, and the Instruction Manual, which provide the procedures for implementing the Directive are attached to this memorandum.  *See* Exs. A-B. The Directive and Instruction Manual are also available online at the following web address: https://www.dhs.gov/publication/directive-023-01-rev-01-and-instruction-manual-023-01-001-01-rev-01-and-catex (last visited June 10, 2021).

reviewable (if at all) on review of a final decision made under the procedures set forth therein. *See* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action . . . not directly reviewable is subject to review on the review of the final agency action."). Plaintiffs fail to allege Defendants have issued any permit, implemented any project, or taken any other comparable action reflecting implementation of the Manual's procedures.

The Instruction Manual fails the first prong of the *Bennett* test for finality.

### 2.      The Instruction Manual Does Not Bind DHS with the Force of Law.

The Manual fails the second prong of the *Bennett* test because it does not determine any rights or obligations, and it has no legal consequences. *See* 520 U.S. at 177–78. A challenge to an agency action fails the second prong of the *Bennett* test if the challenged action "establishes only the procedural framework under which the [agency] intends to operate." *Home Builders Ass'n of Greater Chi.*, 335 F.3d at 619. Internal policy memoranda and guides for agency operations—that lack the force of law—do not generally constitute reviewable final agency actions. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015) (finding FAA notice on expanded use of passenger portable electronic devices does not constitute a final agency action, because it does not purport to amend any FAA regulation and "merely provides guidance to aviation safety inspectors who enforce FAA regulations"); *Broadgate Inc. v. U.S. Citizenship & Immigration Servs.*, 730 F. Supp. 2d 240, 247 (D.D.C. 2010) (holding internal guidelines used by USCIS in determining eligibility for H-1B visa program were not "final agency action"). *See also RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 44 (D.D.C. 2009) (holding that a USCIS policy was not final agency

23

action because it merely allowed adjudicators to take an action that determined rights and obligations, rather than requiring adjudicators to do so).[13]

Here, the Instruction Manual provides a narrative description of how the NEPA process works within DHS. Rather than a set of rules or precise directives, the Instruction Manual (i) generally describes how the NEPA process should be integrated with DHS's missions (Instruction Manual at IV-1), (ii) provides a narrative overview of NEPA's requirements *id.* at V-1), (iii) contains a nonexclusive list of examples of the kinds of actions that normally would require NEPA review *id.* at V-9, V-14), and (iv) explains that DHS components are responsible for determining the appropriate level of NEPA analysis for any action *id.* at IV-1).

Legal consequences do not flow from the Instruction Manual: The Manual does not make any final determination under NEPA with respect to any DHS action or exempt any action from NEPA review; it does not authorize (or prohibit) any third-party activity; and because it merely establishes a "flexible framework for implementing NEPA," Directive 023-01, it does not impose binding legal obligations on third parties or on DHS itself. DHS's Instruction Manual does not bind the agency with the force of law. As the district court in *Whitewater Draw* correctly held, to the extent the Instruction Manual references any substantive requirements at all, they are requirements imposed by NEPA and NEPA's implementing regulations, not new requirements created by the Manual. *Whitewater Draw*, 2018 WL 4700494, at *2-4 (dismissing identical claim for failure to meet first and second prongs of *Bennett*).

Because the Manual does not bind DHS with the force of law or have any other legal consequences, it fails the second prong of *Bennett's* test for finality as well as the first prong. The Court should dismiss Count I.

---

[13] Likewise, Plaintiffs here improperly challenge the Instruction Manual rather than a specific decision made by the agency under the Manual.

C.        **Count II Must Be Dismissed Because that Claim is a Non-Justiciable Programmatic Challenge.**

In Count II of the Complaint, Plaintiffs allege that DHS's "decision to proceed without initiating any NEPA compliance" for a vast array of "visa related regulations is contrary to NEPA, CEQ regulations, and . . . violat[es] the APA." MCIR Compl. ¶ 99; Huhn Compl. ¶ 86. Specifically, Plaintiffs list 80 different actions initiated by DHS or its predecessor agencies between 1981 and 2019, to which they object. MCIR Compl. ¶ 69; Huhn Compl. ¶ 57. Plaintiffs contend that these actions, which they classify into seven broad categories—"Refugee Visas," "Granting of Citizenship," "Non-Immigrant Visas," "Entrance without Visas," "Employment Immigrant Visas," "Family Immigrant Visas," and "Student and Exchange Visitor Program"— "have the potential to increase the population of the United States and thus impact the environment." MCIR Compl. ¶ 69; Huhn Compl. ¶ 57. However, the APA does not provide a cause of action that allows Plaintiffs to lodge a programmatic challenge to agency programs in gross. Plaintiffs' broad challenge to a list of 80 "visa related regulations" referenced in Count II is also not reviewable under the APA because it does not target discrete final agency action.

The APA provides a right of judicial review to a person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702; *see also id.* §§ 704, 706(2) . "Agency action" is a statutory term of art that is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear[.]" *SUWA*, 542 U.S. at 62 (citing 5 U.S.C. § 553(4), (6), (8), (10), (11)). Consequently, a person seeking judicial review under the APA must target some discrete "agency action" that "affects him in the specified fashion; it is judicial review 'thereof' to which he is entitled." *Nat'l Wildlife Fed'n*, 497 U.S. at 882 (quoting 5 U.S.C. § 702).

25

That requirement prohibits broad, programmatic attacks on agency policies or groups of separate actions. In *National Wildlife Federation*, for example, the plaintiff challenged what it identified as the "land withdrawal review program" of the Bureau of Land Management (BLM). This "program" consisted of a broad variety of BLM's land status determinations and other actions taken under the Federal Land Policy and Management Act. *Id.* at 877. The plaintiff alleged that BLM was carrying out this "program" in violation of that Act and NEPA, *id.* at 879, including by failing "to provide adequate environmental impact statements," *id.* at 891. Attached to the complaint was a list of allegedly unlawful actions that BLM had taken under the challenged "program." *Id.* at 879, 890.

The Court held that the "program" was not reviewable under the APA because it was "not an 'agency action' within the meaning of § 702, much less a 'final agency action' within the meaning of § 704." *Id.* at 890. As the Court explained, the "program" did "not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations[,]" and was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* at 890. The "flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction," *id.* at 892-93, the Court explained, because the APA authorizes courts to intervene "only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect," *id.* at 891 (citation omitted). NEPA does not "give citizens a general opportunity to air their policy objections to proposed federal actions. The political process, and not NEPA, provides the

26

appropriate forum in which to air policy disagreements." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983).

Although this "case-by-case approach" may be "understandably frustrating" to plaintiffs who are seeking "across-the-board" relief, "this is the traditional, and remains the normal, mode of operation of the courts." *Nat'l Wildlife Fed'n*, 497 U.S. at 894. Consequently, plaintiffs seeking "wholesale improvement" of agency programs must pursue such changes from the agency itself or "[in] the halls of Congress, where programmatic improvements are normally made." *Id.* at 891; *see also* 33 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 8322 (2d ed. 2019) ("The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.' Those wishing to obtain broad policy changes should instead seek them from agencies or Congress." (citation omitted)).

Here, Plaintiffs seek to bring precisely the same kind of improper programmatic attack that was held to be non-justiciable in *National Wildlife Federation*. DHS's ongoing administration of various visa and immigration programs is not an "agency action" within the meaning of § 702, nor "final agency action" within the meaning of § 704. *See Nat'l Wildlife Fed'n*, 497 U.S. at 890. And, despite Plaintiffs' claim that DHS's programs are causing population growth and environmental harm, the administration of the various groups of activities that Plaintiffs list cannot be "laid before the courts for wholesale correction." *Id.* at 892-93.

In *Whitewater Draw*, the district court dismissed Plaintiffs' programmatic claims. There, Plaintiffs sought judicial review under the APA of seven immigration statutes pertaining to employment based immigration, family based immigration, long-term nonimmigrant visas,

parole, Temporary Protected Status, refugees, asylum, and DACA, an immigration non-enforcement policy of the DHS. *Whitewater Draw*, 2018 WL 4700494 at *4. Plaintiffs proceeded "on the theory that the seven statutes and the non-enforcement policy are subject to judicial review because they are 'programs' requiring 'programmatic environmental analysis,'" under 40 C.F.R. § 1508.18(b)(3). *Id.* The Court rejected and dismissed the claims because it determined that "[p]laintiffs do not seek review of an 'agency action' because they seek review of entire operations which are 'continuing (and thus constantly changing).'" *Id.* at *5 (quoting *Lujan*, 497 U.S. at 890 & n.2).

Here, in Count II of the Complaint, Plaintiffs allege that DHS's "decision to proceed without initiating any NEPA compliance" for a vast array of "visa related regulations is contrary to NEPA, CEQ regulations, and . . . violat[es] the APA." MCIR Compl. ¶ 99; Huhn Compl. ¶ 86. Specifically, Plaintiffs refer to a list 80 different actions initiated by DHS or its predecessor agencies between 1981 and 2019, to which they object. *Id.* ¶ 57.

The fact that Plaintiffs have proffered a list of 80 discrete actions that DHS has taken since 1981 does not absolve Plaintiffs of compliance with the APA's requirements. As in *National Wildlife Federation*, Count II does not challenge any of the listed actions individually. Instead, it improperly seeks to challenge the entirety of the list in gross. Plaintiffs likewise seek broad, programmatic relief wholly untethered from the listed actions, including a declaratory judgment requiring procedures and guidance for the environmental analysis of USCIS's "visa and citizenship programs" and a broad injunction preventing DHS from promulgating new NEPA procedures that fail to address environmental impacts of USCIS "visa and citizenship policies." MCIR Compl. Prayer for Relief; Huhn Compl. Prayer for Relief. Yet, Plaintiffs' prayer for relief does not ask the Court to set aside a single one of the 80 listed actions, nor does

28

it refer to any of them at all.  Plaintiffs' failure to request relief from particular agency actions further underscores that Count II improperly challenges groups of ongoing "programs" and "policies" rather than any particular agency actions.  The APA requires that a claimant direct its attack "against some particular 'agency action' that causes him harm," *Nat'l Wildlife Fed'n*, 497 U.S. at 891, and Count II does not comply with that basic requirement.

Because Plaintiffs' challenge to DHS's ongoing implementation of groups of actions involving immigration is not reviewable under the APA, Count II should be dismissed.

**D.      Most of the Agency Actions Challenged in Count II are Barred by the Statute of Limitations.**

As noted above, Count II fails because it is a programmatic challenge, which the APA does not allow for.  And even if Plaintiffs were to bring challenges to one or more of the actions they list, the majority of the agency actions they list (65 of 80) are time-barred by the statute of limitations because they were promulgated more than six years prior to Plaintiffs filing the Complaint on November 24, 2020.

"Civil claims against the United States—including those brought pursuant to the APA— are subject to the statute of limitations contained in 28 U.S.C. § 2401, which allows for civil actions against the United States so long as 'the complaint is filed within six years after the right of action first accrues.'" *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (quoting *Harris v. FAA*, 353 F.3d 1006, 1009 (D.C. Cir. 2004)).  Here, 65 of the 80 actions that Plaintiffs list were published in the *Federal Register* prior to November 24, 2014, *i.e.*, more than six years prior to Plaintiffs bringing the instant lawsuits.  For example, Plaintiffs challenge a 1981 final rule by the INS amending regulations relating to refugee and asylum procedures.  MCIR Compl. ¶ 69; Huhn Compl. ¶ 57 (Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981)).  They challenge a 1991 rule by the INS implementing a provision of

29

the Immigration Act of 1990 by providing petition procedures for employment-based immigrants. *Id.* (Employment-Based Immigrants, 56 Fed. Reg. 60,897 (Nov. 29, 1991)). They also challenge a 2002 interim rule amending INS regulations governing review and certification of INS-approved schools and continuing implementation by which schools are approved to access the Student and Exchange Visitor Information System. *Id.* (Requiring Certification of all Service Approved Schools for Enrollment in SEVIS, 67 Fed. Reg. 60,107 (Sept. 25, 2002)). And they challenge a 2011 DHS final rule amending regulations to establish the location where petitions by certain persons may be filed, accepted, and processed. *Id.* (Requiring Residents Who Live Outside the United States To File Petitions According to Form Instructions, 76 Fed. Reg. 28,303 (May 17, 2011)).

Plaintiffs' challenges to each of these rules—promulgated over four decades—are time-barred by 28 U.S.C. § 2401(a). The same is true of all of Plaintiffs' challenges to each of the 65 rules promulgated prior to November 24, 2014. Plaintiffs offer no explanation as to why their challenge to those rules is timely. And they have asserted no reason why the statute of limitations does not foreclose their challenges. Nor could they.

In addition to being an improper programmatic challenge, to the extent Plaintiffs seek to challenge in Count II agency actions taken prior to November 24, 2014, those challenges are time-barred under the six-year statute of limitations.

## V.   CONCLUSION

For all of the foregoing reasons, the Court should grant Defendants' motion to dismiss the consolidated cases, *with prejudice*.[14] Plaintiffs lack standing to challenge U.S. immigration

---

[14] The district court in *Whitewater Draw* dismissed an identical challenge to the Instruction Manual and a programmatic challenge similar to Count II here *without leave to amend*, because "amendment of Claims I and II would be futile." *Whitewater Draw*, 2018 WL 4700494, at *5.

policy generally over several decades, the Department's Instruction Manual is not final agency action reviewable under the APA, Plaintiffs may not bring a programmatic challenge under the APA, and the statute of limitations has expired on all but a small number of the agency actions Plaintiffs list in that programmatic challenge.

Dated:  June 11, 2021                    JEAN E. WILLIAMS
                                         Acting Assistant Attorney General
                                         United States Department of Justice

                                         */s/ Erika Norman*
                                         ERIKA NORMAN (CA 268425)
                                         SEAN C. DUFFY (NY 4103131)
                                         Environment & Natural Resources Division
                                         Natural Resources Section
                                         150 M Street NE
                                         Washington, DC 20002
                                         Tel:  (202) 305-0475 (Norman)
                                         Fax:  (202) 305-0506
                                         E-mail:  Erika.norman@usdoj.gov
                                                  sean.c.duffy@usdoj.gov

                                         *Attorneys for Defendants*