## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MASSACHUSETTS COALITION FOR<br>IMMIGRATION REFORM,<br>111 Edinboro St.<br>Newton MA 02460;<br> KEVIN LYNN,<br>13 W. Chestnut St. No. 1<br>Lancaster, PA 11603;<br>LINDA HUHN,<br>2553 Dupont Ave. South<br>Minneapolis, MN 55405;<br> BRUCE ANDERSON,<br>9220 Grove Drive<br>Chisago City MN 55013;<br> ROB  MEYER,<br>1399 Clement St.<br>Mendota Heights, MN 5511;<br>STEVEN CHANCE SMITH,<br>6981 E Hwy 80<br>Portal AZ 85632;<br>GAIL  GETZWILLER,<br>P.O. Box 815<br>Sonoita, AZ 85637<br><br>     Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY,<br>3801 Nebraska Ave. NW<br>Washington, DC 20394;<br>U.S. DEPARTMENT OF  STATE,<br>2201 C St NW<br>Washington, DC 20522;<br>U.S. DEPARTMENT OF JUSTICE,<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br><br>     Defendants. | Civil Case No: 20-cv-3438- TNM<br><br><br>**AMENDED COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

# I.     __INTRODUCTION__

1.      In 1970, President Nixon signed the National Environmental Policy

Act ("NEPA") into law. The Nat'l. Env't. Policy Act of 1969, Pub. L. No. 91-190, 42

U.S.C. 4321-4347 (Jan. 1, 1970). Known widely as the "Magna Carta" of our

nation's environmental laws, NEPA espouses the ideals of public participation and

democracy by giving citizens a voice in government decision making.

2.      The era of the New Deal and later, the Great Society, created and

expanded a federal administrative state. Contemporaneously, Congress also

passed a series of laws to enable the federal judiciary to protect the public and

state and local governments from federal administrative overreach. The first of

these was the Administrative Procedure Act ("APA") Pub. L. No. 79–404, 60 Stat.

237, enacted June 11, 1946, followed by the Freedom of Information Act ("FOIA")

5 U.S.C. § 552, enacted in 1966. NEPA is the last in the series of these laws

designed to force transparency and accountability on the administrative state, and

included the most comprehensive public disclosure obligations.

3.      As interpreted over the next five decades, NEPA has become one of

the mechanisms through which the public can participate in federal decision-

making process in connection with those federal actions impacting the

environment.[1]  NEPA also expressly requires the federal government to "create

and maintain conditions under which man and nature can exist in productive

---

[1] Public participation under NEPA serves to improve the agency's process by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004).

harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331.

4.      The Congressional declaration of a need for a "national" policy was no accident. Support for a law like NEPA grew in part out of an increasing concern that the vastness of the federal administration can cause agencies to work at cross purposes with each other regarding actions that impact the environment.[2]

5.      Congress's embrace of NEPA, as well as of other major environmental statutes that soon followed[3] also grew out of a public consensus that environmental protections were needed given that the American population had grown substantially in the prior decades and that population growth can yield harmful environmental impacts. NEPA is explicitly concerned with the harmful impacts resulting from unending population growth. Indeed, "population growth" is the first concern addressed in NEPA's "Congressional declaration of national environmental policy." 42 U.S.C. § 4331(a). As referenced in the statutory notes, Congress specifically called for a study on population growth, which was passed as "An Act to establish a Commission on Population Growth and the American

---

[2] NEPA was the brainchild of Senator Henry "Scoop" Jackson, known for his support for conservation and wilderness. Jackson's own Interior Committee had witnessed a perfect example of the right hand not knowing what the left was doing in federal agencies in 1967 and 1968 regarding Florida's Everglades. On the one hand, the Interior Department and the National Park Service were seeking to acquire more land and protection for Everglades National Park. On the other, the Army Corps of Engineers and other federal agencies planned dams and canals that might drain the Everglades and the Department of Transportation proposed building a giant airport right next to them. Jim Kirshner, *NEPA, the National Environmental Policy Act*, HISTORY LINK (Aug. 27, 2011), https://www.historylink.org/File/9903.

[3] Major Congressional action following NEPA included the creation of the Environmental Protection Agency, the Endangered Species Act, the Clean Water Act, the Clean Air Act, as well as others.

Future." Pub. L. No. 91-213, § 2, 84 Stat. 67 (1970). This commission, chaired by

John D. Rockefeller III (the "Rockefeller Commission"), was established to

"conduct and sponsor such studies and research and make such recommendations

as might be necessary to provide information and education to all levels of

government in the United States, and to our people regarding a broad range of

problems associated with population growth and their implications for America's

future." *Id.*

6.    In its March 27, 1972 report, the Rockefeller Commission examined

population growth's effect on "Resources and the Environment." The Commission

studied both the implications of population growth in "local areas" as well as in

the "nation as a whole." Regarding domestic population growth, it concluded:

> 1) Population growth is one of the major factors affecting the demand for
> resources and the deterioration of the environment in the United States. The
> further we look into the future, the more important population becomes.
> 2) From an environmental and resource point of view, there are no advantages
> from further growth of population beyond the level to which our past rapid
> growth has already committed us. Indeed, we would be considerably better off
> over the next 30 to 50 years if there were a prompt reduction in our population
> growth rate. This is especially true with regard to problems of water,
> agricultural land, and outdoor recreation. 3) While the nation can, if it has to,
> find ways to solve the problems growth creates, we will not like some of the
> solutions we will have to adopt. With continued growth, we commit ourselves
> to a particular set of problems: more rapid depletion of domestic and
> international resources, greater pressures on the environment, greater
> dependence on continued rapid technological development to solve these
> problems, and a more contrived and regulated society. So long as population
> growth continues, these problems will grow and will slowly, but irreversibly,
> force changes in our way of life. And there are further risks: Increasing
> numbers press us to adopt new technologies before we know what we are
> doing. The more of us there are, the greater is the temptation to introduce
> solutions before their side effects are known. With slower population growth
> leading to a stabilized population, we gain time to devise solutions, resources to

4

implement them, and greater freedom of choice in deciding how we want to live in the future.[4]

7.      While media sensationalism of the period made a number of far more catastrophic (and ultimately untrue) population related predictions,[5] the Commission's report found not that Americans would be destroyed by population growth, but rather that Americans cannot live nearly as *freely* in a country with a larger and denser population:

> Imbedded in our traditions as to what constitutes the American way of life *is freedom from public regulation*—virtually free use of water; access to uncongested, unregulated roadways; freedom to do as we please with what we own; freedom from permits, licenses, fees, red tape, and bureaucrats; and freedom to fish, swim, and camp where and when we will. Clearly, we do not live this way now. Maybe we never did. But everything is relative. *The population of 2020 may look back with envy on what, from their vantage point, appears to be our relatively unfettered way of life.*[6]

8.      With 2020 now in hindsight, this prediction is indeed prescient. Regulations, red tape, permits, and fees seem to be an inescapable and growing part of everyday life. Just in the past fifty years, since the adoption of NEPA, the US population has grown substantially, from 203 million to over 330 million. Environmental regulation has commensurately increased, even as major environmental statutes are now only infrequently passed.[7]

---

[4] COMM'N ON POPULATION GROWTH AND THE AM. FUTURE, POPULATION AND THE AMERICAN FUTURE 42 (1972).

[5] For instance, in 1968, Paul Erlich published the book "The Population Bomb" and frequented the Tonight Show with a host of predictions of imminent mass doom that have not aged particularly well.

[6] COMM'N ON POPULATION GROWTH AND THE AM. FUTURE, *supra* note 4, at 51.

[7] In the 1970s, when Americans had a broad consensus regarding environmental problems such as clean water, clean air, and the protection of open space and biodiversity, there was support for bipartisan environmental laws. Today a lack of public consensus on issues, such as the impacts of carbon in American life, has led some presidential administrations to unilaterally use administrative agencies to impose policies in the name of environmental protection that were

9.     The Rockefeller Commission discussed both the causes of population growth and its effects. The Commission explained that fertility and immigration are the drivers of population growth in the modern day. Though the Commission noted that in prior times, such as the first decade of the twentieth century, "40 percent of the population growth" was "attributable to immigration," it chose to focus mostly on an analysis centering on birthrates for its projections into the future from the vantage point of March 1972.[8]  Notably, in early 1972, despite changes to the immigration system passed in 1965 that would result in significant changes many years later, immigrants had been declining as a share of the U.S. population for decades. Therefore, the Commission's emphasis on birthrates rather than immigration in the report is not surprising. Today, after decades of an ever-increasing immigrant share of the population, the need to recognize immigration as the source of U.S. population growth is obvious. Future projections of population reveal that immigration, not fertility, is the primary source of current and future population growth. According to the census's latest projections, at current rates, immigration is projected to be 95% of the population growth of the next forty years.[9]

---

never sanctioned by Congress. For instance, President Biden's Executive Order 13990 purports to have the authority to determine specific values for the "social costs" of greenhouse gases in virtually every regulatory program administered by the federal government and thus regulate vast areas of American life. Laws like NEPA and the APA provide some check upon the power of administrative agencies from simply imposing new, consequential actions that will have sweeping changes on American citizens without any public involvement whatsoever.

[8] *Id.* at 17.

[9] *See* Steven Camarota & Karen Zeigler, *Projecting the Impact of Immigration on the U.S. Population*, CTR. FOR IMMIGR. STUD. (Feb. 4, 2019), https://cis.org/Report/Projecting-Impact-Immigration-US-Population.

10.     The Congressional reference to the Rockefeller Report establishes that NEPA's original proponents did not consider that federal agencies policies directly accelerating population growth should be exempt from the new law mandating agencies to analyze, take public comment, and consider the environmental effects of their actions. NEPA itself does not expressly exempt immigration related decision making. Significantly, the publication of the Rockefeller Report, which specifically authorizes and implements a study of American population growth, proves that when NEPA was passed, the prospect of forecasting the effects of population was not deemed to be too difficult for government agencies to accomplish.

11.     NEPA was designed to promote informed decision-making, and informed decision-making in connection with the causes and environmental effects of population growth goes to the very heart of the Congressional concerns, purpose, and goals set forth in the Act. In the fifty years since NEPA's adoption, it has become obvious that environmentally informed decision-making regarding population growth is inextricably intertwined with immigration related activities.

12.     While NEPA does not apply to the private actions of citizens, it does impose a duty upon federal agencies to consider the environmental consequences of their own actions. Immigration is population growth implemented through federal policy. Immigration induced population growth does not primarily occur through the free choices of Americans, as fertility driven population growth does.

13.     If NEPA should apply to *any* government policy, it should be to federal policies that induce population growth. When the federal government makes the choice to create population growth through immigration,[10] it makes a decision yielding significant and foreseeable environmental consequences. Yet, despite NEPA's plain language, federal agencies continually make choices and take actions that directly increase the American population without conducting *any* NEPA review. This pattern has continued for decades, indeed, it has continued since NEPA was adopted.  When it comes to agency decision-making about immigration, American citizens are continually denied a seat at the table.

14.     The courts have held that NEPA applies when there is discretion attached to any agency action that widely impacts the environment. The Immigration and Nationality Act ("INA"), which establishes U.S. immigration law, delegates many areas of discretion to federal agencies.[11] The transition between the Trump and Biden administrations regarding immigration administration has been stark. The changes to immigration policies has already had a profound influence on the "human environment." No immigration laws were changed that

---

[10] Population growth through government policies encouraging their citizens to choose to have more children, is a far more complex matter. Government created incentives meant to change family planning decisions by citizens often miss the mark, but as long as large numbers of foreign nationals wish to emigrate, inducing population growth through immigration has the direct and reasonably predictable effect of increasing the size of the American population.

[11] Richard Boswell, a law professor specializing in immigration, characterizes the grant of discretion to agencies as follows: Congress "delegated broad, and arguably unchecked discretion to a myriad of government agencies to enforce the immigration statutes."  Immigration law, Professor Boswell asserts, is a "patchwork of promulgations" that represents a "tide-like shift between restrictiveness and openness towards immigrants." While "unchecked" discretion is an overstatement in many situations, the implementation of immigration programs is widely recognized as entailing a vast array of discretionary choices that affect immigration policy in a host of ways. RICHARD BOSWELL, ESSENTIALS OF IMMIGRATION LAW 1 (2d ed. 2009).

led to these actions which are yielding ongoing, vastly significant environmental effects— which means they qualify as actions subject to NEPA.

15.     There are three primary agencies that have implemented the most environmentally consequential immigration policy changes: the Department of Homeland Security ("DHS") and its component agencies, the Department of State ("DOS") and the Department of Justice ("DOJ"). DHS regulates the entry and settlement of foreign nationals into the United States through its authority to regulate, implement, and administer immigration law and policy. DOS regulates the entry and settlement of foreign nationals through its role in the provision of visas. DOJ administers the nation's immigration courts. To a substantial and increasing degree, most American population growth in the past several decades has been caused and continues to be caused by the entry and settlement of foreign nationals as a result of discretionary choices by these federal agencies.

16.     The current administration has adopted the overarching policy choice of inducing high levels of population transfer from other countries into the United States, as evidenced by its public statements and its actions. Defendants' actions precipitating and encouraging this large scale population transfer, the mass entrance and settlement of foreign nationals into the United States, has created and will continue to create significant environmental impacts. The settlement of foreign nationals in the United States increases the U.S. population. Their entry, when not via legal ports of entry, also results in significant environmental degradation in the southern borderlands, including the border of Arizona, where

Plaintiffs Steven Chance Smith and Gail Getzwiller live and work. NEPA recognizes that agencies must not make environmentally unenlightened decisions without any awareness of their consequences about major actions that may have significant environmental impacts. *See Kleppe v. Sierra Club*, 427 U.S. 390, 394 (1976). NEPA therefore mandates DHS, DOS, and DOJ to conduct environmental reviews of their immigration increasing actions prior to the commencement of such actions.

17.     The current presidential administration has ignored the myriad environmental consequences of its immigration actions by failing to conduct any NEPA review of the actions at issue. Ironically, on his first day in office, President Biden signed Executive Order 13990, "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis." 86 Fed. Reg. 7,037 (Jan. 20, 2021). This order stated that: "Our Nation has an abiding commitment to empower our workers and communities; promote and protect our public health and the environment." *Id.* In order to do so, it listed, among other things: "ensur[ing] access to clean air and water; ... "hold[ing] polluters accountable, including those who disproportionately harm communities of color and low-income communities; reduc[ing] greenhouse gas emissions; ... "prioritiz[ing] both environmental justice and the creation of the well-paying union jobs necessary to deliver on these goals." *Id.*

18.     Further, in Executive Order 14008 "Tackling the Climate Crisis at Home and Abroad," 86 Fed. Reg. 7619 (Jan. 27, 2021), President Biden declared a

goal of conserving at least 30% each of our lands and waters by the year 2030 in order to preserve biodiversity and safeguard our health and food supplies. Yet, as a NEPA analysis would reveal, immigration-driven population growth exacerbates the very problems the Biden administration's environmental order purports to remedy. Population growth induced effects include, but are not limited to: development that overtakes and degrades our lands and waters, lost wildlife habitat, increases in pollution, decreased access to clean air and water, and increased greenhouse gas emissions, the particular subject of the Executive Order. Environmental impacts from immigration also tend to most heavily affect communities of color and low income communities. The point is not to blame foreign nationals for being particularly prone to causing environmental degradation, but to recognize that all humans cause environmental impacts, and to begin to correct the federal government's delusion that foreign nationals cease having an ecological footprint the minute they cross the U.S. border.

19.    At the same time agencies such as the Department of Interior and the Environmental Protection Agency are calling upon American citizens to reduce their use of energy, resources, and land, the agencies that administer immigration policy are inviting more and more foreign nationals into America, without *any* NEPA analysis. This administration's planned population increases will only make its most important stated environmental goals harder to achieve. Furthermore, an increased population will force American citizens to make even more drastic changes to their lives to have any hope of meeting the environmental

goals that the Biden Administration envisions. As noted above, one of NEPA's primary purposes is to prevent our unelected executive agencies from making decisions that work at cross purposes when it comes to environmental protection. Ensuring a public voice in federal actions that result in such wholesale changes to the American way of life, natural resources, and communities is the quintessential reason Congress passed NEPA.

20.     NEPA mandates that federal agencies discuss these potential impacts with the public publicly and listen to their comments *before* the executive agencies implement the actions that will carry out that plan. NEPA's transparency requirements intend to prevent both the public from losing track of what the federal government is doing, and the federal government from losing track of how the public is reacting to their actions.

21.     Plaintiffs seek to compel DHS, DOS, and DOJ to comply with NEPA in connection with its actions that expand the entry into and settlement of myriad foreign nationals in the United States. Plaintiffs seek a declaration from this Court that Defendants are violating NEPA and an injunction to require Defendants to comply with the law. Further, Plaintiff asserts that, in the course of approving its agency actions implementing its programs regulating the entry into and settlement of foreign nationals in the United States, Defendants have continually violated their fundamental obligation to engage in well-reasoned, non-arbitrary decision-making under the Administrative Procedure Act, ("APA"). *See* 5 U.S.C. § 701 *et seq.*

22.     Plaintiffs hereby specifically challenge the implementation of nine recent actions taken by the Biden Administration to augment the American population (the "Biden Population" actions), and the implementation of DHS's final NEPA procedures which arbitrarily and capriciously created no framework to for DHS, DOS, and DOJ to comply with NEPA when implementing immigration related actions, including the Biden Population actions.

## II.     <u>JURISDICTION AND VENUE</u>

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2012), 5 U.S.C. § 706 (APA), and 28 U.S.C. § 1361 (mandamus).  Plaintiffs also seek declaratory and injunctive judgment and further relief pursuant to 28 U.S.C. § 2202.

24.     Venue in this judicial district is proper under 28 U.S.C. § 1391(e) because this is an action against an agency of the United States.

## III.     <u>PARTIES</u>

### A.     PLAINTIFFS

25.     Plaintiff Massachusetts Coalition for Immigration Reform ("MCIR") is a nonpartisan, membership-based public interest group.

26.     The members of the Massachusetts Coalition for Immigration Reform (MCIR) are citizens united by their belief that record levels of mass immigration into the United States in recent years, both legal and illegal, have distinctly negative effects on our environment and quality of life, as well as on taxpayers and the wages of working Americans. MCIR therefore takes a strong interest in

seeing implementation of NEPA live up to the statute's mandate that the federal government engage in environmentally informed decision-making. MCIR and its members, including, specifically, Henry Barbaro, Steve Kropper, David Holzman, and Mike Hanauer are being, and will continue to be, harmed by the failure of DHS and USCIS to comply with NEPA.

27.    Henry Barbaro is a co-chair of MCIR and lives in Newton, Massachusetts and has lived in the state for sixty-one years, his entire life. He is also a member of the New England Coalition for Sustainable Population and was a member of the Sierra Club and was on its Population Committee for the Boston area. Mr. Barbaro has devoted his entire adult life to environmental work; he graduated with a B.S. in Environmental Science from UMass Amherst and a Masters in Natural Resources Planning (with an emphasis on water chemistry) from the University of Vermont. He is a naturalist with an avocation watching and photographing wildlife, natural landscapes, and other open spaces. In his role as a career environmental scientist and community planner, Mr. Barbaro helps communities protect their water resources (e.g., drinking water aquifers, wetlands, rivers, streams, floodplains) and promote land use laws and ordinances (e.g., on-site sewage disposal, land use zoning, subdivision regulations) so as to protect neighborhood character and the natural resources of the communities. In his free time, he often participates in volunteer river clean-ups.

28.    Steve Kropper has served as co-chair of the Massachusetts Coalition for Immigration Reform (MCIR) for over a decade. He has lived in the Boston area

for a total of 50 years and was born in Needham, Massachusetts. He has an MBA from Cornell University and a BA from Boston University. Since 1979, his professional life has revolved around three sectors: cleantech; telecommunications and wireless communication, and big data. Professionally, he is currently an entrepreneur. Since 1972, he has been an active member of the Sierra Club, the Wilderness Society, the Appalachian Mountain Club, the Green Mountain Club, and other environmental organizations. More recently, he founded Windpole Ventures to provide specialized meteorology data to both wind farm developers and managers of the electrical grid to assist in renewable energy source integration. Politically, his politics are "progressive, supporting liberal causes and Democrat candidates since 1976." He believes that current levels of immigration, and resultant population footprint growth, are negatively affecting social justice and environmental justice.

29.     David Holzman is a member of MCIR and is a resident of Lexington, Massachusetts, which is 10 miles from downtown Boston. A freelance journalist by trade, he holds bachelor's degree in Zoology from UC Berkeley. Mr. Holzman is an environmental activist who has written about protection and stewardship of the environment for New York Times, the Washington Post, and the Boston Globe over the last twenty years. He used to be a member of Zero Population Growth and the Sierra Club but quit over their denial of U.S. overpopulation causes.

30.     Mike Hanauer is a member of MCIR and a longtime Massachusetts resident who has resided in Carlisle, Massachusetts for the past 19 years. He

graduated from college with a BS in electrical engineering, with additional training in psychology, computers, and systems engineering from the University of Massachusetts in Lowell; he then obtained an MS in Engineering Management from Northeastern University. An ardent environmentalist, he believes that "true sustainability should be a major goal of all environment organizations, and that population growth (led largely by immigration) in the overarching issue of the century." Mr. Hanauer has been a sustainability, climate change, and population activist for over twenty-five years. He has served as a climate action coordinator, has been co-chair of the New England Coalition for Sustainable Population and chair of Zero Population Growth of Greater Boston. He has also served as a Director on the National Board of Zero Population Growth (now Population Connection). He was inspired to this life of activism because of his love for nature; he continues this fight to combat the harms he experiences personally because of immigration-led population growth.

31.    Plaintiff Kevin Lynn is Executive Director at Progressives for Immigration Reform (PFIR), which exists to protect American workers from unemployment and wage suppression caused by unfair labor and trade practices. He is also a member of a few environmental organizations, such as Respect Farmland and Lancaster Against Pipelines. He is a long time progressive and Democrat, and his primary goal in forming PFIR was to have an open conversation about immigration within the left, especially on what are the

unintended consequences of immigration and more particularly on the environment and workers' rights.

32.     Plaintiff Linda Huhn is a citizen of Minnesota. She was born in Minnesota, and has lived in the state for 72 years, most of her life.  She now resides in Minneapolis. Ms. Huhn has been involved in environmental activism for decades. She has been a longtime member of Zero Population Growth, the Minnesota Public Interest Research Group (founded by activist Ralph Nader), and The Nature Conservancy. She also participates in volunteer work trips to rehabilitate state parks and wildlife habitats. A graduate of Mankato State College, she is a professional event and nature photographer.

33.     Plaintiff Rob Meyer has spent most of his career in Minnesota and has lived in the twin cities since 1980.  He majored in Economics at Augsburg College in Minnesota and received an MBA in Business Economics from the University of Washington. Throughout his life as an environmental activist, he has belonged to a variety of environmental organizations including the Center for Biological Diversity, Negative Population Growth, The Trust for Public Land, Northeastern Minnesotans for Wilderness, Friends of the Boundary Waters Wilderness, National Resources Defense Council, and the Minnesota Land Trust, and others.

34.     Plaintiff Bruce Anderson is a resident of Chisago City, Minnesota. When he was in high school, his parents purchased 120 acres of forest land and wetlands in north central Minnesota. It was exploring the natural landscapes and

wild places on this property that sparked his love of nature that launched his natural resources education and career. He graduated from North Dakota State University in 1977 with a degree in Range Management (Botany Department) with a minor in Wildlife Management. Following graduation, he began a long career with the U.S. Forest Service as a Range Management Specialist and Wildlife Biologist. He began as a range management specialist in the National Grasslands of SE North Dakota, and then continued in the Badlands of Western North Dakota, the Black Hills National Forest (NF) of South Dakota, the Custer NF in South Central Montana, Nez Perce NF in West Central Idaho and finally the Superior NF in Northeast Minnesota. After leaving the Forest Service, he was hired by the Minnesota Department of Natural Resources and had a four-year career as an Assistant Wildlife Manager in northern Minnesota.

35.    Plaintiff Chance Smith is a cattle rancher who manages an 87 square mile ranch on the border with Mexico about 33 miles east of the border town of Douglas, Arizona. He lives a few miles away from the ranch where he works. Mr. Smith is deeply connected to the land where he lives and works and the ranching way of life. His family lived in Wilcox, Arizona before he was born. They lived on a ranch on the border in the Chiricahua Mountains, was in his mother's family since the 1800's. Parts of the original land have changed hands over time but Mr. Smith's parents still own and live on a small 20 square mile ranch from the original land in Arizona. Mr. Smith grew up ranching, and it has always been his way of live, from the time he lived on his family's farm in Wilcox. After graduating

high school, he got a degree in animal husbandry, and then returned to racing,

first in New Mexico, and then Arizona where he currently works.

36.     Plaintiff Gail Getzwiller is a cattle ranch owner who owns and

manages two ranches, a 3000 acre ranch in Benzon, Arizona and a 70 acre ranch

in Sonoita, Arizona. She has lived in Arizona managing these ranches for 40

years. She loves the land in Arizona that she lives on and all of the borderland

surrounding her own ranches. She believes that ranchers are true

environmentalists—their very economic viability depends on the health of the

land they live on. In her belief, environmental activist and author Wendell Berry

said it best that the "care of the Earth is our most ancient and most worthy, and

after all, our most pleasing responsibility. To cherish what remains of it and to

foster its renewal is our only hope."

## B.     DEFENDANTS

37.     Defendant DHS is a federal agency established in 2003, pursuant to

the Homeland Security Act ("Act") passed on November 25, 2002. *See* Pub. L. No.

107–296, 116 Stat. 2135. Under the Homeland Security Act, most of the

immigration functions originally delegated to the Attorney General by the

Immigration and Nationality Act (INA) were transferred to the Secretary of

Homeland Security. Prior to the Homeland Security Act's passage, these

immigration functions were housed in a subdivision of the DOJ, the Immigration

and Naturalization Service ("INS"). The INS was then dissolved, and DHS is now

the principal of the five major departments of the executive branch of the federal government with a role in the immigration process.[12]

38.      Pursuant to this grant of authority, DHS is now the agency mandated to administer border security, immigration enforcement, naturalization, and establish and administer rules governing the granting of visas or other forms of permission to enter the country. *See* Pub. L. No. 107–296, 116 Stat. 2178, 2187. DHS now carries out the functions of the former INS, that is, the regulation of immigration into the U.S., through three sub-agencies, U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE"), and U.S. Citizenship and Immigration Services ("USCIS"), CBP and ICE took over the law enforcement functions of INS. USCIS took over the service and benefits functions of INS. CBP is responsible for inspecting both persons and goods arriving at the border and granting or denying entry to the United States. ICE is responsible for investigating and enforcing violations of the immigration laws within the United States. USCIS adjudicates benefits for immigrants and non-immigrants, such as granting and extending visas, green cards, and naturalization, and reviews appeals of visa decisions. ICE is responsible for enforcement of immigration laws and has the authority to enter into agreements with states and subdivisions of states and with local law enforcement. CBP prevents unauthorized entry of foreign nationals. USCIS reviews petitions for immigration, adjustment of status,

---

[12] The five major departments of the executive branch of the federal government involved in the immigration process are the Department of Homeland Security, the Department of State, the Department of Justice, the Department of Labor, and the Department of Health and Human Services.

and naturalization, as well as asylum and refugee applications, and is the main agency implementing visa related regulations.

39.     Defendant DOS is a federal agency. DOS issues visas to foreign nationals wishing to enter the U.S. overseas through U.S. consulates abroad. Consular officers screen visa applications and grant or deny visas.[13] DOS also issues opinions on refugee and asylum petitions and implements cultural and exchange programs.

40.     Defendant DOJ is a federal agency. After 2003, when most immigration functions were transferred to the Department of Homeland Security, the DOJ retained authority over the Executive Office of Immigration Review ("EOIR"). EOIR comprises the immigration courts and the Board of Immigration Appeals (BIA). Immigration judges preside over removal hearings in the immigration courts, and their rulings can be appealed to the BIA. The Homeland Security Act placed the EOIR directly under the control of the Attorney General.

41.     DHS, DOS, and DOJ control most immigration policy in the United States.  As federal agencies, all three, DHS, DOJ, and DOS are subject to NEPA and the APA. In accordance with NEPA, all three agencies have adopted NEPA regulations to guide their discretionary agency action decision making.

## IV.   LEGAL AND FACTUAL BACKGROUND

### A.     THE ADMINISTRATIVE PROCEDURE ACT

---

[13] Authority over visas is shared by DOS and DHS, because DOS issues the visas overseas (by a consular officer) and DHS promulgates rules governing the requirements for the visa. CBP also has the power to refuse admission at the U.S. border or port of entry.

42.     The APA provides for judicial review of federal agency actions. *See* 5 U.S.C. § 701 *et seq*. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (2012).

43.     A federal agency must examine the relevant data and articulate a satisfactory explanation for its action, including "a rational connection between the facts found and the choice made."[14] An agency must explain in an explicit and rational manner how its decision is based upon and complies with the relevant factors specified in the controlling statutory provision(s), together with applicable agency regulations.[15] A reviewing court may set aside, as arbitrary and capricious, agency factual findings and conclusions found to be unsupported by substantial record evidence. 5 U.S.C. § 706(2).

## B.     THE NATIONAL ENVIRONMENTAL POLICY ACT

44.     NEPA was the first major environmental law of the United States, and it has often been called the "Magna Carta" of the nation's environmental laws. NEPA expressly recognizes Congressional concern for "the profound influences of population growth" on "the natural environment[.]" 42 U.S.C. § 4331(a). Through NEPA, Congress directs, in relevant part, that the Federal Government shall:

> use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

---

[14] *Motor Vehicle Mfrs. Ass'n of the U.S. Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines* v. *United States*, 371 U.S. 156, 168 (1962)).
[15] *See id*. at 42-43.

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2)  assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3)  attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4)  preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible an environment which supports diversity and variety of individual choice;

(5)  *achieve a balance between population and resource use* which will permit high standards of living and a wide sharing of life's amenities . . . . 42 U.S.C. § 4331(b) (emphasis added).

45.     To accomplish its goals, NEPA requires each federal agency to

identify and consider the environmental impacts of its proposed federal actions.

*See generally* 42 U.S.C. § 4331. Each agency must also consider alternatives and

mitigating measures which could avoid or reduce such impacts before

implementing federal agency actions that may significantly affect the

environment. To these ends, NEPA establishes, in relevant part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall--

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impacts of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action, . . .

(v) any irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.

46.     NEPA is designed to inject environmental considerations early into a federal agency's decision-making process in order to "ensure that agencies consider environmental impacts in their planning and decisions." 40 C.F.R. § 1501.2(a). NEPA is also designed to engage the public through comment. NEPA promotes its sweeping commitment to environmental protection "by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *see* 40 C.F.R. § 1500.1(b); *see also* §§ 1503.1(a)(2)(v) (inviting comments and requesting information and analyses), 1506.6 (public involvement) (2020). Because public involvement is paramount in the NEPA process, each agency shall "[p]rovide public notice of NEPA-related hearings, public meetings, and other opportunities to comment, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." 40 C.F.R. § 1506.6(b). NEPA thus is, at the very least, an environmental disclosure and public participation tool.

47.     NEPA established the White House Council on Environmental Quality ("CEQ"), which issues regulations guiding agencies' compliance with NEPA. *See* 42 U.S.C. § 4341 *et seq.* (2012); 40 C.F.R. § 1500 (2020). CEQ regulations were first promulgated in 1978 and were substantially updated in 2020. In 1978, CEQ's regulations provided that each federal agency shall adopt procedures to ensure that its "decisions are made in accordance with [NEPA's] policies and procedures . . . ." 40 C.F.R. § 1505.1 (archived). The current

regulations originally set a deadline of September 15, 2021 for every federal agency to promulgate new NEPA procedures in accordance with the 2020 CEQ regulations. Recently, CEQ announced that it was extending this deadline by two years, until September 14, 2023, in order for CEQ to engage "in an ongoing and comprehensive review of the 2020 Rule for consistency with the nation's environmental, equity, and economic priorities; to evaluate the process CEQ used in developing the 2020 Rule; and to consider whether the 2020 Rule properly and lawfully interprets and implements NEPA." 86 Fed. Reg. 34,154 (June 29, 2021).

48.     These regulations define what constitutes agency action and set forth the process for determining whether an action or program significantly affects the quality of the human environment; "Major federal actions" are defined to include "new and continuing activities including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; [and] new or revised agency rules, regulations, plans, policies, or procedures . . . ." 40 C.F.R. § 1508.1 (q)(2) (2020).

49.     An agency must specifically ensure that its NEPA procedures provide for designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them. *Id.*

50.     Pursuant to 42 U.S.C. § 4332(C), each agency is required to prepare an "Environmental Impact Statement" ("EIS") for each "major federal action[] significantly affecting the quality of the human environment. . . ."

25

51.     CEQ regulations provide for the preparation of a document known as an Environmental Assessment ("EA") to enable an agency to determine whether a particular action may have a significant impact on the quality of the human environment and thus require preparation of an EIS. 40 C.F.R. § 1501.5 (2020).

52.     An EA or EIS must also discuss and analyze alternatives to a proposed program or project, including a "no-action" alternative, which may have less environmental impact than the proposed action, as well as mitigation measures in relation to potential environmental impacts. *See* 40 C.F.R. §§ 1502.14, 1502.16 (2020).

53.     CEQ regulations provide that "agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action." 40 C.F.R. § 1502.4(a). An adoption of a new agency program is an action for which an EIS may be prepared. *See* 40 C.F.R. § 1502.4(b) (2020). When preparing EISs on programmatic actions, agencies may evaluate if actions have "relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter." 40 C.F.R. § 1502.4(b)(ii) (2020).

54.     For those federal actions that are not categorically excluded and are, following completion of an EA, determined not to have "a significant impact on the human environment" and thus do not require preparation of an EIS, the agency issues a "finding of no significant impact" ("FONSI"). 40 C.F.R. § 1501.6 (2020).

55.    CEQ issued a handbook explaining the NEPA process in 2007 called "A Citizen's Guide to NEPA" which it updated in 2021 which includes a helpful visual of the NEPA process:[16]



---

[16] COUNCIL ON ENV'T QUALITY, A CITIZEN'S GUIDE TO NEPA 8 (2021).

C.      **THE NEPA PROCEDURES PROMULGATED BY IMMIGRATION AGENCIES**

56.      The complete absence of NEPA in DHS, DOJ, and DOS's immigration decision making dates back decades, to the agencies' respective initial adoption of these CEQ-mandated NEPA regulations.

1.      **DOJ's NEPA Regulations**

57.      The DOJ originally promulgated its NEPA regulations in January 1981. 46 Fed. Reg. 7,953 (Jan. 26, 1981), 28 C.F.R. § 61 (2021). The DOJ's NEPA regulations largely do not address immigration related actions, but they contained an Appendix specifically governing INS. *See id.* at app. C. These regulations include a brief description of INS itself:

> The INS administers and enforces the immigration and national[it]y laws. This includes determining the admissibility of persons seeking entry into the United States and adjudicating requests for benefits and privileges under the immigration and nationality laws. The enforcement actions of INS involve the prevention of illegal entry of persons into the United States and the investigation and apprehension of aliens already in the country who because of inadmissibility at entry or misconduct committed following entry may be subject to deportation. In carrying out its statutory enforcement responsibilities[,] the INS is authorized to arrest and detain aliens believed to be deportable and to effectuate removal from the U.S. of aliens found deportable after hearing. *Id*.

58.      With respect to INS, the DOJ's NEPA regulations specifically applied to "efforts associated with the leasing, purchase, design, construction, and maintenance of new and existing INS facilities." *Id*. Thus, in 1981, the DOJ, then the federal agency primarily responsible for implementing the immigration process in the U.S., acknowledged that its mission included managing the entrance and permanent residence of foreign nationals. Yet its NEPA regulations

simply did not contemplate whether its decisions in furtherance of that mission would have environmental impacts. Indeed, the NEPA regulations only address the issue of those occasions when INS physical facilities require construction or expansion-- such as when a larger number of foreign nationals need to be detained than existing facilities could hold. Appendix C therefore reveals a basic misunderstanding on DOJ's part of the purpose of NEPA. It is not a mandate to conduct environmental review before constructing, expanding, leasing, designing, or purchasing a new physical structure. It is, rather, a mandate for environmentally enlightened decision-making.

59.     These DOJ NEPA regulations do, however, demonstrate that INS did not consider its entire immigration mission to be somehow categorically excluded from NEPA compliance. An agency that reviews one of its actions, and determines that action fits a specified categorical exclusion has indeed conducted NEPA review, albeit the lowest level of environmental review. If this was the DOJ's stance, that immigration actions were categorically excluded from review, it could have created a categorical exclusion for immigration related actions. Rather, the DOJ operated as though immigration-related actions were exempt from NEPA compliance by the NEPA statute itself. In the decades after the DOJ promulgated these NEPA regulations, DOJ never cited NEPA at all in the myriad regulations, policies, and other actions DOJ promulgated and undertook to both create and update large-scale immigration programs.

29

60.    While DOJ no longer performs most of its prior immigration functions, it retains those of the Executive Office of Immigration Review (EOIR). There is still no mention of the immigration courts nor the Board of Immigration Appeals in DOJ's NEPA procedures. Clearly, at no point has the DOJ conducted any scoping to determine whether or not EOIR's mandate could possibly have environmental impacts, including when the Homeland Security Act reorganized the structure of immigration processes in the United States and placed the EOIR directly under the control of the Attorney General.

### 2.    DOS's NEPA Regulations

61.    DOS promulgated its NEPA regulations in 1980. 45 Fed. Reg. 59,553 (Sept. 10, 1980) (to be codified at 22 C.F.R. pt. 161). DOS's NEPA regulations set up no framework for analyzing the potential environmental impacts resulting from the entrance of foreign nationals through its issuance of visas. DOS simply did not and does not contemplate whether its regulations or policies governing its visa programs might result in a difference of many millions of foreign nationals entering the United States, much less what environmental impacts would result from those admissions. DOS's NEPA regulations at least appear to set up a categorical exclusion for the provision of visas themselves from the application of NEPA review.

62.    Section 161.7(b)(2) of the NEPA regulations defines the following as one of its categorical exclusions: "Provision of consular services–visas, passports and citizenship, and special consular services, such as issuing or reviewing

30

passports and visas, taking legal depositions, notarizing absentee ballots and other documents and delivering retirement checks, social security payments and veterans benefits." The underlying logic of the categorical exclusion appears to assume that the issuance of a visa to a foreign national allowing that individual to enter, and possibly settle into the United States, is no different from mere paperwork undertaken to provide services to citizens abroad. This assumption is disconnected from the reality that, en masse, the issuance of visas means more than paperwork: it significantly drives population growth, even when visas granted are intended to be temporary.[17] DOS does not cite any administrative evidence for this categorical exclusion. Strangely enough, however, while the DOS has never put any of its major decisions regarding visas through any sort of NEPA review, it also has never specifically cited this categorical exclusion as an explanation, or cited it at all. Historically, DOS has simply failed to mention NEPA altogether rather than make use of this categorical exclusion.

### 3.   DHS's NEPA Procedures

63.    In 2002, the creation of the DHS offered a chance to rectify the mistake that the INS had made in failing to properly apply NEPA to its administration of the entry and settlement of foreign nationals in the United States. The creation of DHS included a massive reorganization of the agencies in charge of immigration processes in the U.S.—presumably because Congress felt

---

[17] How many foreign nationals remain in the country on a long-term basis is unclear, but it is potentially a large source of population growth. In 2019, DHS released a report showing that 676,422 visa holders overstayed their visa in FY 2019. U.S. DEPT. OF HOMELAND SEC., FISCAL YEAR 2019 ENTRY/EXIT OVERSTAY REPORT 13 (2020).

the current structure was not meeting the needs of Americans. For instance, under the INS, the enforcement functions of what would become ICE and CBP were housed in the same sub agency as the naturalization functions of what would become USCIS. This reorganization included a years-long initial process that promulgated new NEPA procedures. However, during its promulgation of new NEPA procedures, DHS did not take the opportunity to evaluate whether any lessons could be learned regarding the environmental effects of immigration, a significant part of its mandate, over the years since 1981. According to DHS's administrative record, its development of its categorical exclusions included at least one "legal" or "environmental" professional from INS.[18] DHS has never made public, however, what this expert contributed, and there is no record support that it included reasoned analysis regarding the potential environmental effects of immigration policies, including whether immigration related activities are lawfully exempt from NEPA or subject to a categorical exclusion..

64.    DHS's procedures were finalized in 2014 with the issuance of DHS Directive 02301, Implementation of the National Environmental Policy Act ("Directive"), and Instruction Manual 023-01-001-01 ("Instruction Manual"), Notice of the Final Directive and Instruction Manual was published in the *Federal Register* on November 26, 2014 and became effective on March 26, 2015. 79 Fed. Reg. at 70,538. Together, the Directive and the Instruction Manual, which went through public notice and comment, and established legally consequential

---

[18] U.S. DEPT. OF HOMELAND SEC., ADMINISTRATIVE RECORD FOR CATEGORICAL EXCLUSIONS (2006).

procedures, constituted final agency action under the Administrative Procedures Act. According to DHS itself:

> Together, the Directive and Instruction apply to all of the Components of DHS and help ensure the integration of environmental considerations into DHS decision making as required by NEPA. The Instruction serves as the DHS implementing procedures for NEPA (as required by 40 CFR 1505.1 and 1507.3) and includes the Department's list of Categorical Exclusions, found in Appendix A, Table 1.[19]

65.     DHS chose not to follow the DOJ's example by publishing its procedures in the Code of Federal Regulations. Functionally, however, DHS's NEPA procedures operate and bind DHS in the same manner as DOS's, and DOJ's, and any others that have been published in the Code of Federal Regulations.

66.     The Instruction Manual continued to perpetuate the INS blindspot regarding the myriad environmental consequences of its actions concerning the entry into and settlement of mass numbers of people into the United States. The administrative record suggests that the only influence that the INS NEPA expert had on the new procedures was in the formation of one categorical exclusion:

> D1     Minor renovations and additions to buildings, roads, airfields, grounds, equipment, and other facilities that do not result in a change in the functional use of the real property (e.g. realigning interior spaces of an existing building, adding a small storage shed to an existing building, retrofitting for energy conservation, or installing a small antenna on an already existing antenna tower that does not cause the total height to exceed 200 feet and where the FCC would not require an environmental assessment or environmental impact statement for the installation).

---

[19] *Administrative Revisions to DHS Instruction 023-01-001-01 Rev 01 - DHS Categorical Exclusions under the National Environmental Policy Act*, U.S. DEPT. OF HOMELAND SEC. (last visited Aug. 30, 2021), https://www.dhs.gov/administrative-revisions-dhs-instruction-023-01-001-01-rev-01.

67.     This categorical exclusion, which is unrelated to immigration altogether, comes in part from the "legacy categorical exclusion" of INS:

> Reference: 28CFR61 Appendix C: 10. Actions Which Normally Do Not Require Either an Environmental Impact Statement or an Environmental Assessment: (a) Construction projects for existing facilities including but not limited to: Remodeling; replacement of building systems and components; maintenance and operations repairs and general improvements when such projects do not significantly alter the initial occupancy and program of the facility or significantly impact upon the environment.

68.     The administrative record of the DHS NEPA procedures, therefore, shows that despite having one or more environmental experts from INS, DHS applied only extremely narrow consideration of the potential environmental impacts of the three new sub agencies that would take over its functions. DHS only considered the potential environmental consequences of ICE and CBP for construction related actions—even though that is only a small part of those agencies' missions. Furthermore, DHS never considered the potential environmental effects of the entire mandate of USCIS at all. None of the categorical exclusions on DHS's list adopted in Appendix A of the Instruction Manual relate in any way to USCIS's mandate of visa and citizenship related activities.[20] Nor does DHS consider whether positive actions taken that hamper ICE and CBP's ability to prevent illegal aliens from crossing and staying in the United States, have the potential to impact the environment. The administrative

---

[20] *See* U.S. DEPT. OF HOMELAND SEC., INSTRUCTION MANUAL 023-01-001-01, REVISION 01, IMPLEMENTATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) A-1 to A-30 (2014).

record of DHS's Categorical Exclusions show these impacts were not

contemplated.[21]

69.     In promulgating new NEPA procedures to replace the INS NEPA

procedures, DHS acted in an arbitrary and capricious manner by failing to

consider whether the INS's programs and actions had in fact resulted in any

individual or cumulative impacts in the decades after the adoption of NEPA. To

investigate such a question required no speculation or forecasting-- such effects

had already happened. DHS clearly failed to consider the question of whether

INS's NEPA review process was based on reason and fact.

70.     DHS's Instruction Manual, as finally promulgated, failed to adopt

any instructions to agency personnel, as to how to either conduct an

environmental impact statement or an environmental assessment for immigration

related actions environmental analysis, or as to what categorical exclusion might

apply when it considers the adoption of an immigration related action.

71.     Therefore, a visual representation of the NEPA process in the

immigration context, as adapted from that of the general NEPA process in a

Citizens' Guide to NEPA, looks like this:



---

[21] *See* U.S. Dept. of Homeland Sec., Synopsis of Administrative Record to Support Proposed New
Categorical Exclusions Under the National Environmental Policy Act (2014).

72.     The absolute silence of the DHS NEPA procedures in connection with the administration of immigration policies appears to stem from DHS's belief that the scope of NEPA itself pertains only to those instances when an agency builds a physical structure. But the scope of NEPA is not that narrow. The purpose of NEPA is not to ensure some level of environmental review occurs only when an agency may be involved in the purchase or construction of a physical structure. Rather, the core purpose of NEPA is to ensure that, before a federal agency undertakes a federal action, its decision-makers consider the range of potential environmental impacts the action may have on the "human environment[.]" 42 U.S.C. § 4332(1)(C) (2020).

73.     The administrative record of DHS's Instruction Manual demonstrates the agency never even contemplated the question of whether NEPA applies to immigration related actions before the Manual was finally promulgated. However, due to efforts by the public through the APA notice and comment process, and challenging the issue in federal courts, upon information and belief, DHS did engage in a series of inconsistent and irrational post hoc justifications under the radar. These justifications are to be found in the NEPA sections of final and proposed immigration regulations.[22]

74.     Before the 2014 procedures, DHS (and INS before DHS replaced it), failed to mention NEPA entirely when promulgating immigration related

---

[22] *See e.g.* 80 Fed. Reg. 23680 (Apr. 29, 2015); 81 Fed. Reg. 13039 (Mar. 11, 2016); 81 Fed. Reg. 82398 (Nov. 18, 2016); 82 Fed. Reg. 5238 (Jan. 17, 2017). In these regulations, DHS determined that the actions were categorically excluded.

regulations. Starting in 2015, following public comments, DHS invoked the

application of categorical exclusions in promulgating immigration regulations. It

specifically relied on Instruction Manual Categorical Exclusion A3, parts (a) and

(d):

> Promulgation of rules, issuance of rulings or interpretations, and the
> development and publication of policies, orders, directives, notices,
> procedures, manuals, advisory circulars, and other guidance documents"
> that are either: a) "Those of a strictly administrative or procedural nature;"
> or d): "Those that interpret or amend an existing regulation without
> changing its environmental effect.[23]

75.     Upon information and belief, categorical exclusion A(3), both parts (a)

and (d), was not developed with any consideration of the impacts resulting from

DHS's actions relating to  immigration, and accordingly, the application of these

particular categorical exclusions is self-evidently the result of DHS officials sifting

through DHS's list of categorical exclusions and picking two that are broad

enough to cover any kind of action.

76.     The Instruction Manual does not define what "administrative or

procedural" means. It might refer to regulations that make no substantive change

in enforcement of the regulation at issue. However, the immigration actions that

result in the admission of foreign nationals into the United States are substantive,

and result in individual and cumulative impacts. "Administrative" could also

technically mean "anything an agency does at all"—but such a categorical

exclusion would entirely cancel NEPA. Meanwhile, categorical exclusion A3 (d),

---

[23] *See* U.S. DEPT. OF HOMELAND SEC., INSTRUCTION MANUAL 023-01-001-01, REVISION 01,
IMPLEMENTATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT (NEPA) A-1 to A-2 (2014).

which provides in relevant part: "Those that interpret or amend an existing regulation without changing its environmental effect" appears to be fundamentally tautological. Analysis at some level is required to determine whether a change to a regulation changes its environmental effect, particularly, if the regulation changes a program that itself never initially went through any NEPA analysis.

77.     As of January 2017, DHS still cited these categorical exclusions. But it rightly did not try to go so far as to claim an exemption from NEPA for immigration related actions. DHS stated: "DHS agrees that NEPA applies to this, as to every, final rule-making." 82 Fed. Reg. 5238, 5271 (Jan. 17, 2017).

78.     After a few years, DHS went further than simply citing two categorical exclusions which were unrelated to immigration as its basis for failing to conduct any NEPA review. In January 2019, DHS claimed in response to public comment on a proposed rule regarding immigration that NEPA did not apply to the rule at all. DHS stated that it had "analyzed this action and has concluded that NEPA does not apply due to the excessively speculative nature of any effort to conduct an impact analysis." 84 Fed. Reg. 888, 952 (Jan. 31, 2019).[24]

79.      In a recent joint proposed rule by DHS and EOIR, "Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers," DHS and DOJ explicitly claimed

---

[24] This regulation made some changes to the rules that must be followed for petitioners filing H-1B petitions on behalf of aliens subject to the H-1B cap.

that NEPA does not apply to immigration in general.[25] The rule proposes to change asylum policy such that it is probable that more foreign nationals will be admitted to the country.[26] That is, the proposed rule admits its potential to increase the settled foreign born population of the United States-- possibly by a very large number ultimately, though DHS/DOJ admit they have not attempted to calculate any numbers. There is no inherent limit in the numbers of foreign nationals that could be admitted pursuant to this rule change. Regarding whether NEPA applies, the proposed rule states: "Generally, the Departments believe NEPA does not apply to a rule intended to change a discrete aspect of an immigration program because any attempt to analyze its potential impacts would be largely, if not completely, speculative." *Id.*

80.      The Departments' claim to an exemption from NEPA for immigration programs is contrary to both NEPA and NEPA precedent. As soon as NEPA passed Congress, agencies attempted to avoid applying it by claiming that conducting NEPA analysis would be too speculative, but such mere assertions proved unavailing:

> The agency need not foresee the unforeseeable, but by the same token neither can it avoid drafting an impact statement simply because describing the environmental effects of and alternatives to particular agency action involves some degree of forecasting. And one of the functions of a NEPA

---

[25] 86 Fed. Reg. 46906, 46939 (Aug. 20, 2021).

[26] The rule explicitly states that "The proposed rule could result in an increase in the number of noncitizens in expedited removal paroled out of custody." *Id.*  Given that the administration plans to expand asylum eligibility by broadening what constitutes a "particular social group," it is reasonable to believe that a large number of foreign nationals will be granted the right to stay. Once admitted, asylees have a five-year pathway to citizenship under the law. *See* Andrew R. Arthur, *Is Biden's Plan a Five-Year Path to Citizenship for Every Illegal Migrant?*, CTR. FOR IMMIGR. STUD. (Aug. 31, 2021), https://cis.org/Arthur/Bidens-Plan-FiveYear-Path-Citizenship-Every-Illegal-Migrant.

statement is to indicate the extent to which environmental effects are essentially unknown. It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known. Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry." *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C. Cir. 1973).

81.     Furthermore, as is not surprising for a statute that explicitly mentioned population growth as its first area of concern, courts very early on that population growth inducing effects must be analyzed under NEPA. Courts have called it "plain common sense" that the number of people in an area has a significant effect on the environment, through factors such as urbanization, infrastructure development, pollution, and stress on natural resources. *See City of Davis v. Coleman*, 521 F. 2d 661, 675 (9th Cir. 1975).

82.     Furthermore, immigration is just about the least speculative cause of growth-inducing impacts that the federal government does-- immigration by its very nature *is* the act of augmenting the population. DHS and DOJ recently argued that changes to an immigration program cannot be analyzed under NEPA because the agencies have no way to know how many people might come in through a certain change. Perhaps they do not know without attempting to calculate it. But attempting to calculate the effects of related programs on population growth and present that analysis to the public is the quintessential reason NEPA was passed.

83.     Certainly, past effects on the American population of specific immigration programs are calculable, and government agencies like the Census daily perform population projections into the future. Jessica Vaughan, the Director of Policy Studies at the Center for Immigration Studies has calculated that approximately 40 million foreign nationals have entered and settled in the United States through specific legal immigration programs in the years between the passage of NEPA and 2018.[27] Those immigration programs were the Refugee/Asylum visa program, the Non-Immigrant Visas program, the Employment Immigration Visa program, Family Immigrant Visa program, and the Student and Exchange Visitor program. Over 80 separate implementing regulations created or amended them in the period between 1981, when the DOJ first promulgated NEPA regulations, and 2018.  NEPA analysis was never conducted prior to the issuance of any of these regulations.

84.     Given the immensity of these regulations' environmental impacts, both individually and cumulatively, DHS and DOJ clearly committed many individual NEPA violations during this period. These agencies had relied first on the DOJ's NEPA regulations 28 C.F.R. Part 61, and then on DHS's Instruction Manual to ensure their compliance with NEPA and the CEQ's regulations for implementing NEPA, 40 C.F.R. Parts 1500 to1508. If these regulations had not arbitrarily and capriciously failed to establish a procedural framework for the

---

[27] 40 million does not comprise the total effect on the population of the United States of these programs because the immigrants also have descendants.

analysis of effects resulting from immigration related actions, the continuing

violations of NEPA by INS and, subsequently, DHS would not have occurred.

85.     Furthermore, DHS, and other agencies including DOJ and DOS

which carry out immigration related actions jointly with DHS, continue to rely on

DHS's Instruction Manual to ensure their compliance with NEPA.

86.     The effects of DHS's NEPA procedures are to create and maintain a

continuing de facto doctrine at DHS that a federal action inducing the mass

entrance and settlement of foreign nationals does not have the potential to

significantly impact the environment. This doctrine not only defies common sense

and NEPA's mandate, but it is easily demonstrated false with modern

environmental science.

## D.     The Environmental Significance of Population Growth

### 1.     The Environmental Effects of America's Past Decades of Immigration

87.     Population growth within the United States has been a key factor in

a wide variety of environmental impacts. Some of the most prominent are: urban

sprawl and farmland loss; habitat and biodiversity loss; an increase in worldwide

levels of greenhouse gas emissions, and an increase in water usage and pollution.

Plaintiffs have engaged environmental expert Dr. Philip Cafaro to summarize

American population growth's significant environmental impacts.[28]

---

[28] Dr. Cafaro produced a report for Plaintiffs called "The Environmental Impact of Immigration into the United States," which provides an overview of how population growth, as driven by immigration inevitably yields a host of significant impacts. The report can be accessed at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Cafaro.pdf.

88.     According to Dr. Cafaro, population growth is responsible for one of the leading environmental problems across the United States: urban sprawl, that is, new development on the fringes of existing urban and suburban areas.[29] Sprawl increases overall energy and water consumption and air and water pollution, and decreases open space and natural wildlife habitat, endangering the survival of many species. From 1982 to 2010, a period of massive immigration, 41.4 million acres of previously undeveloped urban land was built on to accommodate the United States' growing cities and towns—an area approximately equivalent to the State of Florida.[30]

89.     Population growth also threatens to accelerate biodiversity loss and the extinction of animal and plant species. The United Nations Secretariat of the Convention on Biological Diversity estimates that humanity may be causing the extinction of one out of every three species on Earth in the next one to two hundred years.[31] Conservation biologists agree that the most important "direct drivers" of biodiversity loss are: habitat loss, the impacts of alien species, over-exploitation, pollution, and global climate change.[32] They also believe that all five are caused by increased human population and the increased human activities associated with human population growth.

---

[29] *Id.* at 24.
[30] *Id.*
[31] *Id.* at 41.
[32] *Id.* at 42.

43

90.    The carbon dioxide ("CO2") emissions produced in the United States

have also increased because of immigration-driven population growth.[33] Those

foreign nationals that have settled in the United States produce an estimated four

times more CO2 in the United States than they would have in their countries of

origin. The estimated 637 tons of CO2 produced annually by U.S. immigrants is

482 million tons more than they would have produced had they remained in their

home countries.[34] Immigration to the United States is responsible for

approximately 5 percent of the increase in annual world-wide CO2 emissions since

1980. These numbers do not even include the CO2 impacts of children born to

United States immigrants.[35]

91.    Because a greater population uses more water, population growth

also results in a higher aggregate water use. This higher aggregate use has put

increased pressure on water systems, including rivers and underground aquifers.

Water taken for human consumption is necessarily removed from an ecosystem,

leading to a cascade of harmful environmental impacts. According to Dr. Cafaro,

"when too much water is taken from these ecosystems for consumptive use by

human beings, there may not be enough water left behind to perform these critical

ecosystem services and functions."[36]

---

[33] *Id*. at 58.
[34] *Id*. at 67.
[35] On January 27, 2021, the White House issued an Executive Order on Tackling the Climate Crisis At Home and Abroad, stating that "The Federal Government must drive assessment, disclosure, and mitigation of climate pollution and climate-related risks in every sector of our economy." https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/
[36] CAFARO, at 79.

44

92.     Given that population growth has caused so many impacts, it is not surprising that consideration of population-growth-inducing effects is routine for most federal agencies in their NEPA analysis. When Dr. Cafaro surveyed the "purposes and needs" sections of several recent federal and state agency EISs, he found that new, environmentally harmful projects are continually created around the country to accommodate immigration-driven population growth.[37] These recent EISs cite anticipated or planned population growth as creating the need for a wide range of environmentally harmful new infrastructure, for example, transit projects, such as the creation of light rail systems, new airports, and projects for road-widening and road construction: energy projects, such as coal and natural gas development, new power plants, and pipelines, along with water supply projects, such as new dams and reservoirs.[38]

### 2.    Immigration's Environmental Impacts Will Only Grow Increasingly Significant Without Policy Change

93.     Immigration played a big role in past American population growth, and is set to play an even greater role in the future. Center for Immigration Studies Director of Research Steven Camarota has shown immigration accounted for about 57 percent of U.S. population growth between 1990 and 2017.[39] He also demonstrates that the most recent Census Bureau projections indicate that the

---

[37] *Id*. at 16.
[38] *Id*. at 44.
[39] Steven A. Camarota, THE IMPACT OF IMMIGRATION ON U.S. POPULATION GROWTH 2 (2020), accessible at https://cis.org/sites/cis.org/files/Litigation/NEPA/MCIR-v-USCIS/Camarota.pdf.

U.S. population will be nearly 85 million larger in 2060 than it otherwise would be if there were no new immigration.[40]

94.     The result of immigration actions already has been massive, federally induced, population growth. These impacts are amplified over time. Center for Immigration Studies Policy Director Jessica Vaughan has found that when foreign nationals enter the United States, the resulting population growth is not merely limited to those individuals who enter the country and the children they will have. Foreign nationals who ultimately become lawful permanent residents ("LPRs") can themselves sponsor further immigration to the country via what is known as "chain migration." One prominent team of researchers has calculated a chain migration "multiplier." This multiplier is based on data on family-sponsored immigration for the period 1996-2000.[41] According to this research, every 100 original immigrants to the United States during this period sponsored another 345 family members as immigrants.[42]

95.     Immigration's effect on population growth will be even larger, and thus cause even more significant impacts, if new programs are adopted to increase immigration even further. Given the major impacts of population growth upon the environment, the adoption of any group of concerted actions to implement a specific policy or plan, or of any series of systematic and connected agency

---

[40] *Id.* at 1.
[41] Stacie Carr & Marta Tienda, *Family Sponsorship and Late-Age Immigration in Aging America: Revised and Expanded Estimates of Chained Migration*, 32 POPULATION RES. AND POL'Y REV. 825, 825 (2013).
[42] *Id.* at 844.

decisions allocating agency resources to implement a specific statutory program or executive directive, with the aim or foreseeable consequence of substantially augmenting the American population through the entrance and settlement of foreign nationals, must go through environmental analysis under NEPA, for individual or cumulative effects.

96.     The Biden administration has adopted a set of concerted actions in order to induce large scale population growth in the United States without conducting any NEPA review at any level.

## V.     ONGOING NEPA VIOLATIONS BY THE BIDEN ADMINISTRATION

### A.     The Biden Administration Plan to Greatly Augment the American Population through Synergistic Actions on Immigration

97.     The Biden Administration has a general policy of increasing the settled population of the United States by promoting immigration and amnesties through myriad policies. In keeping with House and Senate proposals to expand immigration and provide amnesty to illegal aliens. DHS, DOS, and DOJ have carried out this general policy through a network of specific actions (the Biden Population Actions) that have been implemented. The promotion of the permanent settlement of millions of foreign nationals in the United States is no remote or speculative possibility that depends upon unforeseeable and irrational actions of third parties. The Biden administration has adopted a deliberate policy of

permanent population transfer from other countries to the United States,

implemented via administrative action where legislation is not possible.

98.     For instance, Executive Order 14012 of February 2, 2021 announced

that its policy must reflect the view that:

> Our Nation is enriched socially and economically by the presence of
> immigrants, and we celebrate with them as they take the important step of
> becoming United States citizens. The Federal Government should develop
> welcoming strategies that promote integration, inclusion, and citizenship,
> and it should embrace the full participation of the newest Americans in our
> democracy. E.O. 14012, Feb. 2, 2021.

99.     Likewise, Executive Order 14012 states in its policy section that

"immigrants have come to the United States with little more than the clothes on

their backs, hope in their hearts, and a desire to claim their own piece of the

American Dream. These mothers, fathers, sons, and daughters have made our

Nation better and stronger…" and the Biden Administration will "enhance lawful

pathways for migration to this country and will restore and strengthen our own

asylum system."

100.     The Administration's May 3, "Statement by President Joe Biden on

Refugee Admissions" stated that the United States Refugee Program is "a

statement of who we are and who we want to be," and promised to "use every tool

available" to increase the number of refugees settled in the United States.[43]

101.     These and many other references in Biden Administration public

documents and statements make clear that the Biden Administration believes,

---

[43] Press Release, White House, Statement by President Joe Biden on Refugee Admissions (May 3, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/03/statement-by-president-joe-biden-on-refugee-admissions/.

when it comes to the entrance and permanent settlement of foreign nationals into the United States, that is, population augmentation through immigration, more is better. This case is not about whether or not such policies are good, bad, or neutral for the well-being of American citizens. It may be the case that they are good for some current American citizens and bad for others. However, such a policy undoubtedly has the potential to impact the human and natural environment of the United States. Therefore, any specific major agency actions taken in further of this policy must be analyzed under NEPA.

102.    Even though generally the individuals that were the driving force behind NEPA were convinced that population growth was not in the interests of United States citizens, NEPA itself does not make actions that augment the population unlawful. But NEPA mandates a level of transparency and public involvement in the process of carrying out such actions.

103.    DHS, DOS, and DOJ's NEPA regulations have assisted in enabling these agencies to fail to carry out their immigration related duties under NEPA in the past. These procedures now enable the Biden Administration to start a policy of massive population augmentation through the Biden Population Actions while entirely avoiding NEPA analysis.

104.    Collectively and in isolation, these immigration-related actions have caused and will continue to cause significant effects to the quality of the environment where the plaintiffs live, work, and recreate. Defendants have not prepared an environmental impact statement nor an environmental assessment

for any of these actions. Defendants have not cited a categorical exclusion that would cover these actions. Nor can Defendants point to anything in any of their NEPA procedures that would provide guidance for how to conduct lawful environmental analysis for these actions.

105.   This case does not identify every one of the ever growing list of actions that work synergistically in furtherance of the Biden Administration's population growth agenda. Nor does it challenge every department of the Cabinet that has the potential to affect immigration policy. This case challenges those major actions primarily determined and implemented by DHS, DOS, and DOJ impacting and with the potential to continue to impact the Plaintiffs both cumulatively and individually.

106.   The nine Biden Population Actions listed below all work synergistically to augment the size of the American population, and they fall into three categories. All are affirmative, positive actions taken in order to achieve the overarching agenda laid out by President Biden's executive orders to substantially augment the population of the current American citizenry with a very large population of foreign nationals. These actions are *not* all of the actions that the Biden Administration is taking or has taken to augment the population. Such a listing would be impossible, particularly because, due to a lack of NEPA framework for any of Defendants' immigration actions, the public is not informed or even aware of all the actions in the first place. Many actions have been taken behind closed doors, and none have been open to public comment. Plaintiffs have

50

therefore limited themselves to a finite list of major actions which, even without the holding of NEPA public hearings, Plaintiffs are aware of or know must exist. Plaintiffs have chosen the actions over which they are dismayed that no public hearings were afforded which they could attend to have their voices heard.

107.   The nine Biden Population Actions are organized into three categories for organizational purposes. The first category of actions consists of those that ease entry at the southwest border; the second category concerns actions that dismantle interior enforcement, thereby granting those who have entered illegally a *de facto* right to stay; and the third category consists of actions expanding and creating "humanitarian" programs that directly grant permission to foreign nationals to enter the country through parole or the provision of visas.

## 1.   First Category: agency actions which increased ease of illegal entry at the southern border

108.   First, the Biden Administration ordered a suspension of all border wall projects with Proclamation 10142 of January 20, 2021.[44] It carried out this policy through several specific According to DHS's "Border Wall Plan Pursuant to Presidential Proclamation 10142, June 9, 2021" DHS has now "suspended performance of all border barrier contracts and southwest border barrier construction activities, with the exception of activities related to ensuring project sites are safe and secure in accordance with the terms and conditions of the

---

[44] Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021). DHS has often announced its activities. *DHS Announces Steps to Protect Border Communities from Wall Construction*, U.S. DEPT. OF HOMELAND SEC. (Apr. 30, 2021), https://www.dhs.gov/news/2021/04/30/dhs-announces-steps-protect-border-communities-wall-construction.

contracts."[45] In this Proclamation, DHS proclaimed its intention to follow the NEPA process in analyzing what damage *building* the border wall had done, illustrating its persistent blind spot that only construction has the potential to create environmental effects. However, DHS's action to abruptly, and with no NEPA analysis, cease construction on the wall was environmentally significant in itself—and no waivers for NEPA were available under the law. Nor did DHS attempt to claim a waiver. DHS simply ignored the potential environmental significance of the act of encouraging border crossers by canceling the wall. DHS continues to terminate existing contracts in accordance with this plan.[46]

109.    Second, DHS and DOS took actions to end the policies which are collectively known as the "Remain in Mexico" policy.[47] The Remain in Mexico policy consisted of four components: a) the Migrant Protection Protocols; b) the Asylum Cooperative Agreements; c) Prompt Asylum Case Review, and d) the Humanitarian Asylum Review Program. Under the Migrant Protection Protocols, non-Mexican foreign nationals seeking to enter the United States unlawfully through the Southern Border were returned to Mexico to wait there for the duration of their INA Section 240 removal proceedings.[48] Through the Asylum

---

[45] U.S. DEPT. OF HOMELAND SEC., DEPARTMENT OF HOMELAND SECURITY BORDER WALL PLAN PURSUANT TO PRESIDENTIAL PROCLAMATION 10142 (June 11, 2021), accessible at https://www.dhs.gov/publication/department-homeland-security-border-wall-plan-pursuant-presidential-proclamation-10142.
[46] *DHS to Cancel Laredo Sector Border Barrier Contracts*, U.S. DEPT. OF HOMELAND SEC. (July 23, 2021), https://www.dhs.gov/news/2021/07/23/dhs-cancel-laredo-sector-border-barrier-contracts.
[47] Exec. Order No. 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021).
[48] U.S. DEPT. OF HOMELAND SEC., TERMINATION OF MPP PROGRAM MEMO (June 1, 2021), accessible at https://www.dhs.gov/publication/dhs-terminates-mpp-and-continues-process-individuals-mpp-united-states-complete-their.

Cooperative Agreements (ACAs) with Honduras, Guatemala, and El Salvador, aliens apprehended at the U.S. southern border were given the option to seek humanitarian relief in a regional country closer to the home country they were allegedly fleeing from persecution.[49] The Prompt Asylum Case Review program expedited credible fear screenings for most non Mexican nationals. Finally, the Humanitarian Asylum Review Program efficiently handled asylum screenings at the southern border. Taken together, these initiatives were highly effective in discouraging asylum forum shopping by curtailing the number of illegal aliens permitted into the United States to possibly make an asylum defense against removal.

110.    Third, upon information and belief, CBP agents have now adopted a policy of giving permission slips to seek more permanent legal status to those illegal border crossers they meet, and helping them board buses to destinations within the interior of the country. The new policy is to process and enable, rather than stop, statutorily unlawful entry by foreign nationals.[50]

## 2.    Second Category: agency actions that dismantle interior enforcement

[49] Press Release, U.S. Dept. of State, Suspending and Terminating the Asylum Cooperative Agreements with the Governments El Salvador, Guatemala, and Honduras (Feb. 6, 2021), https://www.state.gov/suspending-and-terminating-the-asylum-cooperative-agreements-with-the-governments-el-salvador-guatemala-and-honduras/.
[50] Todd Bensman, *Catch-and-Bus: Thousands of Freed Border-Crossing Immigrants Are Dispersing Across America*, CTR. FOR IMMIGR. STUD. (Mar. 31, 2021), https://cis.org/Bensman/CatchandBus-Thousands-Freed-BorderCrossing-Immigrants-Are-Dispersing-Across-America; C. Douglas Golden, *Watch: Border Patrol Dropping Off Illegals at Bus Station, Sending Them Out of Town*, WESTERN J. (July 25, 2021), https://www.westernjournal.com/watch-border-patrol-dropping-off-illegals-bus-station-sending-town/.

111.    First, on February 18, 2021, in a memorandum labeled Policy

Number 11090.1 from Tae D. Johnson to all Immigration and Customs

Enforcement (ICE) employees, DHS prohibited Immigration and Customs

Enforcement (ICE) from detaining and removing of all foreign nationals

unlawfully present except those who meet a few narrow categories.[51] This order

was immediately binding on ICE employees and went into immediate effect. ICE

applied this guidance to its Immigration Attorneys as well.[52] This "guidance," which is,

in fact, actually mandatory, significantly restricts the abilities of ICE agents to

arrest and remove aliens from the interior of the United States.[53]

112.    Second, on April 23, 2021, DHS announced that it would stop fining

aliens for failing to depart the United States.[54] Failing to penalize illegal aliens for

failing to leave, further removes increases the incentive to stay, and sends the

message that DHS does not discourage illegal aliens from remaining in the United

States.

113.    Third, on July 15, 2021, the Attorney General reinstated

administrative closure in EOIR's immigration courts with the publication of

---

[51] Memorandum from Tae D. Johnson, Acting Director, U.S. Immigr. and Customs Enf't, to All ICE
Employees (Feb. 18, 2021), https://www.ice.gov/doclib/news/releases/2021/021821_civil-
immigration-enforcement_interim-guidance.pdf.
[52] Memorandum from John D. Trasvifna, Principal Legal Advisor, U.S. Immigr. and Customs Enf't,
to All OPLA Attorneys (May 27, 2021), https://www.ice.gov/doclib/about/offices/opla/OPLA-
immigration-enforcement_interim-guidance.pdf
[53] *See* Andrew R. Arthur, *ICE's Enforcement Guidance Wastes the Resources It Claims to Be
Conserving*, CTR. FOR IMMIGR. STUD. (Feb. 23, 2021), https://cis.org/Arthur/ICEs-Enforcement-
Guidance-Wastes-Resources-It-Claims-Be-Conserving.
[54] *See DHS Announces Rescission of Civil Penalties for Failure-to-Depart*, U.S. DEPT. OF HOMELAND
SEC. (Apr. 23, 2021), https://www.dhs.gov/news/2021/04/23/dhs-announces-rescission-civil-
penalties-failure-depart.

*Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021). This case overruled *Matter of Castro-Tum*, 27 I&N Dec. 271. Administrative closure is a process whereby a judge in an immigration court has the ability to remove the case from the docket without deciding the merits of it, leaving the case in adjudicatory limbo for an indefinite period of time.

114.     Although the Attorney General's reinstatement of administrative closure described it as a "long-standing practice," history belies that assertion. Although adjudication of deportation cases began in the 1890s, the process for administrative closure was not created until nearly 100 years later, when it was established by policy, rather than by law, in 1984.[55] Between 1984 and 2012, administrative closure required the consent of the prosecuting agency because it infringed upon that agency's prosecutorial discretion to determine which deportation or removal cases should be prosecuted and which ones should not. Further, well-established case law mandated that immigration judges or the Board of Immigration Appeals were required to adjudicate cases unless the prosecuting agency elected not to pursue them.[56] Between 2012 and 2018, however, the consent of the prosecuting agency was no longer required, allowing immigration judges or the Board of Immigration Appeals to assume the roles of prosecutors and to pick and choose which cases should be prosecuted and move

---

[55] Memorandum for All Immigration Judges, from William R. Robie, Chief Immigration Judge, EOIR, Re: Operating Policy and Procedure 84-2: *Cases in Which Respondents/Applicants Fail to Appear for Hearing* at 1–2 (Mar. 7, 1984).
[56] *See, e.g., Matter of Lopez-Barrios*, 20 I&N Dec. 203, 204 (BIA 1990); *Matter of Gutierrez-Lopez*, 21 I&N Dec. 479, 480 (BIA 1996).

forward in the adjudicatory process. At most, the administrative closure
reinstated by the Attorney General existed for only six years out of an
adjudicatory history of approximately 130 years.

115.    Similarly, although the Attorney General described administrative
closure as "temporary," EOIR's own statistics belie that assertion. As of June 30,
2021, over 303,000 cases have been administratively closed by EOIR with the
average length of closure being over 6,000 days, or approximately 17 years.[57] Over
55,000 cases have been administratively closed for more than 30 years already.[58]
As of the third quarter of 2021, a total of 1.612 million cases were pending—
which means that *Cruz-Valdez* opens up the possibility of the Board of
Immigration Appeals or individual immigration judges being able to
administratively close a very large number of additional cases. [59]

116.    In practice, administrative closure has been used, not as a temporary
technique for administrative reasons, but to close a large number of cases which
then remain indefinitely suspended without a final resolution. One circuit court
described the use of administrative closure as "an adjudicatory default. . .that. . .
strikes directly at the rule of law." In particular, the administrative closure of
cases with pending asylum applications contradicts the statutory requirement of 8

---

[57] EXEC. OFF. FOR IMMIGR. REV., ADJUDICATION STAT.: ADMINISTRATIVELY CLOSED CASES (2021),
https://www.justice.gov/eoir/page/file/1061521/download.
[58] EXEC. OFF. FOR IMMIGR. REV., ADJUDICATION STAT.: INACTIVE BUT PENDING CASES BY FY OF
ADMINISTRATIVE CLOSURE (2021), https://www.justice.gov/eoir/page/file/1307016/download
[59] EXEC. OFF. FOR IMMIGR. REV., ADJUDICATION STAT.: ACTIVE AND INACTIVE PENDING CASES (2021),
https://www.justice.gov/eoir/page/file/1139516/download.

U.S.C. 1158(d)(5)(A)(iii), that such applications should be adjudicated within 180 days absent exceptional circumstances.

117.   No statute authorizes general administrative closure authority, no regulation explicitly authorizes it, and *Castro Tum* found that the Board of Immigration Appeals and immigration judges lack a delegation of such authority from the Attorney General. *Cruz-Valdez* grants that authority to the Board of Immigration Appeals and immigration judges. This decision therefore grants the authority to clear pending immigration court and Board of Immigration Appeals cases by simply taking them all off the docket without adjudication. It also violates a clear statutory mandate to adjudicate asylum cases within a specified period of time. The decision in *Cruz-Valdez*, which represents the consummation of the Attorney General's decision-making process under 8 U.S.C. 1103(g)(2), and which imposed obligations from which legal consequences flow, including mandating agency inaction through administrative closure despite statutory deadlines to the contrary, constitutes a final agency action subject to judicial review.

118.   *The Cruz-Valdez* decision by the Attorney General, in keeping with the Biden Administration's agenda to integrate larger numbers of foreign nationals into American society, further weakens interior enforcement. As the Supreme Court has found in *INS v. Doherty*, 502 U.S. 314, 323 (1992): "in a deportation proceeding...as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States."

57

3.   **Third Category: agency action to expand entry and settlement of foreign nationals on the basis of "humanitarian" concerns.**

119.    First, this Administration took actions to substantially enlarge the

U.S. Refugee Admissions Program (USRAP), which augments the U.S. population

through the resettlement of foreign nationals in various communities across the

United States through a partnership between DOS and various refugee

resettlement non-government organizations (NGOs).[60] On May 3, 2021, President

Biden raised the refugee admissions ceiling to 62,500 for this fiscal year, and in a

statement said he intended to set a goal of 125,000 refugee admissions in fiscal

year 2022, a more than eightfold increase from the original fiscal year 2021

USRAP admissions ceiling.[61] This order reflected agency actions taken by DOS

internally to implement the expansion to the program.

120.    On April 19 , 2021 DOS's Bureau of Population Refugees and

Migration published an "FY 2022 Notice of Funding Opportunity for Reception

and Placement Program," ("R & P Program") Funding Opportunity Number:

SFOP0008037 on grants.gov.[62] In this notice, DOS stated that it:

> Intends to award Cooperative Agreements (CA) for FY 2022 to well-
> qualified non-profit organizations able to offer a range of services

---

[60] *See* BUREAU OF POPULATION REFUGEES AND MIGRATION, U.S. DEPT. OF STATE, U.S. REFUGEE ADMISSIONS PROGRAM, https://www.state.gov/refugee-admissions/reception-and-placement/. This list of NGOs involved, all of whom have been involved in the USRAP resettlement for many years, is available at the Refugee Processing Center's website, at: https://www.wrapsnet.org/rp-agency-contacts/, last accessed August 28, 2021

[61] Press Release, White House, Statement by President Joe Biden on Refugee Admissions (May 3, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/05/03/statement-by-president-joe-biden-on-refugee-admissions/.

[62] BUREAU OF POPULATION REFUGEES AND MIGRATION, U.S. DEPT. OF STATE, SFOP0008037, FY 2022 NOTICE OF FUNDING OPPORTUNITY FOR RECEPTION AND PLACEMENT PROGRAM (2021), https://www.grants.gov/web/grants/.

throughout networks of multiple locations across the United States. This will include applicants that have demonstrated satisfactory performance under previous agreements with the Bureau and/or applicants that meet the selection criteria described below and have demonstrated the ability to provide required services.

121.    DOS also posted a link to further information about its selection criteria (which it had determined in final form for FY 2022 before the notice was published for the program).[63] The final criteria for FY 2022 included: "1) Be a well-established social service provider with demonstrated case management expertise and experience managing a network of affiliates that provide reception and placement or similar services to refugees or other migrant populations in the United States; 2) Have been a non-profit in operation for at least three full years with 501(c)(3) status with the IRS, other than institutions of higher education; 3) Document the availability of private financial resources to contribute to the program; and 4) Operate in multiple locations across the United States." *Id.*

122.    The deadline to submit proposals to be considered for such cooperative agreements was July 2, 2021. These contracts will increase assistance and other integration support to refugees who are resettled in communities selected by the applicant NGOs and approved by DOS. Through these contracts, DOS "partners with and provides partial financial support to non-governmental organizations (NGOs) to carry out the R & P Program." *Id.* Participating NGOs will "combine the Bureau's financial assistance and projected private resources for

---

[63] *See* Press Release, U.S. Dept. of State, FY 2022 Notice of Funding Opportunity for Reception and Placement Program (Apr. 19, 2021), https://www.state.gov/fy-2022-notice-of-funding-opportunity-for-reception-and-placement-program/

the provision of R & P services for refugees admitted to the United States during the period October 1, 2021 through September 30, 2022." *Id*. Therefore, all of these contracts will have been finally awarded by Oct. 1, 2021. *Id*.

123.    As part of their proposals, NGO applicants were required to name and provide other information about the capacities of their proposed "local affiliates" throughout the United States that will do the actual work of resettling refugees.[64]  At no stage in any of this process, which will determine the communities throughout the United States that will receive refugees in FY 2022, has the process been open to any kind of public transparency. Nor will the public, including the instant Plaintiffs, be able to view the contracts even after they are made final and determine which communities across the country will receive refugees. These decisions taking place out of the public eye will include such considerations as: which NGO local affiliates in which communities will handle resettlement, maximum resettlement capacity for each location, which nationalities could be resettled in that location, the availability of local resources for language or financial help, and the actual number of admitted refugees who will resettled in that community over the course of the fiscal year.

124.    Second, this Administration has started a new program through the use of parole authority by DHS specifically for Afghani nationals. On August 23, 2021, DHS issued a memorandum from DHS Secretary Alejandro Mayorkas to

---

[64] *See* BUREAU OF POPULATION REFUGEES AND MIGRATION, U.S. DEPT. OF STATE, SFOP0008037, FY 2022 NOTICE OF FUNDING OPPORTUNITY FOR RECEPTION AND PLACEMENT PROGRAM, 2022 R&P – Abstract Template (2021), https://www.grants.gov/web/grants/.

Troy Miller, Commissioner of CBP, "Guidance for the Immigration Processing of Afghan Citizens During Operation Allies Refuge." This memorandum invokes Section 212(d)(5) of the INA for CBP officers to use parole for the "processing, transporting, and relocating" of Afghan nationals for a period of two years.[65] It creates another pathway for Afghani nationals to enter the U.S. in addition to the refugee resettlement program and the Special Immigrant Visa for Afghanis created by statute.

125.    Third, this Administration has restarted a program through the use of parole authority by DHS in lieu of a refugee program specifically for Central Americans. On March 10, 2021, DOS announced that it was "expanding legal pathways to enter the United States by reopening the Central American Minors (CAM) program."[66] The CAM program was originally created in 2014. It used the Secretary of Homeland Security's authority to grant parole[67] or refugee status to allow certain categories of aliens without lawful status to petition to bring their minor children to the United States. The program went into immediate effect, by opening previously closed cases. DOS's announcement also explained that CAM's scope would be expanded.

---

[65] The Immigration and Nationality Act (INA) gives the Secretary of Homeland Security discretionary authority to parole into the United States temporarily under such conditions as he may prescribe "only on a case by case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 C.F.R. § 212.5 (2021). The words "case by case" basis shows that parole was not meant to be an alternate refugee program but the Obama Administration and, now, the Biden Administration, have seen the authority to grant parole to individual foreign nationals on a case by case basis as source of creating new programs to augment the population.

[66] Press Release, U.S. Dept. of State, Restarting the Central American Minors Program (Mar. 10, 2021), https://www.state.gov/restarting-the-central-american-minors-program/.

[67] See footnote 65, *infra*.

126.    On June 15, 2021, DHS and DOS released a joint statement updating its progress expanding CAM. They would be expanding the criteria of those who could petition to obtain parole to minor children in Central America.[68] The expansions would "dramatically expand" the CAM program. The press release states that:

> Eligibility to petition will now be extended to include legal guardians (in addition to parents) who are in the United States pursuant to any of the following qualifying categories: lawful permanent residence; temporary protected status; parole; deferred action; deferred enforced departure; or withholding of removal.  In addition, this expansion of eligibility will now include certain U.S.-based parents or legal guardians who have a pending asylum application or a pending U visa petition filed before May 15, 2021.  It will allow them to petition for access to the U.S. Refugee Admissions Program on behalf of their children who are nationals of El Salvador, Guatemala, or Honduras for potential resettlement in the United States.

127.    These expansions, which appear to take effect immediately, are part of the general agenda to promote migration from Central America through this expansion of legal pathways to seek humanitarian protection in the United States.

### 4.    How the First and Second Categories of Biden Population Actions have not just induced Population Growth, but ignited a border crisis at the southwest border

128.    The three actions from the second category, which expand the right to remain in the United States, work hand in glove with the three actions in the first category, which make it easier to enter the United States at the southwest border. These two categories of actions together yield increasing population

---

[68] *See* Press Release, U.S. Dept. of State, Joint Statement by the U.S. Department of State and U.S. Department of Homeland Security on the Expansion of Access to the Central American Minors Program (June 15, 2021), https://www.state.gov/joint-statement-by-the-u-s-department-of-state-and-u-s-department-of-homeland-security-on-the-expansion-of-access-to-the-central-american-minors-program/.

growth in the United States. Without these new federal actions that allow individuals already here to integrate into American society, foreign nationals who have already entered here would not stay. In addition, the evidence overwhelmingly establishes that allowing foreign nationals who have previously entered to integrate and remain is a key incentive for foreign nationals who are considering whether to migrate to the southwest border. Federal actions that send the message to foreign nationals that entrance into the country comes with the right to settle and obtain the benefits of integration into U.S. society is known to be a key incentive to foreign nationals who migrate by crossing the southern border illegally.[69]

129.    The immigration actions addressed above create synergistic effects that must be evaluated under NEPA. *See e.g. Kleppe v. Sierra Club*, 427 U.S. 390 (1976). A cumulative impact analysis is essential to determine and evaluate their effect. The cumulative nature of actions that augment the U.S. population makes it all the more necessary for DHS's NEPA procedures themselves to create a framework that ensures such analysis. It is the lack of a proper framework in DHS's procedures that leads DHS and other agencies implementing immigration policy to falsely contend, without any sort of record evidence, that NEPA exempts immigration programs because calculation of their effects would be too "speculative." Yet federal agencies routinely carry out NEPA analysis of actions

---

[69] Todd Bensman, *New DHS Threat Assessment: Expect a Mass Illegal Migration Crisis Next Year*, CTR. FOR IMMIGR. STUD. (Nov. 1, 2020), https://cis.org/Bensman/New-DHS-Threat-Assessment-Expect-Mass-Illegal-Migration-Crisis-Next-Year

that are much more speculative than the effects on population growth induced by immigration. An example of a far more diffuse and speculative environmental effect than population growth is climate change, the precise calculation of which in a wide variety of areas is a focal point of Biden Administration policies.[70]

130.    The environmental effects of the mass migration at the southern border include both population growth in the interior, and environmental degradation at the border itself. Plaintiffs can also establish that the first six Biden Population actions were what caused mass migration through the border since January 2021, and that the effects were foreseeable.

131.    Todd Bensman, Center for Immigration Studies Senior National Security Fellow, has extensively reported on the ongoing mass migration that has been occurring at the Southern Border since January 2021. Mr. Bensman is an award winning journalist who covered national security topics for twenty years, with a particular focus on the Texas border. He has personally visited the Southern border five times since January 2021 and has also visited Central

---

[70]Executive Order 13990, "Protecting Public Health and the Environment and Restoring Science To Tackle the Climate Crisis." 86 Fed. Reg. 7,037 (Jan. 20, 2021),
https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01765.pdf. Section 5 states:
"Accounting for the Benefits of Reducing Climate Pollution. (a) It is essential that agencies capture the full costs of greenhouse gas emissions as accurately as possible, including by taking global damages into account.
Doing so facilitates sound decision-making, recognizes the breadth of climate impacts, and supports the international leadership of the United States on climate issues. The "social cost of carbon" (SCC), "social cost of nitrous oxide" (SCN), and "social cost of methane" (SCM) are estimates of the monetized damages associated with incremental increases in greenhouse gas emissions. They are intended to include changes in net agricultural
productivity, human health, property damage from increased flood risk, and the value of ecosystem services. An accurate social cost is essential for agencies to accurately determine the social benefits of reducing greenhouse gas emissions when conducting cost-benefit analyses of regulatory and other actions."

America. What he witnessed at the southern border in the El Paso Sector, the Del Rio Sector, the Big Bend Sector, and the Roma Port of Entry on the Texas, upon information and belief, is mirrored by similar occurrences in many places on the Southern border, including in Arizona and New Mexico as well as Texas.

132.    That these actions would cause mass migration was reasonably foreseeable since before the November 2020 presidential election. The Biden Campaign's promises to grant the right to settle in the United States permanently to those who entered illegally fueled high enthusiasm and travel plans throughout Latin America and the world. DHS even issued a Homeland Security assessment in October 2020 that warned of a border crisis. U.S. Dept. of Homeland Sec., Homeland Threat Assessment (Oct. 2020). This report named as a factor likely to drive the next mass migration influx: migrant "perceptions of U.S. and Mexican immigration and enforcement policies" due to ongoing "inter-governmental division and inconsistent messaging." *Id*. at 24. That is, that foreign nationals were paying close attention to the Biden campaign's promises.

133.    According to Mr. Bensman's reporting, the majority of approximately 70,000 foreign nationals within Mexico who had applied for Mexican asylum in the months before the election had the intention to cross the border into the United States after the election if President Trump lost. Because of the Trump Administration's "Remain in Mexico" policy, migrants like these did not have the ability to cross and claim asylum at the United States border with the intention of disappearing into the U.S. interior. When the Biden Administration ended the

65

Remain in Mexico policy, combined with its termination of the border wall, the incentive and ability to cross the border and obtain residence in the United States was restored. When these actions were followed by orders to ICE and immigration courts that virtually all who managed to cross would not be subject to interior enforcement, the floodgates opened.

134.    As greater and greater numbers of foreign nationals began to pour across the border-- encouraged by the success of those who came before them, Biden Administration policies progressed from dismantling enforcement to actively working to facilitate mass unlawful border crossing, a policy that Mr. Bensman has called "catch and bus."

135.    In a visit to Del Rio Texas in March 2021, Mr. Bensman first ran into the phenomenon of "catch and bus." According to Mr. Bensman:

> When DHS encounters illegal border crossers it now gives them papers and then steers them towards buses, often arranged by non-governmental organizations (NGOs). I have read their tickets, and found that they are headed to places all over the country. One evening during that visit, I saw an idling charter bus parked on a lot prepared to disperse a new kind of import throughout the American landscape. The bus and a small van nearby were packed with sixty or so mostly Haitian families fresh out of the Rio Grande from their illegal crossings.
> I was able to find out more through investigating the charter buses themselves. The papers that DHS provides to many of the border crossers consist of an administrative document titled "Order of Release on Recognizance," which grants them the legal right to be present inside the United States. Passengers agreed to show two such documents to me. I saw that the documents require the border crosser to self-report to a deportation officer in their destination cities by a specific date provided. One Nicaraguan national showed me a DHS document titled "Interim Notice Authorizing Parole," which grants him a renewable one-year term to live legally inside the country. Most will likely use their time to apply for asylum, a lengthy, backlogged process that allows for work authorization

and Social Security cards during an adjudication process that can drag on for years.

136.     Local media confirms Mr. Bensman's reporting. Tiffany Burrow, volunteer operations director at the Val Verde Border Humanitarian Coalition, explained that the Border Patrol will call the organization, bring them to the center, where volunteers will help arrange transportation to destinations all over the country.[71] In Del Rio, transportation is also arranged by the El Buen Samaritano Migrante Church. As witnessed by Mr. Bensman, migrants leave for places like Fort Lauderdale, Orlando, West Palm Beach, and Newark, New Jersey. 22. The border crossers do not head to all places in the U.S. equally; most head to specific areas where existing communities and relatives will welcome newcomers from specific places. Haitian, Venezuelan, and Cuban bus passengers often head towards Florida and New Jersey. Those from Nicaragua and other Central American nations have been delivered to Tennessee, Massachusetts, Indiana, Michigan, North Carolina, Georgia, Kentucky, and to large cities in Texas such as Dallas and Houston.

137.     In places like Roma, Texas, where the channel of the Rio Grande is very narrow, the mass-migration phenomenon is of truly historic proportions. While on a trip to Roma in May, Mr. Bensman reported watching boat after boat full of migrants, generally families and children, and operated by cartel

---

[71] Vanessa Croix, *A new surge of migrants is overwhelming this Texas border town's resources*, KENS5 (Feb. 4, 2021), https://www.kens5.com/article/news/special-reports/at-the-border/a-new-surge-of-migrants-overwhelming-border-towns-resources/273-15eb48c6-de8c-4f90-8c18-3353bc02e150.

smugglers, land and unload passengers at an openly established raft crossing. These passenger unloadings go on all night long, every night, and hundreds of similar raft crossings. At these crossings, the boat passengers, at least those that include minors, flag down Border Patrol agents, who direct them to mobile Border Patrol crossing stations. At these stations, new arrivals take a seat on the ground, while border patrol agents tend to their water, food, baby formula, and diaper needs. Another agent would collect their personal belongings in a plastic bag with their names on it. These would go separately to the brick-and-mortar facility. Other agents would take their personal information and shoot photos, then put them in another queue to wait for a bus, which would then take them to an NGO to arrange their transportation to the interior.

138.     Mr. Bensman asked many border crossers what motivated them to come, and found that they all had a very sophisticated and accurate understanding of the new rules of entry. Most have booked passage with cartels, at around $5,000 a person. The process has become an organized business, run in foreign countries by professional, highly organized cartels. For instance, the cartel La Linea sells a more expensive "package deal" for $11,000. The package deal offers passage from Guatemala to any desired destination in the United States. Guatemalan nationals arrive with laminated directions, specifying exactly which bus to go to and where to catch them. The cartels are able to market their packages because the immigrants are successful in coming and successful in settling into the interior of the United States.

139.     According to Mr. Bensman, this mass migration phenomenon has normalized into a streamlined, industrial fixture with conveyor-belt supporting infrastructure expanding on both sides of the border, a 7-days-a-week, 365 days-a-year part of the landscape. Cartel smugglers and the U.S. government have openly and closely partnered in it, with no pretense otherwise. Upon information and belief, buses are leaving regularly not only from Texas but from Arizona and California as well, dispersing foreign nationals throughout the United States.

140.     An exact estimate of how many foreign nationals have crossed and settled in the United States as a result of these actions is difficult to calculate. Between the end of February and the end of July of this year, there were over a million southwest border encounters by Border Patrol.[72] However, not all illegal border crossers are apprehended—some researchers believe it is about 68%.[73] It seems reasonable to estimate well over a million additional foreign nationals have entered the country with plans to stay because of the Biden Administration's population actions in the first six months of the Biden Administration.

## VI.    Standing: the Specific Damages to Plaintiffs from the DHS Instruction Manual and the Biden Administration's Population Actions

141.     The arbitrary and capricious lack of a framework for NEPA analysis in immigration agencies' NEPA regulations was necessary to enable the historical

---

[72]See *Southwest Land Border Encounters*, U.S. CUSTOMS AND BORDER PROTECTION (last visited Sept. 2, 2021), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.
[73] Conn Carroll, *Biden border crisis far worse than official numbers show*, WASH. EXAMINER (July 26, 2021), https://www.washingtonexaminer.com/opinion/biden-border-crisis-far-worse-than-official-numbers-show.

neglect of NEPA compliance, as well as the ongoing failure of the Biden Administration to comply with NEPA in its immigration actions. Both the historical neglect of NEPA and the Biden Administration's failure actions have caused specific damages to the Plaintiffs and the places they cherish.

142.    Four members of Plaintiff MCIR: Henry Barbaro, Steve Kropper, David Holzman, and Mike Hanuer; and Plaintiffs Linda Huhn, Rob Meyer, Bruce Anderson, Kevin Lynn, Steven Chance Smith, and Gail Getzwiller, have all personally witnessed environmental degradation to places and environments they value because of DHS's arbitrary and capricious NEPA procedures. Without these irrational, absolutely inadequate NEPA regulations, DHS, and INS before it, would never have been able to maintain an institutional blindspot that rendered it incapable of carrying out its responsibilities under NEPA for decades.

143.    As a result of his career in regional planning, Henry Barbaro realized that the source of all the environmental impacts and degradation that he works to prevent is population growth. As a regional planner in New Hampshire, Mr. Barbaro worked with a variety of municipalities with a focus on environmental management. He helped communities protect their water resources (e.g., drinking water aquifers, wetlands, rivers, streams, floodplains) and promoted land use laws and ordinances (e.g., on-site sewage disposal, land use zoning, subdivision regulations) so as to protect neighborhood character and the natural resources of the communities. All of these land use controls had their basis in the municipal master plans.

70

144.     Mr. Barbaro was struck when he realized that the introductory content of every plan had a population projection, with the remainder of the plan methodically describing how the town was going to accommodate the future population growth. What proved to be true is that no matter what land use laws were passed by the community's legislative body, growth and development kept marching forward, inexorably changing farmland, forests, and fields into subdivisions, apartment buildings, and commercial/office developments.

145.     After some years, Mr. Barbaro came to realize that as long as population growth continued, the natural landscape and character of every community within the seacoast of New Hampshire, places that he cherished, would be forever changed. He loved to visit these rural landscapes and enjoyed their rich ecology. Mr. Barbaro greatly mourned as he personally watched natural areas and views in Massachusetts and New Hampshire be lost to development as the population grew through immigration. Mr. Barbaro is a hiker and cross country skier, and his ability to enjoy these outdoor activities in New England has significantly declined because of overcrowding caused by population growth. Cross country skiing trails are now overrun with snowmobiles and walking trails are saturated with mountain bikers, making it hazardous for him to enjoy them and get exercise as he used to in the past. The over-trafficking of the hiking trails he once enjoyed exposes rocks, protruding tree roots, and unstable soil, which often leads to complete destruction of these trails due to erosion.

146.    Mr. Barbaro has also personally witnessed the spread of invasive species—greatly caused by greater footprint encroachment by a greater population. This spread of invasive species choke out native coastal vegetation and coastal marshes, makes more difficult and less rewarding his job as a conservationist, his enjoyment of nature as a photographer, and his local use of nature as an outdoorsman.

147.    Mr. Barbaro knows that the population growth he has experienced in Massachusetts is due in part to the federal government's immigration policies. According to numbers from the Migration Policy Institute, as of 2019,17.3% of the population in Massachusetts is foreign born.[74] The growth in the foreign born population in Massachusetts between 1990 and 2000 was 34.7%  and the growth in the foreign born population between 2000 and 2019 was 54%. *Id*. In contrast, the growth in the native born population between 1990 and 2000 was only 2.5% and the growth in the native born population was only 2.3%. *Id*. The migration of foreign nationals, therefore, contributes to the increasing overcrowding he experiences.

148.    Mr. Barbaro was deeply disappointed when he learned that NEPA has never been applied to immigration actions. He believes that if America's immigration agencies had not been following unlawful and inadequate NEPA

---

[74] *State Immigration Data Profiles: Massachusetts*, MIGRATION POLY'Y INSTITUTE (last visited Sept. 2, 2021), https://www.migrationpolicy.org/data/state-profiles/state/demographics/MA#:~:text=Massachusetts%20%20%20Demographics%20%20%20,%20%2054.0%25%20%2024%20more%20rows%20.

regulations, at the times they exercised their discretion to continually expand immigration, different decisions might have been made.

149.    Mr. Barbaro also is disappointed that the Biden Administration has continued to violate NEPA in the nine Biden Population Actions it has taken since January that by design are augmenting the American population with large numbers of foreign nationals. He is aware that, because of the six actions that ease entry for illegal border crossers, and then allow illegal border crossers to stay, over a million illegal aliens have been absorbed into the interior since January. He feels that many more millions may come in over the next three and a half years if these actions continue.

150.    This border crisis, just like most, is felt more in some American communities than others, rather than equally spread through every square mile of the U.S. Some cities are a greater draw than others. Upon information and belief, Boston is a fairly popular destination for those arriving on buses and planes from the border, particularly those from Central American countries. Mr. Barbaro has been informed that a sample of those heading into the interior have bus tickets to the Boston area, where he lives.

151.    Mr. Barbaro also knows that the Boston area must have a substantial number of new asylum seekers who have recently entered because on July 19, EOIR added the Boston Immigration Court to the list of ten other immigration courts with a dedicated docket to families who were apprehended

between ports of entry after May 28, 2021.[75] Mr. Barbaro also recognizes that with the new Biden Action allowing immigration courts to clear cases without adjudication, the end result will likely  mean that if this Boston docket gets too full, Boston immigration judges may simply chose to clear their dockets without ordering deportations for any of those who might have false asylum claims.

152.    While Mr. Barbaro himself cannot know the exact numbers of those arriving in the community where he lives, a NEPA analysis would at a minimum provide those numbers. As a regional planner, he realizes that local government and private industry must plan ahead in order to meet the demands of a growing population. This need to plan locally is exactly why NEPA analysis of proposed immigration actions before such actions are carried out is so publicly beneficial and serves the very purpose the statute was passed—determining the causes and effects of population growth. If many people head to the Boston area from the border and settle there, the community will have to adjust accordingly, and will have to make environmental tradeoffs to accommodate a sudden influx of working age people and families.

153.    Steve Kropper has been subject to personal adverse effects of immigration led population growth. Mr. Kropper is concerned that increased emissions from a growing population has caused rising temperatures. Increased temperatures in Massachusetts have led to a "the huge upswing in deer ticks and poison ivy throughout the state. As a result, he records that he and his friends and

---

[75] *See Boston Immigration Court*, EXEC. OFF. OF IMMIGR. REV. (July 19, 2021), https://www.justice.gov/eoir/boston-immigration-court.

family are much more hesitant to use the outdoors. Warmer temperatures make one of his favorite pastimes, skiing much more limited in duration and lesser in quality.

154.    Mr. Kropper's own neighborhood in Lexington, Massachusetts, a suburb of Boston, has seen a devastating impact on open space and quality of life because of local population growth, much of which is due to immigration. As a resident of Lexington, he frequently drives to Boston, and the population growth has increased the traffic in the area greatly–it used to take 18 minutes to drive to Boston and now it takes an hour. The recent actions by the Biden administration will create even more congestion. As an elected town meeting member involved with development, he knows that local planning is hugely affected by population growth. New foreign nationals heading to Boston will need to be housed, and they will drive on the roads.

155.    Mr. Kropper enjoys hiking and has always felt attached to the wildlife he sees on his hikes. He has hiked over 272 miles of Vermont's Long Trail. In his youth, he enjoyed the ample biodiversity, especially the Timber Rattlesnake, Bald Eagle, and the Eastern Mountain Lion. In his adult life, these species have never appeared during months of solo and group hiking. Increased human footprint, because of immigration-led growth, and never evaluated under NEPA have decimated these species. He grieves his children cannot have the same enjoyment of biodiversity he had himself.

156.    Mr. Kropper has also developed strong attachments to places he has traveled to in the United States that are at particular risk from the border crisis caused by the six Biden Population Actions that brought over a million people across the border from February to July this year, as well as from population growth. One place that is particularly special to him, recreationally and aesthetically, is Big Bend, Texas.

157.    Mr. Kropper has visited Big Bend National Park, located near the U.S.-Mexico border in Texas, nine times since 1980. He has rafted, walked, cycled, and hiked the park. Big Bend is a rich yet fragile ecosystem: each sub-region has species that are uniquely adapted to the terrain, animal life, and rainfall patterns. For example, Guadalupe fescue is a short-lives grass, a perennial, which grows only at high altitude in the Chisos. On his nine visits to Big Bend, rangers have endeavored to point out signature regional mammals (such as Black Bears in the Chisos Mountains or the Mexican long-nosed bat); unfortunately, many are now considered threatened species, and he has not been able to see one despite deeply hoping to as he visited over the years.

158.    Illegal border crossing across the park tramples and disrupts this pristine nature that Mr. Kropper values greatly. Border crossers simply discard anything they no longer need as they cross, and seeing this trash and refuse left behind is very upsetting to Mr. Kropper. Increased border crossing also makes it dangerous as a hiker to be in these areas for fear of cartel human smuggling. Every time Mr. Kropper has returned, he has been more and more disturbed to

see the time lapse in ongoing, persistent degradation of the park by unlawful border crossers.

159.   The six Biden Population Actions to encourage illegal border crossing have had a devastating effect on the area. As Mr. Bensman has reported, the Big Bend Sector in Texas has never been busier. La Linea cartel controls the area, where "foot guides" lead groups of border crossers on eight to 12 day treks with the goal of getting them to U.S. Interstate 10. They use the cartel's services because of "*la invitacion,*" (the invitation), the promises presidential candidate Biden made to foreign nationals that if they get to the U.S. border, they will be able to cross into the interior, and never fear deportation. These promises have been fully kept by President Biden's immigration actions: the termination of the border wall; the end of the Remain in Mexico policy; the institution of "catch and bus" by the Border Patrol; the exemption from deportation of almost all illegal aliens; the exemption from penalties for breaking immigration laws; and the restoration of the immigration court discretion to end mass numbers of those cases that do enter deportation proceedings. These are all part of "*la invitacion.*"

160.   And now, upon information and belief, large groups of 50-100 foreign nationals each are continually flowing through the Big Bend Sector. Vehicles blast in from the Mexican side and wreak havoc upon the park. Mr. Kropper would love to go back to Big Bend, as he regularly has, but these days, he does not think it is safe to do so. And he is devastated when he contemplates how little the cartel operation will pay attention to preserving the wilderness.

161.    David Holzman also has suffered specific harms to places and wildlife he cherishes. David Holzman's love for the unique geography and open spaces of the United States can be traced back to the cross-country road trips he took with his family as a child to national parks. He vividly remembers the wide open spaces he passed through Kansas and the Colorado Great Plains. Since then, he has derived great spiritual and benefit from visiting open spaces. He visited Nevada by train on a route surrounded by completely undeveloped land.

162.    Over time, the open spaces Mr. Holzman valued have disappeared in part because of population growth which is driven by immigration actions authorized without NEPA analysis. These places are further threatened by the actions the Biden Administration has authorized in the service of even greater population expansion. He mourns for the lost open spaces between Tucson and Phoenix, the San Francisco Bay area, and around Salt Lake City, which he experienced in the 1970's but have disappeared in recent years, as he has observed on numerous trips.

163.    Mr. Holzman lives now in the same neighborhood in Lexington Massachusetts that he did during his childhood. As a child he used to enjoy the sounds of silence from his porch and Monarch and Swallowtail butterflies, along with lightning bugs. Now with sprawl and traffic, he has measured 60 decibels most of the day and evening from traffic on the nearest highway. He sees about as many butterflies over the whole summer as he would see in a mere couple of days as a child. He used to see Monarch butterflies in Cape Cod frequently, and now he

hasn't seen a Monarch butterfly there in two decades. The noise pollution and loss of wildlife has lessened his intrinsic enjoyment and connection to nature in his daily life.

164.     These environmental impacts, which were already increasing with continued immigration driven population growth, will intensify even with the addition of over a million additional new residents and an unknown number to come, a portion of whom are headed to the Boston area where he lives.

165.     Mike Hanauer also dreads the potential population growth in the Boston area that will result from the Biden population augmentation program that is being implemented without NEPA review. Mr. Hanauer used to love to walk, hike, and observe nature. His recreation and enjoyment of nature near his home in Massachusetts has been impaired by population growth. Losing open spaces around him is a very upsetting experience. He depends on regular biking for both his mental and physical well-being. However, because of immigration driven population growth, local roads are more congested and more dangerous every year. Even when he attempts to take his bike recreation out of the city, bike trails are now often congested with people, and therefore as dangerous as the roads because of overpopulation. "being turned into housing, shopping malls, schools and just plain ugly sprawl." When he does try hiking locally, he has found a considerable increase in trails trampled, litter, trail wear, and crowding.

166.     Plaintiff Kevin Lynn has also been palpably affected by the population growth allowed by DHS failure to conduct NEPA review on

immigration. Mr. Lynn is unhappy if he does not have regular access to nature and open space. He spent many years living in Southern California, a region of the country whose population grew exponentially because of immigration before it happened to the rest of the country. Mr. Lynn first lived in a small cabin in Malibu, where there was plenty of open space–he could embark onto mountain biking trails from his own porch. As years went by, development caused by immigration driven population growth changed the area he lived beyond recognition–it went "from pastoral to suburban, public space to exclusive estates, and hiking trails to backyards." He considered it ruined recreationally and aesthetically, and no longer worth the longer and longer commute to his job in downtown Los Angeles.

167.    When he moved downtown, he found overpopulation, driven by the constant immigration of foreign nationals, every year made his life more and more stressful. He spent hours behind the wheel of a car in gridlock. His recreation and environmentally friendly-habits were also threatened by congestion: though he tried to bicycle to work and other places, he found it was too hazardous to navigate Los Angeles traffic. He also suffered from pollution, finding the smog disgusting and bad for his health.

168.    Because population growth had made California so much less enjoyable, Mr. Lynn moved back to Pennsylvania. He wished he could move back to his native Bucks County, but it had also changed. The area has been transformed beyond recognition since his childhood. It used to have wide and

plentiful open spaces, and some of the best game lands in the country. Population growth and sprawl have transformed open spaces, bucolic landscape, and wild game areas into suburban guard-gated communities.

169.    As a result, Mr. Lynn decided to move to Lancaster County for a more rural existence where he could ride his bike to go buy fresh produce. According to Forbes, the county is one of the top places in America to visit, with a bucolic countryside and a large Amish population. Mr. Lynn finds this lovely, unique American environment to be exactly what he was seeking. However, the whole character of the area that means so much to Mr. Lynn is likely to be changed forever by one specific immigration policy that has been changed by the Biden Administration—refugee resettlement. In 2017, the BBC called Lancaster the "refugee county of America."[76]

170.    Between 2013 and 2017, Lancaster County had taken in 20 times more refugees per capita since 2013 than any other county in America. Through refugee resettlement NGOs with local branches in Lancaster such as Church World Service (CWS) Lancaster, DOS directs federal dollars here to resettle refugees. DOS makes agreements with these NGOs, according to whether they meet certain criteria, and they determine how many refugees to bring and where to settle them. Local citizens never have a chance to weigh in or know what is coming, and no NEPA analysis is ever conducted regarding how the area may be

---

[76] Franz Strasser, *Lancaster, Pennsylvania: America's Refugee Capital*, BBC (Jan. 27, 2017), https://www.bbc.com/news/av/world-us-canada-38776233.

transformed by this resettlement. Locals do not even get to see the contracts awarded after the fact.

171.    The refugee ceiling under the Trump Administration meant that the number of refugees resettled in Lancaster County specifically would be small. But, with the Biden Administration having quadrupled the refugee ceiling and planning to raise it by eight fold or more in later years, this one immigration program has the potential to single handedly transform the character of the area. Furthermore, the Biden Administration may resettle refugees by another program it recently created as well. In August, DHS created a new program to resettle Afghani nationals including those on Special Immigrant Visas (SIVs), through the parole power, which it authorized to last for two years. Afghani nationals on SIVs, at least, are eligible to join DOS's refugee resettlement program. CWS Lancaster has already increased its calls to increase Afghan refugee resettlement.[77] This parole program—which is a pure creation of executive authority that goes beyond the plain scope of the statute of the INA—does not appear to have any numerical limit.

172.    Mr. Lynn is currently involved in organized efforts to fight development in order to save the farmland and rural character of the area. He feels there are already many more people in Lancaster County than sustainable and the unending population growth has already led to less open space, more pollution, and more traffic. Population growth from refugee or parolee

---

[77] *See Serving refugees and immigrants in Central Pennsylvania*, CWS LANCASTER (last visited Sept. 2, 2021), https://cwslancaster.org/.

resettlement would negate Mr. Lynn's personal efforts to preserve the rural character of Lancaster and his enjoyment of the area. He feels he might have to move yet again.

173.     Mr. Lynn learned of NEPA years ago. He was disappointed to learn that DHS's NEPA procedures allow federal immigration agencies to authorize countless immigration actions without conducting any NEPA review. Mr. Lynn wants to weigh in on the recent actions by the Biden Administration that will increase immigration, particularly the actions with the potential to transform the character of Lancaster County that he cherishes and has fought hard to save.

174.     Plaintiff Linda Huhn has also been personally affected by DHS's NEPA procedures that allow federal agencies to authorize immigration actions without NEPA review. As a longtime resident of Minneapolis, she also lives in an area that is impacted by immigration, but profoundly affected by one immigration program in particular: refugee resettlement.

175.     In the 2000's and 2010's Ms. Huhn noticed far more foreign nationals in Minneapolis and its surrounding area than she did in the early 1990's as the Minneapolis/St. Paul area became home to a large number of refugees. An area of the city near the University of Minnesota campus is known as little Mogadishu because it is home to more Somali people than anywhere outside Somalia. According to a New York Times article in 2020, Minnesota has about

57,000 Somali refugees altogether.[78] However, the mere number of refugees does not tell the whole story of population growth, as many refugees who settle in Minneapolis from places such as Somalia have very large families. Refugees also have the right to bring members of their families into the country as well through chain migration. Ms. Huhn is aware that government decisions have directly resettled refugee populations into her state, especially Minneapolis. DOS signs contracts with non-governmental organizations (NGOs) with local branches in Minnesota to do so. These NGOs include Lutheran Social Service of Minnesota, Catholic Charities of Mpls/St. Paul, Catholic Charities of Winona, the MN Council of Churches, the International Institute, and Arrive Ministries. Local citizens like Ms. Huhn do not have the opportunity to speak out, much less have a seat at the table regarding these actions before they occur. Nor has Ms. Huhn ever been shown the contracts between the NGOs and DOS to resettle refugees in her community.

176.    Now that the Biden Administration has raised the refugee ceiling, and plans to raise it next further even more— altogether, an 8-fold increase in the number of refugees over 2020, Ms. Huhn expects the refugee program to have continuing, increasing effects. She also wonders whether the numerous local NGO's in Minnesota will ultimately also take Afghani nationals from the new parole program.

---

[78] Kimiko de Freytas-Tamura, *In Minneapolis Somali-Americans Find Unwelcome Echoes of Strife at Home*, N.Y. TIMES (June 7, 2020), https://www.nytimes.com/2020/06/07/us/minneapolis-somalis-george-floyd.html

177.    Ms. Huhn has been already personally affected by the population growth created by the refugee program in the Twin Cities. She is a nature photographer.ne of her favorite subjects to photograph, the endangered Karner Blue Butterfly, now no longer exists in Minnesota. It disappeared from the state because road development wiped out the butterfly's main food source. Ms. Huhn now must travel outside the state in hopes of observing and photographing it. Another local photographic subject she was once able to enjoy was the native wildflowers on virgin prairie remnants near historic Fort Snelling. This area was bulldozed for light rail construction for the airport, rendering her photography impossible. The light rail's construction was due, in part, to the need to accommodate the new population brought to Minneapolis by immigration.

178.    Ms. Huhn's losses also include her aesthetic enjoyment of the nature which used to surround Minneapolis which has been lost. She has frequently driven from Minneapolis to her childhood home of New Ulm. Over the years, she found: the trip grew longer as the Minneapolis urban area sprawled farther west. Instead of two hours, by the mid 1990's the 100-mile trip had stretched to nearly three.  It was also less scenic. Construction of office buildings atop a hill overlooking the Minnesota River outside a western suburb on her route meant destruction of about half the hill prairie on which she would view seasonal wildflowers.

179.    Other favorite and memories from the grounds of her childhood home were the frequent sounds of frogs and the Eastern Meadow Lark—which are

seldom seen or heard in the area now. She used to love watching and photographing wild birds, including Northern Flickers, Chickadees, Northern Cardinals, Robins, Blue Jays, and Red-Headed woodpeckers, which all used to be a common sight. Population growth has taken its toll on her enjoyment of this avian biodiversity, for instance, a recent news article informed her the woodpecker's population is down by 95% in Minnesota because of loss of oak savanna habitat—a result of increased development and population growth.[79]

180.    She grieves over the decades of her life spent slowly watching the gradual loss of the wilderness she grew up enjoying. This loss was driven by government choice, but Ms. Huhn never has had the chance to make her voice heard on any of these impacts under NEPA. She worries about the survival of a conservation program she lobbied for–the Minnesota Scientific and Natural Areas program, which protects lands in Minnesota with exceptional ecology and rare species. With continuing population growth driving unstoppable development, some of these protected lands are being encroached on and endangered by urban sprawl. Protecting an area itself is not enough if development or farmland reaches close enough to its borders–invasive species travel into a protected area via livestock, pets, gardens or waste. Urban sprawl has nearly reached the borders of her personal favorite protected area, the Helen Allison Scientific and Natural

---

[79] Gustave Axelson, *Nearly 30% of Birds in U.S., Canada Have Vanished Since 1970*, CORNELL CHRONICLE (Sept. 19, 2019), https://news.cornell.edu/stories/2019/09/nearly-30-birds-us-canada-have-vanished-1970.

Area. She worries that much of the legislative and citizen activism in which she has participated will be thus nullified by endless population growth.

181.    Sharp population growth has led to serious housing shortages. Tent camps for unsheltered people have been part of daily news for over two years. Sadly, many of these tent camps are impinging on the ecological integrity of suburban and urban open spaces per the camps' physical footprints or the trash and debris they produce. Aesthetically, functionally, and recreationally, her enjoyment of her own neighborhood has been reduced. She fears that if population in Minnesota continues to increase through immigration, particularly the newly enlarged refugee program, more and more of the open spaces and biodiversity she has enjoyed all her life will continue to be lost.

182.    The quality of life of Plaintiff Rob Meyer, also a resident of the Twin Cities, has also been affected by immigration-driven population growth and has caused places special to him change for the worse. The wilderness in Minnesota and Wisconsin has always been of special value to him. His family owns a lakeshore cabin in northwest Wisconsin, which was once in a wilderness but has now slowly been developed. More and more cabins are being built in the woods. Open spaces once ripe for bird and animal watching are evaporating; areas where he and his family could camp as children are paved over.  Today, virtually all lakeshore on Minnesota and Wisconsin lakes has been developed—with cabins built right on the roads that circle the lakes. The contrast Mr. Meyer sees between his ability to connect with nature in Minnesota and that of his children is stark.

183.    Population growth has caused massive suburban development on the east Metro Area of Minneapolis-Saint Paul in the St. Croix River Valley. The bare pastureland Mr. Meyer drove by on the way to high school in the early 1970's has been replaced by major shopping centers and endless single-family houses interlaced with multistory apartments and townhomes. This suburban sprawl around the Twin Cities constantly affects Mr. Meyer personally.  When he first moved to the Twin Cities in 1980, traffic levels and congestion were much less than they are now. He now spends hours in traffic as a direct result of population growth, with his commute to work increasing by 20-30 minutes a day just in the past 12 years.

184.    In addition, the population growth has significantly reduced the quality of Mr. Meyer's recreational opportunities along the rivers and his enjoyment of interstate waterways. The St Croix River, a designated National Scenic Riverway, is a special place to him. Throughout his life, he, along with his family, has frequently boated on the St. Croix, Mississippi River, and Minnesota Rivers. All three of these rivers are becoming progressively more crowded each year as the local population grows.

185.    Many years of immigration driven population growth has also necessitated an increase in farmland production to meet the growing local population's increased demand for food. This increased farmland production means that far more farming-related sediment is washed into streams where Mr. Meyer likes to go boating: it causes lower visibility of potential water-borne

hazards, clogs his boat's cooling vents, shallows the waterways, and rapidly forms sandbars, which are very hazardous. He and his children once found themselves grounded on a newly formed sandbar on a section of the Mississippi River known as Lake Pepin, and had to jump into ankle deep water. When the population of this area was smaller such a thing would never have happened.

186.    Mr. Meyer is aware of NEPA and how it was designed to promote environmentally-informed decision making and to enable public participation in federal agencies' actions. When he learned of NEPA, he realized that the government has a legal duty to let his voice be heard on the decisions it makes before irrevocably altering the environment around him. He especially wonders why there was never any local NEPA hearing when NGOs settled refugees around the area he lived. Refugee resettlement in particular has had a profound impact on Mr. Meyer's community.

187.    On information and belief, not only is the Minnesota the state with the most resettled refugees per capita but Minnesota is also the number one state in the nation for "secondary migration"–refugees moving to Minnesota after their initial resettlement elsewhere. Minnesota is so attractive because it has so many social services available for refugees, including one of the most sophisticated health systems specializing in refugee health.[80] The population impacts of refugees are far greater than the mere numbers who settle. Refugees in the Twin

---

[80] LUTHERAN SOC. SERV. OF MINN., REFUGEE FACTS AND FIGURES (updated Feb. 1, 2018), https://www.lssmn.org/sites/default/files/2018-06/Refugee%20Facts%20and%20%20Figures-Updated%2002012018.pdf.

Cities have historically brought in many more family members through chain migration. In addition, refugees have a much higher fertility rate than native Minnesotans. Therefore, the environmental impacts of this one program's ongoing addition of population to Mr. Meyer's local community have been and will continue to be very palpable to him.

188.    Mr. Meyer now knows that INS, DHS, and DOS all had promulgated NEPA regulations that allowed this neglect. The refugee program specifically has had a huge impact on the Twin Cities, although its effects were smaller at the end of the Trump Administration. However, Mr. Meyer's expectations that the future effects of the refugee program might remain small changed with the change in administrations. President Biden soon quadrupled the yearly refugee cap, and Mr. Meyer expects that it will continue to increase every year of the Biden administration. With the refugee ceiling so substantially increased, and with two more humanitarian programs recently created by DHS using the parole power, Mr. Meyer reasonably fears that more refugees or parolees will be resettled in the Twin City without any kind of NEPA review.

189.    Mr. Meyer is aware that Minnesota is historically home to a number of refugee resettlement non-governmental organizations (NGOs), including Lutheran Social Service of Minnesota, Catholic Charities of Mpls/St. Paul, Catholic Charities of Winona, the MN Council of Churches, the International Institute, and Arrive Ministries. He knows these NGOS privately make arrangements with the Department of State to determine how many refugees to

resettle in my local community. He believes a process like this is ideally suited for the kind of public transparency that NEPA is supposed to guarantee to citizens before their communities are transformed by public/private partnerships according to non-public contracts. But instead, the process has been frustratingly opaque.  Mr. Meyer believes if there were public transparency, the process would also move along with greater accountability. As it is, without NEPA review, the DOS takes action behind the scenes–determining the criteria for awarding contracts to NGOS, and granting them without public knowledge.

190.    As a native Minnesotan, Plaintiff Bruce Anderson has always particularly valued two natural landscape features: native grasslands and wetlands, particularly prairie wetlands, both of which are under threat in Minnesota from urban sprawl caused by population growth.

191.    Mr. Anderson is an avid a birdwatcher and nature observer but his enjoyment of these activities has become more and more threatened by urban sprawl and other development spurred by population growth that encroaches ever further into the wilderness. While observing nature in Minnesota and Wisconsin, over time Mr. Anderson has personally witnessed the dramatic decline of many species he used to find easily.  This includes endangered species such as the Western Fringed Prairie Orchid, the Piping Plover and Black Footed Ferret. He fears that if federal government driven population growth continues or accelerates, these cherished species will disappear altogether.

192.    When people move to these places, they put pressure on the environment in all sorts of ways. Over the past forty years Mr. Anderson has personally seen the huge proliferation of motorized recreation in places he used to be able to observe nature in solitude and quiet. He has been dismayed by the roar of motors echoing through the wilderness. His enjoyment of certain trails is interrupted or hazarded because of ATV traffic—where years ago they would never be seen.  The physical and acoustic footprint of these vehicles negatively impacts big small game and non-game species, which are sensitive to excessive noise and disturbance particularly during the breeding season and throughout the winter. Displacement during winter depletes energy reserves needed for survival and reproduction by mammals and birds. Engine noise scares and disorients animals while physical tracks destroy habitat and food sources.

193.    Mr. Anderson has witnessed entire landscapes in Minnesota and western states succumb to invasive plant expansion over time.  Invasive plant species, spread and encouraged by human activity in developments, has altered many places he used to observe nature. He greatly fears that if federal government driven population growth continues or accelerates, these once abundant species will disappear altogether. His fears have been realized with the abrupt change in immigration policies imposed by the Biden Administration that have already led to greatly accelerated population growth.

194.    As a Forest Service natural resource manager, Mr. Anderson is familiar with NEPA—he has been responsible for various aspects of

92

environmental analysis under NEPA himself. He has observed and written NEPA documents for minor federal actions such as issuing federal permits for ranchers to graze livestock, develop small water structures and treat noxious weeds. He finds it hard to believe in contrast that tens of millions of people have and continue to be granted permission to move to this country permanently without the government giving any consideration of the environmental impacts at all. It is his opinion that any agency regulations that allow such a gross oversight must be arbitrary and capricious.

195.    The refugee resettlement program has had an especially tangible effect on Mr. Anderson because the program has such a great influence on Minnesota, where his favorite habitats are so vulnerable to the effects of population growth. Minnesota is a notable destination for refugees, and the family members that follow them through chain migration. Unlike the arrangements between cattle ranchers and the Forest Service to graze cattle, the arrangements between refugee resettlement agencies and the DOS are never analyzed under NEPA. In fact, they are kept secret to the local public. Yet, these arrangements directly bring the people from other countries into Minnesota. For Mr. Anderson, the refugee program is the perfect example illustrating that the neglect of NEPA analysis for immigration is entirely arbitrary.

196.    DOS has just announced that it will be awarding contracts to resettle refugees to NGOs, and Mr. Anderson expects more if the Biden Administration continues to raise the refugee ceiling. There are several local branches of these

NGOs in Minnesota that will resettle refugees through the State Department's program. These contracts will accelerate population growth in Mr. Anderson's community, which will further encroach on his favorite habitats and wildlife.  But Mr. Anderson will have no opportunity in any kind of local hearing to hear what the plans are for the Twin Cities, as NEPA ought to provide him.

197.    Plaintiff Steven Chance Smith has been especially damaged by the six Biden Population Actions encouraging foreign nationals to cross the southern border between ports of entry. Collectively they caused the ongoing mass migration crisis at the southern border.

198.    Mr. Smith has lived almost his entire life on the border, and he understands that the number of crossings ebb and flow based on the actions of the presidential administration in power. He understands that the people who cross are extremely attentive to the promises made by those who are in charge of our immigration agencies like DHS: migrants come if they believe they are being encouraged by our government, and they do not come if they know they will be kept out.

199.    Mr. Smith also sees that DHS has ordered the Border Patrol to stand down. He no longer sees agents patrolling, and they have removed the cameras and sensors they used to use to monitor the border. He also talks to Border Patrol agents personally–many of them are demoralized because they want to do their job, but are not allowed to. They have told him that they have been ordered to release even criminal aliens into the interior with a Notice to Appear. This stand

94

down of law enforcement has allowed cartels to have free reign over the borderlands.

200.    Because Mr. Smith lives and works on the border, he personally witnesses the flow of border crossers. The six above-mentioned Biden Population Actions caused the number of crossers he personally sees crossing the ranch to increase to eight or nine times it was before. Not only does he see the people themselves cross, he finds signs of increased traffic on the ranch all the time–new blankets, new clothes, new carpet booties (to prevent leaving tracks), and new campsites. He has to pick up what they leave behind.

201.    Mr. Smith's daily life and peace and quiet working on the ranch and the enjoyment of leisure time at home are regularly disrupted by this increase in border crossings. Ranching is difficult, physical work, and Mr. Smith needs to take care of the cattle, letting them graze, and then rounding them up in order to brand and calve them. He rides around the ranch alone, gathering the cattle up. This process can take days, but be undone in a minute if border crossers open the gates and leave them open. The cattle are also stressed and less able to thrive as a result of border crossers and the trash they leave behind.

202.    Mr. Smith believes that to be a rancher is to be a steward of the land: he must take care of the land if he wants the cattle to thrive and to be able to sustain his way of life. He feels the land is entrusted to his care, and he cares greatly about it. Ranching is the life he knows and loves, even though he now knows it is impossible to live a normal life when the cartels are in control of the

border. When he is out on horseback or in his truck on the ranch, he is two hours from any law enforcement. He needs to bring a pistol at all times, even though he would prefer not to. However, he knows he is under threat of trouble from cartel members at all times when the border is not under control by law enforcement.

203.    Life on the border during mass migrations is very stressful. Mr. Smith feels that he has acclimated to it, but he often worries about his wife and children. They all know that gang members may break into their house at any time, and they have witnessed drug smugglers packing drugs through their property. He and his wife see all kinds of people crossing their property on the game cameras–many of them carrying A-K 47's. The constant threat certainly affects the quality of their lives and their enjoyment of their home and the land around them. His wife is often, quite reasonably, scared to death, and he worries for her. Relaxing at any time is impossible, because even when no border crossers or cartel members are visible to the eye, they leave signs that they have been there, like tracks or trash in the yard. Sometimes, drug smugglers will even bury drugs or guns on their property.

204.    The mass migration caused by the Biden Administration's recent actions has been particularly stressful, because law enforcement on the border has been ordered to completely stand down. Mr. Smith finds that many of the border crossers are more aggressive than they have ever been before, and this adds to his stress and worry, and makes it impossible for him to enjoy his ranching life. Border crossers also sometimes cause damage to the forest. In the past year, they

set two fires, which destroyed federal forests that Mr. Smith's employees would lease to ranch their cattle. Losing the ability to access this part of the forest was a substantial blow.

205.    Mr. Smith believes that DHS is able to carry out all of these actions because the public is in the dark about the scale of the environmental consequences. The land is being overrun and constantly degraded. The constant passage of people has all kinds of environmental and other consequences, but the Biden Administration is able to hide it because it never has to account for the actions they are taking. If NEPA were properly applied to immigration related actions, the situation might be different.

206.    Plaintiff Gail Getzwiller also experiences the environmental impacts of the Biden Administration's actions that have eased illegal entry and created incentives for illegal border crossers to come. The rush of people that have come through in the past seven months have done incredible damage to the environment that she cherishes along the border in Arizona.

207.    Recently, the numbers of people crossing the southern border have increased tremendously on the border near her ranches in Arizona, with no end in sight. Two particular hotspots are Sasabe, Arizona and Three Points, Arizona, both in Pima County. Sasabe is located right next to a gap in the border wall, and it is a place where the river usually runs dry. It is therefore, as it is, a very easy place to cross, and it has now become a significant point of entry for the cartels to

97

traffic in their human cargo, with enormous amounts of trash dropped in their wake.

208.    Local volunteers, including Ms. Getzwiller, in a supportive role, will go to hotspots on the border in order to clean up the trash that piles up when people cross illegally. In the past three years, upon information and belief, volunteers at the Arizona border have picked up 10,000 tons of trash left by border crossers. Illegal border crossers often discard everything they had with them on the journey north: diapers, backpacks, plastic water bottles, clothing. They often wear camouflage clothing to make the trek up to the border, but change into street clothes and clean themselves up once they are safely over the border. Cleaning this up is an incredibly big job. With Sasabe and Three Points undergoing such an environmental crisis, Ms. Getzwiller drives to both of these places in order to help support the ongoing clean-up efforts. She helps with the logistics–carrying out an enormous trash pickup operation in the middle of a desert requires a great deal of support. Helpers need to bring food, water, trucks to haul the massive amounts of garbage away.

209.    The larger the border crisis, the more impossible it is for volunteers to keep up with it—and the more it will harm the delicate and precious ecosystem that Ms. Getzwiller and her community relies upon for sustenance and renewal. The borderlands of Arizona have long been under threat from illegal border entry, and, over the years, she has had many people cross her ranches, and leave trash along the way. Picking up this trash is incredibly important to the health of the

ecosystem. Even if it is not on her own ranch, large amounts of trash cause

watershed degradation, soil erosion, damage to infrastructure, and loss of

vegetation and wildlife. It pollutes the water and is bad for human health, and

bad for the health of the cattle on her ranch as well. Seeing the damage from this

trash grieves her tremendously.

210.    Ms. Getzwiller believes the sustainability of her own way of life

depends on stopping the damage to the health of the local ecosystem—her own

cattle will not be healthy if the land is not tended. She also deeply cherishes and

values the borderlands there, with its unique and beautiful desert landscapes and

wildlife. Arizona has one of the most ecologically diverse landscapes in the nation,

and seeing it be a thoroughfare for migrant crossing highly disturbs her.

211.    While the land in Arizona can be harsh, Ms. Getzwiller feels that

seeing what it produces is incredibly rewarding. Arizona is an incredibly dry place,

and landowners must keep the soil in condition to receive the rain that does fall,

in order that the local Santa Cruz river will fill and, so that it will properly

replenish the land as well as provide water to people living in Arizona. No Arizona

landowner like her can fail to care about the health of the local rivers. The essence

of environmentalism, she believes, is local attachment to the land, with neighbors

and communities cherishing and taking care of the land near them.

212.    Thus, she is deeply upset by the intense environmental damage being

wrought by the current border crisis, which is occurring as a result of the Biden

Population Actions. Ms. Getzwiller sees that the Biden Administration wants to

encourage more people, from everywhere in the world, to come into the United States, and the federal agencies that control immigration policy have backed up that mandate with both words and actions. The more out of control the situation gets, the easier it is for more to come, and more and more are encouraged.

213.    Ms. Getzwiller knows that officials high in the DHS have clearly ordered the Border Patrol to stand down. She estimates that she sees about 25% of border protection activity that she did before the beginning of the Biden Administration. Border patrol agents simply do not patrol anymore. Some of it is because their manpower is taken up by processing families and children at the border. The cartels are very good at distracting border patrol agents from doing any enforcement that they might still do. For instance, cartels will leave children alone in the desert, stranded. The Border Patrol is obliged to save them.

214.    If construction on the wall had continued, Ms. Getzwiller would not be seeing such devastation in Sasabe. Closing the gap in the wall would have made such a huge difference, and if it had been built, far fewer border patrol agents would have been able to do the job of preventing entry. She would never have seen the trash pile up in massive amounts as she has. She wishes that the federal government had followed the mandate NEPA, and considered the environmental impacts of actions before carrying them out. The six Biden Population Actions that encourage migration at the southern border certainly have had significant impacts right at the border itself that have diminished her

enjoyment of the landscape and way of life she loves. But no agency carried out any NEPA analysis before going forward and implementing these actions.

215.     Furthermore, Ms. Getwiller is disturbed that DHS under the Biden Administration has entirely changed the mission of the border patrol. Living near the border, she sees that the foreign nationals apprehended at the border are mostly families or children traveling alone. The Border Patrol apprehends them, processes them, and then hands them over to other immigrant agents who bring them to non-governmental organizations like Catholic Services who take them, including minor children, and board them onto buses or planes to all sorts of places in the interior, either with papers to appear in court, or with nothing at all. The children come from Guatemala, Honduras and Ecuador primarily.

216.     Recently, while at the airport in Tuscon, Ms. Getzwiller spoke to a young volunteer for Catholic Charities who told her that he was putting six minors from Ecuador on a plane to New York City, where supposedly, Catholic Charities would try to find a family member. The young man explained to her that the border crossers are continually processed by immigration agents of the federal government, and taken to Casa Linda Lodge— a local housing space owned by Catholic Charities. Volunteers and employees at Casa Linda Lodge arrange transportation for the migrants from there to all over the United States interior. This particular story struck her with worry. She wondered if these six minors could really all be headed to New York City to be reunited with family–or if they were being trafficked, as many children traveling with non genetic relatives have

been. She wishes that the federal government had to disclose what sort of arrangements the Border Patrol really had with this NGO. As far as she knows, U.S. immigration agencies are, in essence, partnering with cartels and NGOs to bring millions of people into the country, and this partnership is big business. She feels that the disinfectant of sunlight is desperately needed.

217.    Ms. Getzwiller is also concerned about the public health and public safety risks of de facto allowing cartels to determine who crosses the nation's border and settles in the United States. She has heard that some crossers come from terrorist hotspots. While she has never been afraid for her physical safety from the border crossers themselves before, now she is. At this point, living so close to the frontlines, her peace and quiet, and enjoyment of her land is wrecked by worry. The worry and distress of living under these conditions and seeing places she cherishes overrun with migrants who could be from anywhere in the world is so great she is considering moving to Idaho. But at the same time, she can hardly imagine leaving a place she loves so much.

218.    Ms. Getzwiller believes that if our federal immigration agencies had to go through a NEPA process before carrying out these actions, the American public would react and have its voice heard. The news media has moved on from the chaos at the border, and much of the public is simply in the dark.

219.    Therefore, Plaintiffs have been harmed by the effects of the nine above-mentioned immigration actions in particular. No NEPA analysis of any of these actions was done whatsoever, even though they, cumulatively and

102

individually, had environmental impacts that have affected and will continue to affect Plaintiffs. The failure to attempt to conduct any sort of NEPA analysis also would not have happened if DHS's Instruction Manual had set up a rational framework to conduct analysis of the impacts of immigration related actions.

## VII.   CAUSES OF ACTION

### COUNT I

**The DHS Instruction Manual Violates the APA and NEPA by Failing to Require NEPA Compliance with Respect to its Actions Relating to the Entry Into and Settlement of Foreign Nationals in the United States.**

220.     Plaintiffs reallege the above paragraphs as if fully set forth herein. DHS promulgated its current NEPA procedures under CEQ regulations requiring each federal agency to adopt internal NEPA procedures to ensure NEPA compliance. 40 C.F.R. § 1507.3. These agency NEPA procedures needed to comply with CEQ regulations. 40 C.F.R. § 1507.1 (2017).

221.     CEQ's previous regulation 40 C.F.R. § 1507.3(b)(2) requires DHS to set forth "specific criteria for and identification of those typical classes of action[]" which normally require (i) the preparation of an environmental impact statement, (ii) the finding that they are subject to categorical exclusion, or (iii) the preparation of an environmental assessment.

222.     DHS promulgated its current Instruction Manual on November 6, 2014. The Instruction Manual qualifies as a "rule" under the APA because it is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or

103

describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (2012). NEPA rules qualify as final federal actions under the APA. 40 C.F.R. §1508.18(a) provides that federal actions include "new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals[.]"

223.    The regulation of the entry into and settlement of foreign nationals in the United States is a major component of DHS's statutory mission, and such regulation comprised "principal programs" pursuant to 40 C.F.R. § 1505.1(b) and "typical classes of action" pursuant to 40 C.F.R. § 1507.3(b)(2).

224.    The entry into and settlement of foreign nationals in the United States has myriad impacts on the "human environment" subject to NEPA analysis, including, but not limited to, population growth and the attendant impacts such growth produces. 42 U.S.C. § 4331(c)(C).

225.    The Instruction Manual, which is a final agency action with legal consequences, omits any mention of immigration policy. DHS's failure to address these "typical classes of actions" and/or "principal programs" in its Instruction Manual violated the CEQ NEPA regulations 40 C.F.R §§ 1500-1508. DHS's promulgation of this final agency action was arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS's action should be held unlawful and set aside.

## Count II

**Failure to Prepare an EIS for Termination of Border Wall Construction Violates NEPA and the APA.**

226.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

227.     The suspension of all border wall projects has had the potential to cause significant environmental effects which DHS has completely failed to consider, in violation of NEPA. Defendants have not prepared either an EIS or an EA to study the significant environmental impacts of abruptly terminating the border wall.

228.     In taking the above-referenced major actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS's action should be held unlawful and set aside.

## Count III

**Failure to Prepare an EIS or EA for Termination of "Remain in Mexico" Policies Violates NEPA and the APA**

229.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

230.     The termination of the "Remain in Mexico" policy by cancelling: 1) the "Migrant Protection Protocols;" 2) the Asylum Cooperative Agreements with Honduras, Guatemala, and El Salvador; 3) Prompt Asylum Case Review, and 4) the Humanitarian Asylum Review Program; has had the potential to cause significant environmental effects which DHS and DOS have completely failed to consider, in violation of NEPA. Defendants have not prepared either an EIS or an EA to study the environmental effects of these policies.

231.     In taking the above-referenced major actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS and DOS's actions should be held unlawful and set aside.

## Count IV

**Failure to Prepare an EIS or EA for the Adoption of a Policy for CBP Agents to Grant Temporary Permission to Stay in the United States and Arrange Transportation for Encounters at the Border Violates NEPA and the APA**

232.     Plaintiffs reallege the above paragraphs as if fully set forth herein.

233.     The adoption of a new policy by DHS to instruct CBP agents to give permission slips to seek more permanent legal status to those illegal border crossers they meet, and to help them board buses to destinations within the interior of the country has had the potential to cause significant environmental effects which DHS has completely failed to consider, in violation of NEPA. DHS has prepared neither an EIS nor an EA to study the environmental effects of these policies.

234.     In taking the above-referenced major actions without conducting any sort of environmental analysis, Defendants have taken final agency actions that are arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS's actions should be held unlawful and set aside.

**Count V**

**Failure to Prepare an EIS or EA for the Adoption of a Policy that Prevents ICE from Detaining and Removing the Vast Majority of Illegal Aliens in the Interior of the U.S. Violates NEPA and the APA**

235.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

236.    The adoption of a new policy by DHS to forbid ICE from detaining and removing of all foreign nationals unlawfully present except those who meet a few narrow categories has had the potential to cause significant environmental effects which DHS has completely failed to consider, in violation of NEPA. DHS has prepared neither an EIS nor an EA to study the environmental effects of this policy.

237.    In taking the above-referenced major actions without conducting any sort of environmental analysis, DHS has taken final agency action that is arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS' action should be held unlawful and set aside.

**Count VI**

**Failure to Prepare an EIS or EA for the Adoption of a Policy to No Longer Penalize Illegal Aliens from Failing to Depart the U.S. Violates NEPA and the APA.**

238.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

239.    The adoption of a new policy by DHS to stop fining aliens for failing to depart the U.S. has had the potential to cause significant environmental effects

107

which DHS has completely failed to consider, in violation of NEPA. DHS has not

prepared either an EIS or an EA to study the environmental effects of this policy.

240.    In taking the above-referenced major actions without conducting any

sort of environmental analysis, DHS has taken final agency actions that are

arbitrary, capricious, and otherwise not in accordance with law, or without

observance of procedure required by law, within the meaning of the APA. 5 U.S.C.

§ 706(2). As such, DHS's action should be held unlawful and set aside.

## Count VII

### Failure to Prepare an EIS or EA for Reinstating Administrative Closure in EOIR's Immigration Courts Violates NEPA and the APA

241.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

242.    The adoption of a new policy by DOJ to reinstate administrative

closure in EOIR's immigration courts has had the potential to cause significant

environmental effects which DOJ has completely failed to consider, in violation of

NEPA. DOJ has not prepared either an EIS or an EA to study the environmental

effects of this policy.

243.    In taking the above-referenced major action without conducting any

sort of environmental analysis, DOJ has taken final agency action that is

arbitrary, capricious, and otherwise not in accordance with law, or without

observance of procedure required by law, within the meaning of the APA. 5 U.S.C.

§ 706(2). As such, DOJ's action should be held unlawful and set aside.

## Count VIII

## Failure to Prepare an EIS or EA for Expanding the Refugee Resettlement Program Violates NEPA and the APA

244.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

245.    The adoption of a new policy by DOS to expand the refugee resettlement program has had the potential to cause significant environmental effects which DOS has completely failed to consider, in violation of NEPA. DOS has not prepared either an EIS or an EA to study the environmental effects of this policy.

246.    In taking the above-referenced major action without conducting any sort of environmental analysis, DOS has taken final agency action that is arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DOS's action should be held unlawful and set aside.

## Count IX

## Failure to Prepare an EIS or EA for Restarting a Program Through the Use of Parole Authority Specifically for Central Americans Violates NEPA and the APA

247.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

248.    The adoption of a new policy by DHS to restart a program through the use of parole authority by DHS in lieu of a refugee program specifically for Central Americans has had the potential to cause significant environmental effects which DHS has completely failed to consider, in violation of NEPA. DHS

109

has not prepared either an EIS or an EA to study the environmental effects of this policy.

249.    In taking the above-referenced major action without conducting any sort of environmental analysis, DHS has taken final agency action that is arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS's action should be held unlawful and set aside.

## Count X

**Failure to Prepare an EIS or EA for Creating a New Program Through the Use of Parole Authority Specifically for Afghani Nationals Violates NEPA and the APA**

250.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

251.    The adoption of a new policy by DHS to create a new program through the use of parole authority by DHS in lieu of a refugee program specifically for Afghani nationals has had the potential to cause significant environmental effects which DHS has completely failed to consider, in violation of NEPA. DHS has not prepared either an EIS or an EA to study the environmental effects of this policy.

252.    In taking the above-referenced major action without conducting any sort of environmental analysis, DHS has taken final agency action that is arbitrary, capricious, and otherwise not in accordance with law, or without observance of procedure required by law, within the meaning of the APA. 5 U.S.C. § 706(2). As such, DHS's action should be held unlawful and set aside.

110

## Count XI

**Alternatively, Failure to Prepare a Programmatic EIS of the Biden Population Actions Collectively Violates NEPA and the APA**

253.    Plaintiffs reallege the above paragraphs as if fully set forth herein.

254.    CEQ regulation 40 C.F.R. § 1508.1(q)(3)(iii) provides that federal actions subject to NEPA include: "Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive."

255.    The Biden Population Actions taken collectively constitute the adoption of such a program. This program constitutes a "coherent plan of national scope, [whose] adoption surely has significant environmental consequences." *Kleppe*, 427 U.S. at 400.

256.    Defendants were therefore alternatively required to prepare a programmatic EIS to evaluate the Biden Population Actions collectively if they were not evaluated individually. Defendants have not attempted to comply with NEPA for any of these actions. Defendants have therefore violated NEPA by failing to prepare an EIS, or even an EA, for the Biden Population Actions collectively. Collectively, these actions have had significant environmental effects.

257.    Defendants' decision to proceed without initiating any NEPA compliance accordingly is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA.

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing, Plaintiffs respectfully request that this Court grant the following relief:

1) Enter a declaratory judgment that DHS's failure to address immigration in the Instruction Manual is arbitrary and capricious and in violation of its duties under the law both at the time DHS promulgated its NEPA procedures and under the law today;

2) Enter an injunction that DHS shall adopt new procedures that shall address the environmental effects of its immigration related actions which considers, at minimum, their effects on population growth, and that provides guidance for how DHS shall coordinate NEPA compliance with other agencies when they conduct joint actions with DHS that relate to immigration.

3) Enter a declaratory judgment that Defendants have violated NEPA and the APA in adopting the Biden Population Actions by failing to prepare a programmatic EIS to study their impacts on the environment.

4) Enter an injunction that Defendants shall conduct a nationwide EIS on the Biden Population Actions.

5) Award Plaintiffs reasonable attorney fees, costs, and expenses incurred in pursuing this action to the extent permitted by law; and

6) Provide such other relief as this Court deems just and proper.

Dated: September 3, 2021

Respectfully submitted,

/s/ Julie B. Axelrod

D.C. Bar No. 1001557
Center for Immigration Studies
1629 K Street, NW, Suite 600
Washington DC, 20006
Telephone: 202-466-8185
FAX (202) 466-8076
Email: jba@cis.org