**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **MASSACHUSETTS COALITION FOR IMMIGRATION REFORM, *et al.*,**<br><br>Plaintiffs,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,**<br><br>Defendants. | Case No. 1:20-cv-3438 (TNM) |

## MEMORANDUM AND ORDER

The Massachusetts Coalition for Immigration Reform (MCIR) and six individuals
(collectively, the Coalition) challenge the Biden Administration's immigration actions—on
environmental grounds.  The Coalition contends that three federal agencies have not complied
with the National Environmental Policy Act (NEPA), which requires agencies to perform
environmental impact analysis before taking certain actions.  According to the Coalition, the
agencies' disregard of NEPA caused environmental harm.  The agencies move to dismiss all
claims for lack of subject matter jurisdiction and for failure to state a claim.

At this initial stage, the Court finds that it has jurisdiction.  But the Court dismisses two
claims: that the DHS's Instruction Manual violates NEPA and the Administrative Procedure Act
(APA) (Count I) and that the Biden Administration should have prepared a "programmatic"
environmental analysis of its immigration-related actions (Count XI).  The Manual does not
qualify as "final agency action" so this Court cannot hear an APA challenge to it.  And the
Coalition's programmatic challenge is not reviewable under the APA because it is not a

"discrete" agency action.  The Coalition's remaining claims survive the Government's Rule 12(b)(6) objections.

**I.**

The National Environmental Policy Act (NEPA) requires agencies to conduct environmental impact analysis before undertaking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "Major federal actions" include "new and continuing activities . . . financed, assisted, conducted, regulated, or approved by federal agencies" and new agency rules, regulations, and policies.  40 C.F.R. § 1508.1(q)(2). In a recommendation or report proposing a major Federal action that significantly affects the environment, agencies must include a detailed statement—called an Environmental Impact Statement (EIS)—about the action's projected environmental effects, the feasibility of alternatives, and more.  *See* 42 U.S.C. § 4332(2)(C)(i-v).  Instead of an EIS, an agency may conduct a preliminary Environmental Assessment (EA) to determine whether a particular action might significantly impact the environment at all.  If the answer is yes, an EIS becomes necessary.  *See* 40 C.F.R. § 1501.5.

These "action-forcing" provisions of NEPA and accompanying regulations require agencies to take a "hard look" at the environmental consequences of their actions.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Agencies must also share any EIS with the public, *see* 42 U.S.C. § 4332(2)(C)(v), so that potentially affected individuals can comment.  *See Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 123 (D.C. Cir. 1990).  Though NEPA "simply prescribes the necessary process" without "mandat[ing] particular results," its "procedures are almost certain to affect the agency's substantive decision."  *Robertson*, 490 U.S. at 350.

Plaintiff MCIR is a non-partisan group whose members have both professional and recreational interests in the quality of the environment.  *See* Am. Compl. ("Compl.") ¶¶ 26–30, ECF No. 17.  And MCIR believes that mass immigration has had "distinctly negative effects on [the] environment."  *Id.* ¶¶ 25–26.  Indeed, MCIR contends that "[i]f NEPA should apply to *any* government policy, it should be to federal policies that induce population growth."  *Id.* ¶ 13.  MCIR alleges that changes to immigration policies "between the Trump and Biden administrations . . . ha[ve] already had a profound influence on the 'human environment.'"  *Id.* ¶ 14 (quoting 42 U.S.C. § 4332).

One of the many policies MCIR alleges should have received NEPA review is DHS's decision to end construction on the southern border wall.  *See id.* ¶ 108.  But according to MCIR, the Biden Administration has not conducted NEPA analysis before changing wide swaths of policy impacting population growth.  *See id.* ¶¶ 13–14.  Because NEPA requires agencies to "engage in environmentally informed decision-making" by publishing an EA or EIS and soliciting public comment, MCIR alleges that the Biden Administration's ongoing failure to do so "denie[s] [Americans] a seat at the table."  *Id.* ¶ 13, 26.

Six individual plaintiffs join MCIR's suit.  *See id.* ¶¶ 31–36.  These individuals similarly espouse personal and professional interests in their local environment.  *See id.*  Two of the individual plaintiffs reside near the southern border and allege harm from the Government's repeated failure to perform NEPA analysis.  *See id.* ¶¶ 197–218.

For example, Plaintiff Chance Smith—who manages a cattle ranch near the southern border—claims that increased border crossings disrupt his enjoyment of his ranch and the surrounding environment.  *See id.* ¶¶ 35–36; 201–04.  Smith alleges that border crossers have set fires, destroying land integral to Smith's cattle ranch, and that they have left trash, campsites,

and other refuse on his land.  *See id.* ¶¶ 203–04.  Smith concludes that if the Government had properly conducted NEPA analysis before changing its immigration policies, the environmental consequences may have been different because the public would not be "in the dark about the scale of the environmental consequences."  *Id.* ¶ 205.

The Coalition sued the Department of Homeland Security (DHS), the Department of State (DOS), and the Department of Justice (DOJ) (collectively, the Government) for their failure to conduct NEPA analysis before taking certain federal immigration actions that allegedly cause environmental impacts.  *See id.* ¶¶ 38–41.  Each agency has its own NEPA procedures. *See id.* ¶¶ 57, 61, 64.  The crux of the Coalition's claim is that the Government failed to follow these procedures by neglecting to perform an EIS or EA before making or changing immigration policies.  *See, e.g.*, *id.* ¶¶ 22, 71.

The Coalition claims that the following actions required NEPA analysis: ending construction of the southern border wall (Count II); terminating the "Remain in Mexico" Policies (Count III); allowing border patrol agents to grant permission to aliens to stay in the country, and helping them board buses to other states (Count IV); preventing immigration officials from detaining and removing aliens (Count V); ending the practice of fining aliens for failing to leave the country (Count VI); reinstating administrative closure in immigration courts (Count VII); and expanding various refugee programs (Counts VIII, IX, and X).  *See id.* ¶¶ 226–52.  The Coalition also alleges that DHS's Instruction Manual violates NEPA because it does not require NEPA compliance for immigration-related actions (Count I), and that the Government's failure to "prepare a programmatic EIS" for all the actions in Counts II-X violated NEPA (Count XI). *See id.* ¶¶ 220–25, 253–57.  The Coalition seeks declaratory relief as to Counts I and XI, and injunctive relief for the rest.  *See* Compl. at 112.

The Government argues that the Court should dismiss all counts under Federal Rule of Civil Procedure 12(b)(1), on standing grounds, and under Rule 12(b)(6) because they are unreviewable under the APA. *See* Gov't Mot. to Dismiss (Gov't MTD), ECF No. 19. That Motion is now ripe.

## II.

To sue in federal court, a plaintiff must show injury, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must be concrete, particularized, and actual or imminent. *Id.* at 560. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* at 561. The Court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).

To seek prospective injunctive relief, a plaintiff must allege facts sufficient to show an imminent threat of future injury. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012). A plaintiff must also show a causal connection between his injury and the challenged conduct. *Id.* And it must be likely that a favorable decision will redress the injury. *Lujan,* 504 U.S. at 561. Only one plaintiff needs standing to press each claim. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

When a plaintiff sues under a statute, the Court must also determine whether he "falls within the class of plaintiffs whom Congress has authorized to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). To assess so-called "prudential standing" the Court interprets the statute to analyze whether it encompasses the injuries a plaintiff claims. *See id.* at 127. If so, a plaintiff falls within the statute's "zone-of-interests." *See id.* And "[t]he zone of interests test is not meant to be especially demanding." *Cement Kiln Recycling Corp. v.*

*EPA*, 255 F.3d 855, 871 (D.C. Cir. 2001) (cleaned up).  If a plaintiff brings an APA claim

involving another statute, a claim need only "arguably" fall within the statute's zone of protected

interests.  *Id.* at 870.

To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. Pro.

12(b)(6).  A claim is plausible when it "allow[s] the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Id*.  And the Court must draw all such

inferences in the plaintiff's favor.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129

(D.C. Cir. 2015).  The Court treats any documents attached to the Complaint—like individual

declarations—"as if they are part of the complaint."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

NEPA does not provide for judicial review.  Challenges to compliance with it therefore

proceed under the Administrative Procedure Act (APA).  *See Fund for Animals, Inc. v. U.S.*

*Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).  The APA permits judicial review of

all "final agency action" unless a "statute preclude[s] judicial review" or "agency action is

committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704.  Agency action is final if it is

the "consummation of the agency's decisionmaking process" and determines "rights and

obligations" or imposes "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Congress may preclude judicial review through express statutory language or the structure of the

statutory scheme.  *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  And an action is

committed to agency discretion by law if the statute's terms are so broad that the Court "would

have no meaningful standard against which to judge the agency's exercise of discretion."

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  The Court analyzes motions to dismiss on the grounds that an action is committed to agency discretion by law under Rule 12(b)(6).  *See Sierra Club v. Jackson*, 648 F.3d 848, 853–54 (2011).

### III.

The Government contends that the Coalition lacks Article III standing, *see* Gov't MTD at 9–16, and that the Coalition's injuries lie outside NEPA's "zone of interests," *see* Gov't Reply in Support of Mot. to Dismiss at 5–6 (Gov't MTD Reply).

A plaintiff must establish standing at each phase of litigation.  *See Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 48 (D.C. Cir. 2016).  But the Coalition's burden to prove standing at this stage is lighter than it will be at summary judgment.  *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.,* 369 F. Supp. 3d 141, 145 (D.D.C. 2019); *see also Osborn v. Visa Inc.*, 797 F.3d 1057, 1063 (D.C. Cir. 2015) ("A plaintiff's burden to demonstrate standing grows heavier at each stage of the litigation.").

The Coalition bears the burden of establishing constitutional standing and that its claims are within NEPA's zone-of-interests.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015).  For each claim, if at least one plaintiff has constitutional standing and satisfies the zone-of-interests requirement, the case may proceed.  *See Mountain States*, 92 F.3d at 1232.

The Court finds that Plaintiff Chance Smith has constitutional standing as to all Counts and that his claims fall within NEPA's zone-of-interests.  Smith lives and works on the southern border, where he operates a cattle ranch.  *See* Compl. ¶ 200; *see also* Smith Decl. ¶¶ 5–7, ECF No. 22-1.  Smith alleges that the Government's immigration policies have caused direct environmental harm to the land where he lives and works.  *See, e.g.*, *id.* ¶¶ 200–05; Smith Decl.

¶¶ 9–12, 18.  He contends that if the Government had conducted NEPA analysis before performing such actions, the environmental harm he witnesses could have been mitigated.  *See id.* ¶ 205; *see also* Smith Decl. ¶ 19–20.  As detailed below, Smith alleges facts sufficient to meet the tripartite test for constitutional standing, as well as NEPA's zone-of-interests requirement.

For the injury-in-fact element of standing, Smith claims a procedural right under NEPA.  Pls.' Opp'n to Mot. to Dismiss (Pls.' Opp'n) at 5, ECF No. 22.  As the D.C. Circuit has explained, the "archetypal procedural injury" is "an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment."  *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005).  So too here.  Every count in the Complaint challenges the Government's failure to conduct an EIS or EA before taking a major federal action pertaining to immigration.  *See* Compl. ¶¶ 220–57.

To be sure, alleging a bare procedural injury is not enough.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  Smith must also show that deprivation of his procedural rights under NEPA impairs his concrete environmental interests.  *See Summers*, 555 U.S. at 496; *see also City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1185–86 (D.C. Cir. 2007).  The Court finds that he does.

Smith contends that increased illegal immigration across the southern border has harmed his ranch and the surrounding environment.  *See* Smith Decl. ¶ 14.  More, he alleges that border crossers set fire to land he leases and left trash, campsites, and blankets in their wake.  *See id.* ¶¶ 9, 14, 17.  They even buried a gun in his backyard.  *See id.* ¶ 10.  And Smith claims that his heightened awareness of trespassers on and around his land has impaired his enjoyment of the outdoors.  *See id.* ¶ 14; *Cf. Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir.

2019) (explaining that individualized fears of health and environmental consequences which change one's behavior can establish injury-in-fact). Smith has also shown that the Government's failure to follow NEPA procedures posed a "distinct risk to his particularized interests given the location of his home." *City of Dania Beach*, 485 F.3d at 1186 (cleaned up) (finding that a man living next to a runway who alleged increased noise, jet exhaust smell, and residue stated an injury-in-fact under NEPA).

The Government argues that these injuries are too conjectural and speculative to establish injury-in-fact. *See* Gov't MTD at 12–13. Not so for now. The Court's duty to accept well-pleaded facts in the Complaint as true may seem to conflict with the instruction that injuries which are "too speculative will not suffice to invoke the federal judicial power." *Osborn*, 797 F.3d at 1064. Courts reconcile that perceived tension by "distinguishing allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions." *Id.* (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) (cleaned up)). So the Court does not reject allegations as too speculative—even when pled as part of a chain of events—if they can be proven true or false later in the litigation. *See id.* at 1064–65.

Smith also satisfies the standing requirement for injunctive relief because he alleges facts showing he will be "wronged again," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), if the Government does not conduct environmental analysis before taking similar immigration-related actions. *See, e.g.*, Compl. ¶ 93–96 (discussing how immigration is projected to increase and that it will continue to affect the environment); Smith Decl. ¶ 17 (expressing concerns about the current and future environmental impact of border crossings on ranch land).

Smith also pleads facts sufficient to show causation at this preliminary stage. To survive a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct

may suffice." *See Lujan*, 504 U.S. at 561.  Smith need not "prove that if he had received the procedure the substantive result would have been altered." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002).  Rather, facts supporting a "substantial probability" that the Government's failure to conduct any environmental analysis "created a demonstrable risk[] or caused a demonstrable increase in an existing risk of injury to [his] particularized interests" suffice.  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996).

Smith has adequately alleged facts tending to show that non-compliance with NEPA "caused a demonstrable increase in existing risk of injury" to his environmental interests.  For example, he alleges that border crossers "are extremely attentive to the promises" immigration officials make.  Compl. ¶ 198; *see also* Smith Decl. ¶ 5.  As such, he argues aliens "come if they believe they are being encouraged by our government" and "do not come if they know they will be kept out."  Compl. ¶ 198.  Smith also alleges that the Government has ordered immigration officials to "stand down" and to release aliens into the country.  *See id.* ¶ 199.  Not surprisingly, the number of border crossers has skyrocketed since President Biden's inauguration.  *See* Compl. ¶ 200; Smith Decl. ¶ 13; Pls.' Opp'n at 8–9.

The Government argues that Smith fails to allege facts sufficient to support causation. *See* Gov't MTD at 15–16.  To be sure, causation is more difficult to prove if it is the "result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560–61; *see also Arpaio v. Obama*, 797 F.3d 11, 20–21 (D.C. Cir. 2015).  But the Court "does not exclude injury produced by determinative . . . effect upon the action of someone else."  *Bennett*, 520 U.S. at 169.  Excluding such injuries risks unduly narrowing the causation inquiry to circumstances where the "defendant's actions are the very last step in the chain of causation."  *See id.* at 168–69.

More, the Government largely relies on cases decided at summary judgment for its argument about causation. *See, e.g.*, Gov't MTD at 16 (citing *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997 (9th Cir. 2021), which affirmed dismissal on standing grounds at summary judgment); *see also id.* (citing *Fla. Audubon Soc'y*, 94 F.3d 658 (same)).  Viewing those decisions as controlling here on the issue of causation would be improper. *See Osborn*, 797 F.3d at 1065–66 (criticizing district court for relying on cases decided at summary judgment in holding that plaintiffs lack standing).  This is so because a motion to dismiss "is not the occasion for evaluating the empirical accuracy" of a theory. *Id.*

So long as the facts Smith alleges are "specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleading stage." *Id.* at 1066.  Smith need not, as the Government argues, prove that the actions he challenges causes the immigration that is harming his surrounding environment. *See* Gov't MTD at 16–17.  Rather, at this stage he need only allege facts that he can prove at summary judgment. *See Osborn*, 797 F.3d at 1065–66. The Court finds that he clears this comparatively low bar.

Because Smith claims a procedural injury, the Court relaxes the normal standards for redressability and immediacy. *See Lujan*, 504 U.S. at 573, n.7; *see also Manson*, 414 F.3d at 5. The D.C. Circuit has noted that procedural injuries are "easily redressable, as a court may order the agency to undertake the procedure." *Fla. Audubon Soc'y*, 94 F.3d at 668.  And Smith pleads facts to suggest that the relief sought could redress these injuries. *See, e.g.*, Smith Decl. 21 (alleging that if the Government "had to be open and transparent" and "consider the consequences and answer to the American pubic before it carried out these actions, the Biden Administration might well have changed its mind.").

Smith also alleges injuries within NEPA's zone of interests.  "The zone of interests protected by the NEPA is, as its name implies, environmental."  *Gunpowder Riverkeeper*, 807 F.3d at 274; *see also Mountain States*, 92 F.3d at 1235–36 (noting that NEPA's "sweeping list of interests" includes even "aesthetic and environmental interests in the quality of public lands").  Smith alleges environmental injuries: trash and campsites left on his land, man-made fires, and more.  *See, e.g.*, Compl. ¶¶ 198–205; Smith Decl. ¶¶ 9–10, 14, 17.  Though the Government provides an illustrative list of which injuries fall outside NEPA's zone of interests, *see* Gov't MTD Reply at 5, the list does not include the environmental injuries which Smith alleges.  Smith's alleged injuries "have a sufficiently close connection to the physical environment" to fall within NEPA's zone of interests.  *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 778 (1983).

For all these reasons, the Court finds that Smith has constitutional standing to bring the claims, and that his alleged injuries fall within NEPA's zone-of-interests.

## IV.

The Government also argues (1) that claims about the DHS Instruction Manual are unreviewable under the APA because the Manual is not final agency action (Count I); (2) that the APA forecloses the Coalition's broad programmatic challenge (Count XI); (3) that the Court cannot hear the Coalition's claims about administrative closure because another federal statute bars review (Count VII); (4) that DOS's actions to resettle refugees are unreviewable because DOS is merely carrying out Presidential directives (Count VIII), (5) that DHS's NEPA waiver under the Trump Administration continues to apply, and even if it doesn't, ceasing construction is not a major federal action subject to NEPA (Count II), and (6) that the remaining claims fail to state a claim under the APA because they are either not final agency action or they are

committed to agency discretion by law (Counts III, IV–VI, IX-X).  *See id.* at 17–44.  The Court addresses each argument in turn.

## A.

The Coalition alleges in Count I that DHS's Instruction Manual, which implements NEPA, is arbitrary and capricious because it "omits any mention of immigration policy," therefore violating NEPA's implementing regulations.  *See* Compl. ¶¶ 220–25 (citing 40 C.F.R. § 1505.1(b) and § 1507.3(b)(2)), which require agencies to adopt NEPA procedures for "principal programs" and "typical actions" likely to have significant environmental effects).  The Government counters that the Instruction Manual is not "final agency action," and so it is unreviewable under the APA.  *See* Gov't MTD Reply at 17–21.

Section 704 of the APA permits review of "final agency action."  Agency action is final if it is the "consummation of the agency's decisionmaking process," rather than a tentative or interlocutory decision, and if it determines "rights and obligations" or imposes "legal consequences."  *Bennett*, 520 U.S. at 177–78 (cleaned up).  Each of these requirements "must be satisfied independently for agency action to be final."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018).  The Ninth Circuit recently held that DHS's NEPA Instruction Manual fails both requirements.  *See Whitewater Draw*, 5 F.4th at 1008–09.  The Court agrees.

An agency action that is the "last word on [a] matter," marks the consummation of the agency's decision-making process.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001).  Typically, the agency must "arrive[] at a definitive position on the issue that inflicts an actual, concrete injury."  *Darby v. Cisneros*, 509 U.S. 137, 144 (1993) (cleaned up).  And the agency's own treatment of the action can show that it is not the culmination of the agency's consideration

of an issue.  *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012).

The Manual is not DHS's "last word" on anything.  *See Whitman*, 531 U.S. at 478. Rather, DHS's Instruction Manual "establish[es] the policy and procedures DHS follows to comply with" NEPA.  *See* Gov't MTD, Ex. B at III-1.  For example, the Manual lists actions that normally require NEPA review, *see, e.g.*, *id.* at V-9, and it explains that DHS components decide what level of NEPA analysis is appropriate, *see, e.g.*, *id.* at IV-1.  In other words, the Manual helps DHS's components make NEPA decisions; it does not tell them how—or when—they must do so.  Indeed, though the Manual says that NEPA applies to "the majority of" DHS actions, it allows components to categorically exclude some, *see id.* at V-1, V-2, or "otherwise decide to prepare an EA for any action at any time," *see id.* at V-4.

As the Ninth Circuit held, "[t]his is not the stuff of final agency decisionmaking." *Whitewater Draw*, 5 F.4th at 1009.  DHS has not "arrived at a definitive position on the issue that inflicts an actual, concrete injury," *Darby*, 509 U.S. at 144, with the Manual because individual components within the agency ultimately decide whether an EIS or EA is warranted. *See, e.g.*, Gov't MTD, Ex. B at IV-1; *see also Holistic Candlers*, 664 F.3d at 944 (holding that FDA warning letters did not conclude the agency's decisionmaking process because they were merely a preliminary step that "may lead to enforcement action" if firms didn't correct violations).

The Coalition responds that the Manual's publication in the Federal Register after a period of review and comment renders it the culmination of the agency's decision-making process.  But publication in the Federal Register is not dispositive; *Bennett*'s test is.  *See, e.g.*, *Nat'l Ass'n of Home Builders v. Norton*, 298 F. Supp. 2d 68, 79 (D.D.C. 2003) (holding that an

agency's guidance document published in the Federal Register is not final agency action because it fails *Bennett*'s test), *aff'd*, 415 F.3d 8 (D.C. Cir. 2005).

The Manual is not the end of DHS's decision-making process about whether environmental analysis is required under NEPA; it is the beginning.

But even if the Manual were the end of DHS's decision-making, it is not final agency action because it creates no new obligations and has no legal consequences. *See Bennett*, 520 U.S. at 156.

In deciding whether agency action creates new rights and obligations, the Court looks to whether the agency action at issue "had direct and appreciable legal consequences" on regulated entities. *See Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020); *see also Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014). But agency action that "merely clarifies [regulated entities'] existing duties under the [statute] and explains the process [the agency] suggests" does not impose legal obligations. *See Catawaba Cnty. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009). In *Sierra Club*, for example, the D.C. Circuit held that the EPA's guidance document on "Significant Impact Levels" for pollutants did not create new obligations or impose legal consequences. *See* 955 F.3d at 63–64. The Circuit reasoned that EPA's guidance imposes no "obligations, prohibitions, or restrictions on regulated entities" and "does not subject [regulated entities] to new penalties or enforcement risks." *Id.* at 63. "Paramount" in the Circuit's decision that the guidance did not impose legal obligations "is the amount of discretion [regulated entities] retain" under EPA's guidance. *Id.* at 64. So too here.

DHS's Manual by its terms "implements"—rather than augments or alters—NEPA's preexisting requirements. *See, e.g.*, Gov't MTD, Ex. B at V-1; *see also Whitewater Draw*, 5 F.4th at 1009. Its general instructions do not bind DHS or any of its components to a particular

decision.  *See generally id.*  As explained, components remain free to categorically exclude actions from environmental analysis, or not.  More, there are no consequences if a component were to violate the Manual's procedures.  Nor could there be, because a violation of the Manual is really a violation of NEPA itself.  The Manual thus merely "clarifies" existing duties under NEPA and "explains the process [DHS] suggests" for compliance.  *Catawaba Cnty.*, 571 F.3d at 34.

The Coalition's arguments to the contrary are unpersuasive.  That the Manual includes mandatory language that components "must" follow in implementing NEPA, *see* Pls.' Opp'n at 27, does not mean that the Manual imposes these requirements, rather than NEPA itself.  *See Whitewater Draw*, 5 F.4th at 1009.  More, just because the Manual "integrates NEPA" with other federal laws does not mean it creates new substantive legal obligations or alters NEPA's preexisting legal regime as to DHS.  And the Manual's illustrative list of actions that "normally" receive an EIS, *see* Pls.' Opp'n at 28, does not bind DHS components to act similarly in the future.  Finally, that the Manual includes certain "categorical exclusions," *see* Pls.' Opp'n at 28, does not add to or diminish DHS's NEPA obligations.  The Manual itself does not command DHS components to invoke an exclusion for a certain action, and the Coalition has challenged no individual categorical exclusion here.  Thus, the Manual does not alter the existing NEPA regime nor create new substantive legal obligations.

Because the Manual fails both parts of *Bennett*'s test for final agency action, this Court cannot review it under the APA.[1]

---

[1]  The Coalition tries to save the Manual's lack of finality by arguing that it is a rule under 5 U.S.C. § 551(4).  *See* Pls.' Opp'n at 24.  Though the APA defines "agency action" to include an "agency rule," *Bennett* prescribes the test for "final agency action" and, as explained, the Manual does not qualify.

**B.**

The Coalition also challenges the Government's failure to "prepare a programmatic EIS" for what it calls their "population growth agenda."  Compl. ¶¶ 105–06, 254–57 (Count XI).  The Coalition contends that an EIS was necessary because the Government's actions—which include ending construction of the southern border wall, the reinstatement of administrative closure in immigration courts, and other diffuse policy changes, *see id*. ¶¶ 220–257—"work synergistically" to form a "coherent plan of national scope," *id.* ¶¶ 105, 255.  The Government counters that Supreme Court precedent forecloses such broad, programmatic challenges.

Though the APA permits review of final agency action, the challenged agency action must be "discrete."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).  "The limitation to discrete agency action precludes . . . broad programmatic attack[s]."  *Id.*  In *Lujan v. National Wildlife Federation*, for example, the Court rejected a challenge to 1,250 individual agency actions which plaintiffs challenged as the agency's "land withdrawal review program."  *See* 497 U.S. at 890.  The Court explained that the "program" plaintiffs challenged was not "a single [agency] order or regulation" or even "a completed universe of particular [agency] orders and regulations."  *Id.*  Rather, plaintiffs lumped more than a thousand agency actions together, called it a "program," and challenged it in Court.  *See id.*  The Court noted that "the offices of the [agency] or the halls of Congress" are better suited to resolve such a broad challenge, because that is "where programmatic improvements are normally made."  *Lujan*, 497 U.S. at 891; *see also Norton*, 542 U.S. at 64–65.  So too here.

The Ninth Circuit recently rejected a similar programmatic challenge to numerous immigration-related agency actions.  *See Whitewater Draw*, 5 F.4th at 1010–11.  As here, plaintiffs claimed that DHS implements certain "programs" in violation of NEPA including

"employment-based immigration" and "long-term nonimmigrant visas." *See id.* The Ninth
Circuit held that *Lujan* foreclosed such challenges because plaintiffs challenged a collection of
DHS actions regulating immigration, not a discrete agency action. *See id.* More, the Ninth
Circuit explained that plaintiffs failed to name "any regulations, rules, orders, public notices, or
policy statements that authorize or enforce these 'programs.'" *Id.* at 1010. Plaintiffs' inability to
pinpoint any such authority showed that were not challenging a discrete agency action. *Id.*; *see
also Arizona v. Mayorkas*, No. 21-cv-00617-PHX-DWL, 2022 WL 357348, at *4–5 (D. Ariz.
Feb. 7, 2022) (dismissing a similar programmatic challenge combining several of the same
claims the Coalition brings here).

The Coalition's argument in Count XI similarly fails to identify discrete agency action.
Indeed, the programmatic attack essentially lumps together all actions in the ten prior counts to
argue that they are one "program": the "Biden Population Actions." *See* Compl. ¶ 256. Yet, as
*Lujan* and *Whitewater Draw* underscore, labeling diffuse actions a "program" does not a
program make. More, because the Coalition challenges the Government's failure to comply with
NEPA for each action individually, the controversy "has been reduced to more manageable
proportions," *Lujan*, 497 U.S. at 891, and its programmatic challenge is duplicative.

The Court will dismiss the Coalition's programmatic challenge (Count XI) as
unreviewable under the APA.

## C.

The Coalition argues in Count VII that DOJ's decision to reinstate "administrative
closure"[2] in immigration courts should have received environmental analysis under NEPA. *See*

---

[2] Administrative closure is a docket management tool that allows immigration judges to remove
cases from their active calendar without deciding the merits. *See* Compl. ¶¶ 113–16 (describing
the practice); *see also* Gov't MTD at 35 n.13.

Compl. ¶¶ 242–43.  The Government argues that the Immigration and Nationality Act (INA) divests this Court of jurisdiction to hear this claim because it channels challenges "arising from" immigration proceedings into the circuit courts.  *See* Gov't MTD at 35–37.

Federal district courts have jurisdiction over "all civil actions arising under the Constitution, law, or treaties of the United States."  28 U.S.C. § 1331.  Congress may limit this broad grant of jurisdiction "by establishing an alternative statutory scheme for administrative and judicial review."  *Am. Fed'n of Gov't. Emps., AFL-CIO v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019).  The Government contends that the INA creates such a scheme.

The INA provides that "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States . . . shall be available only in judicial review of a final order under this section."  8 U.S.C. § 1252(b)(9).  And it explains that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued[.]"  *Id.* § 1252(a)(5).  The Government contends that these provisions work in tandem to bar the Coalition's NEPA challenge.  *See* Gov't MTD at 36.  This is so, it argues, because the Attorney General essentially intervened in an ongoing removal proceeding (*Matter of Cruz-Valdez*, 28 I&N Dec. 326 (A.G. 2021)) to issue an opinion that immigration judges may again use administrative closure.  *See id.*  As a result, the Government concludes that the Attorney General's opinion "aris[es] from" a removal proceeding and is thus reviewable only through "a petition for review filed with an appropriate court of appeals."  §§ 1252(b)(9), (a)(5).

Not so.  By its terms, § 1252(a)(5) channels into the courts of appeals "petition[s] for review . . . *of an order of removal*." (emphasis added).  The Coalition does not challenge an order of removal; it challenges the lack of NEPA analysis before the Attorney General reinstated

19

administrative closure.  *See* Compl. ¶¶ 113–16; *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 126 (D.D.C. 2019) (holding that § 1252(a)(5) did not bar a challenge to a generally applicable rule because it is not "an order of removal.").  Section 1252(a)(5) therefore does not channel the type of claim the Coalition raises here.

So too for § 1252(b)(9).  Though this provision exists "to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals . . . it applies only '[w]ith respect to review of an order of removal under subsection (a)(1)." *I.N.S. v. St. Cyr*, 533 U.S. 289, 313 (2001) (quoting 8 U.S.C. § 1252(b)).  As explained, the Coalition challenges the Attorney General's NEPA compliance, not an order of removal.

More, the Supreme Court recently explained that the phrase "arising from" in § 1252(b)(9) should not be read with "uncritical literalism . . . leading to results that no sensible person could have intended." *Jennings v. Rodriguez*, 138 S. Ct. 830, 840 (2018) (plurality op.) (cleaned up).  In *Jennings*, aliens challenged statutory provisions requiring detention without a bond hearing.  *Id.* at 839.  The plurality explained that § 1252(b)(9) did not deprive it of jurisdiction even though the aliens had at one time been subject to removal proceedings and did not raise their claims during that process.  *Id.* at 840.  The Court reasoned that just because a removal proceeding was the but-for cause of the aliens' claimed injuries, it proves too much to say that such injuries "arise from" the removal proceedings themselves.  *See id.*  Adopting this logic would render whole categories of claims "effectively unreviewable" because it could be possible that "no such [final] order [of removal] would ever be entered in a particular case, depriving that [person] of any meaningful chance of judicial review." *Id.; see also St. Cyr*, 533 U.S. at 313 (explaining that § 1252(b)(9) "does not bar [] jurisdiction over removal orders *not* subject to judicial review" under the INA in the first place).

To be sure, circuit courts have at times described § 1252(b)(9) as "vise-like in grip . . . swallowing up virtually all claims that are tied to removal proceedings" including "policies-and-practices challenges." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016). But *St. Cyr* and *Jennings* control here. Members of the Coalition will never be subject to a removal proceeding under the INA. So there will never be a final order of removal through which they could challenge the lack of environmental analysis before the Attorney General's reinstatement of administrative closure. *Cf. O.A.*, 404 F. Supp. 3d at 130 ("[I]f there is no final order of removal, there is nothing into which to fold the precedent challenges," and § 1252(b)(9) is inapplicable). Even though the new administrative closure regime technically "arises from" a removal proceeding, this does not end the inquiry. *See Jennings*, 138 S. Ct. at 840; *see also O.A.*, 404 F. Supp. 3d at 109. Adopting the Government's reading of § 1252(b)(9) would flout the Supreme Court's instruction to "eschew uncritical literalism" when interpreting "arising from" in the INA. *Jennings*, 138 S. Ct. at 840.

The Court therefore finds that it has jurisdiction to hear the Coalition's claim in Count VII and that it states a claim under the APA. At this preliminary stage, the Court accepts the Coalition's factual allegations as true, *see Iqbal*, 556 U.S. at 678, and "presum[es] that general allegations embrace those specific facts that are necessary to support [a] claim," *Lujan*, 504 U.S. at 561 (cleaned up).

**D.**

The Coalition contends in Count VIII that DOS's actions to resettle refugees were arbitrary and capricious because DOS did not first conduct NEPA analysis. *See* Compl. ¶¶ 119–23, 245–46. The Government counters that this claim is unreviewable because DOS is merely carrying out Presidential directives, and the APA does not waive sovereign immunity. *See* Gov't

MTD at 38–39.  But the Government misstates the object of the Coalition's challenge.  So its arguments to dismiss Count VIII fail.

Though the Coalition notes that President Biden raised the refugee admission ceiling, *see* Compl. ¶ 119, it does not challenge that action.  Instead, the Coalition argues that DOS's actions to resettle refugees—specifically its request for proposals from charitable organizations throughout the country—should have received NEPA analysis.  *See, e.g.*, Pls.' Opp'n at 36–37 (explaining that the challenge is to "the final decisions by DOS" which includes "[t]he setting of terms and the award to specific grantees of these contracts" which "will have environmental impacts.").  Even though, as the Government notes, the INA gives the President plenary authority to admit refugees, *see* Gov't MTD at 38, the Coalition is not challenging the *number* of refugees, but that DOS is resettling them in partnership with NGOs with no NEPA analysis, *see* Compl. ¶¶ 121–24; Pls.' Opp'n 36–37.

The Court finds that the Coalition states a claim under the APA in Count VII at this preliminary stage.  The Court must accept the Coalition's factual allegations as true, and finds that it states a claim for relief that is plausible on its face.  *See Iqbal*, 556 U.S. at 678.

### E.

Next up is the Coalition's contention in Count II that DHS should have conducted a NEPA analysis before suspending construction on the southern border wall.  *See, e.g.*, Compl. ¶ 227–28; Smith Decl. ¶ 12, 18–20.  The Government counters that this claim should be dismissed because DHS waived NEPA review for border wall projects during the Trump Administration. *See* Gov't MTD at 22–23.  Alternatively, it argues that the termination of border wall construction is "not a major federal action affecting the environment" sufficient to trigger NEPA review.  *See id.*

Both sides agree that the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA) allowed DHS to waive NEPA analysis when beginning border wall construction during the Trump Administration.  *See* Gov't MTD at 23; Pls.' Opp'n at 20–21.  They disagree about whether DHS's waiver is still in force.  The Trump DHS waived NEPA analysis "with respect to the construction of physical barriers and roads."  *See* Gov't MTD at 23; Pls.' Opp'n at 21 (quoting Determination Pursuant to Section 102 of the IIRIRA, as Amended, 85 FR 14961, 14,962–63 (Mar. 16, 2020) ("DHS Waiver")).

The Government contends that a decision to stop construction is a decision "with respect to" construction, so the waiver continues to cover DHS actions.  Gov't MTD at 23.  The Coalition counters that Congress only delegated waiver authority to DHS in Section 102(c) of IRRIRA "to ensure expeditious construction of [] barriers and roads."  Pub. L. No. 109-13, § 102(c).  The Coalition also argues that the waiver must be read in its broader context, which includes the Secretary's justification for the waiver: "an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries."  Pls.' Opp'n at 21 (quoting DHS Waiver).

The Court agrees with the Coalition.  The Government cites *Center for Biological Diversity v. Trump,* 453 F. Supp. 3d 11(D.D.C. 2020), to support their claim that the waiver continues to bind the Biden DHS.  *See* Gov't MTD at 23.  But that case dealt with a NEPA challenge to decisions DHS made during the Trump Administration—the same administration that had waived NEPA.  *See Ctr. for Biological Diversity*, 453 F. Supp. 3d at 35–36.  This case and the others the Government cites, *see* Gov't MTD at 23-24, do not hold—or even suggest— that a prior administration's waiver extends to the next administration when it wants to cancel the project.  *Cf. Nat'l Audubon Soc'y, Inc. v. Watt*, 678 F.2d 299, 307 (D.C. Cir. 1982) (declining

to construe an agreement by one administration about NEPA analysis to "bind the parties [in a new administration] long after it has served its principal purpose.").  It is highly doubtful that the justification for an action can also explain its opposite or that the waiver of provisos to build something also would cover a stop-work order.

The Government's alternative argument for dismissal also fails.  It contends that ending border wall construction "does not alter the substantive environmental status quo" and is thus not a "major Federal action[] . . . significantly affecting the quality of the human environment." Gov't MTD at 24.  Perhaps that may prove to be true.

But the Coalition alleges that ending construction has harmed the land and the surrounding environment.  It claims, for instance, that border crossers left trash and buried a gun on Plaintiff Smith's property.  *See* Smith Decl. ¶¶ 9–10.  The Coalition also alleges that border crossers burned land that Plaintiff Smith leases.  *See id.* ¶¶ 17–18.  So taking the Coalition's allegations as true, "terminating the wall . . . [did not] leave the world as it is," as the Government claims.  *See* Pls.' Opp'n at 22.   The actions of which the Coalition complains were not occurring when the wall was being built.  *See, e.g.*, Smith Decl. ¶ 6–8, 12–14.

The Court finds that the Coalition states a claim under the APA in Count II at this preliminary stage.  The Coalition alleges sufficient facts, taken as true, to state a claim for relief under NEPA and the APA that is plausible on its face.  *See Iqbal*, 556 U.S. at 678.

## F.

In Count III, the Coalition challenges the DHS's termination of four "Remain in Mexico" policies[3] without first performing NEPA analyses.  These policies are the Migrant Protection

---

[3]  The Government correctly notes that what the Coalition labels the "Remain in Mexico" policy is four separate policies, only one of which—the Migrant Protection Protocols—is called "Remain in Mexico."  *See* Gov't MTD at 25.

Protocols (MPP), the Asylum Cooperative Agreements, Prompt Asylum Claim Review, and the Humanitarian Asylum Review Process.  The Government argues that the DHS's termination of the MPP is not reviewable under the APA because it is committed to agency discretion by law. *See* Gov't MTD at 26 (quoting 5 U.S.C. § 701(a)(2)).  It also argues that the Asylum Cooperative Agreements are not reviewable under the APA.[4]

For its claim about the MPP, the Coalition relies on a June 2021 DHS memorandum.  *See* Compl. ¶ 109 n.48; Pls.' Opp'n at 30.  While this case was pending, the Northern District of Texas vacated the June Memorandum, *see* 554 F. Supp. 3d 818, and DHS issued a replacement memorandum in October, *see Biden v. Texas*, 142 S. Ct. 2528, 2537 (2022).  The Supreme Court recently held that this October memorandum is final agency action reviewable under the APA. *See id.* at 2544–45.  Here, the Government contends that the Coalition's NEPA challenge is barred because DHS's rescission of the MPP is an action committed to agency discretion by law. Though the Supreme Court did not address this argument in *Texas*, the Fifth Circuit held that DHS's rescission of the MPP was not committed to agency discretion by law.  *See Texas v. Biden*, 10 F.4th 538, 550–51 (5th Cir. 2021).

Even so, the Coalition does not challenge rescission of the MPP on its face.  Rather, it challenges DHS's failure to conduct NEPA analysis before doing so.  *See* Pls.' Opp'n at 31. DHS's decision—or not—to conduct NEPA analysis does not fit into the narrow category of decisions committed to agency discretion by law.  This category applies only in the "rare

---

[4]  The Government concedes that the Coalition's challenges to the Prompt Asylum Claim Review and Humanitarian Asylum Review Process polices are reviewable.  *See* Gov't MTD at 25–26 n.6 (citing *Las Ams. Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1, 9 (D.D.C. 2020) (finding that these policies are reviewable under the APA)).  But it argues that because the Coalition has not articulated how the termination of the policies will impact it, it lacks standing to challenge them.  For the reasons stated in Part III.A of this Memorandum, the Court finds that Smith has standing to press these claims.

circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Heckler*, 470 U.S. at 830).  But an agency's compliance—or not—with NEPA is an assessment courts make all the time.  The Government's argument that civil and criminal enforcement decisions fall outside NEPA's definition of major federal actions, *see* Gov't MTD at 27, does not help its cause.  As explained, the Coalition is not challenging the recission of the MPP itself, but the decision to rescind it without performing NEPA analysis.  *See* Pls.' Opp'n at 31.[5]

The Government also argues that Congress stripped courts of jurisdiction to hear the Coalition's claims about DHS's rescission of the Asylum Cooperative Agreements (ACAs).  *See* Gov't MTD at 29.  But the provisions the Government cites, *see* 8 U.S.C. § 1158(a)(2)(A) and (a)(3), are inapplicable because—again—the Coalition is not challenging the end of the ACAs themselves, but rather the decision not to conduct NEPA analysis before doing so.

The Court finds it has jurisdiction to hear the challenge to the ACAs, and that the Coalition states a claim under the APA as to the other programs in Count III.  At this preliminary stage, the Court accepts the Coalition's factual allegations as true, *see Iqbal*, 556 U.S. at 678, and "presum[es] that general allegations embrace those specific facts that are necessary to support [a] claim," *Lujan*, 504 U.S. at 561 (cleaned up).

---

[5]  Though the Government raises a parade of horribles which may result if NEPA is required for enforcement decisions, that argument falls flat.  *See* Gov't MTD at 28.  NEPA analysis is required for major federal actions, and the Coalition contends that the rescission of the MPP was one such action.  *See* Pls.' Opp'n at 31.  So the Court breaks no new ground here.

### G.

Counts IV–VI, IX, and X allege that DHS should have conducted NEPA analysis before changing policies related to detention, removal, fines, and the use of parole authority to aid refugees. *See* Compl. ¶¶ 233–40. The Government levies the same objection to all of these claims: that they are committed to agency discretion by law and therefore unreviewable under the APA. *See* Gov't MTD at 30–31; *see also* 5 U.S.C. § 701(a)(2).

For example, the Coalition argues in Count V that DHS should have conducted NEPA analysis before changing the criteria for detaining and removing aliens. *See id*. ¶¶ 111–12, 236–37. DHS announced this policy in a February 2021 Memorandum, which instructs immigration officials as to the criteria they should use when determining whether to detain or remove aliens. *See id.* ¶ 111.

The Court takes judicial notice of the following facts related to the Coalition's claim in Count V. The Southern District of Texas has enjoined the February Guidance the Coalition challenges here. *See Texas v. United States*, 555 F. Supp. 3d 351 (S.D. Tex. 2021). While DHS's appeal was pending, it issued Final Guidance in September 2021 rescinding the February Guidance. *See* Mem. from Tae D. Johnson, Acting Director, U.S. Immigr. and Customs Enf't, to All ICE Employees (Sept. 30, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf. The States challenging the February Guidance in Texas then amended their Complaint to challenge the September Guidance, and sued in another forum. Now, the Fifth and Sixth Circuits disagree about whether the States have standing and whether the September Guidance is valid under the APA. *Compare Texas v. United States*, 40 F.4th 205 (5th Cir. 2022), *with Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022). The Supreme Court has granted

certiorari to decide these questions.  *See* Order, *United States v. Texas*, 22–58, 2022 WL 2841804 (U.S. July 21, 2022).

Here, the Coalition has not sought leave to amend its complaint to challenge the September Guidance.  Nor has the Government contended that the Coalition's challenge to the February Guidance is moot, and that is its "heavy burden" to prove.  *Zukerman v. USPS*, 961 F.3d 431, 441–42 (D.C. Cir. 2020) (analyzing whether a rescinded USPS policy, though replaced by a rule, can still keep causing injury).  In any event, the Coalition's challenge to the February Guidance differs from the issues pending at the Supreme Court because it alleges that DHS should have performed NEPA analysis before issuing the Guidance.  *See, e.g.*, Compl. ¶¶ 236–37.

The Government counters that DHS's enforcement decisions are not reviewable because they are committed to agency discretion by law.  *See* Gov't MTD at 30–31 (citing 5 U.S.C. § 701(a)(2)).  The Government levies the same charge against Counts IV, VI, IX, and X.  But as the Coalition points out, nowhere does it challenge DHS's individual enforcement decision to fine (or not), to parole (or not), or to deport (or not).  *See* Pls.' Opp'n 33–35.  Nor could it because *Heckler v. Chaney* would likely bar such challenges.  *See* 470 U.S. at 831 (holding that that an agency's decision not to prosecute or enforce is committed to agency discretion by law and is therefore unsuitable for judicial review).  The Coalition instead challenges the way DHS adopted *general* enforcement policies.  *See, e.g.*, Compl. ¶¶ 236–37; Pls.' Opp'n at 33–34 ("Defendants ignore that Plaintiffs are simply not challenging either the grant or denial of parole to any individual alien, but rather, [] the decisions to create these programs . . . without NEPA review.").

The Court finds that the Coalition states a claim under the APA in Counts IV–VI, IX, and X at this preliminary stage.  The Court must accept the Coalition's factual allegations as true, and finds that it states a claim for relief that is plausible on its face.  *See Iqbal*, 556 U.S. at 678.

## V.

In sum, the Court has jurisdiction over all but two of the Coalition's claims.  The Coalition's burden to prove standing is lighter here than it will be at summary judgment.  *See Osborn*, 797 F.3d at 1063.  For now, the Court accepts the Coalition's factual allegations as true, *see Iqbal*, 556 U.S. at 678, and "presum[es] that general allegations embrace those specific facts that are necessary to support [a] claim," *Lujan*, 504 U.S. at 561 (cleaned up).  At summary judgment, however, the Coalition must offer admissible evidence affirmatively establishing its standing to proceed and entitlement to vindication on the merits.  *See id.* at 561.  For these reasons, the Government's Motion to Dismiss, ECF No. 19, is GRANTED as to Counts I and XI and DENIED in all other respects.

**SO ORDERED.**


Dated: August 11, 2022                                        _____
                                                             TREVOR N. McFADDEN, U.S.D.J.