UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

MASSACHUSETTS COALITION FOR
IMMIGRATION REFORM, *et al.*,

        Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*

        Defendants.

Case. No. 20-cv-3438 TNM

# PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION TO FILE SUPPLEMENTAL/AMENDED COMPLAINT

**I. Plaintiffs' proposed second amended complaint is timely**

    **A) Examining the timeline of this case belies Defendants' contention of undue delay**

On September 3, 2021, Plaintiffs filed their amended complaint, of which Count IV challenged Defendant DHS's "adoption of a policy for CBP Agents to Grant Temporary Permission to Stay in the United States…" D.E. # 17 at 105. Plaintiffs knew that a mass release policy existed because of their own investigative efforts, but any memoranda memorializing that policy was not disclosed to the public. Defendants moved to dismiss the amended complaint on November 3, 2021, the day after the original policy memorandum enacting the mass release policy was allegedly superseded by another memorandum that also granted border crossers temporary permission to stay in the United States. Briefing on the motion to dismiss finished on January 14, 2022. In this round of briefing, Defendants did not produce any specific memoranda,

1

classifying any such policy merely as "decisions whether to detain" and did not admit to the existence of the policy at all. D.E. # 19 at 31. The Court denied the motion to dismiss this count on August 11, 2022 and the Court ordered the Defendants to produce the Administrative Record on October 20, 2022.

By this time, unknown to Plaintiffs, another memorandum allegedly superseding the second memorandum was issued, on July 18, 2022. All three memoranda provided a pathway for the mass release of border crossers by Customs and Border Protection ("CBP"). *See* D.E. #58, Ex. D. Everything that the Amended Complaint described regarding the policy – that large numbers of border crossers were being released by the Border Patrol with permission to stay for some length of time – applied to the original memoranda and all of the "superseding" memoranda. Plaintiffs alleged that a mass release policy, simply because it is a mass release policy, encourages foreign nationals to cross the border. No other features of the policy were relevant to Plaintiffs' argument, simply, that releasing border crossers into the interior entices them to cross. Defendants, while denying that such a policy existed through self-serving interpretations of Plaintiffs' descriptions of them, stated that the closest documents that met the description was the Notice to Report ("NTR") and offered to compile its administrative record. On December 15, 2022, Defendants produced the administrative record and asserted it was compiled in good faith. D.E. #33 at 4. However, they had greater knowledge at the time than Plaintiffs had and concealed large parts of the relevant record.

Defendants produced only the records for the Notice to Report, the original policy, and withheld information about any existing superseding memoranda. Defendants cannot justify the limited set of records it produced for Count IV on the basis that it only had the obligation to produce parts of the administrative record that pre-dated the Amended Complaint. For the other

records, the Defendants did compile administrative records that included superseding memoranda after the date of the amended complaint. For instance, for Count III, Termination of the Remain in Mexico Policy, the Defendants compiled superseding memoranda that were drafted after the date of the filing of the Amended Complaint. Defendants apparently made the strategic decision to compile an incomplete and potentially misleading record for Count IV to gain advantage later in litigation. As the Court pointed out in its memorandum order, agencies have a motive to "evade federal jurisdiction [mootness is a jurisdictional issue] by refusing to include certain relevant facts in the administrative record." D.E. #52 at 16.

After the production of the administrative record, both Plaintiffs and Defendants submitted their positions to the court on the best way to move forward on January 17, 2023. Defendants stated that they intended to seek discovery on threshold issues of Plaintiffs' harm, traceability, and redressability. Plaintiffs sought limited discovery on the threshold issue of standing for parolees, administrative closure, and refugees, which would have allowed Plaintiffs to demonstrate how many numbers of foreign nationals from each of Defendants programs had settled in the areas they live. When the parties discussed these issues at an in-person status hearing, the Court indicated that discovery regarding any of these issues should not delay the case and set a summary judgment schedule for both parties to proceed without discovery.

Plaintiffs moved for summary judgment on February 27, 2023, using the administrative record compiled by Defendants. Defendants filed a cross motion for summary judgment on April 13, 2023, where, for the first time, Defendants produced a new memorandum, Parole Plus Alternatives to Detention, which they stated replaced the prior memorandum as of November 2021, more than a year before the production of the administrative record. At the same time, Defendants admitted that even this newly produced memorandum had been subsequently

superseded by another. In this motion, Defendants still maintained "there is no such policy" as described in the Amended Complaint. D.E. # 38 at 6. On June 14, 2023, Defendants filed their reply brief, where they mentioned again the original Parole Plus Alternatives to Detention memorandum, arguing that they were entitled to summary judgment because the administrative record had not been before the court. They did not mention any subsequent memoranda in this pleading.

Finally, during the motion hearing on the parties' summary judgment motions in August 2023, for the first time, Defendants admitted that there was yet another memorandum, this one called Parole with Conditions, which, they still did not submit in full to Plaintiffs, but which had in fact been promulgated on May 10, 2023, prior to Defendant filing their final pleading, which made no acknowledgement that any still subsequent memoranda existed.

Given this history, to live up to the Defendants' standards, first, the Plaintiffs would have to manage to be alerted, without any disclosure from Defendants, each time Defendants implemented but failed to publicly disclose a new release memorandum. Second, they would have to ask the court for permission to newly amend the complaint, and run the risk of starting from scratch, at least three times; once prior to the Defendants' filing its motion to dismiss; once while parties were waiting for the court to rule on the Defendants' motion to dismiss; and again, in the middle of summary judgment briefing. Furthermore, Plaintiffs would have to do so knowing that in response, Defendants could simply issue a new and slightly different memorandum in response, that still accomplish its core policy, efficient mass release.

### B) Plaintiffs *did* seek to amend the complaint at their first opportunity.

Defendants' implication that Plaintiffs needed to seek to amend their complaint before even knowing that any new policies existed, is flatly unreasonable. Defendant did not even produce

the administrative record until December 2022, and even chose to withhold the Parole + ATD memorandum.

Recognizing how unrealistic such a standard is, Defendants make the alternative argument that Plaintiffs at least should have sought to amend their complaint "after Defendants pointed out that the NTR challenge was moot in April 2023." D.E. # 60 at 5. This argument fails as well because Plaintiffs *did* seek to amend the complaint in its very next opportunity. Plaintiffs stated in its Opposition to Defendant's Cross Motion and Reply in Support of Plaintiffs' Motion For Summary Judgment that they, in the alternative, they "seek leave to amend their complaint to challenge the latest iterations of the policies in question." D.E. #41 at 32.

Plaintiffs, at that time, had no way to request more specific remedy than seeking leave to challenge whatever ended up being the final iteration of the release policy. Even as Defendants produced the Parole +ATD memorandum for the first time in April 2023, they simultaneously admitted that Parole Plus ATD itself had been "subsequently reauthorized and expanded in July 2022," though they again hid the ball from Plaintiffs by failing to include a copy of the July 2022 memorandum. Furthermore, the July 2022 memorandum also did not prove to be the final iteration of the mass release policy. Only two days before the Plaintiffs' Opposition Brief was due, Defendants issued yet another memorandum, Parole with Conditions, on May 10, 2023. Until Plaintiffs had at least some evidence to believe that there had been a "durable transition to a new substantive policy," they could not move to amend on any solid basis. D.E. # 52 at 19. Defendants refused to even admit to the existence of a policy at all and continued to conceal the name of the final memorandum until the motions hearing on August 31, 2023. At that point, Defendants finally asserted definitively that Parole ATD and Parole with Conditions constituted a durable transition to a new substantive policy (which Plaintiffs still had to find themselves by

hunting through pleadings in the 11th Circuit). Defendants strenuously represented to the Court that they truly intended to replace their original policy with Parole Plus ATD and Parole Plus Conditions and would never use the NTR policy again. Prior to such an assertion, Plaintiffs had a hard time imagining the final policy iteration had been reached and would hold. It's hard to know what other "strategic choice" Plaintiffs could have made other than the one it did.

II.     The Policies Are not "Wholly Distinct."

Evidence from other cases (where Defendants did supply the administrative record it did not supply to Plaintiffs or the Court here) suggests that Defendants have painted a false picture of these policies. Defendants argue that the new policies are "wholly different" agency actions, where one wholly replaced the other with a different approach. D.E. # 60 at 6. But NTR, and the two variations of Parole + ATD are two legal justifications of mass release whose use has the same effect on the border crisis and whose use in fact substantially overlapped. Parole with Conditions was somewhat different—its use did not overlap with the other two, but, it was simply an attempt to create a legal workaround that would let DHS continue its release policies in essentially the same form as Parole +ATD after that policy was enjoined (along with NTR).

NTR, Parole + ATD, and then Parole with Conditions all serve the same function—to act as the processing mechanism for mass releasing millions of inadmissible aliens into the interior of the United States, as alleged by Plaintiffs' original Count IV. On August 31st, Defendants' counsel explained that "there was the NTR policy that ended, and it was replaced by a policy called Parole + ATD." Transcript of Motion Hearing, August 31, 2023 at 62. "And the replacement to Parole + ATD," after it was enjoined, is "called Parole with Conditions." *Id*. Defendants claim that the policies constituted "a different approach," that didn't result in "mass release." D.E. # 60 at 6.  This claim does not withstand scrutiny.

6

While the written justifications explicated in the memoranda establishing NTR and establishing Parole + ATD differ, their functional effects do not. Both were geared towards simply processing and releasing aliens into the interior efficiently, that is to enable the processing of massive numbers. With such massive numbers, the details of the memoranda hardly matter—practically speaking, using NTR or Parole, the process is simple—release as fast as possible. Examining the numbers actually released demonstrates clearly that a single policy of mass release was operating. In the first few months of this policy, between March and July 2021, CBP released over 170,000. See *Florida v. U.S.A*, 21-cv-1066, D.E. # 157 at 35. As time went on, CBP started to gradually use more than just NTR as its method of release, and began to process some individuals with parole even before the November 2021 memorandum which officially authorized the Parole + ATD policy. (Therefore Parole + ATD did not so much suddenly replace NTR as supplement it until it became the preferred processing method gradually). In November 2021, CBP released 34,705 aliens via NTR and only 5,683 under Parole + ATD. *Id*. at 34. By April 2022, Parole + ATD had become the primary mechanism, with 39,918 released that month with parole and 22,534 with NTRs. The shift to Parole + ATD continued, with 89,00 released via the Parole +ATD pathway in November 2022. *Id*. at 35. Rather than a sudden change over from one program to another, CBP authorized the new mechanism to accomplish mass release in certain sectors first while still using the old mechanism for other sectors. *Id*. at 29. When looking at the details, it appears CBP freely used two mechanisms that accomplished essentially the same goal but relied on different reasoning to justify it. But there was essentially a single policy—efficient mass release. Furthermore, access to the administrative record (which Defendants chose not to give to Plaintiffs) shows that the NTR policy was not as finished as Defendants claimed, rather, it was operational long after it had

supposedly been superseded by Parole + ATD[1]—and it is reasonable to wonder if Defendants would use NTR, not just Parole + ATD, again if it is able to win a reversal of the case that has enjoined both.

As with NTR, by using Parole + ATD, DHS processed aliens for removal proceedings by first releasing them into the interior and instructing them to report to an ICE office within 15 days for removal proceedings to be formally instituted against them. Notices to Appear were mailed to the beneficiaries of both programs by the same ICE program, Operation Horizon, created in November 2021. *Id*. at 33. Altogether, as Operation Horizon revealed, by April 2022, over 226,000 had been released combined under the NTR and Parole + ATD policies. *Id.* Furthermore, both policies had the same effect of creating a massive "backlog" in issuing NTAs by ICE because in both programs, the NTA is not issued by ICE before the alien is released but sent later and ICE does not have the capacity to keep up. *Id*. at 33. Sending this notice later takes time and resources and once ICE falls behind, the backlog continues to increase. ICE officials estimated that for every 30 days either NTR or Parole +ATD continues, it will take an additional year and another $8 million dollars to clear the backlog. *Id*. at 34.

---

[1] Even if the NTR was ultimately rendered non-operational, it was not until in March 2023, and only because it was enjoined by a court. NTR was therefore operational as a potential tool, even if the other tool was used more frequently by December 2022 when Defendants compiled the administrative record. At that pivotal time, the Defendants unreasonably interpreted only NTR as being part of the record and as NTR only producing relevant records prior to November 2021. But clearly, original Count IV described a policy that was at least potentially operational in two forms from the time the amended complaint was filed to well past the time the administrative record was compiled. Defendants decided to nevertheless include records regarding the use of only one of the two tools developed by DHS to do what Plaintiff described—the release into the interior with the ability to stay in the U.S. without fear of being forced to leave and the ability to seek to stay even longer at the end of a distant immigration court date. Defendant described its decision to do so as done in "good faith" on multiple occasions. Given that the two tools, parole and NTR, both equally fit the description in Plaintiffs' complaint and both were used as the release mechanism to varying degrees during all relevant time periods, Defendants' description of themselves repeatedly as acting "in good faith" appears to be a case of the agency "doth protesting too much."

**III.     Granting Plaintiffs' motion does not delay the litigation.**

**A) Plaintiffs' proposed amendment neither requires nor entitles Defendant to file an answer or a new dispositive motion: the proposed new Count IV raises no new legal issues that have not already been addressed in previous briefing.**

Ironically, Defendants have proved exactly why Plaintiffs would have had every cause to hesitate to file any motions to amend their complaint every time Defendant substitutes one memorandum with another memorandum that accomplished the same policy effect. Defendants have shown that given any excuse, they will demand to restart the case from scratch, escaping accountability from NEPA duties while the border crisis grows worse and worse. Defendants have already briefed the legal issues in full during litigation over the Amended Complaint. The Updated Count IV is entirely consistent with the original amended complaint—the question is whether Defendants mass release policies can be challenged by Plaintiffs for failure to follow NEPA. None of the legal arguments Defendants raised in its Motion to Dismiss are any different by substituting the Parole + ATD and Parole with Conditions memoranda for the NTR memorandum. The parties have already briefed whether enforcement decisions and discretionary policies are reviewable as final agency actions under the Administrative Procedure Act (APA) and whether DHS' use of parole authority is reviewable under the APA (the use of parole specifically raises an issue that is new only to Count IV, not new to this litigation, as other counts also challenged parole programs and fully briefed all defenses arising under the APA regarding them). In fact, Defendants have even briefed these APA defenses twice—once during their Motion to Dismiss, and the second time, entirely unnecessarily, during their Cross Motion for

9

Summary Judgment and during the Motions Hearing where they presented a host of previously determined APA defenses as if they were new.

Nor do the parties need to repeat their summary judgment motion briefing. Defendants argue that it must be briefed because "summary judgment is the mechanism for deciding whether, as a matter of law, the agency action is supported by the administrative record." *See Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019). But this is not an APA case generally seeking to determine whether an action is properly supported by the record, this is specifically a NEPA case where both parties agree that no NEPA compliance has been done. In a NEPA case, the administrative record contains the NEPA compliance that was performed, and summary judgment tests this record for sufficiency. Defendants do not raise the possibility that there is a record of NEPA compliance in this count—their arguments are about whether they have a duty enforceable by Plaintiffs to do any NEPA compliance. Therefore, producing the rest of the administrative record, the parts that Defendant failed to supply to Plaintiffs, is not going to supply Defendants with any new defenses. If they had, presumably Defendants—who did have access to those records but did not produce them to Plaintiffs, is unlikely to have chosen to conceal them.

If, however, Defendants wish to go through the exercise of belatedly compiling the administrative record for Parole + ATD and Parole with Conditions and presenting APA defenses for the third time, they should be capable of simultaneously litigating this defense without putting their discovery process on hold. Defendants have already produced this administrative record for other litigations—they just failed to share it with Plaintiffs—and they have already briefed their APA defenses twice, so most of the work involved has already been

10

done. The Department of Justice's resources to handle various litigation duties should be up to the task without calling a halt to discovery.

### B) Count IV Should be Included in the Upcoming Evidentiary Hearing

Defendants claim that halting border barriers and ending the Migrant Protection Protocols are "particularly disconnected" from Defendants' release policies, the claim at stake in both the original and the updated Count IV. D.E. #60 at 7. This is false. Plaintiffs' contention, and one of the issues at stake in the narrowed scope of the upcoming evidentiary hearing, is that the release policies were entirely connected to the Defendants' other border policies. Plaintiffs intend to demonstrate that more people started to cross the border because the two primary mechanisms that stopped people from entering were discontinued. The existence of the release policies in the first place was justified because too many people started crossing the border to keep them all in detention. Plaintiffs intend to call experts Mr. Mark Morgan, former Commissioner of CBP, and Mr. Rodney Scott, former Chief of CBP, to testify in support of these theories. They will show that ending the border wall and MPP caused the flood of aliens to enter the southwest border, causing the crisis and creating the excuse to release instead of detain border crossers. Plaintiffs will also show that Defendants intended to cause increased entry on the southern border with these policies. The release policies they chose to adopt and why they chose to adopt them constitute part of the evidence that the increased border flow was not an unintended consequence but an intended consequence of these policies. All three of these policies are relevant to proving enticement theory and showing that the Biden Administration understood enticement theory as well. Therefore, the release policies are already part of the hearing regardless of whether Count IV is included.

11

y

The evidentiary hearing in June is narrow in scope, limited to whether or not Defendants' border policies caused the rise in illegal crossing at the Southern border or whether that rise in illegal immigration, which unquestionably happened, was caused by other factors. As the Court concluded in its September 30, 2023 Memorandum Order, the "only question is whether a reasonable factfinder could conclude that the Government's conduct caused those harms." D.E. #52 at 28. The issues that parties will present evidence on are: would the construction of additional barriers contribute to "decreased migratory flows" in general (not just precisely where the barrier was slated to be constructed); was it "the recission of the MPP [that led] to an increase in illegal immigration" or did "push and pull factors" identified such as Mexico's enforcement polices, relative economic conditions in each country, or the Covid-19 pandemic cause the rise in migratory flows instead. *Id*. at 28-29, 33. In order to answer these questions, Plaintiffs' experts will testify as to what they *do* know causes increased unlawful immigration over their decades of experience, and how they can feel confident in identifying the causes of this particular crisis as driven largely by Defendant's border policies rather than by external push and pull factors. Plaintiffs' experts will introduce evidence that immigration policies during the Biden Administration were all geared toward increasing the flow of immigration, and that all border policies operate synergistically, in this case, to accomplish the ideological aim of the Biden Administration, which is to increase immigration by any means possible.

Given that the various potential causes of the border crisis are the issue at trial, including the release policies the Biden Administration adopted in response to the increased migratory flows that followed the suspension of the border wall and the end of MPP, Plaintiffs proposed Count IV will not cause parties to need to "divert resources from ongoing discovery efforts." Not only

12

*can* evidence for Count IV be "be folded into the scheduled evidentiary hearing on standing on the two active claims," it *must* be. D.E. #60 at 7.

Defendants are operating under a misapprehension that, at this stage of the litigation, the evidentiary hearing is largely about what is going on specifically in "southeastern Arizona." Other than whether no border wall was planned in areas in Arizona because "local terrain is already impassible enough to function like a barrier," the scope of the upcoming evidentiary hearing is not about the border crisis in Southeastern Arizona alone and the Plaintiffs' standing declarations. D.E. 52 at 28. At the outset of litigation, there are three elements of standing that a plaintiff must show 1) that it has suffered an injury in fact; 2) that is caused by the challenged action of the defendant; and 3) that the injury is redressable. *Friends of the Earth Inc., v. Laidlaw Env't Servs. (TOC), Inc.* 528 U.S. 167, 190-181 (2000). D.E. # 52 at 12. The injury-in-fact element of standing is not what has required the "unusual result" of proceeding to a trial. *Id*. at 41. Nor is the third element of standing, redressability, because Plaintiffs only need to show that the defendants have the power to undertake the relevant NEPA procedures. *Id*. at 15. Rather, the factual issues that were disputed during summary judgment where a reasonable factfinder could find on either side related only to the causation element of standing. Causation is more difficult to demonstrate when the plaintiff must show that third parties react in predictable ways. *Clapper v. Amnesty Int't USA* 568 U.S. 398, 413-14 (2013). *See City of Dania Beach*, 485 F.3d at 1186. D.E. # 52 at 13. In this case, the Plaintiffs must prove "the enticement theory." *Id*. at 29. The enticement theory is "based on an extended chain of causation that relies on lay and expert testimony about the behavior of independent third parties." *Id*. at 31. The limited scope of the trial is not about assertions in Plaintiffs' standing declarations. Those assertions go to the simple question of injury-in-fact. Rather, the trial is about the complicated question, that will be

13

determined by expert testimony, of whether the enticement theory holds in this case. Therefore, the question of whether Plaintiffs "specifically" named Parole + ATD or Parole with Conditions in their standing declarations rather than Defendant's release policies in general is not particularly relevant. D.E. # 60 at 8.

Defendants simultaneously complain that work on discovery for this case is so exhausting it leaves them no time to even consider whether updating Count IV might raise new issues under the APA while unnecessarily advocating excessive work for both parties during discovery by expanding the limited scope of the evidentiary hearing. Defendants wish to spend a great deal of time at trial about precisely what is going on in Southeastern Arizona and Southeastern Arizona alone, specifically, migrant traffic patterns and the potential uptick in East Douglas, Sonoita, Tucson, Sasabe, and Three Points Arizona. Devoting large amounts of time to Arizona migration patterns specifically is an inefficient way to address issues regarding the enticement theory. Forcing both parties to spend their limited resources on addressing whether there was really an uptick in migrant activity in Southeastern Arizona seems like an unnecessary expenditure. If Defendants had any evidence there was no uptick in migrant activity specifically in Southeastern Arizona, or that the uptick of migrant activity in Southeastern Arizona was due to unique factors not generally present in the present border crisis, they could have introduced it on summary judgment, when all issues regarding standing, including Plaintiffs' injury in fact, were fully on the table.

## IV. Amending is not futile.

Defendants argue that amending is futile because courts have vacated the policies. These policies have been vacated for being unlawful, however, DHS has appealed the ruling that has vacated the policies at the Eleventh Circuit, and will probably appeal any adverse ruling to the

U.S. Supreme Court. DHS clearly has the intention to reimplement one or both of these policies at any time that it is free to do so. Should the Circuit or Supreme Court ultimately reverse the current ruling— based on whether Defendants had the lawful right to use parole programmatically and whether Florida had standing under the APA—that ruling will not answer the question of whether the Defendants violated NEPA when implementing them. This is no remote or speculative possibility. Higher courts regularly reverse injunctions on novel questions of law regarding important questions of national policy when asked to do so by the federal government.

**V. Plaintiffs would be prejudiced by denial of their motion**

Plaintiffs would clearly be prejudiced by refusing to allow them to make one of their claims, especially since the timing of the motion is due to Defendants' failure more than a year ago to compile a reasonable administrative record. It is no substitute to state that Plaintiffs can bring a separate lawsuit in the future. Plaintiffs have limited resources, and have, for this trial, engaged experts who will already be testifying on how Defendants' release policies have intentionally exacerbated the border crisis. Forcing Plaintiffs to expend the same resources in a future, separate lawsuit, of course harms Plaintiffs.

**VII. Conclusion**

Plaintiffs are not trying to delay the conclusion of this litigation, during which many more millions of migrants crossed the border and continue to cross while Defendants refuse to follow their obligations under NEPA. Defendants' mass release policies, which were operational at the time Plaintiffs filed their complaint and continued to be operational until enjoined by court order which may be reversed, belong in *this* litigation. Plaintiffs are simply not doing what Defendants suggest— attempting to amending their complaint every time Defendants implement

a new immigration action. Defendants have implemented a plethora of truly new immigration actions, also without complying with NEPA, in the time this lawsuit has been ongoing—ending Title 42, implementing a new asylum rule, granting advance parole to ever new categories of migrants, to name just a few. Those are the kind of actions that would be appropriate in a separate lawsuit—not ongoing actions that are simply repackaged over and over to avoid accountability in litigation.

Dated: February 2, 2024

Respectfully submitted,

/s/ Julie B. Axelrod
D.C. Bar No. 1001557
Center for Immigration Studies
1629 K Street, NW, Suite 600
Washington, DC, 20006
Telephone: 202-466-8185
FAX: 202-466-8076
Email: jba@cis.org

Counsel for Plaintiffs