## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**MASSACHUSETTS COALITION FOR IMMIGRATION REFORM**, *et al.*,

        Plaintiffs,

        v.

**U.S. DEPARTMENT OF HOMELAND SECURITY**, *et al.*,

        Defendants.

---

Case No. 1:20-cv-03438 (TNM)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Two Arizona ranchers claim that in the Biden Administration's haste to reverse its predecessor's border policies, it repeatedly flouted longstanding environmental law. The ranchers are correct. Under the National Environmental Policy Act ("NEPA"), any agency contemplating a "major Federal action" must analyze its "environmental effects." 42 U.S.C. § 4332(C). But in 2021, the Department of Homeland Security cancelled all border wall construction and terminated the Migrant Protection Protocols ("MPP") without performing any NEPA analysis. The ranchers have established this much already in litigation.

The question before the Court today is whether these violations injured the ranchers. After a two-day bench trial, the Court now finds that one of the ranchers, Steven Smith, suffered concrete and particularized injuries that fairly trace to these DHS actions. Migrants trespassed onto his land, stole his water, and trashed his property. Some of Smith's cattle ate that trash and died. And two of the former highest-ranking border policy officials at DHS credibly testified that the challenged decisions caused Smith's injuries. So Smith has standing to sue, and he is entitled to relief.

**I.**

This opinion addresses two issues:  (1) whether Plaintiffs have proven their standing by a preponderance of the evidence; and if so, (2) whether DHS violated NEPA, which would entitle Plaintiffs to judgment on their remaining Administrative Procedure Act claims?  The Court starts by explaining the ground it has already plowed.  It then it makes specific findings of fact that bear on the two remaining issues.

**A.**

First, the ground already plowed.  This case began as a sprawling challenge to the Biden Administration's immigration policies.  *See Mass. Coal. for Immigr. Reform v. DHS* ("*MCIR I*"), 621 F. Supp. 3d 84, 88 (D.D.C. 2022).  In an eleven-count Complaint, the Massachusetts Coalition for Immigration Reform and six individual Plaintiffs alleged that three federal agencies violated NEPA when they carried out immigration reforms without considering their environmental impact.  *See id.*

But only two Plaintiffs and two claims survived summary judgment.  *Mass. Coal. for Immigr. Reform v. DHS* ("*MCIR II*"), 698 F. Supp. 3d 10, 25 (D.D.C. 2023).  The only remaining Plaintiffs are Steven Smith and Gail Getzwiller, both ranchers who live along the southern border.  *Id.* at 17–18.  Call them the "Border Plaintiffs."  Their only remaining claims challenge DHS's decision to halt construction on the border wall (Count II) and its decision to rescind the Migrant Protection Protocols (part of Count III).  *See id.* at 28–29.

A word on why these Plaintiffs and claims survived.  Starting with jurisdiction, the Court found that the Border Plaintiffs' standing to sue over these decisions turned on genuine issues of material fact.  *See id.* at 28–34.  On the one hand, the Court concluded that these Plaintiffs "introduced enough evidence for a reasonable factfinder to conclude that they have standing" to

sue under an "enticement theory" of causation. *Id.* at 29. The enticement theory went like this: (1) the Biden Administration enacted policies that caused aliens to believe they would have an easier time unlawfully immigrating into the United States; (2) aliens acted on that belief, increasing the rate of illegal immigration; and (3) some of those illegal immigrants passed through the Border Plaintiffs' property, causing them harm. *Id.* at 28–29.

But the Court found that the parties genuinely disputed whether "illegal immigrants pass through or settle near the Border Plaintiffs," "whether there is environmental damage because of illegal immigrant activity near them," and—most critically—"whether the rescission of the border wall construction and MPP has *caused* the environmental damage that the Border Plaintiffs have observed." *Id.* at 29 (emphasis added). Because "a reasonable factfinder could go either way on" two components of the Border Plaintiffs' standing (injury-in-fact and causation), *id.* at 34, the Court concluded that "full summary judgment for either party would be inappropriate," *id.* at 39.

Because of the genuine issues of material fact on standing, the Court addressed the merits of the Government's motion for summary judgment. *See id.* at 34; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" (cleaned up)).

On the border wall claim, the Court held that the cessation decision constituted a "major federal action" that required NEPA analysis; the Government wrongly suggested that NEPA kicks in "only when the Government plans to do something that will change the environment itself." *MCIR II*, 698 F. Supp. 3d at 35. The Court also rejected the Government's argument that "a waiver under [Illegal Immigration Reform and Immigration Responsibility Act] absolved it of its NEPA obligations," as well as its assertion that "requiring a NEPA analysis 'would lead to

nonsensical results.'" *Id.* at 35–37.  The prior waiver was to build the border wall, not the opposite, and stopping mid-construction was neither covered by the waiver nor likely value-neutral for the environment.  *Id.*

On the MPP claim, the Court similarly held that the rescission decision constituted a "major federal action" that required NEPA analysis; the Government wrongly argued that the rescission merely amounted to a "civil or criminal enforcement action."  *Id.* at 38.  Nor was the Court persuaded by the Government's argument "that the rescission was not a 'major federal action' because 'nothing in the record suggests that MPP directly caused a significant reduction in immigration.'"  *Id.* at 37–38.  The Government's attempt to impose "a direct causation requirement" directly contradicted the text of NEPA and its implementing regulations.  *Id.* at 38.  And there was "unequivocal[]" record evidence "that would permit a factfinder to conclude that MPP led to decreased migration flows"—the Government itself admitted as much.  *Id.*  Finally, the Court held that the rescission decision was reviewable under the APA because the Government had no discretion to ignore NEPA's requirements.  *Id.* at 37–38.

So when the dust settled, the Government failed to prove its entitlement to judgment as a matter of law.  And the case proceeded to "trial in which the only disputed factual issues [went] to the Court's jurisdiction."  *Id.* at 39.  With the Border Plaintiffs' standing hanging in the balance, the Court held a two-day bench trial.  *See* Minute Entry (July 31, 2024); Minute Entry (Aug. 1, 2024).  It heard live witness testimony and received dozens of exhibits.  The Court has thoroughly reviewed the parties' briefing, relevant law, trial transcripts, and exhibits.  So it now rules on the Border Plaintiffs' standing and the liability portion of the remaining claims.

**B.**

Turning now to findings of fact.  The Court begins by reiterating the narrow nature of the parties' factual dispute:  Did the Border Plaintiffs suffer legally cognizable injuries-in-fact?  And are those injuries fairly traceable to DHS's decisions to suspend border wall construction and rescind MPP?  DHS does not contest redressability.  Because the remaining counts "assert 'archetypal procedural injuries'"—the failure to conduct any NEPA analysis—the Border Plaintiffs need not show that "the agency action would have been different but for the procedural violation."  *MCIR II*, 698 F. Supp. 3d at 23 (cleaned up).  The Court may simply "order the agency to undertake the procedure."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc).

The following three subsections specifically constitute the Court's findings of fact.  *See* Fed. R. Civ. P. 52(a)(1).

**1.**

Start with facts that bear on injuries.  And take Smith first.  Smith is a lifelong resident of Cochise County, Arizona.  Trial Tr. 168:18–20 (July 31, 2024).  He lives in Douglas, which sits "about 8 or 9 miles from the border."  *Id.* at 194:21–25.  He also has three leaseholds, which are situated between 20 and 40 miles from the border.  *Id.* at 195:1–12.  The border wall sits directly south of all these properties.  *Id.* at 195:13–15.

Living and working "right along the Mexico border" means Smith has "dealt with border issues . . . as long as he can remember."  *Id.* at 169:19–22.  But Smith noticed striking differences in the volume of illegal immigration between the Trump and Biden Administrations.  When President Trump was in office, Smith "saw the least traffic" of illegal immigrants he "had

ever witnessed on the border in [his] life." *Id.* at 171:18–20.  He described those years as "the most peaceful time [he] had experienced." *Id.* at 171:21–22.

Then things changed "moving on into the Biden Administration." *Id.* at 171:23.  When "the rumor of things that [President Biden] said he was going to do" spread around, "traffic picked up," as did "the rate of crime and the amount of trash." *Id.* at 171:24–172:2.  During the Trump Administration, Smith saw "illegal immigrants" or evidence of their activity on his property "a couple times a month." *Id.* at 182:10–23.  Now he sees illegal aliens or their detritus on an almost "daily basis." *Id.*  This remains the case despite Smith's distance from the border. He "has personal experience" spotting tracks of migrants who first appeared on a neighboring ranch but later appeared on his property "20 or 30 miles away." *Id.* at 195:16–196:7.  The migrant activity "just really dramatically increased," Smith concluded. *Id.* at 182:17.  He also perceived that "illegal activity was getting bolder" and began "witness[ing] more crime and criminal activity." *Id.* at 172:9–17.  So he regretfully started to "pack a pistol" with him wherever he went to protect his family. *Id.*

Increased alien traffic directly affects Smith's ranching operations.  He described in detail that trash deposits increased with "more traffic." *Id.* at 175:6–7.  In Smith's words: "Trash has increased dramatically in the last—easy to sum it up—in the last three years." *Id.* at 178:7–8. He said this will "be a problem for years to come, because there's huge piles and piles of trash that's out there where there is no road." *Id.* at 178:9–13.  Because "there is no good access," Smith suggested that a helicopter would be required to "load it up and pack it out of there." *Id.* at 178:13–15.  But for a rancher, "that's just not reality." *Id.* at 178:15.  So, Smith worried, the trash deposits alone will leave "harmful effect[s] on our environment for years to come." *Id.* at 178:16–20.

For Smith, the trash problem goes beyond visual blight or environmental concerns.  His cattle ingest the trash—a fact Smith knows because he sometimes "cut[s] them open" and finds plastic in their digestive systems.  *Id.* at 202:18–22.  If the slaughterhouse "find[s] plastic in [a] cow's gut" during the production process, Smith "lose[s] a portion of the profits as a result."  *Id.* at 203:5–11.  And although the slaughterhouse does not tell Smith "how old the trash was," *id.* at 203:13–14, Smith testified that he's noticed a sharp uptick in the trash on his land "in the last three years," *id.* at 202:14–15.  So the Court finds that most if not all of the trash ingested by his cattle had been left by migrants in the last three years.

Then there are the water issues.  Smith described water as a scarce resource on his land.  In his rough estimate, ranchers in his area provide their cattle and other wildlife with water on a "hundred-to-one" ratio compared to natural sources.  *Id.* at 175:9–16.  But Smith testified that migrants commonly tie down the "float system" in water troughs, which then "allows the water to free-flow."  *Id.* at 175:18–24.  While this may aid thirsty trespassers, it causes Smith to lose "thousands and thousands of gallons of water," which "can take [him] days and days and days to regain."  *Id.* at 175:24–176:3.[1]  At times, Smith has "a thousand cows-plus" that count on a particular trough for water.  *Id.* at 176:6–9.  But when migrants tie down the float-valve and deplete the reservoir, Smith has to "work night and day . . . to move [the] cattle."  *Id.* at 176:9–10.  That puts stress on his cattle, which limits their ability to reproduce.  *Id.* at 176:12–18.

---

[1] A former Chief of U.S. Border Patrol, Rodney Scott, and the former Acting Commissioner of U.S. Customs and Border Protection, Mark Morgan, each corroborated Smith's experiences. Chief Scott said that in the "ranching community," "pretty pristine areas [were] being filled with trash."  Trial Tr. at 55:9–12 (July 31).  And he noted that migrants often "turn on water spigots," which depletes "a very significant, very scarce resource in the Southwest."  *Id.* at 56:3–5. Commissioner Morgan made similar points in his testimony.  *Id.* at 149:14–150:5 (discussing water and trash issues).

As the Court noted at trial:  "Smith describe[d] various injuries that he has sustained as a result of border crossings.  And he was . . . emphatic that they have increased significantly under [the Biden] Administration."  *Id.* at 212:23–213:1.

Getzwiller offers much less.  She did not testify.  Rather, Plaintiffs' counsel submitted deposition designations in lieu of live testimony under Federal Rule of Civil Procedure 32(a)(4)(B).  Trial Tr. at 5:4–11 (Aug. 1, 2024).  At her pretrial deposition, she said that she found "two illegals in [her] barn" about a month before her deposition.  Getzwiller Dep. at 27:24–28:1, 30:4–5 (Apr. 11, 2024).  She also mentioned that migrants leave trash behind and trespass on her property.  *Id.* at 28:5–21.

But the only trash she personally found on her ranch occurred "more than ten" years ago. *Id.* at 18:24–25.  Since then, she has not personally witnessed migrants leaving trash on her property, although her neighbors tell her they are dealing with trash problems.  *See id.* at 56:2– 11, 73:18–74:20, 121:14–17.  Likewise, aside from the two individuals she found in her barn, Getzwiller has not personally witnessed trespassers crossing her property "while President Biden's been president."  *Id.* at 37:9–12.  She just hears about trespassers on her property "secondhand."  *Id.* at 37:17–22.  And like Smith, Getzwiller said that cows sometimes eat trash, which then "gets caught in their gut and they die."  *Id.* at 29:1–3.  But she never said if this happened to her cattle.

## 2.

Next, facts that bear on causation.  To bridge the gap between the challenged decisions and their harms, Plaintiffs called two experts on border security:  Rodney Scott, the former Chief of the U.S. Border Patrol, and Mark Morgan, the former Acting Commissioner of the U.S. Customs and Border Protection ("CBP").  Trial Tr. at 18:22–23 (July 31) (qualifying Chief Scott

as expert in border security); *id.* at 123:11–12 (same for Commissioner Morgan).  Notably, U.S. Border Patrol and CBP are each housed within DHS.  *See* 6 U.S.C. § 211(a), (e)(1) (establishing CBP and Border Patrol within the "Department"); *id.* at § 101(5) (explaining that "Department" means DHS).

Chief Scott spent nearly 30 years as a Border Patrol agent.  *Id.* at 79:14–16.  He became Chief of U.S. Border Patrol during the Trump Administration and remained in that role through the first part of the Biden Administration, long enough to see the impact of the border wall freeze and MMP reversal.  *Id.* at 9:25–10:4.  He retired in August 2021.  *Id.* at 85:13–14.  In his view, border security boils down to "the ability to know and control who and what enters the United States."  *Id.* at 12:17–20.  Border Patrol got much better at achieving this goal when it started implementing formal strategies in the early 1990s.  *Id.* at 13:1–6.  Ever since, the agency "became very careful about looking at the effects of every policy that [it] made."  *Id.* at 13:7–9.

Yet the success of certain policies can be hard to capture in statistical models.  Over his career, Chief Scott personally oversaw efforts to measure the effectiveness of certain strategies using "social science, economic evaluations," and other methods.  *Id.* at 19:22–24.  Once, he worked with the Government Accountability Office "to create performance statistics."  *Id.* at 19:24–20:4.  On another occasion, the agency worked with private sector entities like Deloitte, Johns Hopkins University, and Boeing.  *Id.* at 20:9–15.  But "every single time," the presence of "different opinions and so many different factors" made it impossible to capture—with certainty—the effectiveness of specific strategies.  *Id.* at 20:16–17.  The biggest problem is the lack of verifiable "baseline situational awareness" against which the agency can measure its strategies.  *Id.* at 20:17–20.  Given the presence of "so many unknowns," Chief Scott said he never found "a model in that world [i.e., the world of statistical modeling] that would actually

work in border security." *Id.* at 20:24–21:3.  While he stopped short of concluding that the

models added "no value," he made clear that they had to be taken with a grain of salt.  *Id.*

So Border Patrol has historically relied on "operational experience" to figure out "what

has worked." *Id.* at 20:22–23.  This experience helps the agency fill in gaps left by cold models

and datasets. *See id.* at 21:23–23:1.  Taken together, the agency "can evaluate the effectiveness

of [its] operations." *Id.* at 22:24–25.

Using this framework as a yardstick for success, Chief Scott said that two things worked

particularly well during his final years at the agency:  the border wall system and MPP.

Together, these programs "reduce[d] the flow of people and/or . . . funnel[ed them] to places

that" Border Patrol could "control." *Id.* at 33:4–7.  And together, these policies made up the

"key pillars" of the agency's strategy on border security. *Id.* at 41:10–14.  Chief Scott unpacked

the significance of these pillars.

*First*, the border wall.  Chief Scott emphasized that the barrier was "a system," "not just a

border wall." *Id.* at 23:6–7.  Then he explained that this system "played a very, very significant

role" because it creates a "visual deterrent" to illegal crossings and it "slows down illegal

entries." *Id.* at 23:9–15.  This gives Border Patrol agents two invaluable resources:  time and

focused manpower. *Id.* at 23:16–24:5.  The barrier gave agents time to respond to incidents.  For

instance, one of the earliest segments of the border wall system allowed agents to arrest "over 90

percent of the people that crossed through in that area." *Id.* at 24:2–4.  But the agency was

"doing it with 150 fewer agents every 24 hours." *Id.* at 24:4–5.  This, in turn, allowed Border

Patrol to move agents "to another area" that needed more manpower. *Id.* at 24:6–13.  After all,

Chief Scott quipped, "it's the *United States* Border Patrol, not the *Southern California* Border

Patrol" or the "*Arizona* Border Patrol." *Id.* at 24:10–11, 36:13–18 (emphases added).

10

Chief Scott hammered this point home.  Anecdotes aside, the border wall system "dramatically changed the operational environment" in "every single place that [the agency] built the border wall system, without exception."  *Id.* at 24:14–17.  "It allowed [the agency] to control that section of border with fewer agents and allowed [the agency] to then move those Border Patrol agents into other enforcement functions to make sure that [the agency was] providing the entire U.S. the best security [it] could."  *Id.* at 24:17–21; *accord id.* at 34:34:16–20 ("[T]he border wall dramatically improved border security and allowed the Border Patrol agents that we had to patrol a much larger section of the border.").  And, Chief Scott punctuated, that success "repeated without exception as [the agency] built out the border wall system throughout the entire Southwest border."  *Id.* at 24:22–25.

*Second*, MPP.  Chief Scott described MPP as a concrete consequence for illegal immigration.  "MPP was implemented and developed," he explained, "in response to a very specific vulnerability in border security that was beginning to overwhelm Border Patrol agents; and that was the use of family groups, whether they were real or false, to cross the border."  *Id.* at 28:24–29:3.  Chief Scott traced this vulnerability to the *Flores* agreement in 2015, which barred the United States from "hold[ing] any family that came across with a child for more than 20 days."  *Id.* at 29:4–10, 29:17–20; *see also* Order at 10, *Flores v. Johnson*, 2:85-cv-4544 (C.D. Cal. Aug. 21, 2015), ECF No. 189.  This led to a "flood of families" that Border Patrol lacked "the ability to detain."  *Id.* at 29:25–4.  So the agency just "release[d] them into the U.S.," which sparked "increasing" levels of family migrations.  *Id.*

MPP changed that.  Under the program, when a family entered the United States claiming asylum, Border Patrol "process[ed] them, set them up for a court hearing, [and] return[ed] them to Mexico."  *Id.* at 30:23–25.  Border Patrol "worked with Mexico to make sure that there was

care and feeding and safe encampments," but migrants "would wait in Mexico for their court date" in the United States. *Id.* at 31:1–3. This closed the "loophole of families being released into the United States automatically." *Id.* at 31:9–11.

Putting it all together, Chief Scott witnessed the border wall system and MPP "reduce[] the number of illegal aliens crossing the border." *Id.* at 33:13–14. "Together," he said, "they work very well" and freed agents up to "get out to areas . . . and do their proactive law enforcement instead of just being reactive." *Id.* at 33:14–17.

Then on his inauguration day, President Biden ordered agencies to halt all border wall construction and directed DHS to consider whether it should "terminate or modify" MPP.[2] So DHS "suspended performance of all border barrier contracts and southwest border barrier construction activities." DX 103.[3] And it terminated MPP. *See* DX 104.[4]

Chief Scott "witnessed firsthand" the combined effect of these two decisions. Trial Tr. at 50:21–51:2 (July 31). "Overnight," he said, the United States "went from having a very secure border" back to a policy of "catch and release" without any "physical deterrent" to illegal

---

[2] *See* Pres. Proc. 10142 of January 20, 2021, Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225 (Jan. 27, 2021); Exec. Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8267 (Feb. 2, 2021).

[3] This exhibit refers to: DHS, Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021).

[4] This exhibit refers to: Memorandum from Alejandro N. Mayorkas to Tae D. Johnson, et al., Termination of the Migrant Protection Protocols (Oct. 29, 2021). MPP was originally terminated on June 1, 2021, in an earlier memorandum issued by Secretary Alejandro Mayorkas. *See* DX 104 at 1. A district court, however, found that the original memorandum violated the APA. *See id.* at 2. So Secretary Mayorkas issued the October 29 memorandum, which reached the same result as the June 1 memorandum with additional reasoning. *See id.* at 1–2.

crossings. *Id.* at 50:25–51:2, 51:21–52:3. The border wall system and MPP were "critical to maintaining border security." *Id.* at 53:2–3. So when "[b]oth were removed," *id.*, Border Patrol "completely lost control of the border," *id.* at 52:1–3. The agency has "seen a massive invasion across the Southwest border that's been uncontrolled ever since." *Id.* at 53:9–11. And this crisis played out in the Tucson Sector, where Scott and Getzwiller live, just like "everywhere else." *Id.* at 53:14–15.

The Government pushed back on this. It pointed out in cross-examination that large swaths of the Tucson Sector have existing border barriers. *Cf. id.* at 87:15–86:5. And it presented Chief Scott with data showing MPP enrollments were comparatively low in this sector compared to others. *Id.* at 94:9–98:21. But Chief Scott noted that those observations were "irrelevant." *Id.* at 53:18. Illegal crossings surged in the Tucson Sector because of these decisions. And Chief Scott explained why. Historically, when Border Patrol "had surges in locations" based on something like "a cartel" or a "caravan," it was "able to take resources from other areas that weren't impacted enough and shift them into that area to take care of it." *Id.* at 53:18–23.

But not anymore. When the border wall and MPP policies "were removed, [Border Patrol] got hit with an increase of illegal activity everywhere." *Id.* at 54:3–4. This meant "there were no resources available to shift back into Tucson." *Id.* at 54:3–5. Agents had to "stay where they were." *Id.* at 54:6–7. "So overnight, the 'got-aways' in Arizona increased and the areas we weren't patrolling increased." *Id.* at 54:16–17. Chief Scott concluded: "[W]e literally had no idea what was crossing through those areas." *Id.* at 54:17–18.

The Government suggested to Chief Smith that the border wall and MPP decisions had no effect on illegal immigration because Border Patrol retained expulsion authority under Title

42. *Id.* at 98:22–99:15.  Chief Smith disagreed.  He explained that "Title 42 was a stopgap measure for . . . COVID.  It was not built into the Border Patrol strategy."  *Id.* at 41:5–7.  MPP came with "sustainable consequences" for illegal crossings, and the border wall system deterred crossings altogether.  *Id.* at 41:10–14.  Unlike these policies, however, Title 42 had the legal effect of a "voluntary return," which equates to "putting someone back in Mexico without a consequence."  *Id.* at 41:15–18.  Because "there was no bar to reentry," migrants came right back.  *Id.* at 42:1–8.

The Government also suggested that any spike in unlawful immigration owed itself to the switch in Administrations, not the challenged policy decisions.  Chief Smith conceded that the agency "started to see a ramp-up at the border . . . of illegal aliens."  *Id.* at 111:9–11.  And all of this, he admitted, "was only based on rhetoric" about the change in Administrations, even though "[n]othing had actually changed" in terms of policies.  *Id.* at 111:12–13.  Yet he explained that rhetoric only produces short-term effects in migration behavior.  *Id.* at 110:11–23.  "[L]ong-term effects are based on actual policy actions."  *Id.* at 111:14–15.  The Court credits this account.

In Chief Scott's opinion, the Biden Administration's decisions "reversed a 27-year proven strategy" that stretched back to the 1990s.  *Id.* at 42:19–24.  These decisions "unsecured the border almost overnight" and left Border Patrol "overwhelmed with individuals."  *Id.* at 42:25–43:1.

Next, Plaintiffs called Chief Scott's old boss:  Mark Morgan, the former Acting Commissioner of U.S. Customs and Border Protection.  *See* Trial Tr. at 114:10–12 (July 31).  Commissioner Morgan stepped down from this role in January 2021 when President Biden took office.  *Id.* at 115:9–12.  Before assuming the role of Acting Commissioner, he served as the Chief of U.S. Border Patrol under the Obama Administration.  *Id.* at 114:7–9.

Commissioner Morgan reinforced many of Chief Scott's main points. He described the border wall system as a "multilayered strategy of infrastructure, technology and personnel." *Id.* at 141:5–10. And he said this system worked in tandem with MPP—the wall system deterred illegal crossings and MPP provided a consequence for family units that did cross. *See id.* at 141:24–143:9. He confirmed that these policies freed up Border Patrol agents and allowed them to be reallocated across the border as needs changed. *See id.* at 150:10–151:7. So whenever the agency "looked at [its] strategy, [it] looked at in in a holistic approach, . . . because a sector doesn't operate in a vacuum." *Id.* at 150:14–16. Commissioner Morgan also agreed that "Title 42 was not an immigration policy," and reiterated the point that a high rate of recidivism accompanied its use. *Id.* at 146:17–149:2.

The Government countered with three witnesses of its own: two mid-level Border Patrol employees and an economics professor.

First up, the Government called Paul Enriquez, the director of the infrastructure portfolio within the U.S. Border Patrol. Trial Tr. at 219:24–220:1 (July 31). In his current role, he oversees "the planning, execution, [and] construction of border infrastructure, including barrier, roads, bridges, gates, [and] everything that is used by the Border Patrol to patrol the border." *Id.* at 220:5–8. His current role situates him several levels below the Chief of Border Patrol, fully four rungs below Commissioner Morgan's old role. *See id.* at 243:21–244:9. During the Trump Administration, Enriquez served as the "division director for the real estate and environmental program" at the U.S. Border Patrol. *Id.* at 220:12–20. In particular, he was responsible for "real estate acquisitions and environmental planning." *Id.*

Enriquez explained that two agencies were responsible for funding and constructing border wall along Arizona's border with Mexico: DHS and the Department of Defense. *Id.* at

229:17–230:20.  After President Biden issued Proclamation 10142, each agency responded with their own agency-level plans that halted border wall construction.  *See* DX 103 (DHS); DX 107 (DOD).[5]  DOD's decision cancelled "just over 18 miles" of border wall in Arizona, although it had already constructed "around 195 miles" of wall in the state.  Trial Tr. at 235:9–14 (July 31).  DHS's decision "suspended performance of all border barrier contracts and southwest border barrier construction activities."  DX 103 at 1.  Yet the DHS decision did not cancel any planned wall construction in Arizona.  *See* DX 108 (map of wall construction in Arizona).

The Government then called another Border Patrol employee:  party representative John Modlin, the Chief Patrol Agent of the U.S. Border Patrol, Tucson Sector.  Trial Tr. at 51:15–17 (Aug. 1).  He served as Interim Chief in Tucson between November 2020 and November 2021, then he moved into his current role.  *Id.* at 51:19–21.

Chief Modlin described the Tucson Sector as an "anomaly on the Southwest border" because "over 90 percent of the migrant traffic through there" consists of "single adult Mexican males."  *Id.* at 53:12–18.  Geography accounts for some of this.  Chief Modlin said that "[t]he terrain in Tucson is probably the most forbidding terrain on the Southwest border."  *Id.* at 54:12–17.  Temperatures are also highly variable.  *See id.*  As a result, very few "people with families" crossed in the Tucson Sector.  *Id.*

So the agency only enrolled "about 1,300 people into" MPP when it was operational in that Sector.  *Id.* at 54:21–24.  In Chief Modlin's opinion, MPP had almost no "deterrent effect in the Tucson Sector," at least "in terms of the population that entered Tucson."  *Id.* at 55:2–5.  Nor did agents in the sector see "a significant increase in the number of families coming through

---

[5] DX 107 refers to a Memorandum from the Deputy Secretary of Defense to the Director, Office of Management and Budget, Department of Defense Plan for the Redirection of Border Wall Funds (June 10, 2021).

Tucson after" MPP was terminated.  *Id.* at 55:13–16.  That said, Chief Modlin explained that "you could certainly see migration patterns shift wherever [MPP] was implemented" along other parts of the border.  *See id.* at 62:16–19.

When asked about the effect of the border wall building pause, Chief Modlin responded that "border crossings were already . . . increasing rapidly" between President Biden's election in November 2020 and the construction pause in January 2021.  *Id.* at 62:22–63:22.  But he did not dispute Chief Scott's explanation on the difference between political rhetoric and policy.  Nor does he "implement border policy"; he simply "execute[s] on whatever policy comes down."  *Id.* at 61:21–22.  He also conceded that "border security operation policies or even infrastructure construction in other states or sectors affect the cross-border illegal activity in the Tucson Sector."  *Id.* at 61:5–11.  And when the Court asked Chief Modlin if he had "any reason to disbelieve Mr. Smith's claims that he's seen significant increased border traffic under President Biden," he responded:  "No, not at all, sir."  *Id.* at 61:15–18.

That leaves the Government's expert:  Dr. Jonathan Guryan, an economist and professor at Northwestern University.  Trial Tr. at 18:8–10 (Aug. 1).  The Government retained him to provide an opinion on whether Chief Scott and Commissioner Morgan validated their conclusions using "the methods that social scientists and economists use to evaluate and measure the causal effect of public policies and outcomes."  *Id.* at 17:7–16.  Given his credentials and experience, the Court admitted Dr. Guryan as an expert in the "methods that social scientists use to determine causal impacts of policy changes."  *Id.* at 36:6–9.  Then, after explaining his methods and the materials he reviewed, Dr. Guryan tendered his conclusion:  Chief Scott and Commissioner Morgan "did not consider other possible factors that could have caused changes in unlawful entries," so it was "inappropriate for them to draw a conclusion that these particular

two policies caused an increase in unlawful entries." *Id.* at 48:24–49:7.  He also concluded that Plaintiffs' experts "did not conduct analysis . . . that would allow you to draw a causal link to the specific harms that have been alleged by" Smith and Getzwiller.  *Id.* at 49:8–12.

**3.**

Now for credibility determinations, starting with Steven Smith.  The Court finds that he gave genuine and honest descriptions of events.  His answers remained consistent and believable. Smith spoke with the authority and knowledge of someone who has lived near the border his whole life and earns his livelihood on the land.  His demeanor was one of sadness and desperation, not anger or bias.  So the Court gives his testimony substantial weight.

The Court finds Chief Scott highly credible.  He struck the Court as an honest broker with an impressive depth of knowledge.  He served Border Patrol for nearly 30 years under administrations of every stripe, often in senior management.  And he seemed genuine in the conclusions he offered, hedging where necessary for accuracy's sake.  Of all the witnesses who testified at the bench trial, Chief Scott's testimony stood out as especially thoughtful and credible.

The Court credits Commissioner Morgan's testimony for its corroborative value.  He was a knowledgeable witness with experience at the highest levels of immigration policy.  Like Chief Scott, he spent most of his life as a career public servant, including as Chief of Border Patrol during the Obama Administration.

The Court finds that Enriquez testified with a steady and believable demeanor.  So the Court credits his explanation of the various construction projects and the ways agency decisions affected those projects.  But the Court is mindful that his perspective comes from the middle-

management rank at the agency.  So to the extent his testimony conflicts with Plaintiffs' experts, the Court credits their testimony over his.

While the Court finds Chief Modlin credible, it assigns his testimony less weight than the testimony of Chief Scott.  In most respects, the two individuals corroborated each other.  Chief Modlin, for instance, endorsed Chief Scott's opinion that the challenged decisions affected the Tucson Sector because they diverted resources and manpower away from that sector to other overwhelmed sectors.  *Compare* Trial Tr. 53:14–54:20 (July 31) (Chief Scott), *with* Trial Tr. at 61:5–11 (Aug. 1) (Chief Modlin).  But where these individuals differed, the Court credits Chief Scott over Chief Modlin.

While demeanor certainly contributes to the weight the Court assigns Plaintiffs' experts, credentials play a big role, too.  As the following excerpted diagram illustrates, each of the Government's fact witnesses served several ranks below Plaintiffs' experts:

[Diagram on Next Page]

```
            ┌─────────────────────┐
            │  Acting Commissioner,│
            │  U.S. Customs and    │
            │  Border Protection   │
            │  (Mark Morgan)       │
            └─────────────────────┘

            ┌─────────────────────┐
            │  Chief,              │
            │  U.S. Border Patrol  │
            │  (Rodney Scott)      │
            └─────────────────────┘

            ┌─────────────────────┐
            │  Deputy Chief,       │
            │  U.S. Border Patrol  │
            └─────────────────────┘
```

| Executive Director, U.S. Border Patrol | Chief of Operations, U.S. Border Patrol |
|---|---|
| Director of Infrastructure, U.S. Border Patrol **(Paul Enriquez)** | Chief Patrol Agent, Tucson Sector, U.S. Border Patrol **(John Modlin)** |

*See* Trial Tr. 243:21–10 (July 31) (Enriquez); Trial Tr. at 61:23–62:9 (Aug. 1) (Modlin); *see generally* CBP Organization Chart, U.S. Customs and Border Protection, https://perma.cc/73UD-7JRX (last visited Sept. 25, 2024).[6]  The Government's witnesses admitted they did not formulate or "implement border policy."  *E.g.*, Trial Tr. at 61:19–22 (Aug. 1).  They said that job fell to Chief Scott and Commissioner Morgan.  *Id.* at 62:4–12.  Naturally, these more senior roles would have access to information and perspectives to formulate policy that lower-level staff would not.  So based on the combination of demeanor, rank, experience, and overall credibility, the Court credits Plaintiffs' experts over the Government's two fact witnesses.

---

[6] The Court may take judicial notice of this website because it is an official website of the U.S. Government.  *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

The Court finds that Dr. Guryan's conclusions meandered beyond his area of expertise. And it gives no credit to his testimony where it conflicts with the testimony of Chief Scott and Commissioner Morgan.  Plaintiffs' witnesses credibly testified about their extensive experience implementing and fine-tuning immigration policies.  Without equivocation, they each said that the challenged decisions directly caused a sharp increase in illegal immigration.  They also explained that "operational experience" proved far better at measuring the effectiveness of immigration policies than "models" crafted by "social scientists."  Trial Tr. at 19:22–21:3 (July 31).  The Court credits this assertion and thus finds Dr. Guryan's conclusions worthy of little value.

*   *   *

In sum, the Court finds that Smith suffered tangible harms that were caused by an influx of illegal immigrants.  The Court fully credits Smith's testimony in general, and his descriptions of these tangible harms in particular.  The Court also finds that DHS's decisions to cancel all border wall construction and terminate MPP substantially contributed to that influx in illegal immigration.  The Court finds that a preponderance of the evidence supports a causal nexus between Smith's harms and the decisions he challenges.  The Court credits Chief Scott and Commissioner Morgan's testimony and discredits the testimony of the Government's witnesses to the extent they contradicted Plaintiffs' experts.  The evidence at trial showed that nexus consisted of three links:  (1) DHS's decisions relaxed deterrents and consequences for illegal immigration; (2) migrants reacted predictably to these relaxed obstacles, leading to a sharp uptick in illegal immigration; and (3) the dramatic increase in illegal immigration harmed Smith.

The Court also finds that the Government's attempt to dismantle these causal links lacks factual support.  Its claim that the challenged decisions never affected Smith—given the border

barriers that already existed in the Tucson Sector or the MPP enrollment rates in that sector—does not account for the testimony of Plaintiffs' experts, who explained that the challenged decisions diverted resources and manpower away from the Tucson Sector. So the Court rejects the Government's view of causation as insufficiently grounded in fact.

## II.

A few legal standards govern this opinion. Because it addresses facts found at a bench trial, Rule 52(a) governs the format. It says that "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). In this circuit, the Court's "findings and conclusions may be incorporated in any opinion or memorandum of decision the court may file." *Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981).

"The Court's findings must be 'sufficient to indicate the factual basis for the ultimate conclusion.'" *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 97 (D.D.C. 2020) (cleaned up). But the Court "need only make brief, definite, pertinent findings and conclusions upon contested matters; there is no necessity for over elaboration of detail or particularization of facts." *Id.* (quoting Fed. R. Civ. P. 52(a) advisory committee's notes to 1946 amendment).

On standing, Plaintiffs have the burden of proving each element "with the same manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). This means Plaintiffs must prove the three elements of standing "by a preponderance of the evidence." *Ramirez*, 471 F. Supp. 3d at 99; *accord New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 576–77 (S.D.N.Y. 2019) (applying preponderance standard to standing issue after bench trial), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Com. v. New York*, 588 U.S. 752 (2019). Note, though, that "the

22

presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

On the merits, the Government concedes it performed no NEPA analysis before DHS enacted the challenged policies. *See MCIR II*, 698 F. Supp. 3d at 24–25. So the merits turn entirely on the law, not facts. And the law is straightforward: Plaintiffs must demonstrate that border wall and MPP decisions constituted "major Federal actions." 42 U.S.C. § 4332(C). If so, DHS should have performed a NEPA analysis, and its failure to do so means it acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### III.

Now for conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). The Court starts with standing. Then (because Smith has standing) it moves to the merits.

### A.

Begin with the standard for standing. Because the basic principles have not changed since its first two opinions on the issue, *see MCIR I*, 621 F. Supp. 3d at 90; *MCIR II*, 698 F. Supp. 3d at 22–23, a summary will suffice. Article III standing requires (1) a concrete and particularized injury (2) fairly traceable to the defendant (3) that the Court can redress. *See MCIR II*, 698 F. Supp. 3d at 22 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

The parties agree that Plaintiffs meet that last element, redressability. Indeed, their only remaining claims allege a failure to perform a NEPA analysis, which constitutes an "archetypal procedural injur[y]." *Id.* at 23 (quoting *Nat'l Parks Conserv. Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005)). And "[b]ecause the complaint in a NEPA case is the failure to follow a process, rather than the specific result reached, the redressability requirement does not require

23

the plaintiff to show that the Government would not have adopted its policy, had it complied with NEPA." *Id.* at 24.  The Court may simply order DHS to perform the NEPA analysis.  *See Fla. Audubon Soc'y*, 94 F.3d at 668.

But the parties contest whether Plaintiffs have suffered an injury-in-fact caused by the challenged decisions.  So the Court evaluates each disputed element in turn.

**1.**

Start with the injury requirement.  Article III requires a plaintiff to show "that he has suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion*, 594 U.S. at 423.  The particularity requirement polices attempts to air "generalized grievances about the conduct of government." *United States v. Richardson*, 418 U.S. 166, 175 (1974) (cleaned up).  It demands some injury that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (cleaned up).  Meanwhile, the concreteness requirement keeps courts in their lane.  It ensures they are deciding only "the rights of individuals," not opining on abstract "legal question[s]." *TransUnion*, 594 U.S. at 423 (cleaned up).

"History and tradition offer a meaningful guide to the types" of harms that qualify as "concrete for purposes of Article III." *Id.* at 424 (cleaned up).  "Certain harms readily qualify as concrete injuries," like "traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425 (cleaned up).  Indeed, "if a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* (cleaned up).  Certain "intangible harms can also be concrete." *Id.*  "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*

Smith offers a few specific harms:  lost profits from cattle that ingested trash, depleted water reserves, and trespass with detritus left behind by migrants.  Each of these harms affects Smith "in a personal or individual way."  *Spokeo*, 578 U.S. at 339.  So he sails past the particularity requirement.  *See MCIR II*, 698 F. Supp. 3d at 28–29.  And his harms qualify as concrete, too.  The Court found that some of his cattle ingested trash that had been deposited sometime in the last three years.  *See supra* Section I.B.1.  And as the Government pointed out in cross-examination, Smith "lose[s] a portion of the profits" when the slaughterhouse "find[s] plastic in [one of his] cow's gut."  Trial Tr. at 203:5–11 (July 31).  That "monetary injury" counts as a "concrete injury under Article III."  *TransUnion*, 594 U.S. at 425.

Smith also suffered concrete harms when migrants drained his water and trespassed on his property.  These harms each bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."  *Id.*  Indeed, conversion remains alive-and-well in American courts.  *E.g.*, *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 130 F. Supp. 3d 236, 258 (D.D.C. 2015) (analyzing "conversion under D.C. law").  And common law trespass has always been recognized as implicating a judicially cognizable harm.  *TransUnion*, 594 U.S. at 447 (Thomas, J., dissenting) ("Where an individual sought to sue someone for a violation of his private rights, such as trespass on his land, the plaintiff needed only to allege the violation." (citing *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (K.B. 1765))).

Getzwiller dealt with trespassers, too.  *See* Getzwiller Dep. at 27:24–28:1, 30:4–5.  But her one instance of trespass—finding "two illegals in [her] barn" earlier this year—does not cut it.  *Id.*  Plaintiffs must have "Article III standing at the outset of the litigation" and maintain it throughout.  *Friends of the Earth*, 528 U.S. at 180.  Indeed, "it has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'"

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567 (2004) (quoting *Mollan v. Torrance*, 9 Wheat. 537, 539 (1824)).  Because Getzwiller's injury happened long after she sued, it cannot count as an injury-in-fact.  And because she failed to produce evidence of other injuries remotely related to her challenge, *see supra* Section I.B.1, she lacks standing under Article III.

## 2.

Now consider causation, the crux of this case.  "This requirement forces plaintiffs to show that their injury 'fairly can be traced to the challenged action of the defendant, and not . . . some third party not before the court.'"  *MCIR II*, 698 F. Supp. 3d at 23 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  But when plaintiffs meet "their burden of showing that third parties will likely react in predictable ways" to the defendant's conduct, *Dep't of Com.*, 588 U.S. at 768, courts will countenance "a domino-effect theory of causation," *MCIR II*, 698 F. Supp. 3d at 23.

The key inquiry is whether "the defendant's actions were 'a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries.'"  *Id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds by Trudeau v. FTC*, 456 F.3d 178, 187–89 (D.C. Cir. 2016)).  Article III demands far less than statistical certainty; it asks only for "*de facto* causality."  *Dep't of Com.*, 588 U.S. at 768 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).

A preponderance of the evidence shows that Smith's injuries fairly trace to DHS's decisions to halt border wall construction and terminate MPP.  The evidence at trial supports each link in Smith's "enticement theory" of standing.  *MCIR II*, 698 F. Supp. 3d at 29.[7]

---

[7] The following three links are also findings of fact for purposes of Rule 52(a)(1).

*Link 1: Relaxed Policies*.  Before President Biden took office, U.S. Border Patrol relied on the border wall system and MPP as "key pillars" of its border security strategy.  Trial Tr. at 41:10–14 (July 31).  Together, these programs provided deterrence and consequences for illegal immigration.  And together, these programs "reduce[d] the flow of people and/or . . . funnel[ed them] to places that" Border Patrol could "control."  *Id.* at 33:4–7.  That is not guesswork or speculation; it comes straight from the former Chief of U.S. Border Patrol.  And his boss, the former Acting Commissioner of U.S. Customs and Border Protection, confirms his account.  *Id.* at 141:5–10, 141:24–143:9.

Then at President Biden's direction, DHS halted construction on the border wall and terminated MPP.  DX 103; DX 104.  According to Chief Scott—a 30-year border security veteran—these two decisions "reversed a 27-year proven strategy" and "unsecured the border almost overnight."  Trial Tr. at 42:19–15 (July 31).

*Link 2: Responsive Migrants*.  Migrants "react[ed] in predictable ways" to DHS's decisions.  *Dep't of Com.*, 588 U.S. at 768.  They walked across the border in droves.  Their reaction left Border Patrol "overwhelmed with individuals."  Trial Tr. at 42:25–43:1 (July 31).  And Border Patrol "got hit with an increase of illegal activity everywhere."  *Id.* at 54:3–4.  This spread Border Patrol thin on resources and manpower.  "Overnight," the agency cut back on patrols near Smith's land because it "had no resources available to shift back into Tucson."  *Id.* at 54:3–17 (cleaned up).

*Link 3: Related Harms*.  So the rate of migrant traffic on Smith's land "dramatically increased."  *Id.* at 182:17.  And he credibly testified that migrants littered on his property and drained his limited water reserves, all of which impacted his cattle and ranching operation.  *See supra* Section I.B.1.

The links in this causal chain are sturdier than the ones the Supreme Court approved in *Department of Commerce*. Plaintiffs there—a host of states and local governments—asserted several injuries (like diminished political representation and the loss of federal funds) that all turned "on their expectation that reinstating a citizenship question" on the decennial census would "depress the census response rate and lead to an inaccurate population count." 588 U.S. at 766–77. The Government countered "that any harm to [plaintiffs was] not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.* at 767. Worse, the Government added, the "intervening, unlawful third-party action would be motivated by unfounded fears that the Federal Government [would] itself break the law by using noncitizens' answers against them for law enforcement purposes." *Id.* at 767–78.

But a chain of causation that depended on *both sides potentially breaking the law* proved strong enough for standing. *See id.* at 768. The sturdiness stemmed from "evidence at trial," which showed that "noncitizen households have historically responded to the census at lower rates than other groups." *Id.* And the Supreme Court found that "the District Court did not clearly err in crediting the Census Bureau's theory that the discrepancy [was] likely attributable at least in part to noncitizens' reluctance to answer a citizenship question." *Id.* With this evidentiary backing, the Supreme Court concluded that plaintiffs' standing rested on more than "mere speculation"; it relied "instead on the predictable effect of Government action on the decisions of third parties." *Id.*

So too here. DHS removed the two "key pillars" of Border Patrol's strategy against illegal immigration. Trial Tr. at 41:10–14 (July 31). Migrants exploited these developments.

28

And Smith, a rancher who lives near the border, suffered as a result.  That is the epitome of "*de facto* causality." *Dep't of Com.*, 588 U.S. at 768 (cleaned up).  Article III demands no more.

Nor has the Supreme Court ever required more than *de facto* causation for standing.  Take *Bennett v. Spear*, 520 U.S. 154, 168 (1997).  In that case, the Government attacked the plaintiffs' standing because they failed to show that the challenged decision was "the proximate cause of [the plaintiff's] harm." *Id.*  But the Court said "[t]his wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Id.* at 168–69.  Although causation cannot be premised on "the *independent* action of some third party not before the court," it will reach an "injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169 (cleaned up).

Applying these principles, the Court in *Bennett* held that ranch operators and irrigation districts adequately traced their asserted harms to an agency's biological impact statement. *See id.* at 170–71.  But notice how that holding condoned a causal chain with many links:  one agency's "Biological Opinion" might have caused another agency to impose "restrictions of lake levels," which might have caused "a diminution in the *aggregate* amount of available water," which might have meant that "*petitioners* [would] receive less water." *Id.* at 167 (emphasis in original).  Despite this attenuation, the Court said it was "not difficult to conclude that petitioners have met their burden." *Id.* at 170–71.

These same principles yielded similar results a decade later in *Massachusetts v. E.P.A.*, 549 U.S. 497, 523–25 (2007).  There, Massachusetts challenged the Environmental Protection Agency's refusal to regulate "greenhouse gas emissions from new motor vehicles." *Id.* at 505.  The EPA countered with Article III.  While the agency conceded "a causal connection between manmade greenhouse gas emissions and global warming," it argued that "its decision not to

regulate greenhouse gas emissions from new motor vehicles contributes so insignificantly to petitioners' injuries that the [EPA] cannot be haled into court to answer for them." *Id.* at 523. The EPA added that the real cause of Massachusetts' harms was the "increase[] in greenhouse gas emissions" that trace to "developing nations [like] China and India." *Id.* at 523–24.

But the Court did not buy it.  It reasoned that the EPA's "argument rest[ed] on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum." *Id.* at 524.  "Yet accepting that premise would doom most challenges to regulatory action." *Id.*  Because agencies usually "whittle away at problems" step-by-step, federal courts generally have "jurisdiction to determine whether [each] step conforms to law." *Id.*  The challenged decision must merely make a "meaningful contribution" to the claimed harm. *Id.* at 525.  So that meant Massachusetts had standing to challenge EPA's decision, despite the "insignificant[]" affect it may have had on Massachusetts' injuries. *Id.* 523–25.

Thirty years of D.C. Circuit caselaw illustrate how standing may rest "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768.

- A "consumer organization had standing to challenge fuel-efficiency regulations based on evidence that non-party manufacturers . . . would be 'substantially likely to respond to market forces' by producing larger vehicles desired by their customers." *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020) (discussing *CEI v. NHTSA*, 901 F.2d 107, 117 (D.C. Cir. 1990)).

- A "manufacturer had standing to challenge an agency decision classifying a chemical in its product as a known carcinogen, based on evidence that third parties would be more likely to buy the product without the classification." *Id.* (discussing *Tozzi v. HHS*, 271 F.3d 301, 307–11 (D.C. Cir. 2001)).

- "[B]iofuel producers had standing to challenge a rule prohibiting non-party manufacturers from using biofuel in emissions testing, because there was 'substantial reason to think that at least some vehicle manufacturers would use' biofuel if that option were legally permitted." *Id.* at 382 (discussing *Energy Future Coalition v. EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015)).

- And broadband internet customers had standing to challenge conditions that an agency placed on the merger of three cable companies because there was a "substantial likelihood" that the merger conditions "caused their cable bills to increase." *Id.* at 376, 384.

The takeaway is clear:  Article III only requires that a plaintiff's injuries be "fairly traceable to"—not proximately caused by—the challenged decision. *Dep't of Com.*, 588 U.S. at 766 (cleaned up).  If third parties "will likely react in predictable ways" to the challenged decision, then a court may factor those reactions into the causation equation. *Id.* at 768.

At trial Smith proved—as a matter of fact—that his harms traced to migrants who reacted predictably to DHS's decisions. *See supra* Section I.B.1–.2.  So he has satisfied Article III's traceability requirement. *See Dep't of Com.*, 588 U.S. at 768.

Against all this, the Government asks the Court to rachet up Smith's burden on the facts and the law.  On the facts, the Government claims the challenged policies had no effect on Smith because DHS (rather than DOD) did not cancel any border wall construction in the Tucson Sector and migrants who crossed in that sector rarely qualified for MPP. *See* Trial Tr. at 77:8–78:19, 87:2–17.

But this argument ignores testimony from the two former highest-ranking officials at Border Patrol and CBP.  Chief Scott testified that the challenged decisions sparked "an increase of illegal activity everywhere, so there were no resources able to shift back into Tucson."  Trial Tr. at 54:3–7 (July 1).  This meant that he had to reduce patrols in Tucson, leaving the agency with literally "no idea what was crossing through those areas." *Id.* at 54:16–18.  And Commissioner Morgan confirmed that the Government's hyper-localized theory of causation blinks reality. *See id.* at 150:10–12 ("I'm always hesitant to say what the impact is on a specific sector because that's not how our strategy worked.").

31

On the law, the Government says Smith should have traced the causal effect of the challenged decisions with "the methods that social scientists use." Trial Tr. at 49:3–7 (Aug. 1). But the law merely requires "*de facto* causality." *Dep't of Com.*, 588 U.S. at 768 (cleaned up). Chief Scott and Commissioner Morgan both explained that, as a factual matter, the challenged decisions caused a spike in illegal immigration. *See supra* Section I.B.2. And Smith testified that he and his ranching operation were injured by this influx. *See supra* Section I.B.1. That is enough. Indeed, Smith "need not produce 'empirical study piled on empirical study predicting with specificity . . . how many third parties would injure' [him] as a 'direct result' of" DHS's decisions. *New Jersey v. EPA*, 989 F.3d 1038, 1049 (D.C. Cir. 2021).

Then the Government recycles its summary judgment argument that *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), makes all the difference. *See* Trial Tr. 90:12–18 (Aug. 1) (closing argument for Government). But that case makes no difference, for reasons that have not changed since summary judgment. *See MCIR II*, 698 F. Supp. 3d at 29–31.

So the Government pivots to *Murthy v. Missouri*, 144 S. Ct. 1972 (2024). But *Murthy* does not help the Government, either. That case involved plaintiffs who lacked standing to obtain forward-looking relief against federal officials who allegedly pressured social media "platforms to suppress protected speech in violation of the First Amendment." 144 S. Ct. at 1981. The defect? The plaintiffs had no "proof of an ongoing pressure campaign," making it "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants." *Id.* at 1993. And "almost all" of the past moderation decisions occurred before the defendants ever contacted the social media platforms, making the evidence on causation "murky." *Id.* at 1992 & n.8.

This case is different.  For one thing, the nature of Smith's NEPA claims means he does not have to satisfy the traditional test for "forward-looking relief" that flummoxed *Murthy*'s plaintiffs.  *Id.* at 1993.  For another, this case does not involve a "weak record" with "murky" evidence on causation.  *Id.* at 1992 & n.8.  The former head of U.S. Border Patrol—and the former Acting Commissioner of Border Patrol's parent agency—*both* attributed the influx in illegal immigration to the DHS decisions that Smith challenges.  That attribution, paired with Smith's testimony on increased migrant traffic after those decisions, amply establishes "*de facto* causality."  *Dep't of Com.*, 588 U.S. at 768.

In sum, Smith has standing to sue on Count II and the MPP portion of Count III.

## B.

One last thing:  the merits.  Unlike the brawl over standing, the parties have nothing new to say on the substance of Smith's remaining NEPA claims.  *See MCIR II*, 698 F. Supp. 3d at 34–39 (addressing merits and rejecting Government's defenses).  So Smith wins.  Both challenged decisions constitute "major Federal actions," 42 U.S.C. § 4332(C), because their effects "may be major" and "are potentially subject to federal control and responsibility," 40 C.F.R. § 1508.18.  And neither decision falls within one of NEPA's exceptions.  *See MCIR II*, 698 F. Supp. 3d at 38.  That obligated DHS to perform a NEPA analysis.  42 U.S.C. § 4332(C).  It concededly failed to do so.  *See MCIR II*, 698 F. Supp. 3d at 24–25.  So DHS promulgated its decisions "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

## IV.

Presidential administrations enjoy significant discretion in the enforcement of our Nation's immigration laws and protection of our borders.  But this latitude does not license violations of other laws.  Smith shows that the Biden Administration ignored this basic principle.

This unlawful shortcut injured him in demonstrable and predictable ways.  A preponderance of the evidence proves so, as the Court finds today.

But the right remedy remains for another day.  Smith admits that some bells are hard to un-ring, *see* Trial Tr. at 73:18–22 (Aug. 1), and NEPA does not guarantee the restoration of a prior status quo.  But this question has not been fully briefed to date, so the Court will allow the parties to weigh-in on the proper remedy for these NEPA violations.  Accordingly, the Court **ORDERS** Smith to file a memorandum addressing remedies by October 25, 2024; DHS's response is due by November 29, 2024; and Smith's reply is due by December 20, 2024.

**SO ORDERED**.

Dated: September 27, 2024                                    TREVOR N. McFADDEN, U.S.D.J.