## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

MASSACHUSETTS COALITION FOR
IMMIGRATION REFORM, *et al.,*

            Plaintiffs,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al*.

         Defendants.

Case. Nos. 20-cv-3438 TNM

 

In accordance with the Court's September 27, 2024 order directing parties to brief the Court on the proper remedy for Defendant Department of Homeland Security (DHS)'s violation of the National Environmental Policy Act ("NEPA"), Plaintiffs hereby submit the following memorandum of points and authorities. Plaintiffs request that this Court should remedy the Defendants' violation of NEPA by a declaratory judgment that DHS was obligated to conduct an Environmental Impact Statement ("EIS") before terminating the construction of the border wall system and the Migrant Protection Protocols ("MPP"), vacating the termination orders of these policies, and entering an injunction to restart border wall construction and the MPP.

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

TABLE OF CONTENTS

I.     Introduction ……………………………………………………………….. 1

II.    Legal Standard for Appropriate Remedies in NEPA Cases …………………………. 3

III.   Argument

       A) As a baseline request, Plaintiffs request vacatur of the challenged policies and a
          declaratory statement that DHS must conduct an EIS of the termination of
          border wall construction and MPP before they are implemented……………….. 5

          1)  The severity of DHS' NEPA compliance failure alone should convince
              this Court not to depart from the presumptive remedy of vacatur in this
              Circuit…..................................................................................................... 5

          2)   Defendants cannot establish an exception to the default remedy for a NEPA
               violation based on the disruptive effects of restarting the wall and MPP....…. 9

       B) Plaintiffs believe a specific permanent injunction is also necessary to effectuate
          meaningful vacatur of the challenged polices, and Plaintiffs meet the burden
          necessary to obtain an injunction………………………………………………… 10
          1)  Plaintiffs have already shown irreparable injury during this case's
              proceedings because they have specifically proved the challenged actions
              caused environmental damage to Mr. Smith……………………………...... 11

          2)  Plaintiffs' environmental harms cannot be remedied by monetary damages. 12

          3)  Defendants cannot point to harms in restarting border wall construction and
              MPP sufficient to counter-balance the harms suffered by Plaintiffs………. 13

          4)  The public interest strongly supports an injunction…………………………. 13

       C) At the very least, if the Court finds that the standard for injunctive relief has not
          already been met, Plaintiffs request that the Court hold further evidentiary
          hearings with Plaintiffs' already qualified experts to determine whatever facts
          still need to be determined to craft an appropriate injunctive remedy…………. 15

IV.    Conclusion…………………………………………………………………….. 16

TABLE OF AUTHORITIES

Cases

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,*

  988 F.2d 146 (D.C. Cir. 1993) ………………………………………………….. 3, 5, 9

*Am. Bioscience, Inc. v. Thompson,*

  269 F.3d 1077 (D.C. Cir. 2001) …………………………………………………… 4

*Amoco Prod. Co. v. Village of Gambell,*

  480 U.S. 531 (1987) ……………………………………………………………... 12, 15

*Brady Campaign to Prevent Gun Violence v. Salazar,*

  612 F. Supp. 2d 1 (D.D.C. 2009) …………………………………………...12, 15

*City of Port Isabel v. FERC,*

  111 F. 4th 1198 (D.C. Cir. 2024) ………………………………………………... 5, 7, 9

*Daimler Trucks North America LLC v. EPA,*

  737 F.3d 95 (D.C. Cir. 2013)………………………………………………………….. 3

*Davis v. Mineta,*

  302 F. 3d 1104 (10 Cir. 2002) ……………………………………………...…13

*eBay Inc.* v. *MercExchange, L.L.C.*

  547 U.S. 388 (2006) ……………………………………………………………… 4, 10

*EDF v. FERC,*

  2 F. 4th 953 (D.C. Cir. 2021) …………………………………………………… 9

*Equal Employment Opportunity Comm'n v. Chrysler,*

  733 F.2d 1183 (6th Cir. 1984) …………………………………………………… 11

*Fund for Animals v. Clark,*

  27 F. Supp. 2d 8 (D.D.C. 1998) …………………………………………………15

*Greater Yellowstone Coal. v. Kempthorne,*

577 F. Supp. 2d 183 (D.D.C. 2008) ……………………………………………………... 4

*Humane Soc'y of U.S. v. Johanns,*

520 F. Supp. 2d 8  (D.D.C. 2007) ……………………………………………………… 4

*Monsanto Co. v. Geertson Seed Farms,*

561 U.S. 139 (2010)………………………………………………………………… 2, 4

*Nat'l Parks Conservation Ass'n v. Semonite,*

925 F. 3d 500 (D.C. Cir. 2019) …..……………………………………….…………… 3, 15

*NRDC v. Wheeler,*

955 F. 3d 68 (D.C. Cir. 2020) ……………………………………………………… 7

*Oglala Sioux Tribe* v*. U.S. Nuclear Regulatory Commission,*

896 F. 3d 520 (D.C. Cir. 2018) …………………………………………………… 2,3,4

*Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.,*

189 F. Supp. 3d (D.D.C. 2016) ………………………………………………….... 4-5

*Realty Income Trust v. Eckerd,*

564 F.2d 447 (D.C. Cir. 1977) …………………………………………………… 15

*Reed v. Salazar,*

744 F. Supp. 2d 98 (D.D.C. 2010) ………………………………………………… 4

*Robertson v. Methow Valley Citizens Council,*

490 U.S. 332 (1989) …………………………………………………………………... 1, 6

*Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n,*

481 F.2d 1079  (D.C. Cir. 1973) ………………………………………………… 7

*Sierra Club v. Army Corps of Eng'rs,*

990 F. Supp. 2d 9 (D.D.C. 2013) ………………………………………………… 15

*Sierra Club v. Fed. Energy Reg. Comm'n,*

827 F. 3d 36 (D.C. Cir. 2016) …………………………………………………… 6

*Sierra Club v. Van Antwerp,*

719 F. Supp. 2d 77 (D.D.C. 2010) ………………………………………………… 4

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,*

985, F.3d 1032 (D.C. Cir. 2021) ……………………………………………………… 2-5

*United Steel v. Mine Safety & Health Administration*,

925 F.3d 1279 (D.C. Cir. 2019) ……………………………………………….... 4

*Valley Cmty. Pres. Comm'n v. Mineta*,

373 F. 3d 1078 (10 Cir. 2004) ………………………………………………… 12

*Vencor Nursing Ctrs v. Shalala*,

63 F. Supp. 2d 1 (D.D.C. 1999) ……………………………………………….. 12

*Weinberger v. Romero-Barcelo*,

456 U.S. 305 (1982) …………………………………………………………… 15

*Whitaker By Whitaker v. Kenosha Unified School District No. 1*,

858 F.3d 1034 (7th Cir. 2017) …………………………………………… 11-12

*Wilderness Soc'y v. United States DOI*,

2024 U.S. Dist. LEXIS 124730 ……………………………………………….... 2, 5


Statutes

5 U.S.C. § 706(2) …………………………………………………………………. 4

42 U.S.C. § 4332(2)(C) …………………………………………………………… 6

Regulations

40 C.F.R. § 1508.1(g) ……………………………………………………………… 6

40 C.F.R. § 1501.5 ………………………………………………………………… 6

v

I.        **Introduction**

NEPA requires that before implementing all actions with potential to have major impacts on the quality of the human environment, agencies must take a "hard look" at the potential environmental impacts of these actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Rather than abide by this "hard look" standard, DHS employed a "no look" standard when it terminated the construction of the border wall system and the MPP, also known as the Remain in Mexico policy. As a result, millions of foreign nationals unlawfully crossed the Southwest Border, and caused a crisis that indubitably resulted in significant environmental impacts. In its Findings of Fact and Conclusions of Law, this Court found that DHS was "obligated to perform a NEPA analysis" before promulgating its decisions to terminate border wall construction and the MPP. ("Court's Findings") Docket No. 81 at 33.

The remaining question is how best to remedy that violation of the law, which includes the questions of whether Defendants must conduct an EIS, and whether they should—as is usual but not universal in NEPA cases—take action to restore the regulatory *status quo ante*, that is, restore the border wall construction policy and MPP as they were before termination, while they conduct NEPA compliance. The first question is easy. Given the clearly massive consequences to the human environment that have already unfolded from these unstudied actions, any environmental analysis short of a full EIS is clearly insufficient. The more complicated question is what should the agencies do regarding their unlawful policies in the meantime? While it is too late to undo the massive environmental damage that unfolded from DHS's procedurally unlawful actions, it is still possible to restore the policies as they were prior to the unlawful termination directives that ended them. While sometimes, it is simply too impractical for courts to direct the parties in good faith to restore the policy *status quo* after a NEPA violation because too many

conditions on the ground have changed, this is not one of those cases. Unlike in many environmental cases, Plaintiffs have the cooperation of the very experts, former Chief of the U.S. Border Patrol Rodney Scott and former Acting Commissioner of Customs and Border Protection Mark Morgan, who implemented the two terminated policies in the first place. They are willing to take an active role in negotiating with DHS the practical steps needed to restore these policies while NEPA compliance takes place to avoid disruptive interim consequences.

Given the practical ability of the Court to order a remedy that includes restoration of the terminated policies, D.C. Circuit court precedent strongly instructs that it should do so. Typically, courts in this circuit do not allow agencies to skip a fundamental procedural step and keep the action in place while belatedly complying with the procedure. The D.C. Circuit has rightfully recognized that to do so would "create perverse incentives for the agency to press forward with a faulty decision and fill in its analysis later." *Wilderness Soc'y v. United States DOI*, 2024 U.S. Dist. LEXIS 124730 at *7. NEPA is designed to compel agencies "to take the required hard look *before* taking that action," and the action forcing purpose would lose "its bite" if an agency could act first and analyze later. *Oglala Sioux Tribe* v. *U.S. Nuclear Regulatory Commission*, 896 F. 3d 520, 532 (D.C. Cir. 2018); *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985, F.3d 1032, 1051 (D.C. Cir. 2021).

To allow DHS to leave in place the actions that caused the border crisis would have precisely those perverse incentives and leave NEPA a toothless statute. In this particular case, DHS needs the added impetus of being enjoined to, in good faith, restart and continue construction on the border wall system and implement MPP in order to start taking its NEPA obligations seriously. In NEPA cases, plaintiffs must meet the traditional four factor balancing test to merit injunctive relief as a remedy. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010). During the

course of proceedings in this case, Plaintiffs have already produced evidence sufficient to show that the balance of equities required for injunctive relief under the traditional test does tip in their favor.

## II.    Legal Standard for Appropriate Remedies in NEPA Cases

While district courts possess considerable discretion in fashioning remedies for NEPA violations, precedent in the D.C. Circuit strongly disfavors allowing an agency to leave in place an action that it implemented despite a "significant deficiency in its compliance with the National Environmental Policy Act," *Oglala Sioux Tribe*, 896 F. 3d at 523. *See, also, Nat'l Parks Conservation Ass'n v. Semonite,* 925 F. 3d 500, 501, (D.C. Cir. 2019) (finding that the district court is "best positioned" to protect the purpose and integrity of the EIS process in determining remedies. If the district court decides to exercise its discretion to depart from this standard remedy it should consider two factors: 1) the seriousness of the deficiency in NEPA compliance; and 2) the disruptive consequences of reversing the policies. *See, e.g.*, *Standing Rock*, 985 F. 3d at 1051, *citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151-152 (D.C. Cir. 1993).

Failure to reverse the unlawful policies remains an extraordinary departure because, as a "purely procedural statute," when an agency fails to comply with NEPA, "refusing to vacate" the action would "vitiate" the statute. *Standing Rock* 985 F. 3d *at* 1052. Agencies must not be given the incentive to act first and "conduct comprehensive reviews later." *Id.*  Just as an agency "could not ordinarily keep in place a regulation" while belatedly completing a "fundamental procedural prerequisite," it cannot keep a policy action in place after skipping NEPA compliance. *Id*, citing *Daimler Trucks North America LLC v. EPA*, 737 F.3d 95, 103 (D.C. Cir. 2013). Letting an agency simply "consider environmental consequences" later would mean that

"NEPA's action-forcing purpose loses its bite" and thus subverts the objectives of the statute. *Standing Rock* at 1051. For, when an EIS is "required but not prepared, courts should harbor substantial doubt" that the agency correctly chose the substantive action in question. *Id.* at 1052, quoting *Oglala Sioux Tribe*, 896 F. 3d at 56. (See also, *United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) "the ordinary practice is to vacate unlawful agency action (citing 5 U.S.C. § 706(2)).[1]

However, if vacatur alone is insufficient to ensure the unlawful action does not remain in place, district courts may also order injunctive relief as a remedy for NEPA compliance after applying the traditional four factor test to determine if injunctive relief is appropriate. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. at 141. The burden for injunctive relief is somewhat higher, requiring a balancing test between the parties rather than the heavy thumb on the scale for plaintiffs of vacatur. Under this test, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc.* v. *MercExchange, L.L.C.* 547 U.S. 388, 391 (2006).

---

[1] A review of DC Circuit precedent finds widespread agreement that vacatur is far more common than leaving the action in place after serious NEPA violations. *See Humane Soc'y of U.S. v. Johanns*, "vacatur is the "standard remedy" in this Circuit for an "action promulgated in violation of NEPA."  520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001)); *Reed v. Salazar*, 744 F. Supp. 2d 98, 118–20 (D.D.C. 2010) (finding NEPA violation and ordering vacatur); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78–80 (D.D.C. 2010) (finding NEPA violation and ordering remand with partial vacatur); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 204–05, 210 (D.D.C. 2008) (finding NEPA violation and ordering vacatur); see also *Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016) (surveying "cases in this district" and noting "the primacy of vacatur to remedy NEPA violations").

### III.    Argument

### A)    As a baseline request, Plaintiffs request vacatur of the challenged policies and a declaratory statement that DHS must conduct an EIS of the termination of border wall construction and MPP before they are implemented.

DHS must reverse the decisions which were promulgated "without observance of procedure required by law" rather than keep them in place while they comply with NEPA. Vacatur of unlawful actions is the default remedy for NEPA violation, and DHS' actions do not meet the factors of that would merit departure from the presumptive remedy. Court's Findings at 33. *See e.g. Standing Rock*, 985 F. 3d at 1051, *Pub. Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv.*, 189 F. Supp. 3d at 3. The Court looks at both the severity of the agencies' procedural deficiencies and the disruptive consequences of a potentially temporary reversal. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d at 150-151. "Put otherwise," the district court "must determine whether there is at least a serious possibility" that the agency "will be able to substantiate its decision on remand," and whether vacatur will lead to impermissibly disruptive consequences in the interim." *Wilderness Soc'y v. United States DOI* , 2024 U.S. Dist. LEXIS 124730 at *7. If the procedural violation is severe enough, the D.C. Circuit has found the second factor does not possess much weight. *See City of Port Isabel v. FERC*, finding "the second Allied-Signal factor is weighty only insofar as the agency may be able to rehabilitate its rationale." 111 F. 4th 1198, 1218 (D.C. Cir. 2024) (internal quotations omitted). The balance of the equities in this case do not come close to meeting the D.C. Circuit's standard.

### 1)    The severity of DHS' NEPA compliance failure alone should convince this Court not to depart from the presumptive remedy of vacatur in this Circuit.

No situation could more strongly forecloses the possibility that the agency could substantiate its opinion on remand than when has completely failed to conduct environmental

analysis of an extremely environmentally consequential decision. NEPA requires agencies to conduct environmental impact analysis before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA obligates the agency to consider not just the direct environmental effects of an action, but also the action's "indirect" environmental effects that are "reasonably foreseeable" and the action's "cumulative impact" when added "to other past, present, and reasonably foreseeable future actions regardless of what agency… or person undertakes such other actions." *Sierra Club v. Fed. Energy Reg. Comm'n*, 827 F. 3d 36, 41 (D.C. Cir. 2016); 40 C.F.R. § 1508.1(g). In a recommendation or report proposing a major Federal action that significantly affects the environment, agencies must include a detailed statement—called an Environmental Impact Statement (EIS)—about the action's projected environmental effects, the feasibility of alternatives, and more. *See* 42 U.S.C. § 4332(2)(C)(i-v). Instead of an EIS, an agency may conduct a preliminary Environmental Assessment (EA) to determine whether a particular action might significantly impact the environment at all. If the answer is yes, an EIS is necessary. *See* 40 C.F.R. § 1501.5. These "action-forcing" provisions of NEPA and accompanying regulations require agencies to take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. at 350.

Before taking the actions in this case, DHS did not merely fail to complete an EIS that took a genuine hard look at the potential effects of terminating MPP and the border wall system—it skipped the NEPA process, including public comment, in its entirety. The administrative record produced in this case demonstrates decisively that DHS conducted no EIS, no EA, and did not even apply its own NEPA procedures or consider whether it would be appropriate to invoke any of the agencies' established categorical exclusions. The Defendants

therefore are not merely culpable for inadequate NEPA analysis, but for no NEPA analysis. Given DHS's maximal compliance failure, it has no way of arguing that this failure was trivial or can be remedied other than starting from scratch. As the D.C. Circuit has repeatedly noted "failure to provide the required notice and to invite public comment—in contrast to the agency's failure . . . adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule—is a fundamental flaw that normally requires vacatur of the rule." *NRDC v. Wheeler*, 955 F. 3d 68, 85 (D.C. Cir. 2020) (internal citations omitted). Furthermore, "when an agency bypasses a fundamental procedural step, the first factor asks "not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." *City of Port Isabel v. FERC*, 111 F. 4th 1198, (D.C. Cir. 2024). That is, whether DHS simply believes it is a foregone conclusion it would have terminated the border wall and MPP, *no matter what* the result of public comment and analysis was, is immaterial. The very premise of NEPA is that public accountability and transparency ultimately has salutary effects on public policy no matter how entrenched in their positions administrative agencies may seem at the outset of the process. The procedural requirements of NEPA are not "dispensable technicalities," but "crucial" for NEPA's "dual functions of informing Congress, the President, other concerned agencies, and the public of the environmental effects of agency action." *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1091 (D.C. Cir. 1973).

DHS cannot here, with further explanation, justify its decision to skip the procedural step of conducting an EIS. If DHS had decided to obey the law from the beginning rather than flout it entirely, it would have needed to conduct an EIS—not merely furnish an explanation why it did not need to conduct one through an EA or invocation of a categorical exclusion. The actions, as

has been found after an evidentiary hearing before this Court, resulted in the entrance and

settlement through the southwest border of millions of foreign nationals. This entrance and

settlement of millions of foreign nationals *did* have significant environmental impacts. Without

even addressing the environmental footprint of the long-term settlement of these millions of

foreign nationals in the interior, the trek across the southwest border alone of millions of foreign

nationals indubitably has a significant and immediate environmental impact. The current

Chairman of the House Natural Resource Committee, Bruce Westerman, has pointed out that the

"Arizona Department of Environmental Quality estimates that each border crosser leaves

approximately six to eight pounds of trash in the desert during their journey." Bruce Westerman

and Paul Gosar, "The environmental cost of the border crisis," *Washington Examiner*, March 22,

2021, at https://westerman.house.gov/media-center/in-the-news/environmental-cost-border-

crisis#:~:text=The%20sheer%20quantity%20of%20illegal%20migrants%20results%20in,along

%20the%20370%20miles%20of%20the%20Arizona-Mexico%20border. The issuance of a

Finding of No Significant Impact after an EA or the invocation of a categorical exclusion would

therefore have been an arbitrary and capricious violation of NEPA itself.

Furthermore, DHS's excuses for their failures to conduct an EIS only heighten the

severity of their NEPA compliance deficiency. Defendants state that no EIS was necessary for

their actions because the effects of these actions were not "reasonably foreseeable." Defendants'

Cross Motion for Summary Judgment at 28, Docket No. 38. However, the effects of the

challenged actions in causing a crisis of elevated crossings across the Southwest border was not

merely reasonably foreseeable—it was foreseen. Plaintiffs' witness Chief Scott explained that

"we had predicted the border would go into chaos, that this would happen, and it did." Transcript

of Evidentiary Hearing at 43. For instance, Chief Scott repeatedly discussed the criticality of the

border wall system and MPP during the transition from the Trump to Biden Administration on behalf of the twenty chief patrol agents he supervised. *Id*. at 78-77. On day one of the Biden Administration, Chief Scott briefed the Secretary of Homeland Security and delivered a review of all the programs which had been put on a 60 day pause by President Biden. *Id*. at 84-85. The Secretary of Homeland Security therefore made the decision to terminate all the programs fully foreseeing that there would be major consequences.

Given DHS's complete lack of a rationale to proceed without an EIS—and its proven inability to justify any rationale if it had advanced one at the time—this factor alone is determinative that vacatur is necessary.

**2) Defendants cannot establish an exception to the default remedy for a NEPA violation based on the disruptive effects of restarting the wall and MPP.**

Even a "significant disruption" is "weighty only insofar as the agency may be able to rehabilitate its rationale," when determining if a district court should depart from the presumptive remedy of vacatur. *City of Port Isabel v. FERC*, 111 F. 4th at 1218 (internal quotations omitted); *EDF v. FERC*, 2 F. 4th 953, 976 (D.C. Cir. 2021). But vacatur in this case would not cause the kind of disruption that courts have recognized as significant, such as the revocation of a rule which numerous private businesses rely upon in order to conduct operations. *See* e.g. *City of Port Isabel v. FERC*; *EDF v. FERC; Allied-Signal v. U.S. Nuclear Regulatory Commission*. In this case, legitimate businesses are not relying on the border crisis continuing to be able to conduct legal operations. Rather than being disruptive to legitimate public interests, restoring the border wall and MPP would have salutary effects in curtailing an on-going border crisis.

**B) Plaintiffs believe a specific permanent injunction is also necessary to effectuate meaningful vacatur of the challenged polices, and Plaintiffs meet the burden necessary to obtain an injunction.**

Simply vacating the termination order of MPP and the border wall system are insufficient to meaningfully effectuate a reversal of the policies in good faith. More than mere vacatur is important because of the significant and planning and logistics efforts that must be done to restore, in an effective way rather than merely in name, the policy conditions that Defendants had the legal obligation to maintain during the NEPA process. Plaintiffs are not seeking an injunction that MPP and wall construction be fully implemented immediately, as it would be impractical to do so. However, Plaintiffs do seek an injunction containing a mandate to initiate a reasonable planning process to be reviewed by Plaintiffs' experts, in preparation to fully implement the MPP program and begin wall construction, and periodic status updates with Plaintiffs' experts to ensure good faith progress is being made. Plaintiffs also ask the court to order the Defendants to submit a list of reasonable planning efforts which can be immediately implemented, as agreed upon by the Plaintiffs. Plaintiffs also seek an order that would go into effect immediately preventing the Defendants from destroying, selling, or otherwise removing the pre-fabricated steel ballards from the government's possession.

While Plaintiffs need to meet a greater burden to obtain an injunction than mere vacatur, Plaintiffs have already met this higher burden during proceedings. In order to obtain injunctive relief, Plaintiffs must show: irreparable injury, for which no remedies are available at law, a balance of hardships weighing in their favor, and no public disservice resulting from a permanent injunction. *eBay Inc.* v. *MercExchange,* 547 U.S. at 391.

1) **Plaintiffs have already shown irreparable injury during this case's proceedings because they have specifically proved the challenged actions caused environmental damage to Mr. Smith.**

The Court has found that "alien traffic directly affects Smith's ranching operations." Court Findings at 6. The Court noted that "trash depositions alone will leave 'harmful effect[s] on our environment for years to come." *Id*. Smith also testified to the irreparability of such harm, explaining that living in a remote area with no access it would take a helicopter to load that trash and remove it from the land—a sheer impossibility for a rancher. *Id*. As there is simply no feasible way to clear this trash, should the border crisis continue unabated while the Defendants conduct the legally required environmental analysis, further irreparable harms to Smith will continue to occur and grow ever more severe. The longer the border crisis lasts, the more impossible it will be to repair the damage. Furthermore, the Court has shown that this trash causes economic harm to Smith because his "cattle ingest the trash." *Id*. at 7. The Court has also found that border crossing migrants regularly cause Smith to lose "thousands and thousands of gallons of water" putting stress on his cattle and causing impairment of ranching operations. *Id*. This Court has therefore already found irreparable injury. The injuries suffered by Smith are classic examples of the type of injury permanent injunctions are intended to prevent.

. Smith also suffers irreparable injuries from the stresses of "witnessing more crime and criminal activity" living near the border, causing him to need to carry a firearm for his safety and the safety of his family. *Id.* at 6. Courts routinely weigh the "irreparable harm" of psychological damage and emotional distress in evaluating requests for injunctions. *See, e.g.*, *Equal Employment Opportunity Comm'n v. Chrysler*, 733 F.2d 1183 (6th Cir. 1984) (enjoining "involuntary retirement" because it caused "emotional distress, depression…and reduced sense of well-being"); *Whitaker By Whitaker v. Kenosha Unified School District No. 1*, 858 F.3d 1034,

1045 (7th Cir. 2017) (injunction warranted where plaintiff faced "diminished well-being" through "psychological distress"); *Vencor Nursing Ctrs v. Shalala*, 63 F. Supp. 2d 1, 12 (D.D.C. 1999) (a "court may consider subjective, psychological harm in its irreparable-harm analysis"); *Brady Campaign to Prevent Gun Violence v. Salazar,* 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (crediting the declarants' concern for "personal safety in parks and refuges" because they are too worried about the potential presence of loaded firearms to "fully enjoy their visits").

2)  **Plaintiffs' environmental harms cannot be remedied by monetary damages**.

The environmental harms of the massive increase in unlawful crossings through the southwest border are the classic type of environmental injury that cannot be remedied through monetary damages. If millions of migrants continue to cross the border during the time the agency takes to undertake full and adequate NEPA compliance, calculating with any precision what the monetary damage these continued crossings would cost is an impossible task—much less remedying these costs with monetary payouts to those damaged. Precisely these kinds of difficulties in formulating a monetary remedy are why courts have long recognized that "environmental injury, by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Such damage "is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor issuance of an injunction to protect the environment." *Id. See also Valley Cmty. Pres. Comm'n v. Mineta*, 373 F. 3d 1078, 1086 (10 Cir. 2004) ("Environmental Harm is by its nature, generally irreparable.")

3) **Defendants cannot point to harms in restarting border wall construction and MPP sufficient to counter-balance the harms suffered by Plaintiffs.**

No harms to DHS will result from restarting the MPP and border wall construction. Restarting these actions will not harm any of DHS' lawful programs. As Plaintiffs' experts emphatically testified, the border wall and MPP assisted DHS in the accomplishment of its mission with much more efficient use of resources. As Chief Scott testified on July 31, "every single place that we built the border wall system, without exception, it dramatically changed the operational environment. It allowed us to control that section of border with fewer agents and allowed us to then move those Border Patrol agents into other enforcement functions." Evidentiary Hearing at 24. Chief Scott also explained how the fiberoptic cables provided a sensor capability that increased border patrol agents' situational awareness so that they could be safer while on patrol. *Id*. at 25.

Any excuse that DHS would be harmed financially by devoting resources to the border wall and MPP should not be given weight. When financial harm to agencies is "self-inflicted" because they "jumped the gun on environmental issues," this harm is not given much weight in balancing against the environmental harm of plaintiffs. *Davis v. Mineta*, 302 F. 3d 1104, 1116 (10 Cir. 2002) Furthermore, DHS made the decision early in 2021 to shift "resources to processing people as quickly as possible against every border expert's advice," and so its claims of financial stress an injunction might cause should not be given undue weight.

4) **The public interest strongly supports an injunction.**

Plaintiffs easily meet the standard of showing that an injunction would not harm the public interest—to the contrary, the public interest would be greatly served by an injunction. The termination of MPP and border wall construction have been found to have caused a crisis of

illegal border crossings at the southwest border. The public interest would be served by preventing this unprecedented crisis from continuing while DHS completes its NEPA analysis, even though the damage that has already been done cannot be undone. Getting back control over the border crossing would allow the Border Patrol to prevent all sorts of criminal activity. As Chief Scott explained, because of the actions taken that "unsecured the border," "Border Patrol agents had so many people in custody they could no longer respond to other known illegal activity. And the cartels traditionally have always used illegal aliens to try to overwhelm Border Patrol so they can bring in a second wave." Evidentiary Hearing at 43. The public interest is strongly served by taking back control over the Southwest border from cartels and thus lessening the occurrence of criminal activity at the border. For instance, as Plaintiffs' experts testified, the original implementation of MPP closed a loophole in the asylum process which had caused "a flood of families coming across the border" that the Border Patrol had to release into the United States. *Id*. at 30. The Border Patrol identified child smuggling and "recycled" children to create "fake families" among these floods of people coming across the border, which the MPP allowed the Border Patrol to stop. *Id*. The public interest strongly supports the decrease of child trafficking and other criminal activity enabled by the challenged actions.[2]

Furthermore, not only does the public have an interest in curtailing the border crisis, it also has a clear interest in the promotion of NEPA, which would be served by an injunction.

---

[2] The current dimensions of this child trafficking crisis are hard to calculate, but on August 19, 2024, the Office of the Inspector General of DHS issued an "urgent" alert that U.S. Immigration and Customs Enforcement were unable to monitor hundreds of thousands of unaccompanied minors released from custody and considered them at high risk for trafficking, exploitation, or forced labor. U.S. Department of Homeland Security, Office of Inspector General, Management Alert—ICE Cannot Monitor All Unaccompanied Migrant Children Released from DHS and U.S. Department of Health and Human Service's Custody, Aug. 19, 2024, at https://www.oig.dhs.gov/sites/default/files/assets/2024-08/OIG-24-46-Aug24.pdf.

The promotion of NEPA alone is a "compelling public interest" is reflected in Congress's enactment of NEPA. *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C. Cir. 1977); *Brady Campaign*, 612 F. Supp. 2d at 26 ("there is no question that the public has an interest in having Congress' mandates in NEPA carried out accurately and completely"); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998). Taking NEPA's purposes into account when crafting a remedy is, in fact, mandatory. *Amoco Prod. Co.*, 480 U.S. at 545; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 315 (1982). Because the "public interest" question is so closely intertwined with the merits in a NEPA case, *Sierra Club v. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013), this factor also tips in the Plaintiffs' favor.

**C) At the very least, if the Court finds that the standard for injunctive relief has not already been met, Plaintiffs request that the Court hold further evidentiary hearings with Plaintiffs' already qualified experts to determine whatever facts still need to be determined to craft an appropriate injunctive remedy.**

If the Court does not believe that the current record is sufficiently developed to grant injunctive relief, Plaintiffs request that the Court set an additional hearing where Plaintiffs' already qualified experts, Chief Scott and Commissioner Morgan, can testify. At such a hearing, Plaintiffs will be able to furnish more evidence, if that is needed, that the balance of equities meets in their favor under the traditional four factors of injunctive relief, and can counter any arguments that Defendants advance in rebuttal. Plaintiffs could also address how to solve any potential impracticalities in the restoration of the unlawfully terminated programs. As found by the DC Circuit court, district courts are "positioned to order additional briefing, gather evidence, make factual findings, and determine the remedies necessary to protect the purpose and integrity of the EIS process." *Nat'l Parks Conservation Ass'n v. Semonite,* 925 F. 3d at 501. The Court in its discretion can certainly do so here.

**IV.      Conclusion**

For the foregoing reasons, the Court should enter a declaratory judgment that DHS was obligated to conduct an EIS before terminating the construction of the border wall system and MPP. Further, the Court should vacate the termination directives of these policies until it can prove that it has conducted a legally adequate EIS. Plaintiffs also request that the Court should enter an injunction that DHS initiate a reasonable planning process to be reviewed by Plaintiffs' experts that will expeditiously restart border wall construction and the MPP and prevent the Defendants from destroying, selling, or otherwise removing the pre-fabricated steel ballards from the government's possession.


DATED: October 25, 2024

<div style="margin-left:50%">

Respectfully Submitted,

/s/ Julie Axelrod

D.C. Bar No. 1001557
Center for Immigration Studies
1629 K Street, NW, Suite 600
Washington, DC, 20006
Telephone: 202-466-8185
FAX: 202-466-8076
Email: jba@cis.org

Counsel for Plaintiffs

</div>